# MYERS

# EXHIBIT C

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 1

1                UNITED STATES DISTRICT COURT
2                WESTERN DISTRICT OF WASHINGTON
                         AT TACOMA
3
4
      LAUREL PARK COMMUNITY, LLC, a        )
5     Washington limited liability         )
      company; TUMWATER ESTATES            )
6     INVESTORS, a California limited      )
      partnership; VELKOMMEN MOBILE        )    No. C09-5312 BHS
7     PARK, LLC, a Washington limited      )
      liability company; and              )
8     MANUFACTURED HOUSING COMMUNITIES    )
      OF WASHINGTON, a Washington          )
9     non-profit corporation,             )
                                           )
10                       Plaintiffs,       )
                                           )
11              vs.                        )
                                           )
12    CITY OF TUMWATER, a municipal        )
      corporation,                         )
13                                         )
                         Defendant.        )
14
15            DEPOSITION UPON ORAL EXAMINATION OF
16                      ROBERT EICHLER
17                    February 15, 2010
                     Tumwater, Washington
18
19                     Taken Before:
              Connie Church, CCR #2555, RPR, CRR
20                Certified Court Reporter
                            of
21             CAPITOL PACIFIC REPORTING, INC.
                2401 Bristol Court SW, Suite A-104
22                  Olympia, WA   98502
       Tel (360) 352-2054 or (800) 407-0148   Fax (360) 705-6539
23
24             www.capitolpacificreporting.com
               admin@capitolpacificreporting.com
25

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 2

```
 1
                              APPEARANCES
 2

 3    FOR THE PLAINTIFF(S):        MR. WALTER OLSEN
                                   ATTORNEY AT LAW
 4                                 OLSEN LAW FIRM, PLLC
                                   604 W. Meeker Street, Ste 101
 5                                 Kent, WA  98032
                                   PH: (253) 813-8111
 6                                 FAX: (253) 813-8133
                                   E-MAIL: walt@olsenlawfirm.com
 7
      FOR THE DEFENDANT(S):        MR. JEFFREY MYERS
 8                                 ATTORNEY AT LAW
                                   LAW LYMAN DANIEL KAMERRER &
 9                                 BOGDANOVICH
                                   P.O. Box 11880
10                                 Olympia, WA  98508-1880
                                   PH: (360) 754-3480
11                                 FAX: (360) 357-3511
                                   E-MAIL: jmyers@lldkb.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1    And the court reporter, of course, is taking things down

2    verbatim.  So it's important for us to try not to

3    interrupt each other so she can take down a good

4    transcript of what's said.

5        If you have any questions about the meaning of my

6    question to you, please let me know.  I'll try to

7    rephrase it.  I think you have the right to understand

8    the question.  Conversely, if I ask you a question and

9    you answered the question, I'll assume that you

10   understood it.  Is that fair?

11   A   All right.

12   Q   Okay.  What is your business address?

13   A   2201 Third Avenue, Number 2303, Seattle, 98121.

14   Q   And you live in the city of Seattle?

15   A   No.

16   Q   Where do you live?

17   A   Hunts Point, Washington.

18   Q   Okay.  You are affiliated with the plaintiff, Laurel Park

19       Community, LLC; correct?

20   A   Yes.

21   Q   Are you the principal owner of Laurel Park Community,

22       LLC?

23   A   The sole member, managing director - managing member.

24   Q   The sole member?  How long have you been - or how long

25       has Laurel Park Community, LLC, been in existence?

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 6

1   A   About two years.

2   Q   And how was Laurel Park Mobile Home Park owned prior to

3       formation of Laurel Park Community, LLC?

4   A   By myself personally.

5   Q   What was the purpose of forming the LLC?

6   A   Basically my attorney's advice.

7   Q   What was the goal of forming the LLC?

8   A   I think LLC's are a protection for liability purposes.

9   Q   Was there any refinancing of the property involved when

10      you formed the LLC?

11  A   No.

12                              (Deposition Exhibit No. 1 marked
                                for identification.)
13

14  Q   (BY MR. MYERS)  Mr. Eichler, I'm handing you an aerial

15      photograph which comes out of the appraisal report done

16      by Stephen Shapiro in this matter.  I just want you to

17      take a look at it and say do you recognize that as being

18      an aerial photograph of your mobile home park?

19  A   Yes.

20  Q   Would you describe the surrounding community that abuts

21      your mobile home park.

22  A   On one side of my property is a vacant ten acres that has

23      been approved for 122 new residences.  On the other side

24      of my property is residential with several new

25      subdivisions abutting the street right across from my

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

1          subdivision?

2    A    As I understand it.  Yes.

3    Q    Is there any multifamily development surrounding your

4          property?

5    A    I haven't investigated by driving around, so I don't

6          believe I can answer that question.

7    Q    Have you done any investigation as to whether there's any

8          multifamily development planned adjacent to or nearby

9          your property?

10   A    No.

11   Q    Okay.  How many acres do you have?

12   A    11.7.

13   Q    And how many spaces do you have in the two phases?

14   A    73.

15   Q    And do you know how - what the zoning is on the property

16         surrounding your mobile home park?

17   A    No, I don't.

18   Q    Okay.  Do you believe that operating the mobile home park

19         is consistent with the surrounding uses in the community?

20   A    No, I don't believe it's consistent with the surrounding

21         properties.

22   Q    Why don't you believe it's consistent with the

23         surrounding community?

24   A    Because the surrounding community is obviously going

25         single-family residential with a much higher density than

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 10

1          my mobile home park.

2     Q    Do you believe that the mobile home park is, in any way,

3          detrimental to the surrounding community?

4     A    Yes, I do.  I think that mobile home parks normally are

5          considered depreciative of values.  It's always been an

6          old joke.  Nobody wants to live next to an old mobile

7          home park.

8     Q    Is your mobile home park detrimental to the surrounding

9          community?

10    A    I don't know.

11    Q    Do you believe that maintaining affordable housing is a

12         legitimate goal for the City of Tumwater?

13    A    Yes.

14    Q    And do you believe that manufactured housing parks

15         provide a source of affordable housing compared to other

16         housing types?

17    A    Yes.

18    Q    Okay.  When did you purchase Laurel Park?

19    A    In September of 1991.

20    Q    How much did you pay?

21    A    A million three.

22    Q    And did you finance the property at that time?

23    A    Yes.

24    Q    And was an appraisal done of the property?

25    A    Not to my knowledge.

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

