# MYERS

# EXHIBIT D

Case 3:09-cv-05312-BHS   Document 23-5   Filed 03/17/10   Page 2 of 14
Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LAUREL PARK COMMUNITY, LLC, a          )
Washington limited liability           )
company; TUMWATER ESTATES              )
INVESTORS, a California limited        )
partnership; VELKOMMEN MOBILE          )     No. C09-5312 BHS
PARK, LLC, a Washington limited        )
liability company; and                 )
MANUFACTURED HOUSING COMMUNITIES       )
OF WASHINGTON, a Washington            )
non-profit corporation,                )
                                       )
                 Plaintiffs,           )
                                       )
        vs.                            )
                                       )
CITY OF TUMWATER, a municipal          )
corporation,                           )
                                       )
                 Defendant.            )

DEPOSITION UPON ORAL EXAMINATION OF
JEANNE-MARIE WILSON
February 15, 2010
Tumwater, Washington

Taken Before:
Connie Church, CCR #2555, RPR, CRR
Certified Court Reporter
of
CAPITOL PACIFIC REPORTING, INC.
2401 Bristol Court SW, Suite A-104
Olympia, WA  98502
Tel (360) 352-2054 or (800) 407-0148   Fax (360) 705-6539

www.capitolpacificreporting.com
admin@capitolpacificreporting.com

```
 1        copy of the report that you prepared dated December 7th,
 2        2009. Are you familiar with your report?
 3   A    Yes.
 4   Q    Okay. What was the nature of the appraisal problem you
 5        were asked to address?
 6   A    It was my understanding that plaintiff's counsel needed
 7        to establish me as an expert witness in a short period of
 8        time. And so we limited the scope of work to include
 9        valuation of the parks or the subject properties by the
10        income approach under continued use with the
11        understanding that I would be completing a
12        before-and-after analysis prior to trial.
13   [Q   Did you complete that before-and-after analysis as part
14        of your December 7th report?
15   A    No.]
16   Q    What type of report is your preliminary report?
17   A    Well, I was asked to model it after the Federal
18        26(a)(2)(B), and I called it a Summary Appraisal Report
19        under USPAP for compliance purposes.
20   Q    On page 1, it notes that you were retained on
21        December 4th, 2009.
22   A    Mm-hmm.
23   Q    And your report was due on December 7th?
24   A    Right.
25   Q    Mr. Olsen was the one who retained you?
```

```
 1   A   Yes.
 2   Q   What instructions did Mr. Olsen give you?
 3   A   We discussed the case, MHCW versus the City of Tumwater.
         And as I just said, we talked about establishing the
         value of the parks under continued use as - under
         continued use so that I could be I guess put in as an
         expert witness.  And because of the short time frame, we
         limited the scope of the assignment at that time.
 9   Q   Okay.  When you discussed the appraisal project under
         continued use, was that instruction that Mr. Olsen gave
         to you?
12   A   It was a scope of work that we decided upon in the
         interest of time.
14   Q   So that was a mutual decision between yourself and
         Mr. Olsen?
16   A   I did not have a problem valuating it under continued
         use.  It was a valuation assignment that was acceptable
         to me, yes.
19   Q   Did you discuss deadlines for this approach?
20   A   December 7th was the deadline.  Right.
21   Q   Was three days sufficient amount of time for you to
         prepare your opinions in this case?
23   A   Under our limited scope of work, I felt that it was.
24   Q   Okay.  Did Mr. Olsen discuss with you why he was
         approaching you only three days before the deadline?
```

Page 13

| | | |
|---|---|---|
| 1 | A | He said that the other appraiser was not available to do |
| 2 | | the work, the original. |
| 3 | Q | Was three days sufficient to do a before-and-after |
| 4 | | analysis? |
| 5 | A | No. |
| 6 | Q | Did you discuss with Mr. Olsen the need to do a before |
| 7 | | analysis? |
| 8 | A | Yes. |
| 9 | Q | Tell me what your discussions were with him. |
| 10 | A | Well, obviously the case centers around the before and |
| 11 | | after values of these properties.  So that would, of |
| 12 | | course, have to be established prior to trial. |
| 13 | Q | What was the effective date of value for the analysis |
| 14 | | that you gave in Exhibit Number 1? |
| 15 | A | December 31st, 2009 (sic). |
| 16 | Q | Why did you select that date? |
| 17 | A | We discussed the fact that because we were valuing it |
| 18 | | under continued use, it would be appropriate to use a |
| 19 | | date prior to Tumwater's ordinance change and the zoning, |
| 20 | | which was, I believe, March. |
| 21 | Q | So the opinions that you gave -- |
| 22 | A | Oh, I'm sorry.  Did I say . . . December 31, 2008. |
| 23 | Q | 2008.  So the opinions of value that you have on page 3 |
| 24 | | reflect a value before the city adopted the mobile home |
| 25 | | park ordinance? |

