# PARTIN

# EXHIBIT A

# Laurel Park Community LLC

## v

# City of Tumwater

Report Prepared By:
Mueller & Partin, PLLC
Certified Public Accountants & Forensic Economists
400 108th Avenue NE, Suite 615
Bellevue, Washington  98004
(425) 455 - 0303

Prepared for:

# Jeffrey Myers
# Law, Lyman, Daniel
# Kamerrer & Bogdanovich, P.S.

# January 6, 2010

# MUELLER & PARTIN P.L.L.C.

**Certified Public Accountants**
**Forensic Economists**

FIRST MUTUAL CENTER
400 108ᵗʰ AVENUE N.E., SUITE 615
BELLEVUE, WASHINGTON 98004

PHONE:        (425) 455-0303
FACSIMILE:    (425) 455-5176
EMAIL:partin@muellerpartin.com

January 6, 2010

Mr. Jeffrey Myers
Law, Lyman, Daniel, Kamerrer, & Bogdanovich, P.S.
2674 R. W. Johnson Blvd. S.W.
Tumwater, Washington 98512

Re:    *Laurel Park Community, LLC v. City of Tumwater*

Dear Mr. Myers,

In accordance with the terms of our engagement, this report summarizes our opinions regarding the economic viability of manufactured housing community operations for Laurel Park Estates, Tumwater Mobile Estates, and Velkommen Mobile Park as a result of the City of Tumwater's Ordinance Number O2008-027 and O2008-009.

We relied upon the accuracy of the information provided. We did not audit or perform similar attest services on the financial statements or data relating to entities discussed in this report. We performed various analytical procedures on the information provided as considered appropriate under the circumstances to evaluate whether the zoning ordinances create a substantial burden on operations of the Plaintiffs as manufactured housing communities. Our procedures were performed exclusively for the purpose of evaluating any economic damages claimed by the Plaintiffs in the above mentioned litigation matter and should not be used for any other purpose. The financial information contained within this report has been designated as confidential by the parties to the litigation and may only be utilized by authorized parties.

## BACKGROUND

Laurel Park Community, LLC, Tumwater Estates Investors, LP, and Velkommen Mobile Home Park, LLC (together referred to as the Plaintiffs), are owners of manufactured housing communities located in the City of Tumwater. The claim arises from the City of Tumwater's zoning Ordinance Number O2008-027 and O2008-009, which became effective on March 23, 2009.

Mr. Jeffrey Myers
January 6, 2010
Page 2 of 29

Ordinance Number O2008-027 amends the City of Tumwater's land use plan, housing plan, Tumwater/Thurston County joint plan, and zoning map. The ordinance established a new land use designation titled "Manufactured Home Park Zone District" only applicable to six of the existing manufactured home communities in Tumwater, including Laurel Park Estates, Tumwater Mobile Estates, and Velkommen Mobile Park. The Manufactured Home Park Zone District allows for 6-9 dwelling units per acre (DU/Acre).

Ordinance Number O2008-009 implements Ordinance Number O2008-027 by creating a new zone district titled "MHP Manufactured Home Park Zone District", which is codified under Tumwater Municipal Code Chapter 18.49.

Laurel Park Estates is located at 3244 66th Ave. S.W., Tumwater, WA 98512. The property is 11.73 acres and is owned by Laurel Park Community, LLC. Laurel Park Estates' former land use designation was multi-family medium density residential zone district (9–15 DU/Acre). It is our understanding that Laurel Park Estates is currently operating its manufactured housing community at a net density of 8.3 DU/Acre.

Tumwater Mobile Estates is located at 930 Trosper Road S.W., Tumwater, WA 98512. The property is 22.44 acres and is owned by the Tumwater Estates Investors, LP. Tumwater Mobile Estates' former land use designation was multi-family high density residential zone district (14-29 DU/Acre) and single-family medium density residential zone district (6-9 DU/Acre). It is our understanding that Tumwater Mobile Estates is currently operating its manufactured housing community at a net density of 7.6 DU/Acre.

Velkommen Mobile Park is located at 2535 70th Ave. S.W., Tumwater, WA 98511. The property is 11.13 acres and is owned by Velkommen Mobile Park, LLC. Velkommen Mobile Home Park, LLC's former land use designation was multi-family medium density residential zone district (9-15 DU/Acre). It is our understanding that Velkommen Mobile Home Park, LLC is currently operating its mobile home park at a net density of 3.9 DU/Acre.

**SCOPE**

Mueller & Partin, Certified Public Accountants and Forensic Economists, has been retained on behalf of the City of Tumwater to evaluate whether the provisions of the City of Tumwater's Ordinance Numbers O2008-027 and O2008-009 create a substantial burden on Plaintiffs operations as manufactured housing communities. We have also been asked to prepare a report summarizing our findings and conclusions. A copy of my curriculum vitae is contained as Attachment 1 to this report, a schedule of hourly rates

Mr. Jeffrey Myers
January 6, 2010
Page 3 of 29

charged for my work is contained as Attachment 2, the listing of legal matters where I have provided sworn testimony for at least the past ten years is contained in Attachment 3 and a listing of publications that I have authored is contained in Attachment 4.  Our work on this project included analysis of the following information:

- Plaintiffs' Complaint for Damages, dated May 26, 2009,

- Answer of Defendant City of Tumwater to Plaintiffs' Complaint for Damages, dated June 17, 2009,

- Declaration of Joel Erlitz with Exhibits, dated December 7, 2009,

- Jeanne-Marie Wilson's Federal Rule 26 (a)(2)(B) Preliminary Report of Market Value, dated December 7, 2009,

- City of Tumwater Ordinance Number O2008-027 with Exhibits, dated February 17, 2009,

- William Robinson's Complete Appraisal and Self-Contained Appraisal Report of the Tumwater Mobile Estates, dated January 6, 2006 (pp. 1 – 126),

- Citibank's Correspondence to William Robinson Regarding Engagement for Completion of Real Estate Appraisal for Tumwater Mobile Estates, dated December 14, 2005 (pp. 127 – 130),

- Various Loan Documents for Tumwater Estates Investors, LP (pp. 131 - 145, 172),

- Form 1065 Income Tax Returns for Tumwater Estates Investors, LP for the years 2007 through 2008 (pp. 146 - 171),

