1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9
10
11
12
13
14
15
16
17
18

| | |
|---|---|
| LAUREL PARK COMMUNITY, LLC, a Washington limited liability company; TUMWATER ESTATES INVESTORS, a California limited partnership; VELKOMMEN MOBILE PARK, LLC, a Washington limited liability company; and MANUFACTURED HOUSING COMMUNITIES OF WASHINGTON, a Washington non-profit corporation,<br><br>　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>CITY OF TUMWATER, a municipal corporation,<br><br>　　　　　　　Defendant. | NO.　C09-5312 BHS<br><br>**DECLARATION OF STEPHEN SHAPIRO IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

19   PURSUANT TO 28 U.S.C. § 1746, Stephen Shapiro, hereby declares as follows:

20   　　1.　　I am over the age of 18, competent to be a witness and make this declaration on

21   personal knowledge.

22   　　2.　　I am a professional appraiser, accredited as an MAI. I have conducted numerous

23   appraisals of real property to evaluate the impact of an event on a property's fair market value.

24   Attached as **Exhibit A** is a copy of my resume and project list where I have been retained as an

25   expert witness on real property appraisal projects. I have previously appraised mobile home parks,

26   including the Cedar Grove Mobile Home Park in King County, where the park was to be closed.

Exhibit A was provided as part of the FRCP 26(a)(2) report which I prepared on January 6, 2010

*LAW, LYMAN, DANIEL,*<br>*KAMERRER & BOGDANOVICH, P.S.*<br>*ATTORNEYS AT LAW*<br>*2674 RW JOHNSON RD., TUMWATER, WA 98512*<br>*PO BOX 11880, OLYMPIA, WA 98508-1880*<br>*(360) 754-3480  FAX (360) 357-3511*

**DECLARATION OF STEPHEN SHAPIRO -- 1**

1    in response to the report of Jeanne-Marie Wilson that was prepared on December 7, 2009. Her

2    December 7, 2009 report was limited to analyzing the fair market value of the plaintiffs' property

3    as of December 31, 2008. She did not do any analysis of any possible impact of value from the

4    enactment of Ordinances O2008-009 and O2008-027 (hereafter "the MHP Zoning Ordinances"),

5    which applied a new manufactured home park (MHP) district to the plaintiffs' properties in the City

6    of Tumwater. The MHP Zoning Ordinances were adopted on February 17, 2009 and became

7    effective on March 23, 2009. As such, any opinion as to the fair market value using the effective

8    date of December 31, 2008 would not consider any impact from the MHP Zoning Ordinances.

9        3.    In order to measure a possible impact from the MHP Zoning Ordinances, an

10   appraiser would be required to conduct an appraisal of the fair market value of the affected

11   properties both before and after enactment. The standards of practice for appraisers licensed in

12   Washington State are the Uniform Standards of Professional Appraisal Practice ("USPAP")

13   published by the Appraisal Standards Board of the Appraisal Foundation. This would be the

14   overarching set of standards applied to the analysis of the issue at hand. Of particular importance

15   is USPAP Standard 1-3 which sets forth the requirements for an appraiser to provide "credible

16   assignment results in developing a market value opinion." USPAP Standard 2-2 requires that an

17   appraisal state an effective date of appraisal (i.e. date of value) and Statement 3 guides how a

18   retrospective appraisal may be conducted. A true and correct copy of USPAP Standards 1-3, 2-2

19   ~~and Statement 3 are attached as **Exhibit B.**~~

20        4.    USPAP does not explicitly address appraisal issues regarding partial acquisitions or

21   takes of real property (physical real estate and/or property rights). Washington State follows the

22   so-called "federal rule" for appraisal problems which involve a partial acquisition or take of real

23   property, which is the before/after approach. A good discussion of how this is expected to be

24   applied is in Chapter 4 of the Washington State Department of Transportation Manual, Appendix

25   4-1 Appraisal Report Guide, Section C, which is attached as **Exhibit C**. Since the issue at hand

26   regards the claim of a partial acquisition of property rights, the WSDOT standards require that it

would be valued under the "before/after" methodology.

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON RD., TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480 FAX: (360) 357-3511*

**DECLARATION OF STEPHEN SHAPIRO – 2**

5.      Another source of guidelines commonly recognized by the appraisal community is the Uniform Appraisal Standards for Federal Land Acquisitions ("UASFLA"). Section B-11 of the UASFLA standards, on page 50, explicitly requires use of a "before /after" methodology when evaluating a partial  acquisition of property.  A copy of the relevant portions of the UASFLA standard is attached as **Exhibit D.**

4.      Attached hereto as **Exhibit E** is a true and correct copy of excerpts of my January 6, 2010 report that responds to Ms. Wilson's December 7, 2009 Report.  I have omitted portions relating to the Plaintiffs' other expert Joel Erlitz, who I am informed by counsel has been withdrawn as a witness.

### *Declaration of Jeanne-Marie Wilson dated February 12th, 2010.*

5.      In addition to my review of Ms. Wilson's report, I have been asked to review her Feburary 12, 2010 declaration.  The opinions expressed in Ms. Wilson's declaration were not disclosed as part of her December 7, 2009 Report.  Moreover, the Declaration does not discuss the methodology or factual basis for how these new "opinions" were arrived at.

6.      Page 2, paragraph 4:  Ms. Wilson notes that owners of manufactured home communities perceive them as popular investments because there is strong demand for mobile home lots and rent levels tend to trend upward each year.  She also notes that communities typically pass through annual rent increases to cover rising costs. These statements contradict her later statements (at pg. 4, ¶11) regarding the difficulty of passing rent onto tenants for property that has a long term highest and best use as a manufactured home community.

7.      Page 2, paragraph 5: Ms. Wilson states that historically, manufactured home parks have been viewed as an interim use of the land. The American Heritage Dictionary defines interim as "temporary." Tumwater Estates is 45 years old; Laurel Park is 40 years old and Velkommen is 28 years old.  Given their ages is it reasonable to ask in what sense their owners would have considered them to be temporary when they were first constructed?  By Ms. Wilson's logic office buildings might be construed as being "interim" uses since many have an expected economic life of around 50 years.  Typically an interim use of real estate is construed to be a property with an

*LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON RD., TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98506-1880*
*(360) 754-3480  FAX: (360) 357-3511*

**DECLARATION OF STEPHEN SHAPIRO – 3**

imminent change of use in response to altered market conditions or a property that is improved with a structure that is nearly fully depreciated either physically or functionally. The stable income attributable to the subjects, continued market demand for their current use and serviceable physical conditions suggest that none of the subjects are operating on an interim use basis.

7.      Page 2, paragraph 6: Ms. Wilson notes that owners of mobile home parks in the path of development may take advantage of increasing property values and redevelop the site to its highest and best use. Redevelopment would be considered feasible if and only if the highest and best use of a property changes such that an alternate use will increase its economic value. In my experience, it is not uncommon for mobile home parks in urban areas that are zoned for alternate use, to continue to be used as a mobile home park because that is the highest and best use. A zone that allows for alternate highest and best use does not, in and of itself, suggest that such a highest and best use is economically better than the existing use. Ms. Wilson did no analysis to determine the highest and best use of the subject properties, either before or after the adoption of the MHP Zoning Ordinances.

8.      Page 3, paragraph 10: The assertion that the change of zone results in a transfer of property rights from the property owner to the tenants makes no sense at all. No property rights have been transferred and no specific right is identified by Ms. Wilson. Prior to the zoning change, the tenants had the right to occupy space they have rented. Nothing pertaining to the change of zone alters this. The zoning change does not result in a leasehold advantage to the tenants because there is no change in the landlord's ability to charge or increase rent in accordance with market considerations.

9.      Page 4, paragraphs 12-14: Ms. Wilson lists a number of multi-family developments near Tumwater Estates and suggests that all of the subject parks are in the "path of development." However, in order to evaluate whether redevelopment to an alternate use is feasible for any of the subjects, it would be necessary to provide market-based evidence pertaining to the supply and demand of multi-family housing as well as an analysis as to whether such use is an economically better use than the existing use as a mobile home park. She has not provided such data or analysis.

**DECLARATION OF STEPHEN SHAPIRO – 4**

LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.
ATTORNEYS AT LAW
2674 RW JOHNSON RD., TUMWATER, WA 98512
PO BOX 11880, OLYMPIA, WA 98508-1880
(360) 754-3480  FAX: (360) 357-3511

1   Absent such data and analysis, her opinions do not meet the USPAP standards for credibility
2   required by Standard Rule 1-3 for appraisers.

3       10.    ·Page 5, paragraph 15: Ms. Wilson's assertion that the zoning change is akin to a 99
4   year lease is ludicrous.  There is nothing about a zoning change that locks a landlord and tenant into
5   a long term lease contract.  However, for the sake of argument, I would note that when long term
6   leases are consummated under market conditions they typically have clauses allowing rents to
7   escalate at market rates, and are construed to be mutually beneficial to the lessor and lessee.

8       11.    Pages 5-6, paragraphs 16-18: Ms. Wilson fails to address the critical question as to
9   whether any of the previously allowed uses represents a more productive economic use of the
10  subject properties than their existing use as mobile home parks, which is permissible under the new
11  zoning code.  Further, she provides no support or evidence for her statement in paragraph 18 that
12  "the owners are not able to capitalize on their investments because redevelopment to a higher and
13  better use is no longer legally possible."  Performing a before/after valuation analysis is the only
14  way to determine this and Ms. Wilson has failed to provide this methodology.  Moreover, she did
15  not conduct an analysis of the highest and best use as required by USPAP Standard 1-3.

