**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT TACOMA**

LAUREL PARK COMMUNITY, LLC, a
Washington limited liability company;
TUMWATER ESTATES INVESTORS, a
California limited partnership;
VELKOMMEN MOBILE PARK, LLC, a
Washington limited liability company; and
MANUFACTURED HOUSING
COMMUNITIES OF WASHINGTON, a
Washington non-profit corporation,

                      Plaintiffs,

    vs.

CITY OF TUMWATER, a municipal
corporation,

                      Defendant.

**NO.   C09-5312 BHS**

**DECLARATION OF JEFFREY S.
MYERS IN SUPPORT OF
DEFENDANT'S RESPONSE TO
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND
MOTION TO STRIKE**

PURSUANT TO 28 U.S.C. § 1746, Jeffrey S. Myers, hereby declares as follows:

1.     I am the attorney for the defendant City of Tumwater in the above entitled matter. I am over the age of 18, competent to be a witness and make this declaration on personal knowledge.

2.     Attached to this declaration as **Exhibit A** is a true and correct copy of excerpts from the deposition of James W. Andersen, taken January 29, 2010, which are cited in the City's Response to Plaintiffs' Motion for Summary Judgment .

3.     Attached to this declaration as **Exhibit B** is a true and correct copy of excerpts from the deposition of William Schmicker, taken February 4, 2010 which are cited in the City's Response to Plaintiffs' Motion for Summary Judgment.

**DECLARATION OF JEFFREY MYERS IN
RESPONSE TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT    – 1**

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON RD., TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480  FAX: (360) 357-3511*

4.   Attached as **Exhibit C** is a true and correct copy of excerpts from the deposition of Robert Eichler (including Deposition Exhibit 4) taken February 15, 2010, which are cited in the City's Response to Plaintiffs' Motion for Summary Judgment.

5.   Attached as **Exhibit D** is a true and correct copy of excerpts from the deposition of Jeanne-Marie Wilson, taken February 15, 2010, which are cited in the City's Response to Plaintiffs' Motion for Summary Judgment.

6.   Attached as **Exhibit E** is a true and correct copy of TMC 18.08.020-.040, TMC 18.10.020-.040 and TMC 18.12.020 -.040, which are referenced in the City's Response Brief.

7.   The Court should strike the Declaration of John Woodring (Doc. 15-9) filed in support of plaintiff's motion for summary judgment because it purports to give factual support to plaintiffs' argument and does not comply with the requirements of FRCP 56(e). Mr. Woodring is an attorney for plaintiff, and has not been identified as a lay witness nor qualified as an expert witness in this case. A supporting affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. FRCP 56(e).

8.   Defendant therefore requests, pursuant to Local Rule CR 7(g) that this Court strike the inadmissible portions of the Woodring Declaration as follows:

| PARAGRAPH OBJECTED TO | STATEMENT OF OBJECTION | FRE GROUND FOR OBJECTION |
|---|---|---|
| ¶ 3, Sentence 1 | Statement does not set out facts. Strike as irrelevant, misleading and prejudicial. Presents an opinion by lay witness and is not helpful to a clear understanding of the testimony. | 402, 403, 701 |
| ¶ 3, Sentence 2 | Strike as misleading and prejudicial; contains hearsay and is an improper characterization of evidence.[1] | 403, 802, 1004 |

---

[1] Declarant purports to quote Council member Ed Stanley's comments at a hearing. However, the Ex. D at 3, attached to Missal Decl. cited in support is not a certified transcript of hearing, but rather uncertified minutes of the meeting taken by Jessica Tate.

**DECLARATION OF JEFFREY MYERS IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT   – 2**

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON RD., TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480  FAX: (360) 357-3511*

| ¶ 4 Sentence 1 | Statement does not set out facts. Strike as irrelevant, misleading and prejudicial. Presents an opinion by a lay witness and is not helpful to a clear understanding of the testimony. | 402, 403, 701 |
|---|---|---|
| ¶ 4 Sentence 2 | Strike as irrelevant, and references hearsay. | 402, 802 |
| ¶ 4 Sentence 3 | Strike as irrelevant, prejudicial and misleading conclusion based on hearsay. | 402, 403, 802 |
| ¶4 Sentence 4 | Strike as an lay opinion based on mischaracterized evidence and hearsay. | 402, 602, 802 |
| ¶ 4 Sentence 6 | Strike because presents lay opinion not grounded in personal knowledge. Statement is misleading and prejudicial. *See* characterization of action as "To support this position..." | 403, 602, 701 |
| ¶ 5, Sentence 1 | Strike as misleading and prejudicial, lacks personal knowledge, presents an opinion by a lay witness. | 403, 602, 701 |
| ¶ 5, Sentence 2 | Strike as misleading and prejudicial, and contains legal argument. Sentence qualified by introduction "To overcome the legal infirmities" presents an opinion by a lay witness. Strike also as lacks personal knowledge as to "Tumwater's real goals and intent." | 403, 602, 701, |
| ¶ 6 | Strike entire paragraph because it contains hearsay, is not based on personal knowledge, presents legal argument and is misleading and prejudicial. | 403, 602, 802 |
| ¶7, Sentence 2 | Strike as misleading and prejudicial, speculative, and presents opinion and argument. | 403, 602, 701, 702 |
| ¶ 8, Sentence 1 | Sentence is not factual. The statement, "These actions are important to the Court's analysis" clearly indicates legal argument that should be excluded pursuant to 56(e). Strike also as opinion not presented by a qualified expert witness on which the expert is competent to provide an opinion. | 403, 701, 702 |
| ¶ 8, Sentence 2 | Strike because presents legal argument and/or opinion not presented by a qualified expert witness. Statement is misleading and prejudicial. *See* characterization of statements as "self serving." | 403, 701, 702 |
| ¶ 8, Sentence 3 | Strike because presents legal argument and/or opinion not presented by a qualified expert witness. Statement is misleading and prejudicial. *See* comment "Not suprisingly..." | 403, 701, 702 |

**DECLARATION OF JEFFREY MYERS IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT   – 3**

*LAW, LYMAN, DANIEL,*
*KAMERRER & BOGDANOVICH, P.S.*
*ATTORNEYS AT LAW*
*2674 RW JOHNSON RD., TUMWATER, WA 98512*
*PO BOX 11880, OLYMPIA, WA 98508-1880*
*(360) 754-3480  FAX: (360) 357-3511*

| ¶ 8, Sentence 4 | Strike because presents legal argument and/or opinion not presented by a qualified expert. Statement is misleading and prejudicial. *See* comment, that predicates are "incomplete and one-sided." | 403, 701, 702 |
|---|---|---|
| ¶ 9, Sentence 1 | Strike because presents legal argument and/or opinion not presented by a qualified expert. Statement is misleading and prejudicial. *See* comments "Tumwater's predisposition," and the "very unusual step..." | 403, 701, 702 |
| ¶ 9, Sentence 2 | Strike hearsay statements. Declarant purports to quote Commissioner Mandeville, but the content within quotations is from uncertified minutes summarizing a Tumwater City Council meeting taken by Valerie Gow. Strike also because declarant lacks personal knowledge. | 602, 802 |
| ¶ 9, Sentence 3 | Strike because presents legal argument and/or lay opinion not helpful to a clear understanding of the testimony. Statement is speculative as to Commissioner Mandeville's state of mind and is misleading and prejudicial. | 403, 602, 701 |
| ¶ 9, Sentence 4 | Strike as misleading and prejudicial, presents legal argument, lay opinion and/or opinion not presented by a qualified expert and draws a legal conclusion. | 403, 602, 701, 701 |
| ¶ 10 | Strike as irrelevant, hearsay statements and legal argument. | 402, 602, 802 |
| ¶ 11 | Strike as irrelevant, hearsay statements and legal argument. | 402, 602, 802 |
| ¶ 12, Sentence 2-3 | Strike as irrelevant, and states expert opinion by person not qualified as an expert. | 402, 702 |
| ¶¶ 13-15 | Strike these paragraphs in their entirety because they contain argument and conclusions of law, hearsay, and lay opinion and they are prejudicial and misleading. | 403, 602, 701, 802 |
| ¶ 16 | Strike because lacks foundation, and presents hearsay, legal argument and/or lay opinion not based on personal knowledge and speculates as to the City Council's response to a recommendation. *See* "This recommendation was ignored..." | 403, 602, 701, 802 |
| ¶ 17 | Strike entire paragraph as irrelevant, misleading and prejudicial, and presents opinion and argument. | 402, 403, 602, 701 |