```
 1          there may be one or two that have four homes per
 2          drainfield, maybe one that has two homes per drainfield.
 3     Q    Okay.  And all of those drainfields are located within
 4          the property limits that are set forth here in red?
 5     A    Yes.
 6     Q    And have you had any problems with the operation of your
 7          drainfields on site?
 8     A    Yes.
 9     Q    What type of problems have you had?
10     A    We've had several failures.
11     Q    When was the last failure you had?
12     A    I'd have to check my records.
13     Q    Have you ever had a drainfield failure that could not be
14          rehabilitated?
15     A    No.
16     Q    Generally speaking, is there a cause of the drainfield
17          failures, to your knowledge?
18     A    I'm not knowledgeable enough about the details of that.
19     Q    Do you know whether Laurel Park has adopted any programs
20          to prolong the life of the drainfield?
21     A    Yes.
22     Q    What type of programs have you implemented at
23          Laurel Park?
24     A    We're very serious about trying to maintain our septic
25          system, because that's the lifeblood of the property.  We
```

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 14

1        have a scheduled pumping program.  And it's looked after

2        by a licensed septic company.

3    Q   Okay.  What other things does your drainfield and septic

4        program involve?

5    A   We advise our residents from time to time on what they

6        should be and what they shouldn't be putting down their

7        systems.

8    Q   Do you restrict use of garbage disposals?

9    A   I don't have that information at my fingertips right now.

10   Q   Okay.  Have you had any discussions with your septic

11       system company concerning the expected life of your

12       existing drainfields?

13   A   No.

14   Q   What's the current space rent that you charge your

15       tenants?

16   A   $460 per month.

17   Q   Is that the 2010 rate?

18   A   It's the current rate.

19   Q   Okay.  Was that the rate in 2009?

20   A   For part of 2009.

21   Q   Okay.  So you raised your rent at some point in 2009?

22   A   Yes.

23   Q   What was the increase from?

24   A   $430.

25   Q   And when did you raise that?

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 15

1   A   Without checking in my records, I think the rent went up
2       on June 1st.
3   Q   Do you normally raise the rents or evaluate rental
4       increases on an annual basis?
5   A   Yes.
6   Q   And did you raise the rent from 2008 to 2009?
7   A   Yes.
8   Q   Okay.  What was the rent in 2008?
9   A   I don't have that information exactly.
10  Q   Okay.  Did Laurel Park make a profit in 2009?
11  A   Yes.
12  Q   And did it make a profit in 2008?
13  A   Yes.
14  Q   2007?
15  A   Yes.
16  Q   Have there been any years since you owned it that it did
17      not make a profit?
18  A   No.
19  Q   Have you had any . . .  What type of water system does
20      Laurel Park have?
21  A   Well water.
22  Q   Have you had any problems providing water to your
23      tenants?
24  A   No.
25                          (Deposition Exhibit No. 2 marked

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 16

1    Q    (BY MR. MYERS)   Mr. Eichler, handing you page 3 of the

2         Plaintiffs' Initial Disclosures in this case, which was

3         provided by legal counsel.  And this is only page 3.  Did

4         you review the initial disclosures when they were made

5         last September?

6    A    I don't understand the --

7    Q    This page I'm representing to you is page 3 of some

8         disclosures that were made in the course of this

9         litigation under the Federal Rules of Civil Procedure.

10        My question is:  Did you have a chance to review the

11        disclosure that was made concerning your testimony, which

12        is shown on this page?

13   A    I looked at a lot of things.  And I can't say absolutely

14        that I looked - reviewed this or not.

15   Q    Okay.  In this disclosure, it states that you will

16        testify concerning the liability and damages that are

17        sought in this lawsuit.  And it makes a statement that

18        the land under appropriate zoning would be valued in a

19        couple of different ways.  My first question has to do

20        with what do you consider appropriate zoning to be for

21        your property?

22   A    The zoning that was in effect when I purchased it, which

23        was medium density multifamily.

24   Q    Okay.  And did the county ever have different zoning than

25        what ultimately became the city's zoning designation of

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