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 14

```
 1    A    Correct.
 2    Q    And the opinions as to value that you have are for
 3         fee simple market value?
 4    A    Right.
 5    Q    How do you define that term?
 6    A    Well, I included it in the supplemental appraisal
 7         information on page 12.
 8    Q    So the definition of "market value" that you have on
 9         page 12 is the same as fee simple market value; correct?
10    A    Yes.
11    Q    And were you defining it in an as-is condition?
12    A    Yes.
13    Q    Hence the definition of "as-is market value" on page 12?
14    A    Right.
15    Q    What assumptions did you make about highest and best use
16         in defining the value of these mobile home parks?
17    A    My assumption as to highest and best use was continued
18         use as a manufactured home community.
19    Q    What methodologies were available to you to estimate the
20         value of the mobile home parks in preparation for this
21         report?
22    A    Well, we specific - I specifically used the income
23         capitalization approach to value.
24    Q    Okay.  What other methodologies were available?
25    A    Sales comparison approach is often another technique or
```

1           allowed in that district?
2     A     No.
3     Q     Have you examined any of the conditional uses allowed in
4           the Manufactured Home Park Zoning District to determine
5           whether they could be economically viable uses?
6     A     No.
7     Q     In paragraph 10, you state that, "The ordinances have
8           transferred property rights from park owners to their
9           tenants." Did you draft that sentence?
10    A     Yes.
11    Q     What property right has been transferred to the tenants?
12    A     Well, the bundle of sticks, I think, which is sort of the
13          basis of ownership, because the park owner can't any
14          longer redevelop this park, has - he's restricted in that
15          he can only continue the existing use. And I believe
16          that gives ownership, in part, to the existing tenant
17          base.
18    Q     Does the tenant have the right to redevelop the park?
19    A     No.
20    Q     Does the zoning ordinance prevent the landlord from
21          terminating his tenants' tenancy?
22    A     No.
23    Q     You state here that the zone change by the district is
24          akin to a long-term lease in favor of the tenants. How
25          is it similar to a long-term lease?

Page 43

1  A  If they can't redevelop the property to its highest and
2     best use, they are limited to the - to continuing the
3     manufactured home park use, because they want to
4     obviously generate the highest income from the underlying
5     land, and vacating use would not obviously provide any
6     income.
7  Q  Do you have Exhibit 2 there in front of you?
8  A  Mm-hmm.
9  Q  I'd like you to turn to page 12 of 19.  Have you reviewed
10    Section 18.49.070, the Use Exception that's provided for
11    by this zoning ordinance?
12 A  I read through it initially, yes.
13 Q  Okay.  Tell me what your understanding is to what is
14    provided by the Use Exception chapter or section of the
15    zoning code.
16 A  The property owner can request a use exception if they
17    meet certain criteria.
18 Q  Okay.  What are those criteria, in your understanding?
19 A  They don't have reasonable use of their property under
20    the current zoning or the uses authorized by the zoning
21    are not economically viable.
22 Q  Okay.  Have you reviewed zoning codes before?
23 A  What do you mean by "reviewed"?  I've read through them.
24 Q  Do you have a basic understanding of the types of uses
25    that most zoning codes allow?

Page 44

1   A   Basic, yeah.
2   Q   Would it be your understanding that the uses authorized
3       by the zoning would be allowed uses, accessory uses and
4       conditional uses?
5   A   Right.  Right.
6   Q   And you have done no analysis to see whether or not the
7       conditional uses authorized by the zoning code are not
8       economically viable; is that right?
9   A   When I have considered the primary uses allowed, they
10      were limited to such a degree that, no, I didn't go on
11      and look at the conditional uses.
12  Q   Is it possible that a conditional use would be
13      economically viable, such as a church or a cemetery?
14  A   I'm sure it's possible.
15  Q   And would you agree that for the three parks in Tumwater,
16      operation of a manufactured housing community is an
17      economically viable use?
18  A   Yes.
19  Q   I want to go back to paragraph 10, because I'm a little
20      confused as to exactly which property right the tenant
21      receives from the park owner.  You mentioned the bundle
22      of sticks.  Can you identify which stick?
23  A   I believe the tenant now has a more secure position with
24      the ground lease than they would have in the before
25      situation.  But I cannot label a specific stick for you.