- Rent Roll for Tumwater Mobile Estates for Month of October 2009 (pp. 173 - 175),

- Rental Summary for Velkommen Mobile Park for the years 2006 through 2009 (pp. 176),

- Form 1040 Income Tax Returns (Schedule E Only) for Phyllis Anderson for the years 2006 through 2008 (pp. 177 - 179),

- Various Purchase and Sales Agreements for Velkommen Mobile Park (pp. 180 - 196),

Mr. Jeffrey Myers
January 6, 2010
Page 4 of 29

- Various Purchase and Sales Agreements for Laurel Park Estates (pp. 197 - 215),

- Profit and Loss Statements for Laurel Park Community, LLC for the years 2006 through 2008 (pp. 215 - 220),

- Century Pacific, LP Documents Regarding Development and Sale Options for Laurel Park Community, LLC (pp. 221 – 230),

- Form 1040 Income Tax Returns (Schedule E Only) for Robert Eichler for the years 2006 through 2008 (pp. 231 - 234),

- Various Documents Regarding Environmental Issues and Development for Laurel Park Estates (pp. 235 - 375),

- Monthly Rent Rolls for Laurel Park Estates for the years 2005 through 2008 (pp. 376 – 379),

- Various Documents Regarding Escrow, Title, and Contract Information for Laurel Park Estates,

- Income Statements for Tumwater Mobile Estates for the years 2005 through September 30, 2009 (pp. 380, 383, 386 - 387),

- Balance Sheets for Tumwater Mobile Estates, as of December 31, 2007, September 30, 2008, December 31, 2008, and September 30, 2009 (pp. 381 - 382, 384 - 385),

- Read Chapter 59.20 RCW, Manufactured/mobile home landlord tenant act,

- Read the United States Court of Appeals, Ninth Circuit decision in Guggenheim v. City of Goleta,

- Reviewed City of Tumwater zoning maps,

- Read December 21, 2009 letter addressed to Jeffrey S. Myers from Philip A. Talmadge,

- Analyzed the "City of Tumwater Housing Plan (2004 update)",

- Analyzed the "City of Tumwater Land Use Plan (2008 update)",

Mr. Jeffrey Myers
January 6, 2010
Page 5 of 29

- Analyzed document titled "Mobile & Manufactured Home Parks; Liquefaction Soil Hazards",

- Read article on Purchase of Thunderbird Village by Park Residents,

- Read data on sale of Western Plaza manufactured home park,

- Viewed "Photographs of Road Collapse from Liquefaction Hazard",

- Site visits and meetings with City of Tumwater planning and land use officials,

- Researched current listings for manufactured home parks and their related capitalization rates,

- Discussed market conditions for manufactured mobile home parks in the State of Washington with a broker specializing in the sale of such properties.

## ANALYSIS

The subject ordinances established a new land use designation in the City of Tumwater titled "Manufactured Home Park Zone District". As stated above, the new zoning was applied to six of the existing manufactured housing communities in Tumwater, including Laurel Part, Tumwater Estates, and Velkommen Park. The Plaintiffs allege that the ordinances violate their civil rights and destroy attributes of property ownership, including the right to freely dispose of the property and the right to economically use the property by restricting redevelopment of the property and interfering with investment backed expectations. The Plaintiffs also allege that the ordinances have "forced the Plaintiffs alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."

We analyzed the Plaintiffs' claims by considering the economic impact on their property rights immediately before and after enactment of the ordinances. We were also asked to determine if there was any evidence that enactment of the ordinances affected a transfer of property value from the owners to the tenants of the impacted mobile home parks. Our analysis included consideration of the three "Penn Central"[1] factors:

1. The economic impact of the regulation on the claimant;
2. The extent to which the regulation has interfered with investment-backed expectations;

---

[1] *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

Mr. Jeffrey Myers
January 6, 2010
Page 6 of 29

3. The character of the governmental action.

## Economic Impact of the Regulation on the Claimant

Enactment of the ordinances had no impact on the Plaintiffs use of their property. The property was improved as manufactured housing parks prior to enactment and that use is allowed to continue after enactment, with no added restrictions on the use of the property for that purpose. Enactment of the ordinances accordingly had no immediate impact on the Plaintiffs.

The highest and best economic use for the subject property at the date of enactment was use as manufactured home parks. Appraisers and real estate consultants not associated with this litigation have noted that the properties are better suited in their current use as manufactured home parks versus redevelopment into higher density multi-family projects (apartments). Campbell Mathewson, Vice President & Designated Broker for Century Pacific, L.P., who assisted the ownership of Laurel Park Estates identify potential development and sale options for the property stated the following in March 2007:[2]

> *"...it may make more sense to continue operating this property as a mobile home park and/or taking it to market on the basis of a mobile home park and not a development opportunity."*

> *"You will notice that the value of this park is a relatively low $23,000 per zoned lot. We believe the reason is due to the lack of market acceptance for smaller dense townhome units in Thurston County which are reflected in relatively low sales prices."*

William Robinson of APT Appraisal & Consulting, LLC noted similar findings in his January 6, 2006 appraisal of Tumwater Mobile Estates for Citibank:[3]

> *"Over the past 5 years, construction costs, rent levels, and most significantly high mitigation fees, have not supported new construction. We anticipate there will be no major changes to the economic base of the area in the near term that would adversely impact rents or occupancy rates in the Tumwater, Lacey, and Olympia market areas."*

> *"Based on the subject's development potential and proximity to employment, community services, recreation and shopping, and considering current and forecast*

---

[2] Correspondence from Century Pacific, LP to Robert Eichler Regarding Laurel Park Estates Development and Sale Options, dated March 9, 2007 (pp. 222).
[3] William Robinson's Complete Appraisal and Self-Contained Appraisal Report of the Tumwater Mobile Estates, dated January 6, 2006 (pp. 28, 32, 42).