16      12.    Page 6, paragraph 19:  Ms. Wilson suggests that a premium associated with
17  redevelopment of the subjects will be lost in the eyes of a willing buyer.  Once again this is an
18  unsupported argument since she has provided no analysis to show that redevelopment would
19  provide a higher economic return than the existing use of the property.  A buyer who purchases any
20  of the subjects for use as mobile home parks under market conditions would pay market value and
21  there would not be any loss of a premium.

22      13.    Page 6, paragraph 20: Ms. Wilson's statements as to a redevelopment premium at
23  Velkommen are not the product of a generally accepted methodology used by appraisers, but are
24  speculative.  Ms. Wilson has not performed the requisite before/after valuation analysis.  Further,
25  there is no such estimate available from Ms. Wilson for Laurel Park or Tumwater Estates because
26  no before/after analysis was performed and no implied analysis can be derived since she provides
    no evidence of purchase offers for these parks prior to the zoning change.

**DECLARATION OF STEPHEN SHAPIRO – 5**

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON RD., TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480  FAX: (360) 357-3511*

14.     Pages 6-7, paragraphs 21-22: Ms. Wilson's reference to the Wildwood MHP in Lacey also lacks the required factual basis and appropriate analysis necessary to identify any development premium. The property at Wildwood is not comparable to those in Tumwater because Wildwood is next to a new power shopping center with tenants including Costco, Home Depot and Best Buy, with new apartments, single family development and retail centers nearby. However, it has no bearing upon any of the subject's potential for redevelopment since their location, physical characteristics and demographics of the local market area are quite different. Once again, the only way to ascertain whether redevelopment of any of the subjects is feasible is to do a before/after-- highest and best use analysis with associated before/after valuation for the subjects.

15.     Page 7, paragraph 22: The circumstance of the sale of Allimor Carriage Estates has the same issues as Wildwood discussed above with respect to the ability to provide any indication of value for the subjects. Ms. Wilson acknowledges that this property included a commercial zone which clearly allows highest and best use potential not available to any of the subjects. Thus, it has no bearing on the value indications of the subjects, which require before/after analyses.

*Deposition Upon Oral Examination of Jeanne-Marie Wilson dated February 15th, 2010.*

16.     As of Ms. Wilson's effective date of value, December 31, 2008, there had been no zoning change in effect and thus no change in the potential use of any subject property. On page 14, line 17 she testified that "my assumption as to the highest and best use was continued use as a ~~manufactured home community." Given her conclusion as to highest and best use as of the stated~~ date of value, she could not have reasonably placed any potential economic benefit upon any alternate use of the subjects other than mobile home parks, even though alternate uses were legally permissible as of the date of value of her report. In this event, there obviously can be no damage to any subject property as a result of the zoning change.

17.     In numerous places in her deposition, Ms. Wilson notes that Mr. Olsen directed her to limit the scope of her appraisal to the valuation of the subjects under the continued use, as- is. She acknowledges the need to do a before/after valuation, which she has not performed to date. USPAP Standard Rule 1-3 requires that the appraiser analyze the relevant factors necessary to

**DECLARATION OF STEPHEN SHAPIRO – 6**

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON RD., TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480  FAX: (360) 357-3511*

1  support the appraiser's conclusion of the highest and best use of property, irrespective of any
2  instructions provided by legal counsel.

3      18.     Page 24, line 18: Ms. Wilson misapplies recognized appraisal standards when she
4  states that "you can't use sale comps after the effective date of valuation." This is not correct under
5  recognized standards for conducting appraisals. USPAP Statement No. 3 notes in part, "Data
6  subsequent to the effective date may be considered in developing a retrospective value as a
7  confirmation of trends that would reasonably be considered by a buyer or seller as of that date. The
8  appraiser should determine a logical cut-off because at some point distant from the effective date,
9  the subsequent data will not reflect the relevant market." Further, the Uniform Appraisal Standards
10  for Federal Land Acquisitions (UASFLA) stipulates on page 39, "sales after the date of acquisition
11  are not per se inadmissible (contrary to popular belief) and with appropriate caution and restraint
12  may be utilized by the appraiser if they meet the usual standards of comparability and are not
13  otherwise incompetent as evidence of value."

14      19.     Page 47, line 11: Ms. Wilson asserts that implementation of the mobile home park
15  zoning is similar to a long term ground lease that "favors the tenant in the respect that they are
16  secure in knowing their rents will only go up at a predetermined rate and schedule." A lease at
17  market rates and conditions (whether long term or short term) favors neither the landlord nor the
18  tenant. Since "market rent" is achieved when rental rates being asked by the landlord are similar
19  to what tenants are willing to pay under typical circumstances then by definition there would be no
20  premium (or value transfer) associated with market rent. Moreover, there is nothing in the MHP
21  Zoning Ordinances that determines the term of leases or regulates the amount of rent that can be
22  charged or increases that can be applied by the landlords.

23      I declare under penalty of perjury under the laws of the state of Washington and the United
24  States of America that the foregoing is true and correct.

25      DATED this 22nd day of March, 2010, at Bainbridge Island, Washington.

26
                                                    Stephen Shapiro

LAW, LYMAN, DANIEL,
KAMERRER & BOGDANOVICH, P.S.
ATTORNEYS AT LAW
2674 RW JOHNSON RD., TUMWATER, WA 98512
PO BOX 11880, OLYMPIA, WA 98508-1880
(360) 754-3480   FAX: (360) 357-3511

**DECLARATION OF STEPHEN SHAPIRO -- 7**

# EXHIBIT A

# RE◆SOLVE

*Real Estate Appraisal, Counseling & Mediation*

STEPHEN L. SHAPIRO, MAI

Stephen Shapiro graduated in June 1986 from the University of Washington in Seattle, Washington. He was awarded an Honors Degree as Bachelor of the Arts in Communications with a major in Journalism and a minor in Economics. Since that time he has worked as a writer, editor and research consultant specializing in land and marine resource issues. Mr. Shapiro was asked to join the firm of **Wronsky, Gibbons & Riely** in March of 1999 by Anthony Gibbons. In July of 1999 Mr. Gibbons formed Anthony Philip Gibbons PLLC, doing business under the new company name of **RE◆SOLVE** – a company providing Real Estate Appraisal, Counseling and Mediation services. Mr. Shapiro joined Mr. Gibbons in his company at that time.

In his capacity as an appraiser for **Wronsky, Gibbons & Riely** and **RE◆SOLVE**, Mr. Shapiro has developed a broad range of experience over a wide variety of property types. Appraisals have been performed on office and industrial buildings; commercial and industrial land; residential subdivision property; natural resource and habitat land, including timberland and wetland property; and high-end estate homes. In addition, he has provided mediation and expert witness services for legal purposes.

Mr. Shapiro is licensed as a certified general real estate appraiser by the State of Washington (license no. 1101561) and is listed on the Washington State Department of Transportation's Approved List of Appraisers and Reviewers. He was awarded the highly regarded MAI designation of the Appraisal Institute in June 2006 (member no. 12394). He has successfully completed the following Appraisal Institute courses, as well as numerous additional professional seminars:

- Appraisal Principles
- Appraisal Procedures
- Standards of Professional Appraisal Practice, Parts A and B
- Highest and Best Use and Market Analysis
- Basic Income Capitalization
- General Applications
- Advanced Sales Comparison and Cost Approaches
- Report Writing and Valuation Analysis
- Advanced Applications
- Advanced Income Capitalization
- Uniform Appraisal Standards for Federal Land Acquisitions
- Condemnation Appraising: Advanced Topics and Applications
- Attacking and Defending an Appraisal in Litigation
- Forestland Road Cost Obligations

Mr. Shapiro has performed appraisal services for a wide variety of clients, and a brief client list follows.

- City of Bainbridge Island
- WA State Dept. of Natural Resources
- Bainbridge Island Parks and Recreation
- Group Health Cooperative of Puget Sound
- Port of Seattle
- Cascade Land Conservancy
- U.S. Forest Service
- NC Power Systems Co.
- City University
- Trust For Public Land
- Bainbridge Island Land Trust
- The Mark A. Robinson Trusts
- Commerce Bank
- First American Title Insurance Co.
- Tulalip Tribes
- Tousley Brain Stephens PLLC
- Ryan, Swanson and Cleveland, PLLC
- Pope Resources, Inc.
- Hockett & Olsen Brothers, Inc.
- Great Peninsula Conservancy
- Central Kitsap School District
- Riddell Williams P.S.
- Whidbey Camano Land Trust
- Michael A. Goldfarb Law Office
- Lawler Burroughs & Baker, P.C.
- Harnish Group, Inc
- Development Services of America
- Preston Gates & Ellis LLP
- Pacific Investment Co.
- Column Financial
- GVA Kidder Mathews
- American Marine Bank
- Batavia Holdings LLC
- Kinzer Real Estate Services
- Knowles/Turner Real Estate Group
- Warren G. Harding Temple Board Assoc.
- GEM1 LLC
- Kitsap County Dept. of Public Works
- Washington State Parks Commission
- Livengood, Fitzgerald & Alskog PLLC
- American Eagle Communities
- McGavick Graves Attorneys at Law
- Wal-Mart
- Black Equities Group LTD
- Methow Conservancy
- Seattle Yacht Club
- Northwest Watershed Institute
- Williams Kastner, Attorneys at Law
- City of Port Townsend
- City of Eatonville
- Kitsap Bank