**DECLARATION OF JEFFREY MYERS IN RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT   – 4**

1    I declare under penalty of perjury under the laws of the state of Washington and the

2  United States of America that the foregoing is true and correct.

3    Executed this 22nd day of March, 2010 at Tumwater, Washington.

4

5                                LAW, LYMAN, DANIEL,
                                 KAMERRER & BOGDANOVICH, P.S.
6

7                                Jeffrey S. Myers, WSBA #16390
8                                LAW, LYMAN, DANIEL, KAMERRER
                                 & BOGDANOVICH, P.S.
9                                P.O. Box 11880
                                 Olympia, WA 98508-1880
10                               (360) 754-3480
                                 Fax: (360) 357-3511
11                               E-mail: jmyers@lldkb.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**DECLARATION OF JEFFREY MYERS IN**          <span style="font-style:italic">LAW, LYMAN, DANIEL,</span>
**RESPONSE TO PLAINTIFF'S MOTION FOR**       <span style="font-style:italic">KAMERRER & BOGDANOVICH, P.S.</span>
**SUMMARY JUDGMENT    — 5**                  ATTORNEYS AT LAW
                                             2674 RW JOHNSON RD., TUMWATER, WA 98512
                                             PO BOX 11880, OLYMPIA, WA 98508-1880
                                             (360) 754-3480  FAX: (360) 357-3511

# EXHIBIT A

Case 3:09-cv-05312-BHS   Document 29   Filed 03/22/10   Page 7 of 55
James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 1

1                UNITED STATES DISTRICT COURT

2         THE WESTERN DISTRICT OF WASHINGTON AT TACOMA

3   _____

4   LAUREL PARK COMMUNITY, LLC, a        )
    Washington limited liability         )
5   company; TUMWATER ESTATES            )
    INVESTORS,  a California limited     )
6   partnership; VELKOMMEN MOBILE        )
    PARK, LLC, a Washington limited      )
7   liability company; and               )
    MANUFACTURED HOUSING COMMUNITIES     )
8   OF WASHINGTON, a Washington          )
    non-profit corporation,              )
9                                        )
                 Petitioner(s),          )
10                                       )
            vs.                          )    No. C09-5312 BHS
11                                       )
    CITY OF TUMWATER, a municipal        )
12  corporation,                         )
                                         )
13               Defendant(s).           )

14   _____

15         DEPOSITION UPON ORAL EXAMINATION OF

16                JAMES W. ANDERSEN

17                January 29, 2010
                Tumwater, Washington
18   _____

19                 Taken Before:
           SUE E. GARCIA, CCR # 2781, RPR
20         Registered Professional Reporter
                       of
21          Capitol Pacific Reporting, Inc.
       2401 Bristol Court SW, #A-104, Olympia, WA 98502
22        Tel (360) 352-2054    Fax (360) 705-6539
                Toll Free (800) 407-0148
23   Tacoma      Seattle     Aberdeen     Chehalis     Bremerton
     (253)        (206)       (360)        (360)         (360)
24  564-8494     622-9919    532-7445     330-0262     373-9032
           e-mail: admin@capitolpacificreporting.com
25            www.capitolpacificreporting.com

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 6

1          The court reporter here is taking down a verbatim

2      transcript so that that can be used in court

3      proceedings.  And it's important that we try not to

4      talk on top of each other.  And so when I ask you a

5      question, make sure I'm done, and then answer the

6      question so that she can take things down.

7          If there are objections made -- Mr. Olsen may make

8      objections -- let him make his objection, and then

9      normally, unless he instructs you otherwise, you will

10     get to answer the question, and we'll proceed on from

11     there.

12         If you need to take break for any reason, let us

13     know.  But if there is a question pending, what I would

14     like you to do is finish the answer to that question,

15     and then we'll take a break.

16         And it's also important that we try to understand

17     each other so that you understand the question I'm

18     asking.  If you have any confusion at all, please don't

19     hesitate to ask me to clarify the question, and I'll

20     try to rephrase it so that you have a good

21     understanding.  If you just answer the question, I'm

22     going to assume that you understood it.  Okay?

23   A   Okay.

24   Q   You are the owner of Velkommen Mobile Home Park?

25   A   No.  I am part of the LLC.

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

| | | |
|---|---|---|
| 1 | Q | Part of the LLC? |
| 2 | A | Correct. |
| 3 | Q | What's your position with the LLC? |
| 4 | A | Manager. |
| 5 | Q | Okay.  And how long have you been the manager of the |
| 6 | | LLC? |
| 7 | A | I believe the LLC came into an existence about ten |
| 8 | | years ago.  I've been managing it, though, since senior |
| 9 | | in high school. |
| 10 | Q | Do you live there? |
| 11 | A | No.  I have in the past. |
| 12 | Q | And when were you a senior in high school? |
| 13 | A | Back in '84. |
| 14 | Q | '84? |
| 15 | A | '84, '85. |
| 16 | Q | Tumwater High School? |
| 17 | A | Yep. |
| 18 | Q | And what was your education after high school? |
| 19 | A | I went to South Puget Sound for about a year and then |
| 20 | | started working for the State. |
| 21 | Q | And what's your employment history after South Puget |
| 22 | | Sound Community College? |
| 23 | A | I've worked Mervyn's for about four years and then |
| 24 | | started working for the State thereafter. |
| 25 | Q | What do you do for the State? |

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 13

```
 1   A    We're hoping that your ordinance goes away.

 2   Q    So you haven't filed any tax appeal of your current

 3        assessment?

 4   A    No.

 5   Q    Do you think that operation of a mobile home park is

 6        detrimental to the properties that surround your mobile

 7        home park?

 8   A    No.

 9   Q    Do you believe that maintaining or preserving

10        affordable housing is a legitimate public goal for the

11        City of Tumwater to be interested in?

12   A    Yes.

13   Q    And is a mobile home park like the one you operate a

14        source of affordable housing?

15   A    Yes.

16   Q    Okay.  And when you testified to the city council, I

17        believe you expressed some concerns about the rates

18        that you were charging your tenants.  Do you recall

19        that?

20   A    The rates.  What rates?  The rent?

21   Q    The rental rates.

22   A    I'm concerned with what we will be forced to charge

23        them.

24   Q    Explain what --

25            Is there anything in the mobile-home-park zoning
```

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 19

```
 1          viable.
 2    Q     Have you done investigations as to the cost to extend
 3          city sewer?
 4    A     Yes, I have.
 5    Q     Okay.  What types of costs are involved in doing that?
 6    A     According to your guys down here in your own office
 7          here, it was about -- I believe they had said three --
 8          three to -- about $300,000 for the city sewer, and
 9          that's doesn't include the construction part of it.
10          Over $100,000 just to connect up to our existing water
11          lines, and that is not running meters out to
12          individuals and does not, I don't believe, include
13          running it down the street either.  And the city sewer
14          is still a ways away.  It's on the corner of Littlerock
15          Road.  So I have to pay an additional to bring it to
16          the park.
17    Q     And if you wanted to redevelop it to some other use
18          besides the mobile home park, you would have to incur
19          all of those costs, as well, would you not?
20    A     Correct, at a higher density.
21    Q     Do you know when your parents purchased the mobile home
22          park?  1977 I believe is what you said.
23    A     I believe I told you '75.
24    Q     '75.  Do you know how much they paid?
25    A     No, I don't.
```