```
 1        multifamily medium density residential?
 2    A   Not while I owned the property.
 3    Q   Okay.  The statement here says that the land - with that
 4        appropriate zoning, for uses currently taking place in
 5        the immediate area, would value Laurel Park as follows.
 6        What do you mean "value" in the context . . .   Do you
 7        know what that term would mean?
 8    A   Would you ask the question again.
 9    Q   Okay.  In the last portion of the paragraph after your
10        office address information, you see the sentence that
11        reads, "The land under appropriate zoning"?  It says,
12        "would value Laurel Park as follows."  What is your
13        understanding of what "value" means?
14    A   "Value" would mean the price that a willing buyer and a
15        willing seller were able to reach for the highest and
16        best use of the property.
17    Q   Okay.  In the next sentence down, it says medium density
18        12 acres at 15 units per acre at 50,000 per unit equals
19        $9,000,000 total value at highest and best use.  My first
20        question is:  What is your understanding of the meaning
21        of the term "highest and best use"?
22    A   Meaning of the term "highest and best use" would be the
23        medium density multifamily zoning.
24    Q   Okay.  How would you go about determining what the
25        highest and best use of property is?
```

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 18

| | | |
|---|---|---|
| 1 | A | Highest and best use is what the demand is for the |
| 2 | | property at any special time. |
| 3 | Q | Has there ever been demand for your property for - to |
| 4 | | purchase it for redevelopment into medium density |
| 5 | | multifamily housing? |
| 6 | A | No. |
| 7 | Q | Do you have an opinion that the fair market value of your |
| 8 | | property before the adoption of the city's zoning |
| 9 | | ordinance was ever $9,000,000? |
| 10 | A | If I understand your question, I believe it was a minimum |
| 11 | | of $9,000,000.  I believe $50,000 per unit was the least |
| 12 | | that the property would have been worth. |
| 13 | Q | And how did you go about determining that? |
| 14 | A | From discussions with people over the period of time and |
| 15 | | from some of my own conclusions.  In Seattle, Auburn |
| 16 | | area, for example, lots were a hundred to hundred and |
| 17 | | twenty-five thousand dollars.  I assumed that - my |
| 18 | | assumption myself that lots in Tumwater were not going to |
| 19 | | be worth the same as in the Seattle area.  And I've |
| 20 | | always thought that the value would be somewhere between |
| 21 | | 60 and 80 thousand dollars per lot to a |
| 22 | | builder/developer. |
| 23 | Q | Would that be for single-family lots or multifamily? |
| 24 | A | Single-family. |
| 25 | Q | How was it you arrive at the number 50,000 per unit?  Or |

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

1   A   There was an analysis done in about 2006.

2   Q   And who did that analysis?

3   A   Century Pacific Realty.

4                       (Deposition Exhibit No. 3 marked
                         for identification.)
5

6   Q   (BY MR. MYERS)  Mr. Eichler, this is a declaration that

7       has been submitted by your legal counsel to me.  And I

8       want to refer you to Exhibit B, which has a letter dated

9       December 13th, 2006 and a memorandum dated April 2nd,

10      2007.

11  A   Okay.

12  Q   Century Pacific, is this the demand analysis that you

13      were referring to?

14  A   What?

15  Q   Does this document, either the December 13th, 2006 or the

16      April 2nd, 2007 memoranda, do they discuss the market

17      demand for your property?

18  A   Yes.

19  Q   Okay.  Can you show me where that is discussed in these

20      documents?

21  A   The discussion of 15 units per acre?

22  Q   The discussion of the market demand to redevelop your

23      property at 15 units per acre.

24  A   I don't . . .

25                      (Deposition Exhibit No. 4 marked

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 22

| | | |
|---|---|---|
| 1 | Q | (BY MR. MYERS) Mr. Eichler, I'm going to show you |
| 2 | | another exhibit, which has been marked as Exhibit 4. And |
| 3 | | this is a letter from Century Pacific dated March 9, |
| 4 | | 2007. Does this letter contain the market analysis we |
| 5 | | were just discussing? |
| 6 | A | Yes. |
| 7 | Q | Okay. And on the first page, which has a number in the |
| 8 | | corner of 222, there is a statement there which said, |
| 9 | | "These numbers suggest that it may make more sense to |
| 10 | | continue operating this property as a mobile home park |
| 11 | | and/or taking it to market on the basis of a mobile home |
| 12 | | park and not a development opportunity." Do you see that |
| 13 | | statement? |
| 14 | A | I remember it. Yes. |
| 15 | Q | Okay. Did you agree with that statement? |
| 16 | A | Yes. |
| 17 | Q | So based on the analysis that Century Pacific did in |
| 18 | | early 2007, you agreed that, at that point in time, the |
| 19 | | highest and best use of the property was as a mobile home |
| 20 | | park? |
| 21 | A | Yes. |
| 22 | Q | Has there been any change in conditions since March of |
| 23 | | 2007 that would create demand for redevelopment of the |
| 24 | | property? |
| 25 | A | I believe if I have my dates right, that there was a |

Page 23

1       housing boom that hit Tumwater after that period and a
2       lot of new houses started to be built, which showed there
3       was a demand for higher and better use of the property.
4       And that had not the recession come, with all the housing
5       going on – particularly with the property right next to
6       me with a permit for 122 houses.  And if you drive around
7       the area, you'll see lots of new houses and developments.
8       It was clear to me that after this period, there was a
9       building boom that had started to happen down in that
10      area.
11   Q  Okay.  Can you tell me when this boom approximately was
12      occurring?  I take it there was a window of opportunity
13      that you would call the boom period before the recession
14      hit.  Is that a fair way to characterize what you just
15      told me?
16   A  Yes, I think there was.
17   Q  Okay.  Can you tell me approximately when this window
18      began and when the recession hit that closed that window?
19   A  I don't have those facts at my fingertips.
20   Q  Okay.  After March of 2007, did you make any effort to
21      sell your property for redevelopment purposes?
22   A  No.
23                           (Deposition Exhibit No. 5 marked
                              for identification.)
24
25   Q  (BY MR. MYERS)  Exhibit 5 is a document that was provided

Page 24

1    through your legal counsel, which appears to be an offer

2    to purchase the Laurel Park Mobile Home Park by West

3    Pinnacle Investments, LLC.

4    A    Yes.

5    Q    Is that your understanding of what this document is?

6    A    Yes.

7    Q    Okay.  And you received this in October of 2007?

8    A    Yes.

9    Q    And West Pinnacle Investments, the individual who was

10        representing them was John Dunham.  Do you know

11        Mr. Dunham?

12   A    I may have met him.

13   Q    Do you know whether he owns the Allimor Mobile Home Park

14        in the city of Tumwater?

15   A    No, I don't.

16   Q    This offer is for $4,000,000.  Did you accept this offer?

17   A    No.

18   Q    Why not?

19   A    Because I didn't think this was anywhere near the