Page 45

1  Q  Okay. With regard to the ground lease, does the zoning
2     change the term of the lease that has been entered into
3     between any of the mobile home park owners and their
4     existing tenants?
5  A  No.
6  Q  In the last sentence in paragraph 10 at the top of page 4
7     of your declaration, you make reference to the fact that
8     the landlord can no longer take advantage of the
9     underlying land's potential for commercial redevelopment.
10    What did you mean by "commercial redevelopment"?
11 A  I just mean not commercial in retail or office building,
12    but higher and better use under zoning.
13 Q  And what type of use would that be for these mobile home
14    parks?
15 A  Well, it would have been with the MFM or the MHM zoning.
16 Q  So commercial redevelopment would be simply a more
17    intensive use than the existing --
18 A  Correct.
19 Q  -- mobile home park use?
20 A  Correct. Correct.
21 Q  What did you mean by the word "potential"?
22 A  Well, underlying land's highest and best use is premised
23    on the value of the underlying land being able to be used
24    to its highest and best use. So if the zoning - the
25    zoning provides potential for a higher and better use.

1    A    Right.

2    Q    Do you know what those --

3    A    It looks like a subdivision.

4    Q    Do you know if that's single-family?

5    A    Looks like it, yes.

6    Q    Immediately across Rural Road Southwest, do you know what

7         property is located to the northwest of the intersection

8         of Rural and Trosper?

9    A    Not at the corner but to the northwest?

10   Q    On the northwest corner.

11   A    Northwest corner.  I believe it's a manufactured home

12        community.

13   Q    Okay.

14   A    Wait a minute.  Wait a minute.  Yeah.  Yeah.

15   Q    Do you believe that or do you have any opinion as to

16        whether the use as a manufactured home community is

17        inconsistent with the surrounding neighborhood at

18        Tumwater Mobile Estates?

19   A    No.

20   Q    No, you don't have an opinion, or no, it's not

21        inconsistent?

22   A    I don't believe it's inconsistent.

23   Q    Do you have any opinions as to whether either Velkommen

24        or Laurel Park is inconsistent with the uses of the

25        surrounding communities?

```
 1   A   No.  They're just more established.
 2   Q   What do you mean more established?
 3   A   Than some of the uses.  They've been there longer than
 4       some of the newer subdivisions that have gone in.  That's
 5       all.
 6   Q   Okay.  In paragraph 15 on page 5 of your declaration, you
 7       talk about how ordinances have shifted value from park
 8       owners to tenants.  Paragraph 15.  You see that?
 9   A   Okay.  Yeah.
10   Q   What methodology did you use to determine whether there
11       was a shift in value from park owners to tenants?
12   A   I don't think there was a methodology.  It's - it's an
13       opinion.
14   Q   And what's the factual basis for that opinion?
15   A   If the landowner doesn't have full use of their property,
16       they have lost value.
17   Q   Can you quantify how much value has been shifted, in your
18       opinion, from the park owners to the tenants?
19   A   No.
20   Q   Did you discuss this value shift in your December 7th,
21       2009 report?
22   A   No.
23   Q   Has this value shift been something created by a change
24       in circumstances since preparation of your report in
25       December of 2009?
```

1   A   No.  It was just the scope of that work was not
2       all-inclusive.
3   Q   In paragraph 16, you state that your appraisal of the
4       real property would recognize owners were permitted to
5       use their properties for a variety of uses.
6   A   Mm-hmm.
7   Q   Is that discussed in your appraisals of the plaintiffs'
8       properties and the December 2009 report?
9   A   No.
10  Q   Why not?
11  A   Because we limited the scope in the December '09 report.
12  Q   Would that . . .  How would that analysis described in
13      the first sentence of paragraph 16 relate to the highest
14      and best use of the property?
15              THE WITNESS:  Can you read that back, please.
16              (Pending question read by reporter.)
17  A   When valuing the property in the before and the after
18      condition, you would take into account the zoning in
19      place prior to March of '09 and the zoning in the after.
20  Q   (BY MR. MYERS)  Okay.  Would a disinterested purchaser
21      looking to buy the property before the adoption of the
22      zoning ordinances look to see what the highest and best
23      use of the property would be?
24  A   As part of their due diligence, I think they would
25      consider the existing use as well as the underlying

Page 58

```
 1        zoning under allowed uses.
 2   Q    And if you were appraising the property before the
 3        adoption of these ordinances, you would also need to
 4        determine the highest and best use in order to figure out
 5        what the fair market value is; is that correct?
 6   A    That's correct.
 7   Q    In paragraph 17, you talk about the valuation of the
 8        properties after the zoning ordinance became effective;
 9        correct?
10   A    Right.
11   Q    Is that discussed anywhere in your January - or in your
12        December 2009 report?
13   A    Only as far as if I refer to the zone change on page - in
14        the opening comments.  I'm not sure.
15   Q    Do you have Exhibit 1 there?
16   A    Yeah.
17   Q    Can you find where you talk about value after the
18        ordinances became effective?
19   A    Only when I refer to the case that Mr. Olsen explained to
20        me on the phone.
21   Q    Where is that referred to in the report?
22   A    Page 2, first full paragraph.
23   Q    The part that says you're familiar with the case only as
24        far as Mr. Olsen explained it to you on the phone?
25   A    Correct.
```