Mr. Jeffrey Myers
January 6, 2010
Page 7 of 29

> *market conditions the sites overall rating is average for its highest and best use as a manufactured home park."*

> *"The subject improvements are a financially feasible use since they are functional and represent a substantial contribution to the property's overall value. The other manufactured home parks in the market area are profitable and provide their owners a long-term stream of income and tax benefits."*

> *"The current improvements and their operation as a 115 pad manufactured home park is the maximally productive use of the subject site."*

Mr. Mathewson's and Mr. Robinson's assessments indicate that Plaintiffs' properties would be best utilized as manufactured home parks, representing the highest and best use of the property. We note that Plaintiffs' damages expert, Ms. Wilson, offered no opinion or evidence indicating that the highest and best use of the property at the date of enactment would be anything other than continued use as a manufactured home park. Plaintiff damages expert, Mr. Erlitz, asserted that redevelopment of the properties into uses with higher densities would represent the highest and best use of the property. However, Mr. Erlitz provided no analysis of the Tumwater market or other objective data supporting his opinion that demand existed to convert the existing manufactured home parks to a more intensive residential use. In addition, Mr. Erlitz failed to provide any evidence that the Plaintiffs were in the process of converting the property to a different use immediately prior to enactment of the ordinances. There is accordingly no evidence that the ordinances had any economic impact on the Plaintiffs at the date of enactment. Mr. Erlitz' arguments appear to relate to alleged investment-backed expectations which are discussed below.

## The Extent to Which the Regulation Has Interfered With Investment-Backed Expectations

The Plaintiffs allege that enactment of the ordinances interfered with their investment backed expectations by restricting the potential for converting the property to uses with higher density in the future. The primary impact of the ordinances on the subject properties was to reduce the density of any future development permitted on the sites. The Manufactured Home Park Zone District allows for 6-9 dwelling units per acre (DU/Acre). The following zoning applied to each Plaintiff prior to enactment of the ordinances:

- Tumwater Mobile Estates:  Multi-family high density residential zone district (14-29 DU/Acre) for 21.25 acres and single-family medium density residential zone district (6-9 DU/Acre) for 1.15 acres.

Mr. Jeffrey Myers
January 6, 2010
Page 8 of 29

- Laurel Park Estates: Multi-family medium density residential zone district (9–15 DU/Acre).

- Velkommen Mobile Home Park:   Multi-family medium density residential zone district (9-15 DU/Acre).

Laurel Park Estates is currently operating at a net density of 8.3 DU/Acre, Tumwater Mobile Estates is operating at a net density of 7.6 DU/Acre, and Velkommen Mobile Park is operating at a net density of 3.9 DU/Acre.  We note that all three of these manufactured housing communities are operating within or below City of Tumwater's Ordinance Number O2008-027 and O2008-009 requirement of 6-9 DU/Acre under the Manufactured Home Park Zone District.  It is our understanding that Velkommen Mobile Estates can increase its density to 9 DU/Acre with an installation of a sewer system.

Plaintiffs' net density on their property has accordingly not been adversely affected by the City of Tumwater's Ordinance Number O2008-027 and O2008-009.  The Plaintiffs can accordingly continue to operate the property, without change, consistent with the use of the property at the time they made their original investment.

The table below summarizes Plaintiffs' reported gross rents from their manufactured housing communities:

| Year | Laurel Park Estates[4] | Tumwater Mobile Estates[5] | Velkommen Mobile Estates[6] |
|------|------------------------|----------------------------|------------------------------|
| 2006 | $339,159 | Not Produced | $128,343 |
| 2007 | $345,033 | $304,003 | $145,152 |
| 2008 | $416,993 | $313,218 | $153,438 |

Gross rents increased each year for Laurel Park Estates, Tumwater Mobile Estates, and Velkommen Mobile Park.  We note that City of Tumwater's Ordinance Number O2008-027 and O2008-009 do not have any provisions limiting monthly rental rates.  Future rental income will increase with inflation and any increase in demand of the general housing market.  Use of the properties as manufactured home parks fills a niche in the

---

[4] Form 1040 Income Tax Returns (Schedule E Only) for Robert Eichler for the years 2006 through 2008 (pp. 232 – 234).

[5] Form 1065 Income Tax Returns for Tumwater Estates Investors, LP for the years 2007 through 2008 (pp. 150, 163).

[6] Form 1040 Income Tax Returns (Schedule E Only) for Phyllis Anderson for the years 2006 through 2008 (pp. 177 – 179).

Mr. Jeffrey Myers
January 6, 2010
Page 9 of 29

supply of housing and the owner's of the parks will enjoy investment returns consistent
with the general housing market and level of investment risk.  The cap rates assigned to
the properties are consistent with that of other income property with comparable risks.

We summarized the historical financial statements provided by each of the Plaintiffs on
Attachments 5 – 7.  Our summaries indicate that the net operating income (revenues less
operating expenses before depreciation and debt service) for each of the Plaintiffs has
generally increased each year as follows:

| Year | Laurel Park Estates[7] | Tumwater Mobile Estates[8] | Velkommen Mobile Estates[9] |
|---|---|---|---|
| 2006 | $207,469 | $264,069 | $97,915 |
| 2007 | $210,014 | $284,250 | $104,388 |
| 2008 | $254,170 | $305,315 | $101,217 |
| YTD 9/30/2009 | Not produced | $236,982 | Not produced |

Total 2009 (post ordinance enactment) operating income for Tumwater Mobile Estates
will likely be $315,976 based on annualizing year to date September 30, 2009
performance, indicating that enactment of the ordinances had no impact on the Plaintiff's
ability to raise rents and increase profits.

We noted a significant discrepancy between the internal financial statements produced
for Tumwater Mobile Estates and its tax returns.  The internal profit and loss statements
produced (Attachment 8) vary materially with the tax returns (Attachment 9).  We noted
similar discrepancies on the balance sheets where the internal balance sheets (Attachment
10) indicate a substantially higher asset value than do the tax returns (Attachment 11).
The Plaintiffs and their experts provided no explanation for the discrepancies.  The
internal financial statements indicate a much more profitable operation in each year than
is reflected on the tax returns.  Investigation into the reason for the discrepancy is beyond
the scope of our engagement, however, if not satisfactorily explained, it could affect the
credibility of the Plaintiff.

We analyzed the Plaintiffs' net operating income as a percentage of annual return on
investment in assets to the extent that relevant information was produced.  The analysis
provides an indication of the return on investment before debt service (debt service was

---

[7] Form 1040 Income Tax Returns (Schedule E Only) for Robert Eichler for the years 2006 through 2008 (pp. 232 – 234).

[8] Form 1065 Income Tax Returns for Tumwater Estates Investors, LP for the years 2007 through 2008 (pp. 150, 163).