- Transnation Title Insurance Co.
- The Ketcham Family
- City of Burien
- Open Space Resources
- Kitsap Conservation District
- Lawyers Title Insurance Corp.
- Kitsap County Dept. Parks and Recreation
- McCormick Land Company
- Trammell Crow Co.
- Pike Place Market PDA
- City of Edmonds Parks and Recreation
- WA State Department of Transportation
- MacMillan-Piper, Inc.
- Port of Allyn
- Pacific Medical Center and Clinics
- Commonwealth Land Title Insurance
- Port Gamble S'Kllallam Tribe
- Madison Ave Real Estate, LLC
- Kitsap County Dept. of Admin. Services
- Olympic Property Group
- Prosperity Treatment Center
- Old Republic Title Co.
- Cullen Law Office LLP
- Port of Olympia
- Washington First International Bank
- Rodgers Deutsch & Turner
- Frontier Bank
- Credit Suisse First Boston
- The Mountaineers
- Bainbridge Public Library
- GMAC Commercial Mortgage
- Farm Bureau Life Insurance Co.
- Starbucks
- Seattle Automotive Dist., Inc.
- Pacific Northwest Title Insurance Co.
- WA State Office of the Attorney General
- Aoki Sakamoto and Grant LLP
- AnMarCo
- King Count Dept. Natural Resources & Parks
- Montgomery Purdue Blankinship & Austin PLLC
- Ogden Murphy Wallace PLLC
- Puget Sound Energy
- Kenyon P. Kellogg, Attorney at Law
- Mundt MacGregor PLLC
- City of Poulsbo
- JWJ Group
- Olympic Resource Management
- Pioneer Human Services
- Capitol Land Trust
- Oldfield & Helsdon, PLLC
- Miller-Nicholson, Inc.

# RE·SOLVE

### Real Estate Appraisal, Counseling & Mediation

## EXPERT TESTIMONY & LITIGATION SUPPORT

### STEPHEN SHAPIRO, MAI

Mr. Shapiro has served as an expert witness or provided litigation support in the following cases.

| **Date** | **Proceeding** | **Client** |
|---|---|---|
| October 2005 | Sound Transit vs. TeGantvoort<br>Provided expert testimony in Washington<br>Superior Court, Pierce County | Paul TeGantvoort |
| March 2006 | Sound Transit vs. Hoang<br>Provided mediation services | Denise Tran , Atty:  Aoki Sakamoto and<br>Grant LLP |
| June 2006 | WA State Dept Transportation vs. Coffey<br>Provided mediation services | Douglas Shaftel, Atty: WA State Attorney<br>General's Office |
| August 2006 | IRS vs. Laws<br>Provided mediation services | James Minorchio, Atty:  Riddell<br>Williams P.S. |
| January 2007 | WA State Dept Transportation vs. Coffey<br>Provided expert testimony in Washington<br>Superior Court, Whatcom County | Douglas Shaftel, Atty: WA State Attorney<br>General's Office |
| June 2007 | Fox vs. John L. Scott<br>Deposed as expert witness | Michael Babcock, Atty:  Schiffrin Olson<br>Schlemlein & Hopkins |
| July 2007 | Jurkovich vs. Island County Hospital<br>Deposed as expert witness | James Haney, Atty:  Ogden Murphy<br>Wallace PLLC |
| November 2007 | Puget Sound Energy vs. Kirchhofer<br>Provided mediation services | Philip Havers, Atty:  Buskirk Havers<br>Lindsay Olsen PLLC |
| April 2008 | WSDOT vs. AnMarCo<br>Deposed as expert witness | James Fitzgerald, Atty:  Livengood,<br>Fitzgerald & Alskog PLLC |
| February 2009 | Kitsap County Dept of Public Works<br>Provided mediation services | Neil Wachter, Deputy Prosecuting<br>Attorney for Kitsap County |
| March 2009 | Labounty Road LID Proceedings<br>Provided expert testimony to the Blaine<br>City Council | Alan Wallace, Williams Kaster |

# EXHIBIT B

# UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE

# 2008-2009 EDITION

## APPRAISAL STANDARDS BOARD

### THE APPRAISAL FOUNDATION

*Authorized by Congress as the Source of Appraisal Standards and Appraiser Qualifications*

The Uniform Standards of Professional Appraisal Practice (USPAP) and guidance material Copyright © 2008 by The Appraisal Foundation are reproduced with permission of The Appraisal Foundation.

Additional copies of USPAP (including Advisory Opinions and Frequently Asked Questions) are available for purchase from The Appraisal Foundation Distribution Center, PO Box 381, Annapolis Junction, MD 20701-0381, (800) 348-2831.

Published in the United States of America.

ISBN: 978-0-9798728-0-8

All rights reserved.

No parts of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopy, recording or otherwise, without the prior written consent of the publisher.

## EFFECTIVE:

## January 1, 2008 through December 31, 2009

Shapiro p. 13

513  Comment on (i)–(v): The information used by an appraiser to identify the property
514  characteristics must be from sources the appraiser reasonably believes are reliable.

515  An appraiser may use any combination of a property inspection and documents, such as a
516  physical legal description, address, map reference, copy of a survey or map, property sketch,
517  or photographs, to identify the relevant characteristics of the subject property.

518  When appraising proposed improvements, an appraiser must examine and have available for
519  future examination, plans, specifications, or other documentation sufficient to identify the
520  extent and character of the proposed improvements.[11]

521  Identification of the real property interest appraised can be based on a review of copies or
522  summaries of title descriptions or other documents that set forth any known encumbrances.

523  An appraiser is not required to value the whole when the subject of the appraisal is a
524  fractional interest, a physical segment, or a partial holding.

525  (f)  **identify any extraordinary assumptions necessary in the assignment;**

526  Comment: An extraordinary assumption may be used in an assignment only if:

527  • it is required to properly develop credible opinions and conclusions;
528  • the appraiser has a reasonable basis for the extraordinary assumption;
529  • use of the extraordinary assumption results in a credible analysis; and
530  • the appraiser complies with the disclosure requirements set forth in USPAP for
531  extraordinary assumptions.

532  (g)  **identify any hypothetical conditions necessary in the assignment; and**

533  Comment: A hypothetical condition may be used in an assignment only if:

534  • use of the hypothetical condition is clearly required for legal purposes, for purposes of
535  reasonable analysis, or for purposes of comparison;
536  • use of the hypothetical condition results in a credible analysis; and
537  • the appraiser complies with the disclosure requirements set forth in USPAP for
538  hypothetical conditions.

539  (h)  **determine the scope of work necessary to produce credible assignment results in accordance with**
540  **the SCOPE OF WORK RULE.[12]**

541  Standards Rule 1-3

542  **When necessary for credible assignment results in developing a market value opinion, an appraiser must:**

543  (a)  **identify and analyze the effect on use and value of existing land use regulations, reasonably**
544  **probable modifications of such land use regulations, economic supply and demand, the physical**
545  **adaptability of the real estate, and market area trends; and**

---

[11] See Advisory Opinion 17, *Appraisals of Real Property with Proposed Improvements.*

[12] See Advisory Opinion 28, *Scope of Work Decision, Performance, and Disclosure,* and Advisory Opinion 29, *An Acceptable Scope of Work.*

546  Comment: An appraiser must avoid making an unsupported assumption or premise about
547  market area trends, effective age, and remaining life.

548  (b)  develop an opinion of the highest and best use of the real estate.

549  Comment: An appraiser must analyze the relevant legal, physical, and economic factors to the
550  extent necessary to support the appraiser's highest and best use conclusion(s).

551  Standards Rule 1-4

552  In developing a real property appraisal, an appraiser must collect, verify, and analyze all information
553  necessary for credible assignment results.

554  (a)  When a sales comparison approach is necessary for credible assignment results, an appraiser
555  must analyze such comparable sales data as are available to indicate a value conclusion.

556  (b)  When a cost approach is necessary for credible assignment results, an appraiser must:

557  (i)  develop an opinion of site value by an appropriate appraisal method or technique;

558  (ii)  analyze such comparable cost data as are available to estimate the cost new of the
559  improvements (if any); and

560  (iii)  analyze such comparable data as are available to estimate the difference between the
561  cost new and the present worth of the improvements (accrued depreciation).

562  (c)  When an income approach is necessary for credible assignment results, an appraiser must:

563  (i)  analyze such comparable rental data as are available and/or the potential earnings
564  capacity of the property to estimate the gross income potential of the property;

565  (ii)  analyze such comparable operating expense data as are available to estimate the
566  operating expenses of the property;

567  (iii)  analyze such comparable data as are available to estimate rates of capitalization and/or
568  rates of discount; and

569  (iv)  base projections of future rent and/or income potential and expenses on reasonably clear
570  and appropriate evidence.[13]

571  Comment: In developing income and expense statements and cash flow projections,
572  an appraiser must weigh historical information and trends, current supply and
573  demand factors affecting such trends, and anticipated events such as competition
574  from developments under construction.

575  (d)  When developing an opinion of the value of a leased fee estate or a leasehold estate, an appraiser
576  must analyze the effect on value, if any, of the terms and conditions of the lease(s).

---

[13] See Statement on Appraisal Standards No. 2, *Discounted Cash Flow Analysis*.