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 33

```
 1            we've paid all these years, stripped that right away
 2            because we've been paying for medium density and now
 3            we're at basically low density.  So here we've been
 4            paying all this money in taxes, and now -- now we're
 5            being --
 6    Q       And you've been paying that money since -- since it was
 7            annexed into the City and --
 8    A       Be prior to that.
 9    Q       How long has it been zoned medium family, or . . . ?
10    A       I'm not aware.
11    Q       "Multifamily medium," I think, is the correct term.
12    A       I'm not aware of the exact time.
13    Q       Are you aware of any time in the past before the
14            adoption of the mobile-home-park zoning when it was
15            zoned something other than medium family or multifamily
16            medium?
17    A       I didn't keep up on the zoning.
18    Q       Okay.  When did you first learn about the proposal to
19            change to a mobile home park or manufactured housing
20            community district?
21    A       I believe I either I saw it in the paper, or Phyllis
22            gave me a notice that came in the mail, one or the
23            other.
24    Q       Was it an article, or was it a notice that the City had
25            published that it was considering the ordinance?  Do
```

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

```
 1   Q   I'm asking specifically about your conversations with
 2       your mother concerning that.
 3   A   We have talked about selling it and whether or not
 4       there would be houses being put in there or developing
 5       it ourselves.
 6   Q   Okay.  When did you discuss developing it yourself with
 7       your mother?
 8   A   It wasn't real in-depth talk.  It was just, you know,
 9       just like little whims.  It wasn't, "Let's go talk to
10       an architect.  Let's go do all this."  It was
11       just . . .
12   Q   So you never consulted with a land-use planner?
13   A   No.  Not -- I myself never have.
14   Q   Do you know if your mother ever did?
15   A   I have no idea.
16   Q   As the managing agent or the managing partner of
17       Velkommen Mobile Park, LLC, would you say you're in a
18       position to know if that consultation occurred?
19   A   In the last three years I've been in that position.
20       Even though I've been managing the park, I wasn't part
21       of the LLC general manager.
22   Q   So you only became the general manager of the LLC about
23       three years ago?
24   A   I believe it was three years ago.  Could be four.
25   Q   2006?
```

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 44

1    A    About that.

2    Q    Who was the general manager of the LLC before that?

3    A    Nobody.

4    Q    What was the decision-making structure before you

5         became the general manager?

6    A    Well, she made her decisions of what she thought needed

7         to be done.  Sometimes she'd work with contractors, get

8         work done in the park.  Other times I would.

9    Q    With regard to possible redevelopment of the park, was

10        there any -- ever any written plans that you have seen

11        to convert it to any specific use?

12   A    Written plans, I have not seen any.

13   Q    And without written plans there were certainly no

14        applications made to Thurston County or the City of

15        Tumwater for approval to convert it to another use?

16   A    Not since '85 that I am aware of.

17   Q    Okay.  I want to go ahead and have . . .

18                          (Deposition Exhibit No(s). 6 marked

19                           for identification.)

20

21   Q    (By Mr. Myers) This is the brokerage agreement that was

22        provided to the City in the response to the discovery

23        in this case.

24             Are you familiar with this document?

25   A    Yeah.  I think I've seen it.

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 83

1              C E R T I F I C A T E

2         I, SUE E. GARCIA, a duly authorized Court Reporter and

3    Notary Public in and for the State of Washington, residing

4    at Tacoma, do hereby certify:

5         That the foregoing deposition of JAMES W. ANDERSEN was

6    taken before me on the 29th of January, 2010, and thereafter

7    transcribed by me by means of computer-aided transcription,

8    that the deposition is a full, true, and complete transcript

9    of the testimony of said witness;

10        That the witness, before examination, was by me duly

11   sworn to testify to the truth, the whole truth, and nothing

12   but the truth, and that the witness RESERVED signature;

13        That I am not a relative, employee, attorney, or

14   counsel of any party to this action or relative or employee

15   of any such attorney or counsel, and I am not financially

16   interested in the said action or the outcome thereof;

17        That upon completion of signature, if required, I shall

18   herewith securely seal the original deposition transcript

19   and serve the same upon JEFFREY S. MYERS, counsel for the

20   DEFENDANT(S).

21        IN WITNESS HEREOF, I have hereunto set my hand and

22   affixed my official seal this February 9, 2010.

23

24

25                                  _____
                                       SUE E. GARCIA
                                       WA Lic. No. 2781

January 29, 2010
**Myers p. 14**          Capitol Pacific Reporting 1-800-407-0148

# EXHIBIT B

1

2                UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
3                        AT TACOMA

4   _____

5   LAUREL PARK COMMUNITY, LLC, a        )
    Washington limited liability         )
6   company; TUMWATER ESTATES            )
    INVESTORS, a California limited      )
    partnership; VELKOMMEN MOBILE        )      No. C09-5312 BHS
7   PARK, LLC, a Washington limited      )
    liability company; and              )
8   MANUFACTURED HOUSING COMMUNITIES    )
    OF WASHINGTON, a Washington         )
9   non-profit corporation,             )
                                        )      COPY
10                    Plaintiffs,       )
                                        )
11           vs.                        )
                                        )
12  CITY OF TUMWATER, a municipal       )
    corporation,                        )
13                                      )
                      Defendant.        )
14  _____

15       DEPOSITION UPON ORAL EXAMINATION OF

16                WILLIAM SCHMICKER

17               February 4, 2010
                Tumwater, Washington
18  _____

19                 Taken Before:
          Connie Church, CCR #2555, RPR, CRR
20              Certified Court Reporter
                        of
21          CAPITOL PACIFIC REPORTING, INC.
           2401 Bristol Court SW, Suite A-104
22              Olympia, WA  98502
      Tel (360) 352-2054 or (800) 407-0148   Fax (360) 705-6539
23

24          www.capitolpacificreporting.com
            admin@capitolpacificreporting.com
25

1   A   You know, I really don't know.

2   Q   With regard to manufactured housing parks, do you believe

3       that that is a form of affordable housing?

4   A   Yes.

5   Q   And do you believe that maintaining affordable housing is

6       a legitimate public goal?

7   A   Yes.

8   Q   Let me ask you about the space rent that you charge on

9       the property.  What are the current space rents at

10      Tumwater Mobile Estates?  And before we do that, why

11      don't we have this marked as an exhibit.

12                              (Deposition Exhibit No. 1 marked
                                 for identification.)
13

14  Q   (BY MR. MYERS) This is Exhibit 1, which is the rent roll

15      that you provided.

16  A   At the time that that rent roll was provided, average

17      rent was about $437, which includes all of our utilities,

18      charges.  The numbers you see there are just the basic

19      space rent.  And we charge for water, sewer, trash, cable

20      TV and a - there's a storm sewer charge.

21  Q   So the basic rental rate would be under the column

22      "Actual Rate"?

23  A   Yes.  I think so.  Let me look at it.  You know, I think

24      you should disregard the "Standard Rate" column because I

25      don't think that is an applicable column.  The

1  A  Well, I don't think it's very well written.  And he says

2     a full feasibility study would be required.  And I don't

3     think he would purport that this is such a study.  He's

4     just, you know, putting some terms in there.  And so, you

5     know, I would personally take exception with, you know,

6     the language he has in here.

7  Q  What would you take - specifically would you take

8     exception with?

9  A  Well, he doesn't mention the fact that there's commercial

10    property in the area.

11 Q  Okay.

12 A  You know.  So I think that's . . .   You know.  How can

13    you miss that?

14 Q  You see under --

15 A  I don't think he probably ever thought anybody was really

16    going to be reading that paragraph with great interest

17    so.

18 Q  Let me refer you then to the previous page under "Legally

19    Permissible Use," where he describes the site being

20    split-zoned, multifamily high and single family medium

21    residential.  Do you know if those zones allow commercial

22    development?

23 A  You know, I'm not familiar with your zoning ordinances,

24    you know, to the degree that I would need to be.  But

25    it's my belief from observation in the past and

WILLIAM SCHMICKER - By Mr. Myers

1    experience that municipalities are willing to rezone

2    multifamily land for commercial land because of the tax -

3    sales tax issue.

4    Q    Is it your experience that they're willing to rezone

5         mobile home parks as commercial property in order to get

6         that sales tax?

7    A    It is.  I've seen it done, yes.  But I will confess to

8         you I've seen it resisted.  Okay.