20        developmental price of the property.  This was more a

21        price for a mobile home park.  I had no desire to sell my

22        mobile home park at mobile home park prices.

23   Q    In your declaration, Exhibit 3, going back to the letters

24        from Century Pacific, the very last page of that is the

25        April 2nd, 2007 memorandum from Century Pacific.  Do you

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 25

1       know, was this from Mr. Mathewson?

2   A   It was from his company.

3   Q   Okay.  This appears to be a redacted document.  Did you

4       see a full version of this document?

5   A   Yes.

6   Q   The portion which is disclosed in this document states

7       that the value - under A, says 11.73 acres MF, medium

8       density residential, nine to 15 units per acre,

9       3.7 million.

10  A   Yes.

11  Q   Was it your understanding that that was Century Pacific's

12      opinion as to the value for redevelopment purposes?

13  A   Yes.

14  Q   And under B, it says, "NOI $250,000."  Is it your

15      understanding that means net operating income 250,000?

16  A   Yes.

17  Q   Is that a correct approximation of your net operating

18      income in 2007?

19  A   An approximation.  Yes.

20  Q   They rounded it; correct?

21  A   (Nods head.)

22  Q   You have to respond audibly so she can take down a word.

23  A   Oh, I'm sorry.  Yes.

24  Q   Okay.  And that the value they were placing on your

25      property was 3.3 million using a cap rate of 7.5 percent?

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 26

1    A    That's what it says here.

2    Q    And that's your understanding as to what they were trying

3         to convey to you in this memorandum?

4    A    Yes.

5    Q    Do you recall whether any other portions of the

6         memorandum that you received on April 2nd, 2007 concerned

7         your mobile home park in Tumwater in any way, shape or

8         form?

9    A    Any other part of the memorandum had nothing to do with

10        Tumwater.

11   Q    So this redacted portion is the only provision in that

12        memorandum that mentioned Tumwater?

13   A    Yes.

14   Q    Going back to Exhibit Number 2, the Initial Disclosures,

15        after there is a calculation of the medium density value,

16        there is another statement that says the value of Laurel

17        Park at $45,000 per space equals $3,285,000.  What is

18        your understanding of the meaning of that sentence?

19   A    Well, someone has put a value of $45,000 per space.

20   Q    Would that be the value of your mobile home park under

21        its current use as a mobile home park?

22   A    I haven't done the calculations recently, so I cannot

23        tell you that today this figure is - of $3,285,000 is the

24        value of my mobile home park.  I will say that it's in

25        that area.

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 37

1    Q    Well, you've drafted this and signed it on January 25th,

2         2010.  And this talks about your expectations in 2008

3         when the annexation was pending.  At that point in time,

4         did you have a plan to redevelop the property within any

5         certain time period?

6    A    My only plan to redevelop the property was when the time

7         came that the highest and best use - demand for the

8         property would be for the higher and better use.  And I

9         really didn't know if it was next year, two years from

10        now, five years from now.  I bought the property in 1991

11        knowing that the highest and best use, value at that time

12        was a mobile home park.  And I looked to the future and

13        hoped for the future that in my lifetime, the demand for

14        that property would be for me to develop it into the

15        zoning that was on the property.  I've never had an exact

16        time and date, because I've had to wait for the

17        opportunity to present itself.

18   Q    Okay.  The last sentence of paragraph 5, you discussed

19        the city had begun a process to rezone the park in 2007.

20        When did you first become aware that Tumwater was in the

21        process to rezone mobile home parks?

22   A    I don't know that I can pin down any date, but certainly

23        after the annexation.  And I think the annexation was in

24        December of 2007.  And I wasn't aware of that - anything

25        they were going to do to change the ordinance until

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 38

 1      sometime after that.

 2  Q   Okay.  Let me go back to your statements concerning

 3      Tumwater's assurance.  You mentioned that Mr. Ginther had

 4      provided that assurance through Mr. Missall.  Was there

 5      assurance from anybody other than David Ginther?

 6  A   Only general conversations with many people who were

 7      somewhat - with some people who were familiar with the

 8      annexation.

 9  Q   Okay.  Were any of those people employed by the City of

10      Tumwater or officials of the City of Tumwater?

11  A   No.

12  Q   Were any of those assurances relaying to you statements

13      from officials of the City of Tumwater?

14  A   Not that I can recall.

15  Q   Do you believe that it's reasonable to believe that

16      property will never be rezoned?

17  A   I don't know that much about the zoning process to know

18      it will never be rezoned.

19  Q   Okay.  Let me ask you about paragraph 3 of your

20      declaration, which says you purchased, sold and managed

21      various manufactured home communities since 1982.  What

22      manufactured home community were you involved in in 1982?

23  A   Auburn Manor in Auburn, Washington.

24  Q   And do you still own that property?

25  A   No.

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 47

1      proposals to the city.

2   Q   Okay.  Do you know whether or not there was a preliminary

3       plat application, whether there was the application that

4       got you on the way to the building permit?

5   A   I don't remember those details.

6   Q   Okay.  Is it . . .  Do you have an understanding of what

7       a preliminary plat application is?

8   A   Again, let me say I'm not a developer.  I'm just starting

9       to think about developing my properties.  And I don't

10      know all the terms.

11  Q   Okay.  Fair enough.  In terms of Laurel Park, have you

12      ever made any application to either Thurston County or

13      the City of Tumwater to get you on the road to building

14      permits for redevelopment?

15  A   No.

16  Q   Okay.  Let's go back to your declaration, Exhibit 3.  And

17      in paragraph 6, you discuss some of the provisions of the

18      2009 manufactured home park ordinance.  Have you read the

19      2009 manufactured home park ordinance?

20  A   Yes.  Just recently.

21  Q   Okay.  Did you read it before you signed this

22      declaration?

23  A   Not in its entirety.

24  Q   In this paragraph, you state that the additional uses

25      that you are allowed to put your property under the

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 48
1       existing zoning are not economically viable uses of your

2       property because some, like parks and trails, are no

3       income at all.  Can you tell me what analysis you have

4       done to determine whether additional uses would be

5       economically viable or not?

6    A  My own personal opinion and being in the business that