[9] Form 1040 Income Tax Returns (Schedule E Only) for Phyllis Anderson for the years 2006 through 2008 (pp. 177 – 179).

Mr. Jeffrey Myers
January 6, 2010
Page 10 of 29

not considered because of the discretionary nature of the amount of debt carried by the Plaintiffs). Balance sheets were not available for each Plaintiff so we utilized information as described below to arrive at an estimate of the annual return on total fixed assets (investment in land, buildings and improvements). We note that the return on equity would be substantially higher in circumstances where the Plaintiffs leveraged their investment with debt.

We calculated net operating income as a percentage of purchase price for Laurel Park. Laurel Park did not produce a balance sheet, but did produce closing documents indicating the amount paid for the property. The annual investment returns were as follows (refer to Attachment 5):

| | |
|---|---|
| 2006 | 16% |
| 2007 | 16% |
| 2008 | 20% |

Laurel Park's return on purchase price is more than double the expected returns for manufactured home parks indicated by the capitalization rates utilized by the Plaintiffs experts.[10]

We calculated net operating income as a percentage of the gross cost of land and improvements (total fixed assets before depreciation) as indicated on the internal financial statements produced by Tumwater Mobile Estates. The annual investment returns were as follows (refer to Attachment 6):

| | |
|---|---|
| 2006 | 22% |
| 2007 | 24% |
| 2008 | 26% |

Tumwater Mobile Estates return on total investment in fixed assets is more than double the expected returns for manufactured home parks indicated by the capitalization rates utilized by the Plaintiffs experts.[11]

We calculated net operating income as a percentage of 2002 assessed value for Velkommen Mobile Park. Velkommen Mobile Park produced no information regarding its investment in fixed assets so we utilized the county assessor's 2002 assessed value. It is likely that that assessed value in 2002 exceeds the cost of Velkommen's investment in the property because it has been under the same ownership for many years. The annual

---

[10] Mr. Erlitz utilized a capitalization rate of 6.5% for Laurel Park and Ms. Wilson used rates ranging from 7% - 7.5%
[11] Mr. Erlitz utilized a capitalization rate of 6.0% for Tumwater Mobile Estates and Ms. Wilson used rates ranging from 7% - 7.5%

Mr. Jeffrey Myers
January 6, 2010
Page 11 of 29

investment returns presented below likely understate the actual returns the owner achieved on the investment (refer to Attachment 7):

| | |
|---|---|
| 2006 | 13% |
| 2007 | 14% |
| 2008 | 14% |

Velkommen Mobile Park return on total investment in fixed assets is double the expected returns for manufactured home parks indicated by the capitalization rates utilized by the Plaintiffs experts.[12]

Analysis of the Plaintiffs' financial information indicates that they are currently earning at least double the expected rate of return on the cost of their investment than expected in the market place for similar investment property. There is no evidence that enactment of the ordinances had any negative impact on the Plaintiffs' profits or return on investment.

The ordinances impacted the maximum density that was originally zoned for the land owned by the Plaintiffs (except for that portion of Tumwater Mobile Estates that was zoned single-family medium density for which there was no impact). However, a reduction of maximum density allowed for a specific parcel of property does not necessarily translate to a diminution of property value. Property values are driven by demand for specific development uses within geographic areas. Demand for residential real property is influenced by a number of factors including:

- Availability of undeveloped property (vacant land) within the permitted zoning

- Absorption rates for vacant land into allowed zoning densities

- Conversion rate of improved property within the zoning district to maximum densities permitted within the zoning area

- Projected population growth rates

- Average family income within the geographic area

Statistical data allowing the analysis of the above factors can be obtained from The City of Tumwater's Housing and Land Use Plans. The Growth Management Act required that the City analyze expected future population growth, housing demand generated by that

---

[12] Mr. Erlitz utilized a capitalization rate of 6.0% for Velkommen Mobile Park and Ms. Wilson used rates ranging from 7% - 7.5%.

Mr. Jeffrey Myers
January 6, 2010
Page 12 of 29

growth and the availability of vacant land within appropriate residential zones to allow construction of new housing necessary to meet future population growth projections. We utilized the data contained in the Housing and Land Use Plans, as described in the following paragraphs, to determine the likelihood and time frame that sufficient demand could exist to justify conversion of the Plaintiffs' property from its current use to a higher density level allowed prior to enactment of the ordinances.

The purpose of the urban area land supply analysis prepared as part of the City's land use plan is to determine how much residential, commercial and industrial land Tumwater will need to have in order to accommodate at least 20 years of projected growth.

Under the Growth Management Act (GMA), counties planning under the GMA are given a 20-year population forecast by the State Office of Financial Management (OFM). These population estimates are used by the counties and the cities within them to designate their urban growth areas. Thurston County and all of the cities and towns within it must accommodate at least the population forecast by OFM.

Figure 1 shows a forecast of population growth for Tumwater and its Urban Growth Boundary. This forecast was developed by the Thurston Regional Planning Council and is based upon a hybrid economic and demographic model.

| TUMWATER AND URBAN GROWTH AREA 20 YEAR POPULATION FORECAST | | | | |
|---|---|---|---|---|
| | 2002* Population | 2022** Population | Population Increase | % Increase (2002-2022) |
| Tumwater | 12,730 | 18,562 | 5,832 | 46% |
| Urban Growth Area | 7,552 | 16,358 | 8,806 | 116% |
| Combined areas | 20,282 | 34,920 | 14,638 | 72% |

Figure 1

* Source: Office of Financial Management, Forecasting Division—*April 1 Population of Cities, Towns, and Counties Used for Allocation of Selected State Revenues, State of Washington, Corrected 10/3/02.*
** Source: The Profile, October 2002, Thurston Regional Planning Council, and the Population and Employment Forecast for Thurston County Final Report, 1999.

The following graph indicates the acreage within the City of Tumwater available to meet the above expected population growth:

Mr. Jeffrey Myers
January 6, 2010
Page 13 of 29



Figure 2

As the chart indicates, 28% of land uses in Tumwater are currently residential, 6% are commercial, and 8% are industrial. The remaining uses are vacant (31%), public/institutional (15%), natural resources (4%), and open space (9%).