USPAP 2008-2009 Edition
                    ©The Appraisal Foundation

Shapiro p. 15

611 STANDARD 2: REAL PROPERTY APPRAISAL, REPORTING

612 In reporting the results of a real property appraisal, an appraiser must communicate each analysis,
613 opinion, and conclusion in a manner that is not misleading.

614 Comment: STANDARD 2 addresses the content and level of information required in a report
615 that communicates the results of a real property appraisal.

616 STANDARD 2 does not dictate the form, format, or style of real property appraisal reports.
617 The form, format, and style of a report are functions of the needs of intended users and
618 appraisers. The substantive content of a report determines its compliance.

619 **Standards Rule 2-1**

620 Each written or oral real property appraisal report must:

621 (a) clearly and accurately set forth the appraisal in a manner that will not be misleading;

622 (b) contain sufficient information to enable the intended users of the appraisal to understand the
623 report properly; and

624 (c) clearly and accurately disclose all assumptions, extraordinary assumptions, hypothetical
625 conditions, and limiting conditions used in the assignment.

626 **Standards Rule 2-2**

627 Each written real property appraisal report must be prepared under one of the following three options
628 and prominently state which option is used: Self-Contained Appraisal Report, Summary Appraisal
629 Report, or Restricted Use Appraisal Report.[16]

630 Comment: When the intended users include parties other than the client, either a Self-
631 Contained Appraisal Report or a Summary Appraisal Report must be provided. When the
632 intended users do not include parties other than the client, a Restricted Use Appraisal Report
633 may be provided.

634 The essential difference among these three options is in the content and level of information
635 provided. The appropriate reporting option and the level of information necessary in the
636 report are dependent on the intended use and the intended users.

637 An appraiser must use care when characterizing the type of report and level of information
638 communicated upon completion of an assignment. An appraiser may use any other label in
639 addition to, but not in place of, the label set forth in this Standard for the type of report
640 provided.

641 The report content and level of information requirements set forth in this Standard are
642 minimums for each type of report. An appraiser must supplement a report form, when
643 necessary, to ensure that any intended user of the appraisal is not misled and that the report
644 complies with the applicable content requirements set forth in this Standards Rule.

---

[16] See Advisory Opinion 11, *Content of the Appraisal Report Options of Standards Rules 2-2 and 8-2*, and Advisory Opinion 12, *Use of the Appraisal Report Options of Standards Rules 2-2 and 8-2*.

STANDARD 2

645  A party receiving a copy of a Self-Contained Appraisal Report, Summary Appraisal Report, or
646  Restricted Use Appraisal Report in order to satisfy disclosure requirements does not become
647  an intended user of the appraisal unless the appraiser identifies such party as an intended user
648  as part of the assignment.

649  (a)  **The content of a Self-Contained Appraisal Report must be consistent with the intended use of the**
650  **appraisal and, at a minimum:**

651  (i)  **state the identity of the client and any intended users, by name or type;**[17]

652  <u>Comment</u>: An appraiser must use care when identifying the client to ensure a clear
653  understanding and to avoid violations of the <u>Confidentiality</u> section of the ETHICS
654  RULE. In those rare instances when the client wishes to remain anonymous, an
655  appraiser must still document the identity of the client in the workfile but may omit
656  the client's identity in the report.

657  Intended users of the report might include parties such as lenders, employees of
658  government agencies, partners of a client, and a client's attorney and accountant.

659  (ii)  **state the intended use of the appraisal;**[18]

660  (iii)  **describe information sufficient to identify the real estate involved in the appraisal,**
661  **including the physical and economic property characteristics relevant to the**
662  **assignment;**[19]

663  <u>Comment</u>: The real estate involved in the appraisal can be specified, for example, by
664  a legal description, address, map reference, copy of a survey or map, property sketch
665  and/or photographs or the like. The information can include a property sketch and
666  photographs in addition to written comments about the legal, physical, and economic
667  attributes of the real estate relevant to the type and definition of value and intended
668  use of the appraisal.

669  (iv)  **state the real property interest appraised;**

670  <u>Comment</u>: The statement of the real property rights being appraised must be
671  substantiated, as needed, by copies or summaries of title descriptions or other
672  documents that set forth any known encumbrances.

673  (v)  **state the type and definition of value and cite the source of the definition;**

674  <u>Comment</u>: Stating the definition of value also requires any comments needed to
675  clearly indicate to intended users how the definition is being applied.[20]

676  When reporting an opinion of market value, state whether the opinion of value is:

---

[17] See Statement on Appraisal Standards No. 9, *Identification of Intended Use and Intended Users.*

[18] See Statement on Appraisal Standards No. 9, *Identification of Intended Use and Intended Users.*

[19] See Advisory Opinion 2, *Inspection of Subject Property,* and Advisory Opinion 23, *Identifying the Relevant Characteristics of the Subject Property of a Real Property Appraisal Assignment.*

[20] See Statement on Appraisal Standards No. 6, *Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions.* See also Advisory Opinion 7, *Marketing Time Opinions,* and Advisory Opinion 22, *Scope of Work in Market Value Appraisal Assignments, Real Property.*

USPAP 2008-2009 Edition
©The Appraisal Foundation

677        •    in terms of cash or of financing terms equivalent to cash, or
678        •    based on non-market financing or financing with unusual conditions or
679            incentives.

680    When an opinion of market value is not in terms of cash or based on financing terms
681    equivalent to cash, summarize the terms of such financing and explain their
682    contributions to or negative influence on value.

683     **(vi)**    **state the effective date of the appraisal and the date of the report;**[21]

684    <u>Comment</u>: The effective date of the appraisal establishes the context for the value
685    opinion, while the date of the report indicates whether the perspective of the
686    appraiser on the market and property as of the effective date of the appraisal was
687    prospective, current, or retrospective.

688     **(vii)**    **describe the scope of work used to develop the appraisal;**[22]

689    <u>Comment</u>: Because intended users' reliance on an appraisal may be affected by the
690    scope of work, the report must enable them to be properly informed and not misled.
691    Sufficient information includes disclosure of research and analyses performed and
692    might also include disclosure of research and analyses not performed.

693    When any portion of the work involves significant real property appraisal assistance,
694    the appraiser must describe the extent of that assistance. The signing appraiser must
695    also state the name(s) of those providing the significant real property appraisal
696    assistance in the certification, in accordance with Standards Rule 2-3.[23]

697     **(viii)**    **describe the information analyzed, the appraisal methods and techniques employed, and**
698               **the reasoning that supports the analyses, opinions, and conclusions; exclusion of the**
699               **sales comparison approach, cost approach, or income approach must be explained;**

700    <u>Comment</u>: A Self-Contained Appraisal Report must include sufficient information to
701    indicate that the appraiser complied with the requirements of STANDARD 1. The
702    amount of detail required will vary with the significance of the information to the
703    appraisal.

704    The appraiser must provide sufficient information to enable the client and intended
705    users to understand the rationale for the opinions and conclusions, including
706    reconciliation of the data and approaches, in accordance with Standards Rule 1-6.

707    When reporting an opinion of market value, a summary of the results of analyzing
708    the subject sales, options, and listings in accordance with Standards Rule 1-5 is
709    required.[24] If such information is unobtainable, a statement on the efforts undertaken
710    by the appraiser to obtain the information is required. If such information is
711    irrelevant, a statement acknowledging the existence of the information and citing its
712    lack of relevance is required.

---

[21] See Statement on Appraisal Standards No. 3, *Retrospective Value Opinions,* and Statement on Appraisal Standards No. 4, *Prospective Value Opinions.*

[22] See Advisory Opinion 28, *Scope of Work Decision, Performance, and Disclosure* and Advisory Opinion 29, *An Acceptable Scope of Work.*

[23] See Advisory Opinion 31, *Assignments Involving More than One Appraiser.*

[24] See Advisory Opinion 1, *Sales History.*

Shapiro p. 18

713     (ix)      state the use of the real estate existing as of the date of value and the use of the real
714                  estate reflected in the appraisal; and, when an opinion of highest and best use was
715                  developed by the appraiser, describe the support and rationale for that opinion;

716     (x)       clearly and conspicuously:

717                    •    state all extraordinary assumptions and hypothetical conditions; and
718                    •    state that their use might have affected the assignment results; and

719     (xi)      include a signed certification in accordance with Standards Rule 2-3.

720 **(b)**     **The content of a Summary Appraisal Report must be consistent with the intended use of the**
721         **appraisal and, at a minimum:**

722         Comment: The essential difference between the Self-Contained Appraisal Report and the
723         Summary Appraisal Report is the level of detail of presentation.

724     (i)        **state the identity of the client and any intended users, by name or type;**[25]

725                  Comment: An appraiser must use care when identifying the client to ensure a clear
726                  understanding and to avoid violations of the Confidentiality section of the ETHICS
727                  RULE. In those rare instances when the client wishes to remain anonymous, an
728                  appraiser must still document the identity of the client in the workfile but may omit
729                  the client's identity in the report.

730                  Intended users of the report might include parties such as lenders, employees of
731                  government agencies, partners of a client, and a client's attorney and accountant.

732     (ii)      **state the intended use of the appraisal;**[26]

733     (iii)     **summarize information sufficient to identify the real estate involved in the appraisal,**
734                  **including the physical and economic property characteristics relevant to the**
735                  **assignment;**[27]

736                  Comment: The real estate involved in the appraisal can be specified, for example, by
737                  a legal description, address, map reference, copy of a survey or map, property sketch,
738                  and/or photographs or the like. The summarized information can include a property
739                  sketch and photographs in addition to written comments about the legal, physical,
740                  and economic attributes of the real estate relevant to the type and definition of value
741                  and intended use of the appraisal.