9    Q    And then on Bates page 42, under "Subject Site 'As

10        Improved,'" Mr. Robinson's appraisal says that, "The

11        remaining option, to remain as is, is considered the best

12        option."

13             And this is under "Physically Possible Use."  Do you

14        see where he says that?

15   A    "The remaining option, to remain as is, is considered the

16        best option."  Okay.

17   Q    Yes.  Do you agree or disagree with that statement?

18   A    At the present time, I agree.

19   Q    Okay.  And do you agree with his conclusion that as

20        improved, the highest and best use of the Tumwater Mobile

21        Estates property is as a manufactured home park?

22   A    At the present time, you know, with - without the

23        presence of this ordinance, I would have concurred with

24        that.

25   Q    So let me then ask you:  Before the city adopted that

CAPITOL PACIFIC REPORTING, INC. (800) 407-0148

WILLIAM SCHMICKER - By Mr. Myers

1   A   Is that relevant?

2   Q   I'm trying to figure out what your experience is with

3       churches.

4   A   Well, we bought a piece of property off of a church

5       recently that we developed a self-storage project on and

6       it had been given to them.  That's how I know that.

7   Q   Are you familiar with what has been called a megachurch?

8       Ever heard that term?

9   A   No.

10  Q   Familiar with an individual by the name of Robert

11      Schuller and the Crystal Cathedral?

12  A   I think I've heard of Robert Schuller.  But I'm not . . .

13  Q   Do you think that his use of a church would be

14      economically viable?

15  A   I have no idea.

16  Q   Okay.  Let's see.

17  A   If he wants to pay me 26 million for the property though,

18      we'll make a deal.

19  Q   Let me ask you this:  Have you done any analysis to

20      pencil out whether any of the conditional uses that are

21      allowed in the mobile home park zoning would be

22      economically viable?

23  A   I've not done any calculations to determine whether or

24      not they are.  But, you know, I mean my experience in the

25      business tells me that you don't see these kinds of uses,

CAPITOL PACIFIC REPORTING, INC. (800) 407-0148

WILLIAM SCHMICKER - By Mr. Myers

1    particularly on high value land.

2              MR. MYERS:  Okay.  Those are all the questions I

3    have.  Do you have any?

4              MR. BRANSON:  Anything you want to clarify?

5              THE WITNESS:  No.  I think not.

6                        (Concluded at 3:15 p.m.)

7.                       (Signature reserved.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAPITOL PACIFIC REPORTING, INC. (800) 407-0148

1          C E R T I F I C A T E

2

3          I, CONNIE CHURCH, a duly authorized Court Reporter and

4    Notary Public in and for the State of Washington, residing at

5    Montesano, do hereby certify:

6          That the foregoing deposition of WILLIAM SCHMICKER was

7    taken before me on February 4, 2010, and thereafter transcribed

8    by me by means of computer-aided transcription; that the

9    transcript is a full, true and complete transcript of the

10   testimony of said witness;

11         That the witness, before examination, was by me duly

12   sworn to testify the truth, the whole truth and nothing but the

13   truth, and that the witness reserved signature;

14         That I am not a relative, employee, attorney or

15   counsel of any party to this action or relative or employee of

16   any such attorney or counsel, and I am not financially

17   interested in the said action or the outcome thereof;

18         That upon completion of signature, if required, I

19   shall herewith securely seal the original transcript and serve

20   same upon Mr. Jeff Myers, counsel for the Defendants.

21         IN WITNESS WHEREOF, I have hereunto set my hand and

22   affixed my official seal this 9th day of February, 2010.

23

24                              Connie Church
                                CONNIE CHURCH
25                              CERTIFIED COURT REPORTER
                                CCR #2555

# EXHIBIT C

Page 1

1
                    UNITED STATES DISTRICT COURT
2                  WESTERN DISTRICT OF WASHINGTON
                              AT TACOMA
3
4
     LAUREL PARK COMMUNITY, LLC, a      )
5    Washington limited liability       )
     company; TUMWATER ESTATES          )
6    INVESTORS, a California limited    )
     partnership; VELKOMMEN MOBILE      )        No. C09-5312 BHS
7    PARK, LLC, a Washington limited    )
     liability company; and            )
8    MANUFACTURED HOUSING COMMUNITIES   )
     OF WASHINGTON, a Washington        )
9    non-profit corporation,           )
                                        )
10                        Plaintiffs,   )
                                        )
11            vs.                       )
                                        )
12   CITY OF TUMWATER, a municipal      )
     corporation,                       )
13                                      )
                          Defendant.    )
14
15            DEPOSITION UPON ORAL EXAMINATION OF
16                        ROBERT EICHLER
17                      February 15, 2010
                        Tumwater, Washington
18
19                       Taken Before:
              Connie Church, CCR #2555, RPR, CRR
20               Certified Court Reporter
                             of
21            CAPITOL PACIFIC REPORTING, INC.
              2401 Bristol Court SW, Suite A-104
22                  Olympia, WA  98502
        Tel (360) 352-2054 or (800) 407-0148   Fax (360) 705-6539
23
24             www.capitolpacificreporting.com
               admin@capitolpacificreporting.com
25

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 10

1      my mobile home park.

2   Q   Do you believe that the mobile home park is, in any way,

3       detrimental to the surrounding community?

4   A   Yes, I do.  I think that mobile home parks normally are

5       considered depreciative of values.  It's always been an

6       old joke.  Nobody wants to live next to an old mobile

7       home park.

8   Q   Is your mobile home park detrimental to the surrounding

9       community?

10  A   I don't know.

11  Q   Do you believe that maintaining affordable housing is a

12      legitimate goal for the City of Tumwater?

13  A   Yes.

14  Q   And do you believe that manufactured housing parks

15      provide a source of affordable housing compared to other

16      housing types?

17  A   Yes.

18  Q   Okay.  When did you purchase Laurel Park?

19  A   In September of 1991.

20  Q   How much did you pay?

21  A   A million three.

22  Q   And did you finance the property at that time?

23  A   Yes.

24  Q   And was an appraisal done of the property?

25  A   Not to my knowledge.

1      proposals to the city.

2    Q  Okay.  Do you know whether or not there was a preliminary

3      plat application, whether there was the application that

4      got you on the way to the building permit?

5    A  I don't remember those details.

6    Q  Okay.  Is it . . .  Do you have an understanding of what

7      a preliminary plat application is?

8    A  Again, let me say I'm not a developer.  I'm just starting

9      to think about developing my properties.  And I don't

10     know all the terms.

11   Q  Okay.  Fair enough.  In terms of Laurel Park, have you

12     ever made any application to either Thurston County or

13     the City of Tumwater to get you on the road to building

14     permits for redevelopment?

15   A  No.

16   Q  Okay.  Let's go back to your declaration, Exhibit 3.  And

17     in paragraph 6, you discuss some of the provisions of the

18     2009 manufactured home park ordinance.  Have you read the

19     2009 manufactured home park ordinance?

20   A  Yes.  Just recently.

21   Q  Okay.  Did you read it before you signed this

22     declaration?

23   A  Not in its entirety.

24   Q  In this paragraph, you state that the additional uses

25     that you are allowed to put your property under the

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 48

```
 1        existing zoning are not economically viable uses of your
 2        property because some, like parks and trails, are no
 3        income at all.  Can you tell me what analysis you have
 4        done to determine whether additional uses would be
 5        economically viable or not?
 6    A   My own personal opinion and being in the business that
 7        I'm in, there are no things on this list of 23 things or
 8        whatever it is that appear to me to be economically
 9        viable.
10    Q   Okay.  Have you done any investigation as to the
11        economics of doing support and child care facilities?
12    A   No.
13    Q   Have you done any investigation as to the economics of a
14        church or cemetery use?
15    A   No.
16    Q   In the last sentence on paragraph - or page 2 carrying
17        over to page 3, you discuss institutional uses, such as
18        churches, cemeteries and essential public facilities.
19        And at the top of page 3, you state a church or a
20        cemetery is hardly a viable economic use.  Can you tell
21        me what the basis for that conclusion is?
22    A   Certainly it's my opinion and it's based on reality.  How
23        could a church or a cemetery return the type of
24        investment that a mobile home park would return.
25    Q   Okay.  Have you had any experience in dealing with
```

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 49

1          cemeteries and how they make money?