7       I'm in, there are no things on this list of 23 things or

8       whatever it is that appear to me to be economically

9       viable.

10   Q  Okay.  Have you done any investigation as to the

11      economics of doing support and child care facilities?

12   A  No.

13   Q  Have you done any investigation as to the economics of a

14      church or cemetery use?

15   A  No.

16   Q  In the last sentence on paragraph - or page 2 carrying

17      over to page 3, you discuss institutional uses, such as

18      churches, cemeteries and essential public facilities.

19      And at the top of page 3, you state a church or a

20      cemetery is hardly a viable economic use.  Can you tell

21      me what the basis for that conclusion is?

22   A  Certainly it's my opinion and it's based on reality.  How

23      could a church or a cemetery return the type of

24      investment that a mobile home park would return.

25   Q  Okay.  Have you had any experience in dealing with

Page 57

1        community, the spaces are small and there are no mobile

2        homes made anymore that will go in that.  And that's what

3        I see also for Laurel Park.  It's an older community

4        that's going to become obsolete fairly soon.

5    Q   But at Laurel Park, you were able to find two homes - two

6        single-wide, 14-foot-wide homes to fill the spots when

7        you did get a vacancy in 2009; is that right?

8    A   Yes.  Those spaces weren't as small as the spaces I had

9        that I was referring to with eight vacancies.  It is

10       difficult to find.  My spaces at Laurel Park are not

11       large spaces, and it's going to become more and more

12       difficult to find homes to fill those spaces.

13   Q   Where did you find the homes that you were planning on

14       replacing, assuming the city council changes its

15       ordinance?  Where did you find the home that you

16       purchased?

17   A   We hope . . .  First of all, it's not my business to be

18       in buying homes to fill my spaces.  We hope that the

19       demand for mobile home spaces and the belief of the

20       council that there's a big demand for mobile home spaces,

21       we hope that the demand - people will call us up, as they

22       did in the past, and want to rent a space in our

23       community.  But the demand for spaces is so low that

24       we're forced to go out and have to buy homes myself to

25       put in there to fill and try to sell.  So I found this

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 58
1       home, I believe - because I didn't find it personally,

2       but my manager's duty to find the homes, but I believe

3       the home was found through a dealer that had taken it on

4       trade.

5    Q  Do you know who that dealer was?

6    A  I don't recall the name.

7    Q  Do you recall whether it was U-Save Mobile Home Parks -

8       or Mobile Homes?

9    A  I don't even recall if I really knew the name.

10   Q  Okay.  Fair enough.

11              MR. OLSEN:   Good spot to take a break at any

12      point?

13              MR. MYERS:   Yeah.  Why don't we go ahead and

14      take a break, because we're just about done.

15                       (Recess was taken.)

16   Q  (BY MR. MYERS)  Mr. Eichler, have you reviewed the

17      Tumwater zoning ordinance provisions concerning a use

18      exception to have the zoning changed back to its previous

19      zoning if there isn't a viable alternative use to a

20      mobile home park?

21   A  Yes.

22   Q  Okay.  Have you made any application to utilize that use

23      exception to the City of Tumwater?

24   A  No.

25   Q  Why not?

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 59

1    A    Because the highest and best use of my property right now

2         is a mobile home park.

3    Q    Is operation of a mobile home park currently an

4         economically viable use for you?

5    A    In today's market.  Not tomorrow's market.  But today's

6         market when there is no demand for building because of

7         the recession, the operation of Laurel Park Estates is a

8         viable use for me.

9    Q    Do you make a . . .  Do you distinguish between an

10        economically viable use and what would be the highest and

11        best use if you were allowed other types of uses for the

12        property?

13   A    I'm not sure I understand the question.

14   Q    I'm not sure I do either.  Let me try to rephrase.  Is

15        there a difference, in your mind, between what would be

16        the highest and best use of the property and economically

17        viable use of the property?

18   A    I'll still try to understand that.  Economically viable

19        use of the property should really be the highest and best

20        use of the property.

21   Q    Let me ask you some questions about the effect of the

22        zoning ordinance on your operations at Laurel Park.  Has

23        the adoption of the mobile home park zoning forced you to

24        incur any additional costs other than the costs of the

25        lawsuits?

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 60
1   A   Well, it certainly has cost me revenue because of lack of

2       being able to put mobile homes on empty spaces.

3   Q   Is that part of the city's 2009 zoning ordinance? Or is

4       that part of something else? Is it your understanding

5       that's part of the city's 2009 zoning ordinance?

6   A   Yes. Maybe I misunderstood your other question.

7   Q   Okay. The mobile home park zoning that limits you to

8       mobile home parks and 22 other uses, has that forced you

9       to incur any costs in operation of Laurel Park?

10  A   I don't have that information at my fingertips, because

11      being in the city may have additional - cost me

12      additional as opposed to being in the county. But I

13      don't have that information.

14  Q   Okay. Is it your . . . What types of costs would being

15      in the city - what types of costs could possibly be

16      incurred as a result of that?

17  A   I'm not an expert on annexation and those things. But it

18      could be increased costs for fire or for police

19      protection. It could be increased cost in taxes. I

20      don't have that information at my fingertips.

21  Q   Okay. Have you been compelled to pay any fees to the

22      City of Tumwater for fire or police protection, to your

23      knowledge?

24  A   I don't have that knowledge at my fingertips.

25  Q   Okay. Has the adoption of the zoning ordinance forced

Page 61

1        you to pay any fees to anybody other than your attorneys?

2   A   No.

3   Q   Okay.  Has the adoption of the zoning ordinance

4        restricted your ability to increase the rent for spaces

5        within Laurel Park?

6   A   No.

7   Q   Is there anything that you were doing as of the date of

8        adoption of that ordinance in operating your mobile home

9        park that you cannot now do under the amended zoning?

10   A   I don't have that information at my fingertips.

11              MR. MYERS:  Mr. Eichler, that's all the

12        questions that I have.

13            Mr. Olsen.

14              MR. OLSEN:  No questions.  We'll reserve

15        signature.

16                      (Concluded at 3:47 p.m.)

17                      (Signature reserved.)

18

19

20

21

22

23

24

25

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 62
```
 1                   C E R T I F I C A T E