As a general rule, land with the fewest site constraints develops first because it is less expensive and more convenient to develop. Land with existing improvements producing market rate returns, such as that owned by the Plaintiffs, are the last to be redeveloped because vacant land has none of the constraints faced by owners of manufactured home parks. Such constraints include the following:

- The cost of complying with the manufactured/mobile home landlord act, which requires that the landlord enter a covenant stating that "the mobile home park will not be converted to a land use that will prevent the space that is the subject of the lease from continuing to be used for its intended use for a period of three years after the beginning of the term of the rental agreement".[13] In addition, the act requires one year

---

[13] Chapter 59.20.60 RCW

Mr. Jeffrey Myers
January 6, 2010
Page 14 of 29

leases (unless waived by the tenant in writing).[14] These provisions could require the property owner to hold the property open as a manufactured home park for up to three years while residents make alternative living arrangements. The required notice period would cause a potential developer to face declining rental income as the manufactured home park vacates for up to a three year period, while at the same time incurring debt service and operating costs associated with holding the property and maintaining services for the remaining tenants. Such costs would be substantial and represent a significant deterrent to redevelopment of the property.

- The existing site improvements would require decommissioning and disposal (i.e., septic systems, roads, existing utilities, abandoned manufactured homes and manufactured home pads).

The cost of removing existing tenants and site improvements would substantially increase the cost to develop the Plaintiffs' property relative to other development alternatives, especially vacant land. The property that is subject in this lawsuit would accordingly be among the last properties with pre-enactment zoning densities to be redeveloped into a higher density use.

The supply of vacant land for residential development in the City of Tumwater is as follows:

Figure 3. Net Buildable Residential Land in Acres.[15]

---

[14] Chapter 59.20.50 RCW

[15] *Source: Thurston Regional Planning Council.*

*Thurston Regional Planning Council (TRPC) estimates that churches, parks, and schools will consume varying amounts of land within different residential zones. The amounts are as follows: MFH is 0%, MFM is 2.5%, SFM is 7.5%, SFL is 7.5%, R/SR is 7.5%, and MU at 0%.

**TRPC estimates that in Tumwater only 10% of land zoned for Mixed Use will develop as residential. This translates to 11 acres of Mixed Use residential development from which 2 acres were subtracted to account for future roads for a net total of 9 acres of buildable residential land in the Mixed Use zone. Source: TRPC 2002 Buildable Lands Technical Documentation—Table 20.

Mr. Jeffrey Myers
January 6, 2010
Page 15 of 29

| Zone | Total Land Area | Developed Land | Undevelopable Land | Future Roads | Other Uses* | Net Buildable Land |
|---|---|---|---|---|---|---|
| R/SR | 249 | 50 | 25 | 30 | 11 | 133 |
| SFL | 1015 | 538 | 66 | 65 | 24 | 295 |
| SFM | 964 | 677 | 36 | 40 | 14 | 179 |
| MFM | 195 | 127 | 4 | 10 | 1 | 50 |
| MFH | 142 | 78 | 4 | 10 | 0 | 51 |
| MU | 235 | 101 | 19 | 2 | 0 | 9** |
| Total | 2800 | 1571 | 154 | 157 | 50 | 717 |

R/SR Residential/Sensitive Resource
SFL   Single Family Low Density
SFM   Single Family Medium Density
MFM Multi-Family Medium Density
MFH Multi-Family High Density
MU   Mixed Use

In order to determine whether or not the City has the capacity to accommodate the projected population, an analysis of all of the proposed residential land use designations was performed. The Mixed Use designation was included in these calculations to reflect the potential of this designation to accommodate residential development. Thurston Regional Planning Council (TRPC) estimates that in Tumwater only 10% of land zoned for Mixed Use will develop as residential. TRPC also estimates that this 10% will develop at the minimum density of 14 dwelling units per acre.[16]

---

[16] Source: TRPC 2002 Buildable Lands Report—Table 20.

Mr. Jeffrey Myers
January 6, 2010
Page 16 of 29

Starting with the Thurston Regional Planning Council buildable lands data, the following assumptions were used for the population accommodation/land supply calculations:

- 17% of land area will consist of right-of-way and utilities. (Thurston Regional Planning Council)

- Churches, parks, and schools will consume varying amounts of land within different residential zones.  (Thurston Regional Planning Council--Buildable Land Report 2002, Technical Documentation, Table 21)

- Critical areas and developed land were removed from the buildable lands data by Thurston Regional Planning Council. (Thurston Regional Planning Council Buildable Land Report 2002, Technical Documentation, Table 12)

- The average number of persons per household in Tumwater will remain at 2.20 for the twenty year planning period. (Thurston Regional Planning Council—The Profile October 2002, Table II-9)

- 10% of the Mixed Use areas will develop with residential uses and these will have a density of 14 dwelling units per acre. (Thurston Regional Planning Council--Buildable Land Report 2002, Technical Documentation, Table 20)

- Development will occur with a minimum density policy. (Tumwater Land Use Plan)

Thurston Regional Planning Council has calculated the average household size in Tumwater to be 2.2 persons.  Based on the projected population increase of 5,832 people and the average household size of 2.2 persons it can be assumed that there will be a need for 2,651 new residential units in Tumwater in the 20-year planning period (2002 through 2022).

Mr. Jeffrey Myers
January 6, 2010
Page 17 of 29

Figure 4. Total Dwelling Units Possible at Maximum and Minimum Density Buildout

| Zone | Density Range Dwelling Units/Acre | Net Buildable Acres | Dwellings at Minimum Density Buildout | Dwellings at Maximum Density Buildout |
|------|-----------------------------------|---------------------|----------------------------------------|----------------------------------------|
| R/SR | 2-4 | 133 | 266 | 532 |
| SFL | 4-7 | 295 | 1180 | 2065 |
| SFM | 6-9 | 179 | 1074 | 1611 |
| MFM | 9-15 | 50 | 450 | 750 |
| MFH | 14-29 | 51 | 714 | 1479 |
| MU | 14 | 9 | 126 | 126 |
| Total | N/A | 717 | 3810 | 6563 |

R/SR  Residential/Sensitive Resource
SFL   Single Family Low Density
SFM  Single Family Medium Density
MFM Multi-Family Medium Density
MFH Multi-Family High Density
MU  Mixed Use

Each land use designation intended for residential uses will utilize a minimum density policy. A minimum density policy requires development to be configured so that infill may occur in the future and ensures that valuable urban land is not developed at extremely low densities.