742     (iv)     **state the real property interest appraised;**

743                  Comment: The statement of the real property rights being appraised must be
744                  substantiated, as needed, by copies or summaries of title descriptions or other
745                  documents that set forth any known encumbrances.

746     (v)       **state the type and definition of value and cite the source of the definition;**

---

[25] See Statement on Appraisal Standards No. 9, *Identification of Intended Use and Intended Users*.

[26] See Statement on Appraisal Standards No. 9, *Identification of Intended Use and Intended Users*.

[27] See Advisory Opinion 2, *Inspection of Subject Property*, and Advisory Opinion 23, *Identifying the Relevant Characteristics of the Subject Property of a Real Property Appraisal Assignment*.

USPAP 2008-2009 Edition
©The Appraisal Foundation

747  Comment: Stating the definition of value also requires any comments needed to
748  clearly indicate to the intended users how the definition is being applied.[28]

749  When reporting an opinion of market value, state whether the opinion of value is:

750  • in terms of cash or of financing terms equivalent to cash, or
751  • based on non-market financing or financing with unusual conditions or
752  incentives.

753  When an opinion of market value is not in terms of cash or based on financing terms
754  equivalent to cash, summarize the terms of such financing and explain their
755  contributions to or negative influence on value.

756  **(vi)**  **state the effective date of the appraisal and the date of the report;[29]**

757  Comment: The effective date of the appraisal establishes the context for the value
758  opinion, while the date of the report indicates whether the perspective of the
759  appraiser on the market and property as of the effective date of the appraisal was
760  prospective, current, or retrospective.

761  **(vii)**  **summarize the scope of work used to develop the appraisal;[30]**

762  Comment: Because intended users' reliance on an appraisal may be affected by the
763  scope of work, the report must enable them to be properly informed and not misled.
764  Sufficient information includes disclosure of research and analyses performed and
765  might also include disclosure of research and analyses not performed.

766  When any portion of the work involves significant real property appraisal assistance,
767  the appraiser must summarize the extent of that assistance. The signing appraiser
768  must also state the name(s) of those providing the significant real property appraisal
769  assistance in the certification, in accordance with Standards Rule 2-3.[31]

770  **(viii)**  **summarize the information analyzed, the appraisal methods and techniques employed,**
771  **and the reasoning that supports the analyses, opinions, and conclusions; exclusion of the**
772  **sales comparison approach, cost approach, or income approach must be explained;**

773  Comment: A Summary Appraisal Report must include sufficient information to
774  indicate that the appraiser complied with the requirements of STANDARD 1. The
775  amount of detail required will vary with the significance of the information to the
776  appraisal.

777  The appraiser must provide sufficient information to enable the client and intended
778  users to understand the rationale for the opinions and conclusions, including
779  reconciliation of the data and approaches, in accordance with Standards Rule 1-6.

[28] See Statement on Appraisal Standards No. 6, *Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions*. See also Advisory Opinion 7, *Marketing Time Opinions*, and Advisory Opinion 22, *Scope of Work in Market Value Appraisal Assignments, Real Property*.

[29] See Statement on Appraisal Standards No. 3, *Retrospective Value Opinions*, and Statement on Appraisal Standards No. 4, *Prospective Value Opinions*.

[30] See Advisory Opinion 28, *Scope of Work Decision, Performance, and Disclosure*, and Advisory Opinion 29, *An Acceptable Scope of Work*.

[31] See Advisory Opinion 31, *Assignments Involving More than One Appraiser*.

STANDARD 2

780 When reporting an opinion of market value, a summary of the results of analyzing
781 the subject sales, options, and listings in accordance with Standards Rule 1-5 is
782 required.[32] If such information is unobtainable, a statement on the efforts undertaken
783 by the appraiser to obtain the information is required. If such information is
784 irrelevant, a statement acknowledging the existence of the information and citing its
785 lack of relevance is required.

786 (ix)  state the use of the real estate existing as of the date of value and the use of the real
787 estate reflected in the appraisal; and, when an opinion of highest and best use was
788 developed by the appraiser, summarize the support and rationale for that opinion;

789 (x)  clearly and conspicuously:

790 •  state all extraordinary assumptions and hypothetical conditions; and
791 •  state that their use might have affected the assignment results; and

792 (xi)  include a signed certification in accordance with Standards Rule 2-3.

793 (c)  The content of a Restricted Use Appraisal Report must be consistent with the intended use of the
794 appraisal and, at a minimum:

795 (i)  state the identity of the client, by name or type;[33] and state a prominent use restriction
796 that limits use of the report to the client and warns that the appraiser's opinions and
797 conclusions set forth in the report may not be understood properly without additional
798 information in the appraiser's workfile;

799 Comment: An appraiser must use care when identifying the client to ensure a clear
800 understanding and to avoid violations of the Confidentiality section of the ETHICS
801 RULE. In those rare instances when the client wishes to remain anonymous, an
802 appraiser must still document the identity of the client in the workfile but may omit
803 the client's identity in the report.

804 The Restricted Use Appraisal Report is for client use only. Before entering into an
805 agreement, the appraiser should establish with the client the situations where this
806 type of report is to be used and should ensure that the client understands the
807 restricted utility of the Restricted Use Appraisal Report.

808 (ii)  state the intended use of the appraisal;[34]

809 Comment: The intended use of the appraisal must be consistent with the limitation
810 on use of the Restricted Use Appraisal Report option in this Standards Rule (i.e.,
811 client use only).

812 (iii)  state information sufficient to identify the real estate involved in the appraisal;[35]

---

[32] See Advisory Opinion 1, *Sales History*
[33] See Statement on Appraisal Standards No. 9, *Identification of Intended Use and Intended Users.*
[34] See Statement on Appraisal Standards No. 9, *Identification of Intended Use and Intended Users.*
[35] See Advisory Opinion 2, *Inspection of Subject Property.* References to Advisory Opinions are for guidance only and do not incorporate Advisory Opinions into USPAP.

USPAP 2008-2009 Edition
©The Appraisal Foundation

Shapiro p. 21

813   Comment: The real estate involved in the appraisal can be specified, for example, by
814   a legal description, address, map reference, copy of a survey or map, property sketch,
815   and/or photographs or the like.

816  **(iv)** **state the real property interest appraised;**

817  **(v)** **state the type of value, and cite the source of its definition;[36]**

818  **(vi)** **state the effective date of the appraisal and the date of the report;[37]**

819   Comment: The effective date of the appraisal establishes the context for the value
820   opinion, while the date of the report indicates whether the perspective of the
821   appraiser on the market and property as of the effective date of the appraisal was
822   prospective, current, or retrospective.

823  **(vii)** **state the scope of work used to develop the appraisal;[38]**

824   Comment: Because the client's reliance on an appraisal may be affected by the scope
825   of work, the report must enable them to be properly informed and not misled.
826   Sufficient information includes disclosure of research and analyses performed and
827   might also include disclosure of research and analyses not performed.

828   When any portion of the work involves significant real property appraisal assistance,
829   the appraiser must state the extent of that assistance. The signing appraiser must also
830   state the name(s) of those providing the significant real property appraisal assistance
831   in the certification, in accordance with Standards Rule 2-3.[39]

832  **(viii)** **state the appraisal methods and techniques employed, state the value opinion(s) and**
833   **conclusion(s) reached, and reference the workfile; exclusion of the sales comparison**
834   **approach, cost approach, or income approach must be explained;**

835   Comment: An appraiser must maintain a specific, coherent workfile in support of a
836   Restricted Use Appraisal Report. The contents of the workfile must include sufficient
837   information to indicate that the appraiser complied with the requirements of
838   STANDARD 1 and for the appraiser to produce a Summary Appraisal Report. The
839   file must be available for inspection by the client (or the client's representatives, such
840   as those engaged to complete an appraisal review), state enforcement agencies, such
841   third parties as may be authorized by due process of law, and a duly authorized
842   professional peer review committee except when such disclosure to a committee
843   would violate applicable law or regulation.

844   When reporting an opinion of market value, information analyzed in compliance
845   with Standards Rule 1-5 is significant information that must be disclosed in a

---

[36] See Statement on Appraisal Standards No. 6, *Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions.* See also Advisory Opinion 7, *Marketing Time Opinions,* and Advisory Opinion 22, *Scope of Work In Market Value Appraisal Assignments, Real Property.*

[37] See Statement on Appraisal Standards No. 3, *Retrospective Value Opinions,* and Statement on Appraisal Standards No. 4, *Prospective Value Opinions.*

[38] See Advisory Opinions 28, *Scope of Work Decision, Performance, and Disclosure,* and Advisory Opinion 29, *An Acceptable Scope of Work.*

[39] See Advisory Opinion 31, *Assignments Involving More than One Appraiser.*

Shapiro p. 22

STANDARD 2

846 Restricted Use Appraisal Report.[40] If such information is unobtainable, a statement
847 on the efforts undertaken by the appraiser to obtain the information is required. If
848 such information is irrelevant, a statement acknowledging the existence of the
849 information and citing its lack of relevance is required.