2     A    No.

3     Q    Did you do any investigation to support this statement

4          that the possibility of return from such a use is

5          illusory?

6     A    Only my own opinion and informal visits with many other

7          people in real estate and development.

8     Q    Okay.  Have you had any informal visits with anyone who

9          is in the cemetery business?

10    A    No.

11    Q    Are you familiar with a church in South King County which

12         is run by a Pastor Casey Treat?

13    A    No.

14    Q    Have you heard of churches that are referred to as

15         mega churches?

16    A    Yes.

17    Q    Tell me what - your understanding of what a mega church

18         is.

19    A    I believe a mega church is a church that has a large

20         population of churchgoers and is a building that's of

21         much greater size than at least I would think of an

22         average town or city church.

23    Q    Have you done any analysis of the demand for real estate

24         that is created by mega churches?

25    A    No.

Page 50

1    Q    Do you believe that a mega church might be interested in

2         purchasing large chunks of property to locate their

3         facilities?

4    A    Ask me that again.

5    Q    Do you believe that a large church, such as a mega

6         church, would be interested in buying large chunks of

7         property to locate their facilities on?

8    A    I believe they might be interested in . . .  Yes.

9    Q    And have you done any analysis of how much a church like

10        that might be willing to pay for property?

11   A    No.

12   Q    Let's go down to paragraph 7, in which you discuss the

13        current appeal that is pending before the City of

14        Tumwater concerning relocation of a manufactured house

15        within Laurel Park.  Can you tell me what your

16        understanding of the dispute is in that appeal?

17   A    Just one moment, please.

18   Q    I'll give you a minute to read paragraph 7.  That may

19        refresh your memory.

20                            (Discussion held off record.)

21   Q    (BY MR. MYERS)  Have you had a chance to read

22        paragraph 7?

23   A    I would like to make a comment.  I read this over and I

24        signed it.  And this is my statement.  But I have seen an

25        error here --

# EXHIBIT D

Page 1

1                  UNITED STATES DISTRICT COURT
2                 WESTERN DISTRICT OF WASHINGTON
                           AT TACOMA
3

4
    LAUREL PARK COMMUNITY, LLC, a       )
5   Washington limited liability        )
    company; TUMWATER ESTATES           )
6   INVESTORS, a California limited     )
    partnership; VELKOMMEN MOBILE       )      No. C09-5312 BHS
7   PARK, LLC, a Washington limited     )
    liability company; and             )
8   MANUFACTURED HOUSING COMMUNITIES    )
    OF WASHINGTON, a Washington         )
9   non-profit corporation,            )
                                        )
10                      Plaintiffs,     )
                                        )
11          vs.                         )
                                        )
12  CITY OF TUMWATER, a municipal       )
    corporation,                        )
13                                      )
                       Defendant.       )
14
15          DEPOSITION UPON ORAL EXAMINATION OF
16                   JEANNE-MARIE WILSON
17                   February 15, 2010
                    Tumwater, Washington
18
19                    Taken Before:
            Connie Church, CCR #2555, RPR, CRR
20             Certified Court Reporter
                           of
21          CAPITOL PACIFIC REPORTING, INC.
            2401 Bristol Court SW, Suite A-104
22               Olympia, WA  98502
    Tel (360) 352-2054 or (800) 407-0148   Fax (360) 705-6539
23
24          www.capitolpacificreporting.com
            admin@capitolpacificreporting.com
25

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 7

1        with?

2    A   I'm an associate member of the Appraisal Institute,

3        working towards the MAI designation.

4    Q   So you are not an MAI?

5    A   I am not.

6    Q   Can you tell me what the difference is between an

7        associate and an MAI?

8    A   MAI has taken a significant level of courses as well as

9        completed a demonstration report and experience credits,

10        which are checked by the institute, and sat for the test

11        basically.

12   Q   Okay.  How many credits are necessary to get to the MAI

13        status?

14   A   Well, there's a course of classes.  I have one more class

15        to take there and then the demo and sit for the test.

16   Q   Okay.  And so you have one more class to take?

17   A   Right.

18   Q   Are you a member of any other professional associations?

19   A   Chamber of Commerce, Thurston County.

20   Q   Are you a member of any other associations concerning the

21        real estate business?

22   A   No.

23   Q   Are you a member of the Manufactured Housing Communities

24        of Washington?

25   A   No.  I was when I was with PGP.  Or rather the firm was a

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

```
 1        member and I was their representative.

 2    Q   So you have not been a member or a participant in the

 3        Manufactured Housing Communities of Washington since

 4        1995?

 5    A   Right.  No.  Since I left the firm in 2001.

 6    Q   2001.

 7    A   Right.

 8    Q   Okay.  So after your completion of the three-year

 9        training program, you continued on at Palmer Groth and

10        Pietka?

11    A   Right.

12    Q   And was that as an analyst and then a senior analyst?

13    A   Right.

14    Q   What's the difference between an analyst and a senior

15        analyst?

16    A   Experience.

17    Q   When did you formally become a senior analyst?

18    A   I don't recall.

19    Q   How are you being compensated for your services in this

20        lawsuit?

21    A   At this point, these - work up to this point has been on

22        an hourly basis.

23    Q   What's your rate?

24    A   250.

25    Q   Have you ever provided services in lawsuits before?
```

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 9

```
 1    A    I was in discussions with another attorney at one point
 2         in a trial that actually ended up settling out of court,
 3         so I never did any depositions or prepared any work
 4         product.
 5    Q    What was the nature of that lawsuit?
 6    A    It was a manufactured housing community in Snohomish
 7         County.  It was a familial disagreement.
 8    Q    So it was a dispute between family members, and the value
 9         of the mobile home park was --
10    A    Right.
11    Q    -- an asset they were arguing about?
12    A    An issue.  Right.
13    Q    Have you had any other lawsuits that you've had
14         experience with?
15    A    No.
16    Q    Have you ever been qualified to testify as an expert
17         witness?
18    A    No.
19    Q    Have you authored any publications in the last 10 years?
20    A    When I was with PGP, they put together a newsletter, a
21         manufactured housing community newsletter, for interested
22         clients and investors.  And we discussed various topics
23         surrounding manufactured home communities and the
24         ownership.  We put that out on a quarterly basis.  And I
25         worked with a team of appraisers out of the Sacramento
```

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 11

1      copy of the report that you prepared dated December 7th,

2      2009.  Are you familiar with your report?

3   A  Yes.

4   Q  Okay.  What was the nature of the appraisal problem you

5      were asked to address?

6   A  It was my understanding that plaintiff's counsel needed

7      to establish me as an expert witness in a short period of

8      time.  And so we limited the scope of work to include

9      valuation of the parks or the subject properties by the

10     income approach under continued use with the

11     understanding that I would be completing a

12     before-and-after analysis prior to trial.

13  Q  Did you complete that before-and-after analysis as part

14     of your December 7th report?

15  A  No.

16  Q  What type of report is your preliminary report?

17  A  Well, I was asked to model it after the Federal

18     26(a)(2)(B), and I called it a Summary Appraisal Report

19     under USPAP for compliance purposes.

20  Q  On page 1, it notes that you were retained on

21     December 4th, 2009.

22  A  Mm-hmm.

23  Q  And your report was due on December 7th?

24  A  Right.

25  Q  Mr. Olsen was the one who retained you?

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 13

```
 1    A   He said that the other appraiser was not available to do
 2        the work, the original.
 3    Q   Was three days sufficient to do a before-and-after
 4        analysis?
 5    A   No.
 6    Q   Did you discuss with Mr. Olsen the need to do a before
 7        analysis?
 8    A   Yes.
 9    Q   Tell me what your discussions were with him.
10    A   Well, obviously the case centers around the before and
11        after values of these properties.  So that would, of
12        course, have to be established prior to trial.
13    Q   What was the effective date of value for the analysis
14        that you gave in Exhibit Number 1?
15    A   December 31st, 2009 (sic).
16    Q   Why did you select that date?
17    A   We discussed the fact that because we were valuing it
18        under continued use, it would be appropriate to use a
19        date prior to Tumwater's ordinance change and the zoning,
20        which was, I believe, March.
21    Q   So the opinions that you gave --
22    A   Oh, I'm sorry.  Did I say . . . December 31, 2008.
23    Q   2008.  So the opinions of value that you have on page 3
24        reflect a value before the city adopted the mobile home
25        park ordinance?
```

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 14

1    A    Correct.

2    Q    And the opinions as to value that you have are for

3         fee simple market value?