 2

 3           I, CONNIE CHURCH, a duly authorized Court Reporter and

 4   Notary Public in and for the State of Washington, residing at

 5   Montesano, do hereby certify:

 6           That the foregoing deposition of ROBERT EICHLER was

 7   taken before me on February 15, 2010, and thereafter transcribed

 8   by me by means of computer-aided transcription; that the

 9   transcript is a full, true and complete transcript of the

10   testimony of said witness;

11           That the witness, before examination, was by me duly

12   sworn to testify the truth, the whole truth and nothing but the

13   truth, and that the witness reserved signature;

14           That I am not a relative, employee, attorney or

15   counsel of any party to this action or relative or employee of

16   any such attorney or counsel, and I am not financially

17   interested in the said action or the outcome thereof;

18           That upon completion of signature, if required, I

19   shall herewith securely seal the original transcript and serve

20   same upon MR. JEFF MYERS, counsel for the Defendant.

21           IN WITNESS WHEREOF, I have hereunto set my hand and

22   affixed my official seal this 24th day of February, 2010.

23

24                          _____
                            CONNIE CHURCH
25                          CERTIFIED COURT REPORTER
```

CENTURYPACIFIC, L.P.

CAMPBELL MATHEWSON
VICE PRESIDENT

March 9, 2007

Mr. Robert M. Eichler
Lake-Land Investments
3455 Hunts Point Road
Bellevue, WA 98004

Re:    Summary of real estate issues

Dear Bob:

Thank you again for the opportunity to allow CenturyPacific to assist you with the development
and sale options of your various mobile home parks. This letter is for the purpose of providing
you with an overview of real estate issues in regards to your mobile home parks located in
▮▮▮▮▮▮▮▮▮▮ Tumwater and ▮▮▮▮▮▮▮▮▮▮ We look forward to an opportunity to
discuss these matters with you at your convenience.

Tumwater (3244 66th Avenue S.W., Olympia, WA 98512)
This 11.73 acre property is zoned Multi-Family Medium Density Residential (MFM) in Thurston
County with a density of 9 to 15 units per acre. Since the county requires a minimum of 9 units
per acre which would provide relatively small 3,700 square foot lots, we believe that the zoning
of this property forces a more dense multi-family product. At 14 units per acre (i.e., one less
than the maximum), the value of the Tumwater site today is $3.7 million (see attached).
However, since you currently yield approximately $250,000 per year in net operating income,
using a 7.0% capitalization rate yields a value of $3.6 million; at a 7.5% cap rate the value is
$3.3 million. These numbers suggest that it may make more sense to continue operating this
property as a mobile home park and/or taking it to market on the basis of a mobile home park
and not a development opportunity. You will notice that the value of this park is a relatively low
$23,000 per zoned lot. We believe the reason is due to the lack of market acceptance for smaller
dense townhome units in Thurston County which are reflected in relatively low sales prices.

REAL ESTATE INVESTMENT BANKERS · ADVISORS · DEVELOPERS
2140 CENTURY SQUARE · 1501 FOURTH AVENUE · SEATTLE, WASHINGTON 98101
(206) 689-7203  ·  FAX (206) 689-7210  ·  E-MAIL cmathewson@dwt.com
www.centurypacificlp.com

Eichler
4    -222-

**SUMMARY**
**Tumwater**
**RESIDUAL LAND VALUE CALCULATION**

| | | | |
|---|---|---|---|
| Gross Land Area | 11.73 acres | 510,959 square feet | |
| Net Developable Land Area | 9.03 acres | 393,438 square feet | 77% |
| # of Lots | 164 lots (at 14/acre) | Zoning: Multi-Family Medium Density Residential 9-15 du/acre | |
| Lot sizes | 2,396 square feet | 393,438 of lot sf | |
| # of months for Preliminary Plat Approval | 18 months | | |
| # of months for Final Plat Approval | 18 months | | |

**AS-IS VALUE**

| | | | | |
|---|---|---|---|---|
| Land Value As-Is | | $ 3,707,207 | $ 22,575 per lot | $9.42 per land square foot |
| Cost of Sales | 7% | $ (259,504) | $ (1,580) per lot | ($0.66) per land square foot |
| Original Cost | | $ 3,447,703 | $ 20,994 per lot | $8.76 per land square foot |
| Profit | | $ (0) | $ (0) per lot | |
| | | $ 3,447,702 | $ 20,994 per lot | |

**PAPER PLAT VALUE**

| | | | | |
|---|---|---|---|---|
| Land Value As-Is | | $3,707,207 | $ 22,575 per lot | $9.42 per land square foot |
| Plus Pre Plat Cost Including Profit | | $2,233,997 | $ 13,604 per lot | $5.68 per land square foot |
| Paper Plat Value including Cost & Profit | | $5,941,204 | $ 36,178 per lot | $15.10 per land square foot |
| Cost of Sales | 7% | ($415,884) | $ (2,532) per lot | ($1.06) per land square foot |
| Paper Plat Value including Cost | | $5,525,320 | $ 33,646 per lot | $14.04 per land square foot |
| Cost of Preliminary Plat | | ($862,950) | $ (5,255) per lot | |
| Paper Plat Value Net of Cost but incl. Profit | | $4,662,370 | $ 28,391 per lot | |
| Value increase over As-Is | | $1,214,667 | $ 7,397 per lot | $3.09 per land square foot |
| Cash on cash return | | 141% | | |

**FINAL PLAT VALUE**

| | | | | |
|---|---|---|---|---|
| Pre Plat Value Before Sales Costs | | $ 5,941,204 | $36,178 per lot | $15.10 per land square foot |
| Plus Final Plat Cost & Profit | | $ 7,196,396 | $43,822 per lot | $18.29 per land square foot |
| Final Plat Value Before Sales Costs | | $ 13,137,600 | $80,000 per lot | $33.39 per land square foot |
| Cost of Sales | 7% | $ (919,632) | ($5,600) per lot | ($2.34) per land square foot |
| Final Plat Value including Cost | | $ 12,217,968 | $74,400 per lot | $31.05 per land square foot |
| Cost of Final Plat | | $ (6,841,247) | ($41,659) per lot | |