The City of Tumwater Housing Plan indicates that approximately 33%[17] of its residents resided in multi-family housing as of 2002 and projected that the existing ratio of multi-family housing to other forms of housing is expected to continue into the future. Therefore, of the expected 2,651 new residential units to be required by year 2022, 875 of the units will be multi-family. The table shown as Figure 4 (above) indicates that existing vacant land, if developed at minimum density levels, is sufficient to accommodate 1,290 new multi-family residential units (2,355 multi-family units if developed at maximum densities).

The above analysis demonstrates that the existing supply of vacant land zoned multi-family medium, multi-family high and mixed use is more than sufficient to meet any anticipated development demand through 2022. Extrapolation of the supply and absorption data beyond year 2022 is speculative, but would indicate that any demand for

---

[17] City of Tumwater Housing Plan (Updated 2004), pp. 6.

Mr. Jeffrey Myers
January 6, 2010
Page 18 of 29

conversion of the subject manufactured home parks into a different use will not occur for at least 20 to 25 years into the future. Manufactured home parks, which contain substantial improvements as compared to vacant land, will have no demand for future redevelopment until the very distant future, if at all. In addition, as vacant land becomes developed over the next 20 years and if it is determined that the supply of vacant land is limited, the City of Tumwater will likely revise zoning to provide more land for multi-family housing. Any such future rezoning would decrease the demand for conversion of the manufactured home parks to higher density use, making the possibility of future redevelopment of the Plaintiffs' property even more speculative.

The Plaintiffs' sites face additional development constraints even if one were to assume that demand for potential redevelopment within the City of Tumwater existed. A number of additional factors are important when considering long term future potential for redevelopment:

- Wetlands/soils conditions

- Location relative to transportation and consumer services

- Competing property that has some form of non-conforming use development (i.e., low density residential), that is not economically viable

Tumwater Mobile Estates, while having a location possibly more favorable for redevelopment than the other Plaintiff sites, has been identified as having a "high" risk of liquefaction and suffered significant damage to infrastructure during the 2001 Nisqually earthquake. The site also has significant wetland issues limiting the area available for any redevelopment. Soil conditions and wetlands on this site would render it undesirable as a redevelopment alternative when compared to other property that would be available for redevelopment in the Tumwater area. Accordingly, the potential to redevelop the Tumwater Mobile Estates property is highly speculative and is not likely to occur at any time in the foreseeable future.

Laurel Park and Velkommen Mobile Park are designated with low to moderate liquefaction risk. However, the location of these properties relative to commercial and transportation centers is not as favorable as other property with potential for possible long-term redevelopment. In addition, the relatively high existing density and income producing capacity of these properties would leave them less desirable for redevelopment than other potential redevelopment parcels.

Even if one were to speculate regarding a potential future loss of property value resulting from enactment of the ordinances, the present value of any possible future loss is de

Mr. Jeffrey Myers
January 6, 2010
Page 19 of 29

minimus, representing a small fraction of the present market value of the property in its current use. Land developers typically expect a 30% return on their equity investment due to the high risk involved with developing or redeveloping property. For purposes of discussion, if one were to hypothetically assume Mr. Erlitz' $9,000,000 value of Laurel Park but for enactment of the ordinances was correct[18], the $4,416,969 difference from its value as a manufactured home park ($9,000,000 - $4,583,031)[19] has a present value of only $11,221[20] or less than 1% of its existing value as a manufactured home park. The calculation confirms conclusions reached by William Robinson, Campbell Mathewson and implicitly by Ms. Wilson, indicating that the potential for redevelopment is so remote as to result in no measurable difference in value from that as a manufactured home park.

Our evaluation of economic impact resulting from enactment of the ordinances and allegations that regulation has interfered with investment-backed expectations resulted in the following conclusions:

- The Plaintiffs' investment-backed expectations are being realized. Their property is currently being utilized for the purpose the Plaintiffs intended prior to enactment of the ordinances. Utilization of the property as manufactured home parks was the primary investment-backed expectation of the Plaintiffs and enactment of the ordinances does not change the ability to realize those expectations.

- Any possibility of converting the existing use to a higher density multi-family use is remote and the value of such possibility is de minimus.

- Enactment of the ordinances did not require any additional expenditure by the Plaintiffs. The property continues to be managed and operated in the same fashion as before enactment.

---

[18]We note that there is no factual basis for the $9,000,000 value assigned to the property by Mr. Erlitz. The amount is based on erroneous assumptions and unsupported speculation as discussed in the Citique of Mr. Erlitz section of this report. We have utilized the amount solely for the purpose of demonstrating the point that a potential for large property value differences at a point in the distant future has a de minimus value at present and is generally not considered by appraisers when valuing property.

[19] Per Declaration of Joel Erlitz dated December 7, 2009.

[20] Our hypothetical calculation made the following assumptions:
- Land developers require a 27% net annual rate of return (30% return less 3% estimated inflation),
- Conversion from existing use as a manufactured home park to a higher density use will not occur for 25 years (based on the previously discussed analysis of demand for redevelopment of the property),
- The differential in property value assumed by Mr. Erlitz will remain constant for the next 25 years but for the impact of inflation estimated at 3% per year.

Mr. Jeffrey Myers
January 6, 2010
Page 20 of 29

- Enactment of the ordinances does not require the Plaintiffs to assume any greater social burden than they have already assumed. The Plaintiffs made the decision to invest in the property and operate it as manufactured home parks prior to enactment.

- The regulatory action removed the non-conforming status of the use and allows the Plaintiffs to continue using the property as they were prior to enactment.

- Chapter 18.49.070 of Ord. 2008-009 provides a use exception allowing a manufactured home park owner to obtain an exemption from the MHP Zone District upon demonstrating that:

  o They do not have reasonable use of their property under the MHP zoning; or

  o The uses authorized by the MHP zoning are not economically viable at the property's location.

An owner is accordingly not forced to bear operating losses or below market risk adjusted returns from operating the property as manufactured home parks. If for example, at some future date manufactured homes fell out of favor as a form of housing to the extent there was insufficient rental revenue generated from operations to meet operating costs, the owner could apply for an exemption to the MHP zone and potentially convert the property to a different use.