850 (ix) state the use of the real estate existing as of the date of value and the use of the real
851 estate reflected in the appraisal; and, when an opinion of highest and best use was
852 developed by the appraiser, state that opinion;

853 (x) clearly and conspicuously:

854 • state all extraordinary assumptions and hypothetical conditions; and
855 • state that their use might have affected the assignment results; and

856 (xi) include a signed certification in accordance with Standards Rule 2-3.

857 Standards Rule 2-3

858 Each written real property appraisal report must contain a signed certification that is similar in content
859 to the following form:

860 I certify that, to the best of my knowledge and belief:

861 — the statements of fact contained in this report are true and correct.
862 — the reported analyses, opinions, and conclusions are limited only by the reported
863 assumptions and limiting conditions and are my personal, impartial, and unbiased
864 professional analyses, opinions, and conclusions.
865 — I have no (or the specified) present or prospective interest in the property that is the
866 subject of this report and no (or the specified) personal interest with respect to the
867 parties involved.
868 — I have no bias with respect to the property that is the subject of this report or to the
869 parties involved with this assignment.
870 — my engagement in this assignment was not contingent upon developing or reporting
871 predetermined results.
872 — my compensation for completing this assignment is not contingent upon the
873 development or reporting of a predetermined value or direction in value that favors
874 the cause of the client, the amount of the value opinion, the attainment of a stipulated
875 result, or the occurrence of a subsequent event directly related to the intended use of
876 this appraisal.
877 — my analyses, opinions, and conclusions were developed, and this report has been
878 prepared, in conformity with the *Uniform Standards of Professional Appraisal Practice*.
879 — I have (or have not) made a personal inspection of the property that is the subject of
880 this report. (If more than one person signs this certification, the certification must
881 clearly specify which individuals did and which individuals did not make a personal
882 inspection of the appraised property.)[41]
883 — no one provided significant real property appraisal assistance to the person signing
884 this certification. (If there are exceptions, the name of each individual providing
885 significant real property appraisal assistance must be stated.)

---

[40] See Advisory Opinion 1, *Sales History*

[41] See Advisory Opinion 2, *Inspection of Subject Property*.

USPAP 2008-2009 Edition
©The Appraisal Foundation

STATEMENT 3

2573 **STATEMENT ON APPRAISAL STANDARDS NO. 3 (SMT-3)**

2574 **SUBJECT: Retrospective Value Opinions**

2575 **APPLICATION: Real Property, Personal Property**

2576 **THE ISSUE:**

2577 Two dates are essential to an appraisal report. Standards Rules 2-2(a)(vi), (b)(vi), and (c)(vi), and 8-2(a)(vi),
2578 (b)(vi), and (c)(vi) require that each appraisal report specify the effective date of the appraisal and the date of
2579 the report. The date of the report indicates the perspective from which the appraiser is examining the market.
2580 The effective date of the appraisal establishes the context for the value opinion. Three categories of effective
2581 dates - retrospective, current, or prospective - may be used, according to the intended use of the appraisal
2582 assignment.

2583 When a retrospective effective date is used, how can the appraisal be prepared and presented in a manner that is
2584 not misleading?

2585 **THE STATEMENT:**

2586 Retrospective appraisals (effective date of the appraisal prior to the date of the report) may be required for
2587 property tax matters, estate or inheritance tax matters, condemnation proceedings, suits to recover damages, and
2588 similar situations.

2589 Current appraisals occur when the effective date of the appraisal is contemporaneous with the date of the report.
2590 Since most appraisals require current value opinions, the importance of specifying both the date of the report
2591 and the effective date of the analysis is sometimes lost.

2592 Prospective appraisals (effective date of the appraisal subsequent to the date of the report) may be required for
2593 valuations of property interests related to proposed developments, as the basis for value at the end of a cash
2594 flow projection, and for other reasons. (See SMT-4 on *Prospective Value Opinions*.)

2595 The use of clear and concise language and appropriate terminology in appraisal reports helps to eliminate
2596 misleading reports. To avoid confusion, the appraiser must clearly establish the date to which the value opinion
2597 applies. In retrospective value opinions, use of a modifier for the term "market value" and past verb tenses
2598 increases clarity (e.g., ". . . the retrospective market value was . . ." instead of ". . . the market value is . . .").

2599 A retrospective appraisal is complicated by the fact that the appraiser already knows what occurred in the
2600 market after the effective date of the appraisal. Data subsequent to the effective date may be considered in
2601 developing a retrospective value as a confirmation of trends that would reasonably be considered by a buyer or
2602 seller as of that date. The appraiser should determine a logical cut-off because at some point distant from the
2603 effective date, the subsequent data will not reflect the relevant market. This is a difficult determination to make.
2604 Studying the market conditions as of the date of the appraisal assists the appraiser in judging where he or she
2605 should make this cut-off. In the absence of evidence in the market that data subsequent to the effective date
2606 were consistent with and confirmed market expectations as of the effective date, the effective date should be
2607 used as the cut-off date for data considered by the appraiser.

2608 Use of direct excerpts from then-current appraisal reports prepared at the time of the retrospective effective date
2609 helps the appraiser and the reader understand market conditions as of the retrospective effective date.

USPAP 2008-2009 Edition
©The Appraisal Foundation

Shapiro p. 24

2610 **CONCLUSIONS:**

2611      •  A retrospective appraisal is complicated by the fact that the appraiser already knows what
2612        occurred in the market after the effective date of the appraisal.
2613      •  Data subsequent to the effective date may be considered in developing a retrospective
2614        value as a confirmation of trends.
2615      •  The appraiser should determine a logical cut-off.
2616      •  Use of direct excerpts from then-current appraisal reports prepared at the time of the
2617        retrospective effective date helps the appraiser and the reader understand market
2618        conditions as of the retrospective effective date.
2619      •  In the absence of evidence in the market that data subsequent to the effective date were
2620        consistent with and confirmed market expectations as of the effective date, the effective
2621        date should be used as the cut-off date.

# EXHIBIT C

obliged to buy the property, would pay, and which a well-informed seller, willing but not obligated to sell it would accept, taking into consideration all uses to which the property is adapted or may be reasonably adaptable. The mathematical difference between the two values (market value "before" minus market value "after") is the just compensation after adjusting for items that are not compensable under the law. The "after value" is based on the value of the remainder property assuming that the actual construction of the proposed project will not be completed until an estimated future date. Any temporary inconvenience during or caused by, the actual construction of the project is not considered in the appraisal. Fair market value shall normally be that of fee simple title.

4.  The public, which must bear the burden of these public projects designed to safeguard and protect the private property of all, should be assured that the compensation awarded shall be just and not generous; shall be adequate but not a windfall; and shall approximate what it can reasonably be assumed the property would bring in cash, in an open market exchange to a willing seller and under normal bargaining procedure.

5.  The property owner has the legal right to inspect the property with the appraiser. Every effort must be made to ensure that the property owner has been extended that opportunity for a joint inspection.

B.  Total Acquisition

When WSDOT's highway project plans necessitate acquisition by WSDOT of an entire ownership, just compensation is the fair market value of the property, taking into consideration as part of the property such improvements that have been determined to be real property, evaluated as of the date of appraisal.

If a tenancy is involved, the tenant-owned real property improvements are evaluated as of the date of the appraisal and as they contribute to the market value of the property or their value for removal, whichever is greater.

C.  Partial Acquisition

1.  General

When WSDOT's highway project plans necessitate acquisition by the state of less than a total ownership, just compensation for the rights to be acquired is the difference between the fair market value of the entire ownership prior to the acquisition and the fair market value of any portion thereof not required by the state's highway project plans after adjusting for items that are not compensable under the law.

a. Both evaluations ("before" and "after") are based on fair market value as of the date of appraisal by the state. Before and after values reflect the amount that one buyer would pay and that one seller would accept under the value definition.

b. If the market evidence reveals no difference between the value before and the value after the acquisition, the Appraiser reports the facts dictated by the market. The Appraiser is not obligated to report a difference when none exists in fact. The Appraiser is obligated to report only the facts and conclusions based purely on appraisal considerations.

c. If a tenancy is involved, the tenant owned real property improvements are evaluated as of the date of the appraisal and as they contribute to the market value of the property or their value for removal, whichever is greater.

2. Benefits

In Washington State, there are three concepts where value may be created by a pending highway improvement. It is necessary to differentiate between these concepts and understand them in order to properly treat them in right of way acquisition. The three concepts are defined as follows:

a. **Enhancement.** Increases in real estate values in advance of right of way acquisition created by knowledge of a pending highway improvement.

b. **Special Benefits.** Value accruing to the remainder of a property by reason of acquisition and use by the state of a portion of such property where such value is special to said remainder and not enjoyed by the general public. Benefits may be special although other owners on the facility receive similar benefits.

c. **General Benefits.** Washington law does not clearly define general benefits. Because of this we have only attempted to explain special benefits and will assume that any benefits that are not "special" may be properly considered to be "general" benefits.

Appraisers' market studies must be sufficiently encompassing to enable them to detect both adverse and beneficial effects on property values in the path of prospective highway improvements. They need to be able to demonstrate and evaluate such effects, thereby avoiding a reporting of value conclusions that would tend to penalize a property owner where values were depressed or to penalize the general public where values were enhanced by knowledge of a pending highway

Shapiro p. 28

improvement. However, maintenance within the control of the owner or tenant must be considered in estimating the market value of a property.

Appraisers' market studies must also enable them to detect special and general benefits to remainders and to differentiate where special benefits are present and to explain their reasoning.