4    A    Right.

5    Q    How do you define that term?

6    A    Well, I included it in the supplemental appraisal

7         information on page 12.

8    Q    So the definition of "market value" that you have on

9         page 12 is the same as fee simple market value; correct?

10   A    Yes.

11   Q    And were you defining it in an as-is condition?

12   A    Yes.

13   Q    Hence the definition of "as-is market value" on page 12?

14   A    Right.

15   Q    What assumptions did you make about highest and best use

16        in defining the value of these mobile home parks?

17   A    My assumption as to highest and best use was continued

18        use as a manufactured home community.

19   Q    What methodologies were available to you to estimate the

20        value of the mobile home parks in preparation for this

21        report?

22   A    Well, we specific - I specifically used the income

23        capitalization approach to value.

24   Q    Okay.  What other methodologies were available?

25   A    Sales comparison approach is often another technique or

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 17

1        would have printed the current zoning as well as the

2        zoning under my effective date of valuation.  So I have

3        both in my file.

4   Q   Okay.  Can you tell me why your report does not mention

5        the mobile home park zoning?

6   A   Because the limited scope of my assignment was under

7        continued use as a manufactured home park.

8   Q   And you brought your file with you today in response to

9        the subpoena --

10  A   I did.

11  Q   -- that we sent?

12  A   Mm-hmm.

13  Q   Okay.  What I'd like to do now is take a short break and

14       examine what you brought off the record, and then we'll

15       continue back on the record.

16                (Recess was taken.)

17           MR. MYERS:  Let's go back on the record.

18  Q   (BY MR. MYERS)  Mrs. Wilson, in your notebook, you have

19       it organized with tabs.  First tab is single-family

20       residential comps from Mr. Shapiro, which includes a

21       table from his analysis; multifamily comps from

22       Mr. Shapiro; review document to Walt, which is your

23       February 7th report; copy of your January 10th

24       declaration.  And that's a draft that . . .  Is that the

25       date you began to prepare that declaration, the

**Myers p. 38**

February 15, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 42

1       allowed in that district?

2    A  No.

3    Q  Have you examined any of the conditional uses allowed in

4       the Manufactured Home Park Zoning District to determine

5       whether they could be economically viable uses?

6    A  No.

7    Q  In paragraph 10, you state that, "The ordinances have

8       transferred property rights from park owners to their

9       tenants."  Did you draft that sentence?

10   A  Yes.

11   Q  What property right has been transferred to the tenants?

12   A  Well, the bundle of sticks, I think, which is sort of the

13      basis of ownership, because the park owner can't any

14      longer redevelop this park, has - he's restricted in that

15      he can only continue the existing use.  And I believe

16      that gives ownership, in part, to the existing tenant

17      base.

18   Q  Does the tenant have the right to redevelop the park?

19   A  No.

20   Q  Does the zoning ordinance prevent the landlord from

21      terminating his tenants' tenancy?

22   A  No.

23   Q  You state here that the zone change by the district is

24      akin to a long-term lease in favor of the tenants.  How

25      is it similar to a long-term lease?

1    A    Basic, yeah.

2    Q    Would it be your understanding that the uses authorized

3         by the zoning would be allowed uses, accessory uses and

4         conditional uses?

5    A    Right.  Right.

6    Q    And you have done no analysis to see whether or not the

7         conditional uses authorized by the zoning code are not

8         economically viable; is that right?

9    A    When I have considered the primary uses allowed, they

10        were limited to such a degree that, no, I didn't go on

11        and look at the conditional uses.

12   Q    Is it possible that a conditional use would be

13        economically viable, such as a church or a cemetery?

14   A    I'm sure it's possible.

15   Q    And would you agree that for the three parks in Tumwater,

16        operation of a manufactured housing community is an

17        economically viable use?

18   A    Yes.

19   Q    I want to go back to paragraph 10, because I'm a little

20        confused as to exactly which property right the tenant

21        receives from the park owner.  You mentioned the bundle

22        of sticks.  Can you identify which stick?

23   A    I believe the tenant now has a more secure position with

24        the ground lease than they would have in the before

25        situation.  But I cannot label a specific stick for you.



Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 56

1    A    No.  They're just more established.

2    Q    What do you mean more established?

3    A    Than some of the uses.  They've been there longer than

4         some of the newer subdivisions that have gone in.  That's

5         all.

6    Q    Okay.  In paragraph 15 on page 5 of your declaration, you

7         talk about how ordinances have shifted value from park

8         owners to tenants.  Paragraph 15.  You see that?

9    A    Okay.  Yeah.

10   Q    What methodology did you use to determine whether there

11        was a shift in value from park owners to tenants?

12   A    I don't think there was a methodology.  It's – it's an

13        opinion.

14   Q    And what's the factual basis for that opinion?

15   A    If the landowner doesn't have full use of their property,

16        they have lost value.

17   Q    Can you quantify how much value has been shifted, in your

18        opinion, from the park owners to the tenants?

19   A    No.

20   Q    Did you discuss this value shift in your December 7th,

21        2009 report?

22   A    No.

23   Q    Has this value shift been something created by a change

24        in circumstances since preparation of your report in

25        December of 2009?

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 60

1          that a fair statement?

2     A    In the immediate time frame.  Yes.

3     Q    Okay.  Have you done any analysis to determine when the

4          market might take an upswing in the future?

5     A    It's the basis of conversation.  But I haven't done any

6          specific analysis.

7     Q    Do you have any opinions as to when the market will take

8          an upswing in the future?

9     A    I think 2010 is going to be flat.  And after that, I

10         think it's anybody's guess.

11    Q    Do you have any opinions as to when the park owners might

12         be able to realize their expected return on the

13         investment by changing to a different use if the zoning

14         ordinance had not been adopted?

15    A    Have I done any analysis to determine when they could do

16         that?

17    Q    Yes.

18    A    Okay.  No.

19    Q    Your opinions in paragraph 20 concerning the impact of

20         value for Velkommen, what impact do you have - do you

21         attribute to the offers of 1.75 and 1.6 million that were

22         made to Velkommen?

23    A    I believe they were associated with potential

24         redevelopment or alternative uses of the property.

25    Q    And how did you determine that those were based on

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 64

1                      (Recess was taken.)

2              MR. MYERS:   Okay.  Let's go back on the record.

3    ' Q   (BY MR. MYERS)  Mrs. Wilson, we were talking about

4          paragraph 20 of your declaration.

5    A     Okay.

6    Q     And you mentioned that Velkommen received offers of 1.75

7          and 1.6 million dollars.  Do you believe those were

8          above-market-value offers for the Velkommen property?

9    A     I think that there was a premium associated with that

10         price given the existing income stream from the

11         manufactured home community.

12   Q     So do you believe that those offers were actually worth

13         more than what you had appraised the property for?

14   A     I appraised it under continued use as a park.  And I

15         believe that those values reflect the potential for

16         redevelopment with the underlying land or the potential

17         for alternative uses.

18   Q     Now, Mr. Nissing's offer was 1.6 million.  And the value

19         range that you identified was 1.4 to 1.5 million;

20         correct?

21   A     Right.  Mm-hmm.

22   Q     So the difference there is between 200 and 100 thousand

23         dollars, depending on which cap rate is assigned.

24   A     Right.

25   Q     Is it . . .  Is that the value of the premium that you're

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 65

1   saying was existing for Velkommen?

2   A   In light of my valuation, which was limited in scope,

3   which we discussed previously, you could say that.  Yes.