| Final Plat Value Net of Cost but incl. Profit | | $ 5,376,721 | $32,741 per lot | |
| Value increase over Paper Plat | | $ 714,351 | $4,350 per lot | $1.82 per land square foot |
| Cash-on-cash return (before tax) | | 10% | | |

**NPV**
**Tumwater**
**RESIDUAL LAND VALUE CALCULATION**

| | | | |
|---|---|---|---|
| Gross Land Area | 11.73 acres | 510,959 | square feet |
| Net Developable Land Area | 9.03 acres | 393,438 | square feet |
| # of Lots | 164 lots | | 77% |
| Lot sizes | 2396 square feet | 393,438 | of lot sf |
| # of months for Preliminary Plat Approval | 18 months | | |
| # of months for Final Plat Approval | 18 months | | |

| | | | |
|---|---|---|---|
| Land Purchase | | | |
| Sales Price Per Home | $0 | $0 | per unit land cost |
| Sales Price (Final Plat Value) | $225,000 | 36% | of Final Plat Value |
| Absorption Period | $80,000 | per lot | |
| Inflation | 3 years | | |
| Cost of Sales | 4% per year | | |
| Permitting Costs (excludes profit) | 7% | | |
| Development Costs (excludes profit) | $ 862,950 | $ 5,255 | |
| | $ 7,704,197 | $ 46,914 | |
| | $ 8,567,147 | $ 52,169 | per lot cost |

| | Year | 2006 | 2007 | 2008 | TOTAL |
|---|---|---|---|---|---|
| Inflation Factor | | 100% | 104% | 108% | |
| Lot Development Rate | | 33% | 33% | 33% | 100% |
| % of Lot Sales | | 0% | 50% | 50% | 100% |
| # of Lots Sold | | 0 | 82 | 82 | 164 |
| Gross Sales Price Per Lot | | $80,000 | $83,200 | $86,528 | |
| Total Gross Sales Per Year | | $ - | $ 6,822,400 | $ 7,095,296 | $ 13,917,696 |
| Less Cost of Sales | | $ - | $ (477,568) | $ (496,671) | |
| Net Sales | | $ - | $ 6,344,832 | $ 6,598,625 | $ 12,943,457 |
| Land Cost | | $ (0) | $0 | $0 | $ (0) |
| Permitting Costs | | $ (862,950) | $0 | $0 | $ (862,950) |
| Development Costs | | $ (2,568,065) | $ (2,670,788) | $ (2,773,511) | $ (8,012,364) |
| NET OPERATING INCOME | | $ (3,431,015) | $ 3,674,044 | $ 3,825,115 | |

| | | |
|---|---|---|
| NPV | 6% | $3,244,719 |
| IRR | 72% | |

Tumwater
**RESIDUAL LAND VALUE CALCULATION**

| | | | |
|---|---|---|---|
| Gross Land Area | 11.73 acres | 510,959 square feet | |
| Net Developable Land Area | 9.03 acres | 393,438 square feet | 77% |
| of Lots | 164 lots | | |
| Lot sizes | 2396 square feet | 393,438 of lot sf (based on Net Developable) | |
| # of months for Preliminary Plat Approval | 18 months | | |
| # of months for Final Plat Approval | 18 months | | |

| Description | Quantity | Unit | Cost/Unit | Total | Notes | Cost/Lot |
|---|---|---|---|---|---|---|
| **HARD COSTS** | | | | | | |
| Demo bldgs / Dispose junk & concrete | 1 | each | $ 20,000 | $ 20,000 | | $ 122 |
| Asbestos removal | 1 | each | $ 15,000 | $ 15,000 | | $ 91 |
| Asphalt removal (pulverize and use for fill) | 4,000 | tons | $ 13 | $ 52,000 | | $ 317 |
| Clear 50 trees | 9.0 | ac | $ 400 | $ 3,613 | | $ 22 |
| Erosion control | 164 | lots | $ 800 | $ 131,376 | | $ 800 |
| Grading import | 50,000 | cy | $ 8 | $ 400,000 | | $ 2,436 |
| Production screened topsoil | 5,000 | cy | $ 8 | $ 40,000 | | $ 244 |
| Rockeries | 10,000 | sf | $ 2 | $ 20,000 | | $ 122 |
| Sanitary sewer | 5,000 | lf | $ 40 | $ 200,000 | | $ 1,218 |
| Force main | 2,000 | lf | $ 12 | $ 24,000 | | $ 146 |
| Lift station | 1 | lump sum | $ 200,000 | $ 200,000 | | $ 1,218 |
| Offsite storm | 1,000 | lf | $ 25 | $ 25,000 | | $ 152 |
| Offsite water | 1,000 | lf | $ 58 | $ 58,000 | | $ 353 |
| Offsite paving | 1,000 | lf | $ 180 | $ 180,000 | | $ 1,096 |
| Underground / Overhead - fiber | 1,000 | lf | $ 200 | $ 200,000 | | $ 1,218 |
| Offsite street lights | 10 | each | $ 6,000 | $ 60,000 | | $ 365 |
| Storm drainage | 5000 | lf | $ 40 | $ 200,000 | | $ 1,218 |
| Lot drainage system | 5000 | lf | $ 11 | $ 55,000 | | $ 335 |
| Water system | 5000 | lf | $ 40 | $ 200,000 | | $ 1,218 |
| Trench import | 12,500 | tons | $ 10 | $ 125,000 | | $ 761 |
| Flexible fittings | 1 | lump sum | $ 20,000 | $ 20,000 | | $ 122 |
| Dynamic consolidation or preload | 1 | lump sum | $ 120,000 | $ 120,000 | | $ 731 |
| Curbs and gutters | 5,000 | lf | $ 25 | $ 125,000 | | $ 761 |
| Onsite base and pave | 5,000 | lf | $ 65 | $ 325,000 | | $ 1,979 |
| Dry utilities trenching | 8,500 | lf | $ 15 | $ 127,500 | | $ 776 |
| Sidewalks | 5,000 | lf | $ 22 | $ 110,000 | | $ 670 |
| boxes | 20 | each | $ 2,000 | $ 40,000 | | $ 244 |
| Idscape common areas | 1 | lump sum | $ 200,000 | $ 200,000 | | $ 1,218 |
| wetland/creek mitigation | 1 | lump sum | $ 40,000 | $ 40,000 | | $ 244 |
| Box culvert(s) | 0 | each | $ 18,000 | $ - | | $ - |
| Geotech piling: pin piles | 0 | lots | $ 35,000 | $ - | | $ - |
| Entry monument | 1 | lump sum | $ 100,000 | $ 100,000 | | $ 609 |
| On-site Street lights | 20 | each | $ 4,000 | $ 80,000 | | $ 487 |
| Plat fencing | 2,500 | lf | $ 22 | $ 55,000 | | $ 335 |
| | | Subtotal of hard construction costs | | $ 3,551,489 | | $ 21,626 |
| Contingency (as % of hard costs) | 15% | | | $ 532,723 | $ 532,723 | $ 3,244 |
| | | | | | | |
| **SOFT COSTS, FEES, ETC.** | | | | | | |
| *Preliminary Plat Approval* | | | | | | |
| Preliminary Engineering | | | | | | |
| Civil | 9 | 1/2 PP months | $ 10,000 | $ 90,000 | | $ 548 |
| Traffic | 9 | 1/2 PP months | $ 5,000 | $ 45,000 | | $ 274 |
| Wetlands/Wildlife | 9 | 1/2 PP months | $ 3,000 | $ 27,000 | | $ 164 |
| Hydraulic/Flood | 9 | 1/2 PP months | $ - | $ - | | $ - |
| Fisheries | 9 | 1/2 PP months | $ - | $ - | | $ - |
| Pre Plat App Fees | 1 | lump sum | $ 15,000 | $ 15,000 | | $ 91 |
| City Review Fees | 9 | 1/2 PP months | $ 3,500 | $ 31,500 | | $ 192 |
| SEPA Review | 1 | lump sum | $ 1,200 | $ 1,200 | | $ 7 |
| EIS Fees | 1 | lump sum | $ 200,000 | $ 200,000 | | $ 1,218 |