**The Character of the Governmental Action**

The subject ordinances preserve the existing use of the land without placing any additional restrictions. Limited commercial development is allowed as specified by the ordinance, allowing the Plaintiffs to pursue some commercial use of the property where economically viable (i.e., retail and day care facilities). The property remains completely within the control of its owners. The government does not occupy or utilize any portion of the Plaintiffs' property.

There is no evidence that the Plaintiffs were "singled out" and "forced alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole". Enactment of the ordinances had no impact on the value of the property at the date of enactment or in the foreseeable future. The Plaintiffs are free to increase rents, increase density up to nine units per acre (within wetland constraints), develop limited commercial uses, improve the condition of the property or sell the property. There is no evidence that any offers have been made by developers or that the current owners had any concrete plans to convert the use of the property to a higher density prior to

Mr. Jeffrey Myers
January 6, 2010
Page 21 of 29

enactment of the ordinances. There is accordingly no evidence of any economic burden being placed upon the Plaintiffs.

## Evidence of Transfer of Property Value From the Owners to the Tenants of the Impacted Mobile Home Parks

We have been asked to evaluate the possibility that enactment of the ordinances resulted in a transfer of value from the owners to tenants such as that associated with enactment of rent controls similar to the situation in the Guggenheim case identified by Mr. Talmadge's December 21, 2009 letter. The subject ordinances have no features associated with rent control. The Plaintiffs are free to set higher rental rates upon expiration of existing leases without governmental restriction. The owners' ability to charge full market rents and establish the rules relating to the operation of the manufactured home park eliminates any potential for transfer of value. The tenants gain no economic advantage as a result of enacting the ordinances. The price tenants pay for rent will be dependent upon the supply, cost and vacancy factors affecting other alternative forms of housing in the local market without regard to enactment of the ordinances.

Manufactured home parks are unique in nature because the tenant must make a substantial investment for the acquisition and set up of the home. Washington law places no limit on the rent a landlord can charge other than specifying that rents must generally be set for twelve month periods. The character of the tenants' investment and the "switching" costs involved in relocating provides a degree of monopoly power to the landlord. In this case, the landlord has the opportunity to control the value of the tenants' home by the rent charged. Tenants must pay increased rents up to the point it becomes less costly to either move the home to another manufactured home park (an expensive process frequently exceeding the value of older manufactured homes) or abandon the home and move into lower cost housing. We note that no evidence has been presented indicating that the value of tenant manufactured homes has increased since the date of enactment.

We concluded that there is no economic mechanism within the ordinances that would allow a transfer of value from the Plaintiffs to tenants.

## Critique of Declaration of Joel Erlitz

We disagree with the conclusions reached by Joel Erlitz in his declaration dated December 7, 2009 for the following reasons:

Mr. Jeffrey Myers
January 6, 2010
Page 26 of 29

## Critique of Jeanne-Marie Wilson's Report

Ms. Wilson's report concluded that values of the Plaintiffs' MHPs fall within the following ranges:

| | |
|---|---|
| Laurel Park | $3,900,000 - $4,200,000 |
| Tumwater Estates | $3,700,000 - $4,000,000 |
| Velkommen  Mobile Park | $1,400,000 - $1,500,000 |

We concur with Ms. Wilson's conclusions to the extent the value of the property is based on its use as manufactured home parks.  The basis of "value" she determined was fee simple market value of each MHP, which when combined with the methodology utilized implicitly indicates that the highest and best use of the property at December 31, 2008

Mr. Jeffrey Myers
January 6, 2010
Page 27 of 29

(prior to enactment of the ordinances) was operation as manufactured home parks.[23] The value Ms. Wilson derived was "as-is market value" defined as the value of the property "in the condition observed upon inspection as then existing under legal allowed uses without hypothetical conditions, assumptions or qualifications as of the relevant date". We note that her conclusions made no reference to any other use of the property that would result in a higher market value as required by professional standards. Ms. Wilson's report accordingly establishes the market value of the Plaintiffs' property at its highest and best use prior to enactment of the ordinances.

Ms. Wilson provided no indication in her report and submitted materials that enactment of the ordinances caused a reduction in operating revenues or an increase in operating expenses of the Plaintiffs. She similarly provided no evidence that enactment of the ordinances would have any impact on the capitalization rate applicable to manufactured home parks. Because her valuation methodology is based on capitalization of the net operating income (revenues less operating expenses) produced by the MHPs, there must be proof that net operating income fell or the capitalization rate increased as a direct result of enactment before any reduction in market value could be attributed to the ordinances. The use of the property did not change before vs. after enactment, nor was there a change in the risk factors applicable to manufactured home parks, therefore the capitalization rate would not be impacted by enactment of the ordinances. There is no evidence that net operating income or capitalization rates changed at any of the Plaintiffs MHPs as a result of enacting the ordinances, therefore, Ms. Wilson's report provides no basis for a claim that the Plaintiffs incurred economic harm as a result of enacting the ordinances.

Ms. Wilson's report omits certain information necessary to support her conclusions. We noted the following deficiencies in terms of factual support for critical assumptions utilized in her analysis:

- She provides no basis for the development of the capitalization rate used in the analysis. Her report states that the capitalization rate was based on market observations and comparable sales data, however, her report fails to disclose any information regarding the five comparable sale transactions allegedly utilized as the basis for selection of the capitalization rate used in the analysis.

- She provides no evidence that she compared the quality and consistency of earnings between the subject property and the guideline (comparable) properties used to

---

[23] We note that USPAP standards require that the appraiser develop an opinion of the highest and best use of the subject property - *"Appraiser must develop an opinion of the highest and best use of the real estate"* (USPAP Standards Rule 1-3 (b)).

Mr. Jeffrey Myers
January 6, 2010
Page 28 of 29

establish the capitalization rate. Such analysis is a necessary step in selecting an appropriate capitalization rate.

- She provides no evidence of consideration for individual park specific factors that can influence capitalization rates. Such factors can include differences in:

    o Site size in terms of gross acreage,
    o Number of pads per acre,
    o Age of property improvements,
    o Cost of property improvements,
    o Portion of the site constrained by wetlands and soils conditions,
    o Lease terms,
    o Tenant turnover rates,
    o Accounts receivable aging, indicative of collection problems,
    o Enforcement of park rules and regulations,
    o Age and condition of manufactured homes placed at the park,
    o Type and condition of septic/sewer system,
    o Source of water supply,
    o Availability of natural gas,
    o Common area amenities and related cost of maintenance.