3. Damages

   a. General

      (1) Damage is the mathematical difference between the value of the remainder after the acquisition and the value of the remainder as a part of the whole prior to the acquisition if no benefits are found to exist.

      (2) The Appraiser is required to fully explain the physical facts which cause the remainder to suffer a loss in value (damages) and the market facts that justify such a conclusion.

   b. Mitigation of Damages

      (1) WSDOT may negotiate for the purchase of property outside the right of way for the purpose of mitigating a portion or all of the damage to remainders in various circumstances when such mitigation can be shown to create a saving to the state. The amounts of such savings are determined by appraisal techniques and documented by confirmed factual cost data secured by the department.

      (2) Certain types of mitigation may not be allowed in legal actions. The Region Appraisal Supervisor consults with the Attorney General's Office when in doubt.

      (3) An improvement lying partially within the right of way to be acquired is considered as acquired in total unless it is found that such improvement may be rehabilitated in place and thereby preserve its utility. In the latter case, there must be a showing that: (a) from the standpoint of the prudent person, such rehabilitation would be the typical action; and (b) such rehabilitation is economically justified. A two-premise appraisal is necessary showing compensation (a) assuming no rehabilitation, and (b) assuming rehabilitation has been accomplished. The Region Appraisal Supervisor secures bid(s) from reliable contractor(s) indicating the cost of rehabilitation.

Shapiro p. 29

# EXHIBIT D

INTERAGENCY LAND ACQUISITION CONFERENCE

# Uniform Appraisal Standards for Federal Land Acquisitions

WASHINGTON, D.C. 2000

Published by the Appraisal Institute
875 North Michigan Ave., Suite 2400, Chicago, IL 60611-1980
in cooperation with
the U.S. Department of Justice

public records.[153] The motivation behind other transactions can be shown, but only as affecting the weight that should be afforded a sale, not as to its admissibility.[154]

Sales to a condemning authority are often inadmissible. (See Section B-18, "Price paid by government entity for similar property.") The reasons for excluding sales to a condemning authority are not applicable, however, to sales *by* a condemning authority. Sales between members of a family or closely related business entities are not arms-length transactions, and since they may involve other factors than market value considerations, such sales are generally inadmissible. Sales involving the exchange of property are generally not admissible because they are considered unreliable indicators of market value and introduce too many collateral issues. As has been explained:

> If evidence of . . . an exchange is to be considered as proof of present valuation, the values of such exchanged lands obviously must be proved by the same standards as attends proof of value of the property being condemned. Then it becomes the task of the trial judge to determine ordinarily whether such collateral issues would be so confusing or so lengthy as to cause him to rule out any effort to prove value of the condemned tract in such a fashion.[155]

Sales that include personal property (e.g., the sale of a farm that includes the farm equipment and/or livestock), are likewise considered inadmissible, unless they can accurately be adjusted to reflect only the real property transaction. Distress sales and sales with atypical financing terms are of questionable reliability and should be used only with great care. If want of available market data necessitates reference to such a sale or sales, it is important that proper adjustments be made.

Sales after the date of acquisition are not per se inadmissible (contrary to popular belief) and with appropriate caution and restraint may be utilized by the appraiser if they meet the usual standards of comparability and are not otherwise incompetent as evidence of value.[156] Sales transacted on or before the date of acquisition are the preferred support for an appraisal and if such sales are available and adequate, there is little justification for using post-acquisition sales. Use of post-acquisition sales should be avoided where they reflect artificially inflated or depressed values resulting from the acquisition itself or from the government's project,[157] or if they significantly post-date the acquisition date.

A binding and unconditional contract of sale, even where title has yet to be conveyed, is generally competent admissible evidence of value and may be utilized by the appraiser as a comparable sale.[158] However, it is essential that the contract be *binding and unconditional.*

153. *United States v. Certain Land in Fort Worth, Texas,* 414 F.2d 1029, 1031-1032 (5th Cir. 1969); *District of Columbia Redevelopment Land Agency v. 61 Parcels of Land,* 235 F.2d 865, 865-866 (D.C. Cir. 1956).

154. *United States v. 6, 162.78 Acres of Land,* 680 F.2d 396, 399 (5th Cir. 1982); *United States v. Certain Land in Fort Worth, Texas,* 414 F.2d 1029, 1032 (5th Cir. 1969); *District of Columbia Redevelopment Land Agency v. 61 Parcels of Land,* 235 F.2d 865, 866 (D.C. Cir. 1956); *United States v. Katz,* 213 F.2d 799, 800 (1st Cir. 1954); *United States v. 5139.5 Acres of Land,* 200 F.2d 659, 661 (4th Cir. 1952).

155. *United States v. Leavell & Ponder, Inc.,* 286 F.2d 398, 406 (5th Cir. 1961), cert. denied, 366 U.S. 944.

156. *United States v. 68.94 Acres of Land,* 918 F.2d 389, 398 (3rd Cir. 1990); *United States v. 0.161 Acres of Land,* 837 F.2d 1036, 1044 (11th Cir. 1988); *United States v. 312.50 Acres of Land,* 812 F.2d 156, 157 n.3 (4th Cir. 1987); *United States v. 428.02 Acres of Land,* 687 F.2d 266, 270 (8th Cir. 1982); *United States v. 320.0 Acres of Land,* 605 F.2d 762, 799-803 (5th Cir. 1979); *United States v. 691.81 Acres of Land,* 443 F.2d 461, 462 (6th Cir. 1971); *United States v. 63.04 Acres of Land,* 245 F.2d 140, 144 (2nd Cir. 1957).

157. Ibid. But in the case of a partial acquisition where offsetting of benefits or damages are involved, post-acquisition sales could be particularly relevant in valuing the remainder. For example, they may also be particularly useful when the measure of damages is the difference between the market value before and after imposition of an easement. *United States v. 1129.75 Acres of Land,* 473 F.2d 996, 999 (8th Cir. 1973).

158. *United States v. 312.50 Acres of Land,* 812 F.2d 156, 157 (4th Cir. 1987); *United States v. 428.02 Acres of Land,* 687 F.2d 266, 270-271 (8th Cir. 1982); *United States v. 114.64 Acres of Land,* 504 F.2d 1099, 1100 (9th Cir. 1974); *United States v. Smith,* 355 F.2d 807, 811-812 (5th Cir. 1966).

allowed severance damages when the damages may be said to flow both from the acquisition and use of only a portion of the owner's property and from the use to which the government puts land acquired from a third party neighbor when the damages are inseparable.[223] An example of such a situation might be the partial taking of a tract for construction of a contaminated soils depository, a portion of which would be constructed on the property acquired and a portion of which would be constructed on property acquired from others—it might not be practical to separate the diminution in value to the remainder caused by the use of the property acquired from the larger parcel from the diminution caused by the use of lands acquired from others. If confronted with such a situation, it is recommended that appraisers seek guidance from agency or Department of Justice legal counsel.

Also, a distinction must be drawn between diminution in value of the remainder caused by the acquisition itself and the use to which the acquired property will be put, which is compensable as severance damage, and damage to the remainder caused by anticipated physical invasion of the remainder that would result from the intended use of the land acquired, which is not compensable. For instance, if the government acquired a flowage easement for construction of a reservoir, an appraiser could not consider damages to the remainder property above the line of the acquisition from anticipated wave action during periods of high winds.[224]

If the United States proposes to put the part of a larger parcel acquired to hazardous use and if fear of the hazard would affect the price a knowledgeable and prudent buyer would pay to a similarly well-informed seller, diminution in value to the remainder caused by the fear is a proper consideration in estimating the market value of the remainder, even if such fear is not well founded.[225] As one court explained:

> [I]n the final analysis, we are concerned only with market value. Although these studies may show objectively the complete safety of these structures, we are not convinced that certain segments of the buying public may not remain apprehensive of these high voltage lines, and therefore might be unwilling to pay as much for the property as they otherwise would. On the record, allowance of incidental damages . . . on each side of the outer boundary of the remainder of the easements appears to us reasonable and proper.[226]

In partial acquisitions, these Standards require with the exceptions noted below and in Section B-14, application of the *before and after* method of valuation[227] in which the appraiser estimates both the market value of the whole property before the government's acquisition and the market value of the remainder property after the government's acquisition.[228] Requiring this method of valuation allows acquiring agencies, the Department of Justice, and the courts to calculate a reasonable measure of compensation by deducting the appraiser's estimated remainder or after value from the appraiser's estimate of the larger

---

223. *United States v. Pope & Talbot, Inc.,* 293 F.2d 822, 825 (9th Cir. 1961); *United States v. 15.65 Acres of Land,* 689 F.2d 1329, 1332 (9th Cir. 1982), cert. denied, 460 U.S. 1041 (1983).

224. Such damage may be compensable in an inverse taking action by the landowner but is not compensable as severance damages in a condemnation action. *United States v. 38.60 Acres of Land,* 625 F.2d 196, 199-200 (8th Cir. 1980); *United States v. 101.88 Acres of Land,* 616 F.2d 762, 768 (5th Cir. 1980).

225. *United States v. 760.807 Acres of Land,* 731 F.2d 1443, 1447 (9th Cir. 1984); *United States v. 6.24 Acres of Land,* 99 F.3d 1140, (6th Cir. 1996).

226. *United States ex rel. T.V.A. v. An Easement & Right of Way,* 405 F.2d 305, 309 (6th Cir. 1968).