4   Q   Okay.  Is it possible that Mr. Nissing or another

5   reasonable buyer would have increased the space rent at

6   Velkommen to increase the income beyond the numbers that

7   you evaluated?

8   A   Yes.

9   Q   Is that a possible explanation for why a buyer might

10   offer more than what you had valued the property at?

11   A   Yes.

12   Q   In paragraph 21, you talk about Wildwood Mobile Home Park

13   in Lacey.

14   A   Mm-hmm.

15   Q   What leads you to the conclusion that there was a premium

16   associated with that?

17   A   I appraised . . .  My office appraised that property for

18   the sale in June 2006.

19   Q   Is that one of the comparables that was listed in

20   Exhibit 3?

21   A   Yes.

22   Q   And it's comparable number five; correct?

23   A   Correct.

24   Q   What value did you assign in your appraisal of Wildwood

25   that you just referred to?

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 70

1        redeveloping the Wildwood property?

2    A   No.

3    Q   Okay.  Let me ask you this:  As an appraiser, what

4        methodology would you use in trying to measure what value

5        the market is assigning to this premium that you have

6        opined about?

7    A   Well, it's the before-and-after valuation that I haven't

8        done yet.  But that was understood that I would be

9        completing after we did this preliminary valuation.

10   Q   Have you done that analysis, as you sit here today?

11   A   I have not.

12   Q   Would an analysis of comparable sales and a comparison

13       between the sales approach and the income approach help

14       identify what the amount of that premium might be?

15   A   I believe the sales and income approach help characterize

16       the value of the park under existing use.  And the

17       analysis in the before situation would provide us with

18       the difference to determine the premium.

19   Q   Is there - is there a formula that you might use in order

20       to identify how much that would be?

21   A   No.

22   Q   Is it based on any established methodology that is used

23       by appraisers under USPAP?

24   A   Well, in the before situation, you'd be valuing the

25       property under its highest and best use with the zoning

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 71

1   in place at that time.  You would go through a

2   fundamental . . .  There's various ways you could go

3   through that valuation process.  One of them would be a

4   fundamental supply and demand analysis, looking at the

5   various opportunities under the prior zoning and then

6   determining what the highest and best use was and then

7   going to value that use with comparable sales.

8   Q   If the highest and best use in the before condition was

9       as a mobile home park and mobile home park is allowed in

10      the after condition, is there any way to determine any

11      difference in value between the before and the after?

12  A   It's the valuation . . .  You're saying if they were both

13      highest and best use as a park?

14  Q   Yes.  In the before condition.

15  A   Right.  If that was your conclusion?

16  Q   Yes.

17  A   Well, I wouldn't think there would be any premium then,

18      if that was the conclusion of the highest and best use

19      analysis.

20  Q   Okay.  Your opinions in paragraph 21 and 22 concerning

21      Wildwood and Allimor, those were not discussed in your

22      December 2009 report; correct?

23  A   Correct.

24  Q   And the information that was used to generate these

25      opinions, that was available as of December 2009;

Laurel Park v. City of Tumwater
Deposition of Jeanne-Marie Wilson

Page 82

1              C E R T I F I C A T E

2

3         I, CONNIE CHURCH, a duly authorized Court Reporter and

4    Notary Public in and for the State of Washington, residing at

5    Montesano, do hereby certify:

6         That the foregoing deposition of JEANNE-MARIE WILSON

7    was taken before me on February 15, 2010, and thereafter

8    transcribed by me by means of computer-aided transcription; that

9    the transcript is a full, true and complete transcript of the

10   testimony of said witness;

11        That the witness, before examination, was by me duly

12   sworn to testify the truth, the whole truth and nothing but the

13   truth, and that the witness reserved signature;

14        That I am not a relative, employee, attorney or

15   counsel of any party to this action or relative or employee of

16   any such attorney or counsel, and I am not financially

17   interested in the said action or the outcome thereof;

18        That upon completion of signature, if required, I

19   shall herewith securely seal the original transcript and serve

20   same upon Mr. Jeff Myers, counsel for the Defendant.

21        IN WITNESS WHEREOF, I have hereunto set my hand and

22   affixed my official seal this 24th day of February, 2010.

23

24                              _____

25                              CONNIE CHURCH
                                CERTIFIED COURT REPORTER

# EXHIBIT E

## Chapter 18.08
## RSR RESIDENTIAL/SENSITIVE RESOURCE ZONE DISTRICT

Sections:

18.08.010   Intent.
18.08.020   Permitted uses.
18.08.030   Accessory uses.
18.08.040   Conditional uses.
18.08.050   Density regulations.
18.08.060   Conversion plans.
18.08.070   Clearing and grading activities.
18.08.080   Screening and buffering requirements.

**18.08.010 Intent.**

The intent of the Residential/Sensitive Resource (RSR) zone district is to accommodate and establish low-density residential neighborhoods in a manner that is compatible with areas of unique open space character and environmental sensitivity.
(Ord. O95-014, Added, 7/18/1995; Ord. O95-035, Amended, 12/19/1995)

**18.08.020 Permitted uses.**

Permitted uses in the RSR zone district are as follows:

A.   Single-family detached dwellings;

B.   Designated manufactured homes on single lots of record, in accordance with the provisions of Tumwater Municipal Code Chapter 18.48;

C.   Parks, trails, open space areas, and other related passive recreation facilities;

D.   Wildlife refuges and forest preserves;

E.   Support facilities;

F.   Accessory buildings or structures to a permitted use on a contiguous lot or lots under the same ownership within the same zone district;

G.   Family child care home; child mini-day care center, subject to review by the development services director;

H.   Adult family homes, residential care facilities;

I.   The housing, care and keeping of livestock, except it is unlawful to house livestock in a covered structure that is located within fifty feet of any property line. (Where this provision may conflict with other provisions of the Tumwater Municipal Code, including Section 6.08.010, this provision shall control);

J.   Agricultural operations incidental and accessory to a single-family residential use, including any facility, accessory building, structure, or land use for the production for personal and/or small-scale commercial purposes of crops (including trees), horticulture, poultry, fish, or livestock.

K.   Attached wireless communication facilities, except that it is prohibited to attach a non-accessory wireless communication antenna on a single family or two-family dwelling;*

L.   Accessory dwelling units, provided they meet the requirements of Tumwater Municipal Code 18.42.010.

*Subject to Federal Aviation Administration (FAA) standards and approval, and pursuant to provisions of Tumwater Municipal Code, Chapter 11.20, "Communication Antennae and Towers."
(Ord. O2005-011, Amended, 07/05/2005; Ord. O2000-004, Amended, 07/18/2000; Ord. O97-019, Amended, 06/17/1997; Ord. O95-035, Amended, 12/19/1995; Ord. O95-014, Added, 07/18/1995)

### 18.08.030 Accessory uses.

Accessory uses in the RSR zone district are as follows:
A.   Structures for the storage of equipment and/or produce, including but not limited to greenhouses, barns, toolsheds, and storage sheds;
B.   Structures directly related to the housing, care and keeping of livestock, except it is unlawful to house livestock in a covered structure that is located within fifty feet of any property line. (Where this provision may conflict with other provisions of the Tumwater Municipal Code, including Section 6.08.010, this provision shall control);
C.   Home occupations, as approved by the director of development services;
D.   Noncommercial recreational structures which could include swimming pools and recreational ball courts;
E.   Energy systems;
F.   Single-family conversions.
G.   Accessory wireless communication antenna.*

*Subject to Federal Aviation Administration (FAA) standards and approval, and pursuant to provisions of Tumwater Municipal Code, Chapter 11.20, "Communication Antennae and Towers."
(Ord. O97-019, Amended, 06/17/1997; Ord. O95-035, Amended, 12/19/1995; Ord. O95-014, Added, 07/18/1995)

### 18.08.040 Conditional uses.

Conditional uses in the RSR zone district are as follows:
A.   Churches;
B.   Freestanding wireless communication facilities;*
C.   Cemeteries;
D.   Child day care center;
E.   Public and/or private schools;
F.   Neighborhood community center;
G.   Group foster homes.