| Development Management Fee (Pre Plat) | 18 | Pre Plat months | $ 10,000 | $ 180,000 | | $ 1,096 |
| Public Relations | 9 | Pre Plat months | $ 5,000 | $ 45,000 | | $ 274 |
| Legal Fees (Pre Plat) | 18 | Pre Plat months | $ 5,000 | $ 90,000 | | $ 548 |
| Marketing of Pre Plat Fee | 4.5 | 1/4 PP months | $ 12,500 | $ 56,250 | | $ 343 |
| *Subtotal Preliminary Plat Approval Fees* | | | | $ 780,950 | | $ 4,756 |
| Bank Charges, Loan Fee, Appraisal Fee, Etc. | 1% | PP Fees/PP Period | $ 1,171,425 | $ 11,714 | | |
| Interest Paid on Loan for Pre Plat Approval | 6% | PP Fees/PP Period | $ 1,171,425 | $ 70,286 | | |
| Developer's Profit on Preliminary Plat | 30% | PP+Bank+i+Land | $ 4,570,157 | $ 1,371,047 | | |
| | | | | | $ 2,233,997 | $ 13,604 |
| | | | | | | |
| *Final Plat Approval* | | | | | | |
| Final Engineering | 164 | lots | $ 2,000 | $ 328,440 | | $ 2,000 |
| paction Testing | 3,500 | lf | $ 18 | $ 63,000 | | $ 384 |
| ey and Final Plat | 164.22 | lot | $ 1,500 | $ 246,330 | | $ 1,500 |
| Public Works Plan Review & Inspection Fees | $ 1,775,744 | 1/2 const value | 3% | $ 53,272 | | $ 324 |
| Final Plat Review Fees: City | 1 | lump sum | $ 20,000 | $ 20,000 | | $ 122 |
| Fire fee | 164 | lot | $ 400 | $ 65,600 | -$25- | 400 |
| Traffic fee | 164 | lot | $ 933 | $ 153,217 | | $ 933 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Parks fee | 164 lot | | $ | 400 | $ | 65,688 | $ | 400 |
| School fee | 164 lot | | | $0 | $ | - | $ | - |
| Stormwater development charges | 164 lot | | $ | 800 | $ | 131,376 | $ | 800 |
| Waste water fee | 164 lot | | $ | 900 | $ | 147,798 | $ | 900 |
| Sewer latecomers frontage fee | 0 lf | | $ | 45 | $ | - | $ | - |
| Water system development charge | 164 each | | $ | 1,525 | $ | 250,436 | $ | 1,525 |
| Water latecomers charges | 1,500 lf | | $ | - | $ | - | $ | - |
| Grading license fee | 1 each | | $ | 2,000 | $ | 2,000 | $ | 12 |
| Bond fees | 164 lots | | $ | 1,100 | $ | 180,642 | $ | 1,100 |
| Development Management Fee | 10% Hard Costs | | $ | 3,551,489 | $ | 355,149 | $ | 2,163 |
| Legal Fees | 18 Final Plat Months | | $ | 2,500 | $ | 45,000 | $ | 274 |
| Developer's Profit | 10% Hard Costs | | $ | 3,551,489 | $ | 355,149 | $ | 2,163 |
| **Other Soft Costs** | | | | | | | | |
| Real Estate Taxes | 18 Final Plat Months | | $ | 126,122 | $ | 189,183 | $  2,652,368 | $   1,152 |
| **FINANCING** | | | | | | | | |
| Interest | 2% %*(FP Time) | | $ | 19,706,400 | $ | 394,128 | $ | 2,400 |
| Loan Fee & Closing Costs | 0.50% % | | $ | 13,137,600 | $ | 65,688 | $   459,816 | $   400 |
| **Building Lot Development Costs** | 164 lots | | $ | (57,425) | $ | (9,430,393) | $   9,430,393 | $   (57,425) |
| Final Plat / Retail Land Value | 164 lots | | $ | 80,000 | $ | 13,137,600 | $ | 80,000 |
| Raw Land Value AS-IS - Cost/lot | 164 lots | | $ | 22,575 | $ | 3,707,207 | $ | 22,575 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **AS-IS VALUE** | | | | | | |
| Land Value As-Is | $ | 3,707,207 | $ | 22,575 per lot | $7.26 | per land square foot |
| Cost of Sales | 7% $ | (259,504) | $ | (1,580) per lot | ($0.51) | per land square foot |
| | $ | 3,447,703 | $ | 20,994 per lot | $6.75 | per land square foot |
| Original Cost | $ | (0) | $ | (0) per lot | | |
| Profit | $ | 3,447,702 | $ | 20,994 per lot | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **PAPER PLAT VALUE** | | | | | | |
| Land Value As-Is | | $3,707,207 | $ | 22,575 per lot | $7.26 | per land square foot |
| Plus Pre Plat Cost Including Profit | $ | 2,233,997 | $ | 13,604 per lot | $4.37 | per land square foot |
| Paper Plat Value Including Cost & Profit | $ | 5,941,204 | $ | 36,178 per lot | $11.63 | per land square foot |
| Cost of Sales | 7% $ | (415,884) | $ | (2,532) per lot | ($0.81) | per land square foot |
| Paper Plat Value including Cost | $ | 5,525,320 | $ | 33,646 per lot | $10.81 | per land square foot |
| Cost of Preliminary Plat | $ | (862,950) | $ | (5,255) per lot | | |
| Paper Plat Value Net of Cost but incl. Profit | $ | 4,662,370 | $ | 28,391 per lot | | |
| Value increase over As-Is | $ | 1,214,667 | $ | 7,397 per lot | $2.38 | per land square foot |
| Cash on cash return | | 141% | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **FINAL PLAT VALUE** | | | | | | |
| Pre Plat Value Before Sales Costs | $ | 5,941,204 | | $36,178 per lot | $11.63 | per land square foot |
| Plus Final Plat Cost & Profit | $ | 7,196,396 | | $43,822 per lot | $14.08 | per land square foot |
| Final Plat Value Before Sales Costs | $ | 13,137,600 | | $80,000 per lot | $25.71 | per land square foot |
| Cost of Sales | 7% $ | (919,632) | | ($5,600) per lot | ($1.80) | per land square foot |
| Final Plat Value including Cost | $ | 12,217,968 | | $74,400 per lot | $23.91 | per land square foot |
| Cost of Final Plat | $ | (6,841,247) | | ($41,659) per lot | | |
| Final Plat Value Net of Cost but incl. Profit | $ | 5,376,721 | | $32,741 per lot | | |
| Value increase over Paper Plat | $ | 714,351 | | $4,350 per lot | $1.40 | per land square foot |
| Cash-on-cash return (before tax) | | 10% | | | | |

Disclaimer

Please note that Washington law generally prohibits any person except a licensed appraiser from providing an estimate of value for real property. One exception to this prohibition is a broker's opinion of value to be utilized to provide acquisition and disposition advice (See RCW 18.140.020(1)). The estimates provided in this report are offered in the context of a broker's opinion of value.

Thank you again for the opportunity to assist you with your various real estate holdings. Please let us know if you have any further questions.

Sincerely,

Campbell Mathewson
Vice President & Designated Broker

CRE 4485v1 28149-28149-1
Seattle

3