    All of the above factors distinguish the value of one manufactured home park from another. Differences in such factors are typically considered by adjustment to net operating income or the capitalization rate selected. There is no evidence that Ms. Wilson considered any of these factors in differentiating the value of the subject property from that of the selected comparable parks used to establish the capitalization rate (with the exception of some replacement reserves).

- Ms. Wilson's analysis failed to adjust management fees to those expected in the market place, but rather used the actual amounts incurred by existing owners. The differences in owner participation in management of the parks should not be a determinate for the market value of the property.

- Ms. Wilson failed to consider traditional valuation methods including the Cost Approach and Sales Comparison Approach in her report. Ms. Wilson conducted a limited appraisal only utilizing the Income Capitalization Approach.

- Ms. Wilson's report is not in conformance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.[24]

    *"Each written real property appraisal report must be prepared under one of the following three options and prominently state which option is used: Self-Contained Appraisal Report, Summary Appraisal Report, or Restricted Use Appraisal Report"* (USPAP Standards Rule 2-2).

Ms. Wilson's opinions regarding the range of market values for the Plaintiffs' property at December 31, 2008 lack factual support for the capitalization rates utilized, which is necessary to establish credibility. Even if accepted as accurate, her analysis fails to establish that enactment of the ordinances resulted in a reduction in the market value of the Plaintiffs property. Her report accordingly provides no basis for any assertion that the Plaintiffs were forced to carry additional economic burdens as a result of the ordinances.

## CONCLUSION

We analyzed the documents produced to date to evaluate the economic impact, if any, of enacting ordinances O2008-027 and O2008-009 on the Plaintiffs. We concluded that there is no objective economic evidence supporting assertions that enactment of the ordinances affected the marketability or value of the Plaintiffs property. There is no economic evidence that a transfer of value occurred from the Plaintiffs to their tenants. There is no economic evidence that enactment of the ordinances had any impact on the Plaintiffs' investment-backed expectations or caused any increase in burdens associated with ownership of the property. The ordinances contain provisions that will allow the Plaintiffs a use exception in the unlikely event that manufactured housing becomes an outdated form of housing and no longer economically viable at some date in the future.

Very truly yours,

William Partin CPA/ABV

---

[24] Source: <u>Uniform Standards of Professional Appraisal Practice</u>. 2008-2009 Edition.
<http://209.190.242.26/html/USPAP2008/index.htm>.

# MUELLER & PARTIN P.L.L.C.

FIRST MUTUAL CENTER
400 108th AVENUE N.E., SUITE 615
BELLEVUE, WASHINGTON 98004

**Certified Public Accountants**
**Forensic Economists**

PHONE:        (425) 455-0303
FACSIMILE:   (425) 455-5176
EMAIL: partin@muellerpartin.com

Attachment 1

## WILLIAM E. PARTIN

Partner
Certified Public Accountant

## EXPERIENCE:

October 1, 1984
to Present

Mr. Partin joined the consulting and accounting firm of Mueller &
Partin as a Partner on October 1, 1984.  Mueller & Partin is a firm
specializing in financial investigations and business valuations.  Mr.
Partin is in charge of the firm's Financial Analysis and Litigation
Support Department.   He has primary responsibility for financial
investigations and the economic analysis of damage claims.  He is
also responsible for business valuations and their related economic
impact upon a business enterprise.    Mr. Partin has extensive
experience with the following types of analysis:

- Business Valuations
- Income Losses
- Property Losses
- Personal Injury
- Fidelity
- Contract Surety
- Proof of Economic Motive
- RICO Investigations
- Antitrust

William E. Partin
Page 2 of 4

> Mr. Partin has served as an expert witness and appraiser in a variety of situations involving tracing financial transactions, documentation of illegal income, and the valuation of businesses, property, and future earnings potential.

August 1976 to
October 1984

> Laventhol & Horwath, Certified Public Accountants
> Mr. Partin was the Manager and Department Head of the firm's Northwest Division of Management Advisory Services. As a consultant, Mr. Partin's diversified experience includes:
>
> - Accounting problems in specialized areas,
>
> - Valuation of income producing properties,
>
> - Valuation of business enterprises for mergers and acquisitions,
>
> - Financial projections for businesses in various industries,
>
> - Market supply and demand analysis,
>
> - Feasibility studies for large scale real estate developments,
>
> - Analysis, evaluation and interpretation of the effect of business transactions and decisions as an expert witness in litigation matters ranging from major antitrust issues to small civil matters,
>
> - Evaluation of organization structures and implementation of recommended structural reorganization in a variety of businesses in different industries.

June 1973 to
August 1976

> Weyerhaeuser Company, Wood Products Division
> At Weyerhaeuser, Mr. Partin was enrolled in the Management Development Program. He held various management positions in

William E. Partin
Page 3 of 4

operations of lumber and plywood manufacturing facilities. He gained experience in the following areas:

- Labor relations

- Factory supervision in a union environment

- Manufacturing processes and techniques

- Factory maintenance

- Budget and cost controls

- Purchasing

- Shipping

## GENERAL:

Mr. Partin has served as guest speaker for a variety of professional associations, addressing topics covering insurance claims and business valuation. In addition, he has contributed to the following publications:

- Insurance Adjuster Magazine

- Seattle Claim Adjusters Newsletter

- Tacoma/Pierce County Claims Adjusters Newsletters

Mr. Partin was appointed to a three-year term to serve on the American Institute of Certified Public Accountant's Management Advisory Services Practice Standards and Administration Committee. The committee is responsible for the establishment of quality standards for consulting engagements. Such standards govern the practice of the accounting profession.

William E. Partin
Page 4 of 4

## EDUCATION:

Washington State University
Bachelor of Arts, Major Economics, Minor Finance

Seattle University
General Studies, Business Administration

Other: Various courses and seminars in accounting, data processing, management and communication skills as offered by Laventhol & Horwath, Weyerhaeuser Company and various institutes, as well as business valuation courses offered by the American Society of Appraisers.

## CERTIFICATION:

Certified Public Accountant

American Society of Appraisers, Levels 1, 2, 3 & 4

Accreditation in Business Valuations

## ORGANIZATION:

Washington Society of Certified Public Accountants

American Institute of Certified Public Accountants

National Association of Forensic Economists

American Society of Appraisers