227. Often referred to as the *before and after rule,* or the *federal rule.*

228. E.g., *United States v. Virginia Electric Co.,* 365 U.S. 624, 632 (1961) (easement acquisition); *United States v. 68.94 Acres of Land,* 918 F.2d 389, 393, n.3 (3rd Cir. 1990);United States v. 91.90 Acres of Land, 586 F.2d 79, 86 (8th Cir. 1978), cert. denied 441 U.S. 944 (1979); *Georgia-Pacific Corp. v. United States,* 640 F.2d 328, 336 (Ct. Cl. 1980). It is the only method of valuation allowed in the Fifth Circuit, *United States v. 8.41 Acres of Land,* 680 F.2d 388, 392, n.5 (5th Cir. 1982).

parcel's before value. The result of this method is a figure that automatically includes the value of the land actually acquired as well as any severance damages and/or special benefits to the remainder property.

Notwithstanding the foregoing, to assist acquiring agencies in meeting their obligations under the Uniform Relocation Assistance and Real Property Acquisition Polices Act of 1970,[229] appraisals must contain an allocation of the difference between the before and after value estimates between the contributory value of the land acquired and damages to the remainder. (See A-30, "Allocation and Explanation of Damages.")

In another approach, the appraiser estimates the contributory value of the part of the whole property to be acquired and adds to or subtracts from that figure an allowance for damages and/or special benefits in value to the remainder.[230] This method may or may not be more complicated, but it usually is more subject to error and more apt to result in duplication,[231] sometimes referred to as *double damages*. When this *taking + damages* method is employed, the value of the part acquired is its value as a part of the whole (i.e., larger parcel), not its value as a separate parcel. Also, if this method of valuation is employed, the appraiser must affirmatively address the issue of possible damages and/or special benefits to the remainder of the larger parcel in the appraisal report. This second taking + damages method should not be utilized by appraisers without the express written authorization from the acquiring agency, or the Department of Justice trial counsel, to employ it.

However, acquiring agencies should bear in mind that there are situations in which insistence upon strict adherence to the before and after rule would impose costly and sometimes nearly impossible burdens upon appraisers. Examples of such situations, in which this second taking + damages method may be applicable, are minor fee or easement acquisitions (for flowage, wetland or habitat protection, roads, pipelines, transmission lines, etc.) from large ranches, industrial complexes, etc., where the cost of valuing the whole unit before and after the acquisition is simply unwarranted in view of the minor nature of the acquisition. Use of this method, however, is generally limited to those instances wherein there are no damages to the remainder property. In short, where its application would be logical, practical, and capable of understanding, the before and after method of valuation in partial acquisitions is preferred. The taking + damages method shall not be utilized without concurrence of the client agency.

In certain circumstances, damage to the remainder may be *cured* by remedial action taken by the owner. The *cost to cure*, however, is a proper measure of damage only when it is no greater in amount than the decrease in the market value of the remainder if left as it stood.[232] When the cost to cure is less than the severance damages if the cure were not undertaken, the cost to cure is the proper measure of damage, and the government is not obligated to pay in excess of that amount.[233] See additional discussion of the cost to cure measure of damage in Section D-4.

---

229.  42 U.S.C. §§ 4601-4655; P.L. 91-646, . Section 4651(3) requires the head of the acquiring agency to make a written offer to purchase to the property owner, separately stating the estimated contributory value of the property to be acquired and damages to the remaining property.

230.  Often referred to as the *taking + damages rule*, or the *state rule. See United States v. 97.19 Acres of Land*, 582 F.2d 878, 880-881 (4th Cir. 1978); *Miller v. United States*, 620 F.2d 812, 829 (Ct. Cl. 1980).

231.  For an example of how this *duplication* occurs see, J. D. Eaton, *Real Estate Valuation in Litigation*, 2nd ed. (Chicago: Appraisal Institute, 1995), 32-33. Some states use this second method because they require a separate finding of severance damage since their law permits benefits from the project to be offset against the severance damage, but not against the value of the land acquired. As will be shown in Section B-12, this reason is not applicable in federal acquisitions.

232.  *United States v. 2.33 Acres of Land*, 704 F.2d 728, 730 (4th Cir. 1983); *United States v. Dickinson*, 152 F.2d 865, 870 (4th Cir. 1946), aff'd, 331 U.S. 745 (1947).

233.  *United States v. 2.33 Acres of Land*, 704 F.2d 728, 730 (4th Cor. 1983).

# EXHIBIT E

# RE·SOLVE

**GIBBONS & RIELY PLLC**
**Real Estate Appraisal, Counseling & Mediation**
261 Madison Avenue South, Suite 102
Bainbridge, Washington 98110-2579
Stephen Shapiro, MAI
Direct Dial 206 855-1090
Email: sshapiro@realestatesolve.com

January 6, 2010

Jeffrey S. Myers
Law, Lyman, Daniel, Kamerrer
  & Bogdanovich, P.S.
P.O. Box 11880
Olympia, WA  98508

Re:   *Laurel Park Community LLC v. City of Tumwater*, U.S. District Court,
       Western District of Washington, No.  C09-5312 BHS

You have asked me to prepare a report in conformity with FRCP 26(a)(2) that addresses the claims of the plaintiffs in the above entitled lawsuit.  You have asked me to review the information provided by the plaintiffs in discovery and reports prepared concerning the valuations of the subject mobile home parks performed by Jeanne-Marie Wilson and Joel Erlitz.

This case concerns the adoption of Ordinance Numbers O2008-027 and O2008-009 by the City of Tumwater, which established mobile home park zoning that applies to six existing mobile home parks in the City, including the three properties owned by the plaintiffs in this matter.  To assess any impact I have evaluated the fair market value of the property currently operated as mobile home parks by Tumwater Mobile Estates, Velkommen Mobile Home Park and Laurel Park.  Attached hereto as Appendices are separate appraisal reports addressing the fair market value of these parks and any impact created by the City's adoption of the Mobile Home Park Zoning Ordinance.  These reports contain my analysis and opinions concerning the affect of the City's adoption of these Ordinances.  My qualifications as an appraiser and prior expert witness testimony are included in these reports.

You have also asked me to comment on the validity of the opinions contained in the reports prepared by Ms. Wilson and Mr. Erlitz to determine if they present reliable opinions as the alleged impacts on the value of the plaintiffs' properties.  Below are my comments and observations concerning their reports.

**Jeanne-Marie Wilson's Federal Rule 26 (a)(2)(B) Preliminary Report of Market Value, dated December 7, 2009**

Ms. Wilson provides a statement of qualifications and in my opinion is considered to be qualified to perform appraisals of the subject mobile home parks.

Ms. Wilson stipulates her appraisal as being USPAP compliant and prepared as a summary report. I would consider this to be minimally compliant with USPAP and not a summary report but rather a restricted use report.

Ms. Wilson acknowledges not having inspected the subjects prior to performing the valuation. Ms. Wilson also notes that she intends to prepare a more complete analysis of all three properties to be used at trial and "in the interest of time this report will employ only the income capitalization approach." This suggests that the opinions contained in the report may be incomplete and inadequately supported. It is impossible to evaluate opinions not expressed in her report or any future analysis and comply with the court imposed deadline of January 6, 2010.

Ms. Wilson relies only on 2008 income and expense data to perform her income capitalization approach. It is typical to rely upon the most recent three years of such data in order to demonstrate the stability of income and expenses over time and support the determination of net operating income derived in the income capitalization analysis.

In general the income capitalization approach is a recognized methodology for valuing this type of property. However, a relevant issue is that Ms. Wilson derives a range of capitalization rates from 5.6%-8.1% but does not provide any factual basis, such as market sales data to support this. Thus, there is no strong justification for the 7.0%-7.5% cap rate range selected, which may be too high (it is higher than that 6.0%-6.5% range concluded by Joel Erlitz) and therefore may imply lower value conclusions for the subjects than is appropriate.

The stated date of value is December 31, 2008. This valuation date is prior to the City's adoption of the Mobile Home Park Zoning ordinance. Thus, Ms. Wilson fails to address any impact from the adoption of that ordinance.

The most significant deficiency in this report is that it lacks any Highest and Best Use analysis. The issue at hand is whether the existing use of the subject properties before the adoption of the Moblie Home Park zoning ordinance (in the before condition) as mobile home parks is a higher economic use than the potential use for multi-family development that was allowed under the previous zoning. Ms. Wilson does not provide any highest and best use analysis. Rather, she just provides a valuation of the subjects under the existing use as mobile home parks. Where an appraiser does not know which of two uses is the Highest and Best Use it is appropriate to perform valuation analyses of both in order to make such a determination. The fact that she only provided a valuation of the subjects under their existing use as mobile home parks suggests that mobile home park use is the Highest and Best Use at the date of valuation and that she does not believe that Highest and Best Use of any of the subjects was for multi-family development. In

that event there is obviously no damage to the property value of any of the subject properties as a result of the zoning change.

**Declaration of Joel Erlitz with Exhibits, dated December 7, 2009**

**Statement of compensation to be paid**

This report is prepared by at my hourly rate of $250 per hour.  Office personnel assisting in this matter will be billed at a rate of $90 per hour.

Please let me know if I can be of further assistance.

Sincerely,

Stephen Shapiro, MAI

Attachments:   Valuation Report, Laurel Park (Appendix A)
                Valuation Report, Tumwater Mobile Estates (Appendix B)
                Valuation Report, Velkommen Mobile Home Park (Appendix C)