*Subject to Federal Aviation Administration (FAA) standards and approval, and pursuant to provisions of Tumwater Municipal Code, Chapter 11.20, "Communication Antennae and Towers."
(Ord. O97-019, Amended, 06/17/1997; Ord. O95-035, Amended, 12/19/1995; Ord. O95-014, Added, 07/18/1995)

## Chapter 18.10
## SFL SINGLE-FAMILY LOW DENSITY RESIDENTIAL ZONE DISTRICT

Sections:

18.10.010   Intent.
18.10.020   Permitted uses.
18.10.030   Accessory uses.
18.10.040   Conditional uses.
18.10.050   Density regulations.
18.10.060   Conversion plans.
18.10.070   Screening and buffering requirements.

**18.10.010 Intent.**

The intent of the Single Family Low-Density Residential (SFL) zone district is to:

A.   Preserve and establish peaceful low-density neighborhoods in which owner-occupied single- family structures are the dominant form of dwelling unit;

B.   Provide designated areas in which a minimum net density of four units per acre and a maximum net density of seven units per acre apply to promote the efficient use of land;

C.   Guide residential development in such a manner as to encourage and plan for the availability of public services and community facilities such as utilities, police and fire protection, streets, schools, parks and recreation.

D.   Encourage development of attractive residential areas that provide a sense of community, establish a pedestrian-friendly atmosphere and contain a variety of housing types.

E.   Ensure that development without municipal utilities is at a density and in a configuration that enables cost effective urban density in-fill development when municipal utilities become available.

(Ord. O95-035, Added, 12/19/1995)

**18.10.020 Permitted uses.**

Permitted uses in the SFL district are as follows:

A.   Single-family detached dwellings;

B.   Designated manufactured homes on single lots of record, in accordance with the provisions of Tumwater Municipal Code Chapter 18.48;

C.   Parks, trails, open space areas, and other related recreation facilities;

D.   Support facilities;

E.   Residential planned unit developments;

F.   Family child care home; child mini-day care center, subject to review by the development services director;

G.   Adult family homes, residential care facilities;

H.   Duplexes which were legally established prior to January 1, 1996, except where there is a cessation of the use for three or more years.

I.   Attached wireless communication facilities, except that it is prohibited to

attach a non-accessory wireless communication antenna on a single family or two-family dwelling;*

*Emergency communication towers and antennae and wireless communication facilities are subject to Federal Aviation Administration (FAA) standards and approval, and furthermore that both uses are subject to provisions for wireless communication facilities in Tumwater Municipal Code, Chapter 11.20, "Communication Antennae and Towers."
(Ord. O2005-011, Amended, 07/05/2005; Ord. O2000-004, Amended, 07/18/2000; Ord. O97-019, Amended, 06/17/1997; Ord. O95-035, Added, 12/19/1995)

### 18.10.030 Accessory uses.
Accessory uses in the SFL district are as follows:
A.   Storage sheds, toolsheds, greenhouses;
B.   Home occupations, as approved by the Director of Development Services;
C.   Noncommercial recreational structures which could include but are not limited to swimming pools and recreational ball courts;
D.   Energy systems;
E.   Accessory dwelling unit, in accordance with the provisions of Tumwater Municipal Code Chapter 18.42.010.
F.   Accessory wireless communication antenna,*

*Emergency communication towers and antennae and wireless communication facilities are subject to Federal Aviation Administration (FAA) standards and approval, and furthermore that both uses are subject to provisions for wireless communication facilities in Tumwater Municipal Code, Chapter 11.20, "Communication Antennae and Towers.
(Ord. O97-019, Amended, 06/17/1997; Ord. O95-035, Added, 12/19/1995)

### 18.10.040 Conditional uses.
Conditional uses in the SFL zone district are as follows:
A.   Churches;
B.   Freestanding wireless communication facilities;*
C.   Cemeteries;
D.   Child day care center;
E.   Public and/or private schools;
F.   Neighborhood community center;
G.   Neighborhood-oriented commercial center;
H.   The following essential public facilities:
   1.   Emergency communications towers and antennae*
I.   Group foster homes;
J.   Agriculture.
K.   Bed and breakfasts.

*Emergency communication towers and antennae and wireless communication facilities are subject to Federal Aviation Administration (FAA) standards and

## Chapter 18.12
## SFM SINGLE-FAMILY MEDIUM DENSITY RESIDENTIAL ZONE DISTRICT

Sections:

18.12.010   Intent.
18.12.020   Permitted uses.
18.12.030   Accessory uses.
18.12.040   Conditional uses.
18.12.050   Density regulations.
18.12.060   Conversion plans.
18.12.070   Screening and buffering requirements.

**18.12.010 Intent.**

The intent of the Single Family Medium-Density Residential (SFM) zone district is to:

A.   Provide for a high standard of development for residential areas of moderate density in which single-family housing is the primary form of development;

B.   Provide designated areas in which a minimum net density of six units per acre and a maximum net density of nine units per acre apply to promote the efficient use of land;

C.   Guide residential development in such a manner as to encourage and plan for the availability of public services and community facilities such as utilities, police and fire protection, streets, schools, parks and recreation.

D.   Encourage development of attractive residential areas that provide a sense of community, establish a pedestrian-friendly atmosphere and contain a variety of housing types.

E.   Ensure that development without municipal utilities is at a density and in a configuration that enables cost effective urban density in-fill development when municipal utilities become available.
(Ord. O95-035, Added, 12/19/1995)

**18.12.020 Permitted uses.**

Permitted uses in the SFM district are as follows:

A.   Single-family detached dwellings;

B.   Single-family attached dwellings, including but not limited to townhouses and rowhouses, within a residential planned unit development;

C.   Duplex on at least six thousand square feet of land area;

D.   Designated manufactured homes on single lots of record, in accordance with the provisions of Tumwater Municipal Code Chapter 18.48;

E.   Parks, trails, open space areas, and other related recreation facilities;

F.   Support facilities;

G.   Residential planned unit developments;

H.   Family child care home; child mini-day care center, subject to review by the Development Services Director;

I.   Adult family homes, residential care facilities;
J.   Attached wireless communication facilities, except that it is prohibited to attach a non-accessory wireless communication antenna on a single family or two-family dwelling;*

*Emergency communication towers and antennae and wireless communication facilities are subject to Federal Aviation Administration (FAA) standards and approval, and furthermore that both uses are subject to provisions for wireless communication facilities in Tumwater Municipal Code, Chapter 11.20, Communication Antennae and Towers.
(Ord. O2005-011, Amended, 07/05/2005; Ord. O2000-004, Amended, 07/18/2000; Ord. O98-009, Amended, 10/20/1998; Ord. O97-019, Amended, 06/17/1997; Ord. O95-035, Added, 12/19/1995)

### 18.12.030 Accessory uses.
Accessory uses in the SFM district are as follows:
A.   Storage sheds, toolsheds, greenhouses;
B Home occupations, as approved by the Director of Development Services;
C.   Noncommercial recreational structures, which could include but are not limited to swimming pools and recreational ball courts;
D.   Energy systems;
E.   Accessory dwelling unit, in accordance with the provisions of Tumwater Municipal Code Chapter 18.42.010.
F.   Accessory wireless communication antenna;*

*Emergency communication towers and antennae and wireless communication facilities are subject to Federal Aviation Administration (FAA) standards and approval, and furthermore that both uses are subject to provisions for wireless communication facilities in Tumwater Municipal Code, Chapter 11.20, "Communication Antennae and Towers."
(Ord. O97-019, Amended, 06/17/1997; Ord. O95-035, Added, 12/19/1995)

### 18.12.040 Conditional uses.
Conditional uses in the SFM zone district are as follows:
A.   Churches;
B.   Freestanding wireless communication facilities;*
C.   Cemeteries;
D.   Child day care center;
E.   Public and/or private schools;
F.   Neighborhood community center;
G.   Neighborhood-oriented commercial center;
H.   Private clubs and lodges;
I.   The following essential public facilities:
    1.   Emergency communications towers and antennae*
J.   Group foster homes;
K.   Agriculture.
L.   Bed and breakfasts.