1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LAUREL PARK COMMUNITY, LLC, a Washington limited liability company; TUMWATER ESTATES INVESTORS, a California limited partnership; VELKOMMEN MOBILE PARK, LLC, a Washington limited liability company; and MANUFACTURED HOUSING COMMUNITIES OF WASHINGTON, a Washington non-profit corporation,

Plaintiffs,

v.

CITY OF TUMWATER, a municipal corporation,

Defendant.

No. C09-05312BHS

DECLARATION OF
WALTER H. OLSEN, JR. IN
SUPPORT OF PLAINTIFFS'
RESPONSE OPPOSING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

Note on Motion
Calendar:  April 9, 2010

(Oral Argument Requested)

Walter H. Olsen, Jr. declares as follows:

1.    I am one of the attorneys representing Laurel Park Community, LLC, Tumwater

Estates Investors, and Manufactured Housing Communities of Washington in the instant case.  I

am over the age of eighteen, competent to testify, and familiar with the facts herein based upon

personal knowledge.

2.    Attached to my declaration as Exhibit A is a true and correct copy of the

Mobile/Manufactured Housing Relocation Assistance Program Update, March 2010, prepared by

Washington's    Department    of    Commerce.    I    downloaded    this    update    from

Declaration of Walter H. Olsen, Jr. - 1

Talmadge/Fitzpatrick
18010 Southcenter Parkway
Tukwila, Washington 98188-4630
(206) 574-6661   (206) 575-1397 Fax

1  http://www.commerce.wa.gov/DesktopModules/CTEDPublications/CTEDPublicationsView.asp

2  x?tabID=0&ItemID=7139&MId=870&wversion=Staging on April 1, 2010.

3       3.     Attached to my declaration as Exhibit B is a true and correct copy of the Closing

4  Mobile/Manufactured Housing Communities, 2007-Current, prepared by Washington's

5  Department    of    Commerce.     I    downloaded   this    report    from

6  http://www.commerce.wa.gov/DesktopModules/CTEDPublications/CTEDPublicationsView.asp

7  x?tabID=0&ItemID=4411&MId=870&wversion=Staging on April 1, 2010.

8

9       4.     Attached to my declaration as Exhibit C is a true and correct copy of a portion of

10  a Data Supplement Report to the Legislature January 2006, which then confirmed that there was

11  over 1800 mobile home parks in Washington.    I downloaded this report from

12  http://www.commerce.wa.gov/ CTED/documents/ID_2704_Publications.pdf on April 4, 2010.

13      5.     Attached to my declaration as Exhibit D are true and correct copies of excerpts

14  from the written transcript for the deposition of William Schmicker which I caused my

15  colleague, attorney Tony Branson, to defend on February 4, 2010.

16      6.     Attached to my declaration as Exhibit E are true and correct copies of excerpts,

17  and Exhibit 4, from the written transcript for the deposition of Bob Eichler which I defended on

18  February 15, 2010.

19

20      7.     Attached to my declaration as Exhibit F are true and correct copies of excerpts

21  from the written transcript for the deposition of James Andersen which I defended on January 29,

22  2010.

23      8.     Attached to my declaration as Exhibit G are true and correct copies of excerpts

24  from the written transcript for the deposition of Michael Matlock which I took on February 9,

25  2010.

26  Declaration of Walter H. Olsen, Jr. - 2

Talmadge/Fitzpatrick
18010 Southcenter Parkway
Tukwila, Washington 98188-4630
(206) 574-6661  (206) 575-1397 Fax

000026

9.     Attached to my declaration as Exhibit H are true and correct copies of excerpts from the written transcript for the deposition of Stephen Shapiro which I took on February 8, 2010.

10.     Attached to my declaration as Exhibit I is a true and correct copy of p. 26 from Stephen Shapiro's Summary Appraisal Report of Velkommen MHP, dated January 6, 2010.

I declare under penalty of perjury under the laws of the State of Washington and the United States that the foregoing is true and correct.

Executed at Yelm, Washington, this 4th day of April, 2010.

Walter H. Olsen, Jr.

Declaration of Walter H. Olsen, Jr. - 3

Talmadge/Fitzpatrick
18010 Southcenter Parkway
Tukwila, Washington  98188-4630
(206) 574-6661   (206) 575-1397 Fax

000027

1

2

The Hon. Benjamin Settle

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT
9                       WESTERN DISTRICT OF WASHINGTON
                                  AT TACOMA
10

LAUREL PARK COMMUNITY, LLC, a
11   Washington limited liability company;
     TUMWATER ESTATES INVESTORS, a
12   California limited partnership; VELKOMMEN
     MOBILE HOME PARK, LLC, a Washington
13   limited liability company; and              NO.  C09-5312 BHS
     MANUFACTURED HOUSING
14   COMMUNITIES OF WASHINGTON, a                GR 17 DECLARATION OF
     Washington non-profit corporation,         JANICE L. MUNSON
15

16                      Plaintiffs,

17   vs.

18   CITY OF TUMWATER, a municipal
     corporation,
19

20                      Defendant.

21        JANICE L. MUNSON declares:

22        I have examined the *Declaration of Walter H. Olsen, Jr. in Support of Plaintiffs'*

23   *Response Opposing Defendant's Motion for Summary Judgment* to which this declaration is

24   attached, and have determined that it consists of five (5) pages, including this declaration, and

25   that said document is complete and legible.  The attached document was received by me via

26

GR 17 DECLARATION OF JANICE L. MUNSON - 1          OLSEN LAW FIRM PLLC
C09-5312 BHS                                            205 S. Meridian
                                                  Puyallup, Washington  98371
000028                                               PH:  253.200.2288
                                                     FAX: 253.200.2289

1    facsimile at 253.200.2289 (formerly 253.813.8133).

2      I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING STATEMENT(S) ARE

3    TRUE AND CORRECT.

4      DATED this 5th day of April, 2010, at Kent, Washington.

5

6                  *Janice L. Munson*

7                  Janice L. Munson
                  OLSEN LAW FIRM PLLC

8                   205 S. Meridian
                  Puyallup, WA 98371

9                   Phone: 253.200.2288
                  Fax:    253.200.2289

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

GR 17 DECLARATION OF JANICE L. MUNSON - 2
C09-5312 BHS

000029

OLSEN LAW FIRM PLLC
205 S. Meridian
Puyallup, Washington 98371
PH:   253.200.2288
FAX: 253.200.2289

**EXHIBIT A**

000030



# Department of Commerce
## Innovation is in our nature.

**Mobile/Manufactured Housing Relocation Assistance**
**Program Update**
**March 2010**

- 16 communities closed in 2006, impacting 715 households.

- 18 communities closed in 2007, impacting 534 households.

- 15 communities closed in 2008, impacting 553 households.

- 5 communities gave notice of 2009 closure date, impacting 137 households.

- 2 communities gave notice of 2010 closure date, impacting 67 households.

- 7 communities are listed for sale, per RCW 59.20.300, Manufactured/mobile home communities – Notice of sale.

- Park closure rates fluctuated between 1989 and 2010.
    - Average park closures 1989 – 2002: 5.8 per year
    - Average park closures 2003 – 2008: 14 per year
    - Average park closures 2009 – 2010: 3.5 per year

- Relocation Assistance is funded by a $100 fee paid by homeowners each time a manufactured home is purchased in a mobile home park/manufactured housing community. The fee is paid for homes over one year old and valued at $5,000 or more.

- 24 households are on the list for relocation assistance, totaling $146,439.61 in approved reimbursement requests. It took approximately 17 months to establish the current wait list.

- Length of time for reimbursement to households on the wait list at current distribution rate: 14 months.

- 2009 average reimbursements: Single section homes $6,234.11; multi-section homes $8,538.85; combined average $6,984.49. Single section homes represented 67% of reimbursements; multi-section homes 33%. 42% of reimbursements represent homes demolished.

- By law, the maximum reimbursements are: single section homes $7,500; multi section homes $12,000.

**EXHIBIT B**

000032



# Department of Commerce
## Innovation is in our nature.

### Closing Mobile/Manufactured Housing Communities   2007 - Current

| # | Park Name | Street Address | City | County | Closure Date | Spaces |
|---|-----------|----------------|------|--------|--------------|--------|
| 1 | Burnt Bridge Village | 320 NE Newhouse Rd | Vancouver | Clark | 01/21/07 | 8 |
| 2 | Columbia Crest (Timm's TC) | 555 W Jewett Blvd | White Salmon | Klickitat | 04/01/07 | 30 |
| 3 | Evergreen Estates | 18626 Hwy 99 | Lynnwood | Snohomish | 05/01/07 | 28 |
| 4 | Goodrich | 10009 S Lake Stevens Rd | Everett | Snohomish | 05/01/07 | 9 |
| 5 | Valley View Manor | 12033 Woodinville Dr | Bothell | King | 05/01/07 | 6 |
| 6 | McMillan Village | 14210 125th St Ct E | Puyallup | Pierce | 05/15/07 | 41 |
| 7 | Windrose Villa | 12418 Pacific Hwy | Long Beach | Pacific | 05/28/07 | 1 |
| 8 | Sunrise Manor | 217 103rd St Ct E | Bonney Lake | Pierce | 06/01/07 | 93 |
| 9 | Holly Vista Manor | 9220 Holly Dr | Everett | Snohomish | 06/15/07 | 40 |
| 10 | Harbor MHP | 111 S Shore Diamond Lake Rd | Newport | Pend Oreille | 06/31/07 | 10 |
| 11 | Cascade Green | 7712 203rd Ct E | Spanaway | Pierce | 07/01/07 | 45 |
| 12 | Terry Acres | 14424 NE 99th St | Vancouver | Clark | 07/31/07 | 5 |
| 13 | Bill & Lil's Senior Estates | 7714 W Tapps Hwy E | Bonney Lake | Pierce | 09/01/07 | 9 |
| 14 | Homewood | 16508 Alderwood Mall Parkway | Lynnwood | Snohomish | 09/15/07 | 29 |
| 15 | Ninth Street | 201 E Ninth Street | Wenatchee | Chelan | 09/29/07 | 98 |
| 16 | Islander | 201 Madrona Way NE | Bainbridge Isl | Kitsap | 10/01/07 | 11 |
| 17 | Halo | 1011 146th St SE | Mill Creek | Snohomish | 10/15/07 | 25 |
| 18 | Mary Jo MHP | 11111 Steele St | Tacoma | Pierce | 11/30/07 | 46 |
| | | | | | | 534 |
| | | | | | | |
| 1 | Madrona Park, LLC | 1037 W Kamilche Lane | Shelton | Mason | 2/1/2008 | 10 |
| 2 | Overland MH & Trailer Park | 1210 N 152nd St | Shoreline | King | 2/20/2008 | 37 |
| 3 | Carriage Court MHP | 2911 South 96th St | Lakewood | Pierce | 3/30/2008 | 40 |
| 4 | Manor Heights MHP | 4015 164th St SW | Lynnwood | Snohomish | 4/30/2008 | 43 |
| 5 | River City Trailer Park | 636 California Ave | Longview | Cowlitz | 5/1/2008 | 166 |
| 6 | Baker Creek MHP | 341 Telegraph Road | Bellingham | Whatcom | 6/1/2008 | 22 |
| 7 | Myers' Mobile Home Park | 707 West First St | Cheney | Spokane | 6/30/2008 | 44 |
| 8 | Olympic Highway MHP | 3710 Olympic Hwy | Aberdeen | Grays Harbor | 7/1/2008 | 8 |
| 9 | Picnic Pines MHP | 9212 So Silverlake Road | Medical Lake | Spokane | 7/31/2008 | 49 |
| 10 | Riverside Drive | | Sumner | Pierce | ASAP - H&S | 31 |
| 11 | W.S. Wright, LLC | 1711 - 1749 Fairview Ave | Bridgeport | Douglas | 8/31/2008 | 5 |
| 12 | Penny Lane MHC | 314 Avenue J | Snohomish | Snohomish | 9/13/2008 | 22 |
| 13 | Sunny Point Resort Park | 1408 Gulf Road | Point Roberts | Whatcom | 10/1/2008 | 16 |
| 14 | Whispering Firs | 12354 Silverdale Way NW | Silverdale | Kitsap | 10/1/2008 | 32 |
| 15 | Jensen Trailer Court | 937 N 97th St | Seattle | King | 10/9/2008 | 28 |
| | | | | | | 553 |
| | | | | | | |
| 1 | Country Air MHP | 17102 Meridian Avenue East | Puyallup | Pierce | 2/28/2009 | 70 |
| 2 | Perch Point Resort | 5943 Road J SE | Moses Lake | Grant | 3/31/2009 | 18 |
| 3 | Whispering Firs Meadow Park | 220th Street Court E. | Graham | Pierce | 6/1/2009 | 7 |
| 4 | Westward Mobile Home Park | 9685 Martin Luther King Jr. Way | Seattle | King | 6/18/2009 | 33 |
| 5 | Cooke Mountain Trailer Court | 4 Old Kettle Falls Road | Republic | Ferry | 7/23/2009 | 9 |
| 6 | Mountain View Trailer Park | Harrison Avenue, Centralia | Centralia | Lewis | 5/1/2010 | 24 |
| 7 | Willows Trailer Park | 5 East Columbia Dr | Kennewick | Benton | 5/1/2010 | 43 |
| | | | | | | 204 |
| | Updated 3/3/2010 | | | | | |

000033

**EXHIBIT C**

000034



**STATE OF WASHINGTON**
DEPARTMENT OF COMMUNITY,
TRADE AND ECONOMIC DEVELOPMENT

# Office of Manufactured Housing
ESHB 1640: Manufactured/Mobile Home Landlord-Tenant Disputes

# DATA SUPPLEMENT
May 13 through December 31, 2005

Report to the Legislature
January 2006

**Stephen H. Buxbaum**
Assistant Director for Housing

**Teri Ramsauer**
Manager, Office of Manufactured Housing

**Amy Leneker**
Project Manager, Office of Manufactured Housing

000035

# Table of Contents

I.  Executive Summary...................................................................................................1


II. Data.......................................................................................................................3
   A.  Park List and Registration ................................................................................3
   B.  Notification Campaign.....................................................................................7
   C.  Dispute Investigations......................................................................................8


**Appendix** ..................................................................................................................14
   A.  Park Lists
       a.   Registered Parks
       b.   No Response Parks
   B.  Actions Taken on Each Complaint

000036

# I. EXECUTIVE SUMMARY

ESHB 1640 directed the Department of Community, Trade and Economic Development (CTED) to collect and submit data on complaints and outcomes of conflict resolution efforts from May 13, 2005 through December 31, 2005. The department submitted a report in December of data collected through November 30. This supplement contains data collected during the entire reporting period and fulfills the reporting requirement.

This supplement includes the following data for May 13 – December 31, 2005:

- statistics about manufactured housing communities (also known as parks)
- number of parks that have registered with CTED
- number of residents and owners notified
- number of requests for service received
- outcome of investigations

Prior to ESHB 1640, the office received an average of 58 requests for service per month. In December, the Office of Manufactured Housing (OMH) received 91 requests for service with a landlord-tenant complaint. The department sent direct notification to over 25,000 residents and also utilized websites, newspapers and newsletters, and radio announcements to ensure that notice was given to each park owner and park resident.



000037

During the month of December, 191 parks registered, resulting in a total of 1,366 registered parks (75 percent). Park registration fees generated $309,765 in revenue ($5 per space multiplied by 61,953 spaces). Registered parks range in size from two to 408 spaces with an average of 45 spaces per park.

2

000033

## II. DATA

### A. PARK LIST AND REGISTRATION

The Department was directed to compile the most accurate list possible of all manufactured housing communities in the state, the names and addresses of the owners of those communities, and the number of spaces subject to chapter 59.20 RCW located in each manufactured housing community. As of December 31, a total of 1,366 parks (75 percent) had registered. Park registration fees generated $309,765 in revenue ($5 per space times 61,953 spaces). Registered parks range in size from two to 408 spaces with an average of 45 spaces per park.



**Park List Data as of December 31, 2005**

| | |
|---|---|
| Number of parks on initial park list (2,400 with complete addresses) | 2,855 |
| Number of parks on current list (presumed to meet definition of 59.20 RCW) | 1,829 |
| Number of initial notifications returned (445 returned; new addresses obtained and second mailing attempt for 89) | 356 |
| Number of parks removed from park list (duplicate listing, park was closed, not a park as defined by 59.20 RCW) | 670 |

**Registration Data as of December 31, 2005**

| | |
|---|---|
| Number of parks on current list (presumed to meet definition of 59.20 RCW) | 1,829 |
| Number of parks registered | 1,366 |
| Percentage of parks registered (1,175 of 2,113) | 75% |
| Number of spaces registered | 61,953 |
| Average spaces per registered park | 45 |
| Amount received in registration fees ($5 per space) | $309,765 |

000039

3

## Number of Parks by County
As of December 31, 2005

| County | Parks Registered | Number of Spaces | Parks No Response | Total Parks |
|---|---|---|---|---|
| ADAMS | 10 | 476 | 1 | 11 |
| ASOTIN | 15 | 465 | 3 | 18 |
| BENTON | 51 | 3098 | 6 | 57 |
| CHELAN | 24 | 801 | 8 | 32 |
| CLALLAM | 46 | 1429 | 7 | 53 |
| CLARK | 58 | 3788 | 16 | 74 |
| COLUMBIA | 4 | 85 | 2 | 6 |
| COWLITZ | 30 | 1562 | 11 | 41 |
| DOUGLAS | 13 | 543 | 8 | 21 |
| FERRY | 9 | 132 | 1 | 10 |
| FRANKLIN | 11 | 721 | 5 | 16 |
| GARFIELD | 2 | 12 | | 2 |
| GRANT | 59 | 1912 | 15 | 74 |
| GRAYS HARBOR | 44 | 1281 | 12 | 56 |
| ISLAND | 18 | 727 | 8 | 26 |
| JEFFERSON | 6 | 214 | 5 | 11 |
| KING | 123 | 9747 | 44 | 167 |
| KITSAP | 38 | 2044 | 9 | 47 |
| KITTITAS | 16 | 385 | 7 | 23 |
| KLICKITAT | 10 | 151 | 3 | 13 |
| LEWIS | 79 | 1196 | 31 | 110 |
| LINCOLN | 6 | 71 | 2 | 8 |
| MASON | 12 | 361 | 6 | 18 |
| OKANOGAN | 27 | 486 | 15 | 42 |
| PACIFIC | 7 | 77 | 4 | 11 |
| PEND OREILLE | 4 | 47 | 3 | 7 |
| PIERCE | 178 | 7560 | 53 | 231 |
| SAN JUAN | 2 | 144 | | 2 |
| SKAGIT | 30 | 1483 | 11 | 41 |
| SKAMANIA | 5 | 161 | 4 | 9 |
| SNOHOMISH | 105 | 5858 | 28 | 133 |
| SPOKANE | 88 | 4298 | 39 | 127 |
| STEVENS | 20 | 428 | 10 | 30 |
| THURSTON | 81 | 3449 | 31 | 112 |
| WAHKIAKUM | 3 | 87 | | 3 |
| WALLA WALLA | 12 | 922 | | 12 |
| WHATCOM | 49 | 1709 | 26 | 75 |
| WHITMAN | 9 | 501 | 4 | 13 |
| YAKIMA | 62 | 3542 | 25 | 87 |
| TOTALS | 1,366 | 61,953 | 463 | 1,829 |

4

000040

## Registered Parks by County
### As of December 31, 2005

| County | Parks Registered | Number of Spaces | Average Number of Spaces per Park |
|---|---|---|---|
| ADAMS | 10 | 476 | 48 |
| ASOTIN | 15 | 465 | 31 |
| BENTON | 51 | 3098 | 61 |
| CHELAN | 24 | 801 | 33 |
| CLALLAM | 46 | 1429 | 31 |
| CLARK | 58 | 3788 | 65 |
| COLUMBIA | 4 | 85 | 21 |
| COWLITZ | 30 | 1562 | 52 |
| DOUGLAS | 13 | 543 | 42 |
| FERRY | 9 | 132 | 15 |
| FRANKLIN | 11 | 721 | 66 |
| GARFIELD | 2 | 12 | 6 |
| GRANT | 59 | 1912 | 32 |
| GRAYS HARBOR | 44 | 1281 | 29 |
| ISLAND | 18 | 727 | 40 |
| JEFFERSON | 6 | 214 | 36 |
| KING | 123 | 9747 | 79 |
| KITSAP | 38 | 2044 | 54 |
| KITTITAS | 16 | 385 | 24 |
| KLICKITAT | 10 | 151 | 15 |
| LEWIS | 79 | 1196 | 15 |
| LINCOLN | 6 | 71 | 12 |
| MASON | 12 | 361 | 30 |
| OKANOGAN | 27 | 486 | 18 |
| PACIFIC | 7 | 77 | 11 |
| PEND OREILLE | 4 | 47 | 12 |
| PIERCE | 178 | 7560 | 42 |
| SAN JUAN | 2 | 144 | 72 |
| SKAGIT | 30 | 1483 | 49 |
| SKAMANIA | 5 | 161 | 32 |
| SNOHOMISH | 105 | 5858 | 56 |
| SPOKANE | 88 | 4298 | 49 |
| STEVENS | 20 | 428 | 21 |
| THURSTON | 81 | 3449 | 43 |
| WAHKIAKUM | 3 | 87 | 29 |
| WALLA WALLA | 12 | 922 | 77 |
| WHATCOM | 49 | 1709 | 35 |
| WHITMAN | 9 | 501 | 56 |
| YAKIMA | 62 | 3542 | 57 |
| TOTALS | 1,366 | 61,953 | |

5

000041

# Office of Manufactured Housing

## Size of Registered Mobile Home Parks by County: December 30, 2005



COUNTY
**Average Units per Park**

6 - 29
30 - 48
49 - 79   (00) Total Registered Parks per County

Washington State Department of
community, trade, and economic development

Provided by GMS / GIS: JAN 06, 2006

000042

6

## B.  NOTIFICATION CAMPAIGN

To ensure that notice was given to each manufactured/mobile home landlord or park owner and each mobile homeowner or tenant, OMH focused notification efforts in five areas:

- Direct mailings
- Websites and electronic mail
- Personal contact and phone calls
- Newspapers and newsletters
- Radio announcements

**Direct mailings:**  As of December 31, over 25,000 resident addresses have been provided and OMH has sent notification to each resident address.  Mobile Home Owners of America (MHOA) members provided the Department with its mailing list and the Department mailed notification to all 1,859 members.  MHOA members also collected addresses and the Department mailed direct notification to each address provided.  In addition, stakeholders were provided over 5,000 notices to distribute to residents.

**Personal contact and phone calls:**  Since May 13, the office has received a total of 636 requests for landlord-tenant services.  Calls are received through a toll-free automated services request line.  In response to an increase in calls, the Department improved the toll-free line by shortening the intake message and also by providing the menu in both English and Spanish.  Each complainant was mailed direct notification of the program and the new law.  The Department also responded to over 650 (via telephone, email, and in person) contacts from park owners and residents with questions about the registration process.

**Newspapers and newsletters:**  A press release was sent to a total of 84 daily and weekly newspapers throughout Washington on September 22, 2005.  The press release was posted on the Access Washington home page on September 23, 2005.  Additionally, at the recommendation of a stakeholder who noted that many veterans live in manufactured housing communities, the press release was posted on the Department of Veterans Affairs home page.  The press release was also sent to stakeholders and interest groups.

**Websites and electronic mail:**  OMH posted all ESHB 1640 information on its website, including a link to the bill, the resident notice, and the registration form.  The website also includes a link to the forms in Spanish.  During the month of December, the website received 180 contacts.

**Radio announcements:**  On November 22, a public service announcement was sent to 12 radio stations.  The Department chose specific stations, targeting counties with the most mobile home parks and the fewest Mobile Home Owners of America (MHOA) members.

000043

## C. <u>DISPUTE INVESTIGATIONS</u>

CTED was required to investigate alleged unfair practices or violations of the Manufactured/Mobile Home Landlord-Tenant Act, 59.20 RCW. The Department was also required to negotiate agreements and document outcomes.

This section includes the following complaint data collected May 13 – December 31, 2005:

1. Requests for Services by Month
2. Number of Complaints
3. Nature and Extent of Complaints
4. Actions Taken on Each Complaint
5. Outcomes of Closed Cases
6. Closed Cases: No Agreement Reached – Reasons

**1. Requests for Services by Month**   May 13, 2005 – December 31, 2005



000044

**2. Number of Complaints Received** May 13, 2005 – December 31, 2005

| | |
|---|---|
| **Complaints Received** *(Number of Complainants)*<br>Complainants often report more than one issue.  Of the 266 complaints under investigation or completed, a total of 739 issues were reported and investigated.  Complaints are defined by ESHB 1640 as the complainant provided documentation that the other party had been notified and that timeframes to remedy, 59.20 RCW have been met. (218 completed investigations plus 48 current investigations underway = 266 total complaints) | 266 |
| **Issues Reported**<br>Complainants often report more than one issue.  Of the 266 complaints received, a total of 739 issues were reported and investigated.  The number of issues per complaint ranged from one to ten. | 739 |
| **Requests for Services**<br>Individuals seeking assistance with a landlord-tenant complaint. | 636 |
| **Complaint investigation on hold pending notification** *(Open Cases)*<br>OMH has notified complainant and sent complaint form.  OMH is waiting for documentation that the other party has been notified and that timeframes to remedy, under RCW 59.20, have been met. | 370 |
| **Complaint investigation underway** *(Open Complaint Investigations)*<br>OMH has received required documentation; timeframes to remedy, 59.20 RCW, have been met; case managers are investigating complaint. | 48 |
| **Complaint investigation completed** *(Closed Cases)*<br>See chart of Outcomes of Closed Cases. | 218 |
| **Communities**<br>The 266 complaints (739 issues) were associated with 132 parks in 29 counties. | 132 |

9

000345

### 3. Nature and Extent of the Complaints Received  May 13, 2005 – December 31, 2005

The 266 complaints received identified the following 739 issues:

| ISSUE (alleged in complaints) | OCCURENCES | PARKS* |
|---|---|---|
| **DIFFICULTIES WITH COMMUNITY MANAGER/OWNER** | | |
| **PARK RULES** — Applied unfairly; retaliatory or discriminatory in nature | 135 | 26 |
| **LEASE CONTENT** — Lack of required items or interpretation discrepancies | 123 | 19 |
| **PARK MAINTENANCE** — Failure of landlord to perform maintenance | 103 | 11 |
| **PARK AMENITIES** — Differing expectations for either use of carports, community room, pool, storage, etc. or payment for their maintenance | 77 | 24 |
| **SAFETY HEALTH/HAZARD** — Dangerous trees, overflowing dumpster, standing or contaminated water | 60 | 2 |
| **EVICTION** — Fear of eviction or received eviction notice from landlord | 42 | 17 |
| **HARASSMENT** — Unfair treatment of landlord, tenant or tenant's family/guests/employees/caregivers | 36 | 14 |
| **LOT/HOME MAINTENANCE** — Lack of maintenance by tenant or landlord | 23 | 11 |
| **UTILITIES** — Charging utility fee in excess of actual usage; failure to provide utilities as provided in lease agreement | 18 | 12 |
| **WATER CONCERNS** — Lack of adequate water pressure, water drainage resulting in standing water | 17 | 6 |
| **RENT ISSUES** — Lack of proper rent increase notice or increases not identified in RCW 59.20 | 12 | 5 |
| **PROPERTY/LOT** — Lot boundaries not clearly defined | 13 | 6 |
| **WATER ACCESS** — No water hookups on tenant lot; allegations of landlord limiting water usage | 10 | 4 |
| **DIFFICULTIES WITH MOBILE HOME RESIDENT** | 7 | 3 |
| **LACK OF LEASE** — Lot rental without a lease agreement | 7 | 3 |
| **RETALIATION** — Retaliatory behavior towards tenant or tenant's family/employee/caregiver/guest (once landlord notified of complaint) | 8 | 2 |
| **SEWER PROBLEMS** — Lack of maintenance of sewer/septic system | 7 | 4 |
| **RESIDENTIAL LANDLORD-TENANT ACT** — Complainant rents their manufactured home – not covered by RCW 59.20 | 5 | 3 |
| | 5 | 3 |

000046

| ISSUE (alleged in complaints) | OCCURENCES | PARKS* |
|---|---|---|
| **DEPOSITS** | | |
| Park occupancy deposit questions; failure to return deposit | 5 | 2 |
| **ENFORCEMENT/MHLTA** | | |
| Lack of enforcement by landlord of RCW 59.20 among park residents | 5 | 1 |
| **SELLING HOME PROBLEM** | | |
| Landlord hindering efforts to sell tenants home | 4 | 2 |
| **WATER QUALITY** | | |
| Water does not meet drinking water standards | 4 | 1 |
| **FINANCIAL TRANSACTION** | | |
| Difficulties selling home or unfulfilled financial agreements | 3 | 1 |
| **PARK ZONING/SITING** | | |
| Management misusing property zoned or sited for other use or re: fire (parking/building) regulations | 2 | 2 |
| **PETS** | | |
| Pets allowed in park against rules, or not allowed conditionally (e.g. support animals) | 2 | 1 |
| **DISCRIMINATION** | | |
| Disparate treatment based on race, religion, marital status, creed, etc. | 3 | 1 |
| **SHED MAINTENANCE** | | |
| Permanent structure requiring landlord to maintain; landlord's failure to maintain as an amenity or requiring maintenance by resident | 1 | 1 |
| **PARK PURCHASE** | | |
| Failure to notify of park sale; confusion re: right of first refusal for resident purchase park | 1 | 1 |
| **LEASE TRANSFER** | | |
| Withholding transfer of lease | 1 | 1 |
| **TOTAL** | 739 | 1 |

\* Park count may be higher due to database start up problems.

000047

## 4. Actions Taken on Each Complaint

Below is a summary of actions taken on each complaint. A detailed report of actions taken on each complaint is included in the Appendix.

| | |
|---|---:|
| **Complaint investigation on hold pending notification** (*Open Cases*)<br>OMH has notified complainant and sent complaint form. OMH is waiting for documentation that the other party has been notified and that timeframes to remedy, under RCW 59.20, have been met. | 370 |
| **Complaint investigation underway** (*Open Complaint Investigations*)<br>OMH has received required documentation; timeframes to remedy under 59.20 RCW have been met; case managers are investigating complaint. | 48 |
| **Complaint investigation completed** (*Closed Cases*)<br>See chart of Outcomes of Closed Cases. | 218 |

## 5. Outcomes of Closed Cases May 13, 2005 – December 31, 2005

| | |
|---|---:|
| Agreement reached | 19 |
| Partial agreement reached[1] | 15 |
| No agreement reached | 100 |
| Complainant withdrew complaint | 5 |
| Caller could not be reached | 12 |
| Determined to be non-1640 | 17 |
| Information only | 50 |
| **Total closed cases** | **218** |

---

[1] "Partial agreement reached," means some but not all of the issues raised in a dispute were resolved.

000048

**6.  Closed Cases: No Agreement Reached – Reasons** May 13, 2005 – December 31, 2005

**No response from Community Owner/Manager**
Tenant provided notice and received no response/remedy.  OMH then attempted to
contact by phone or in writing and received no response, or contacted with a proposed
remedy and received no response.                                                                          83

Resident pursuing legal action                                                                              6

Community owner pursuing legal action                                                            3

**No response from resident**
Resident submitted complaint material but failed to respond to OMH attempts to
contact                                                                                                                    4

**Resident responsible**
Resident failed to provide receipt needed for settlement                                2

Reason unknown/not reported to OMH                                                            2

**Total cases closed as "no agreement reached"**                                     **100**

13

000019

**EXHIBIT D**

000050

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 11

1          But that's my recollection.

2     Q    Okay.  How many acres is there?

3     A    Well, there's some discussion about that.  I'm trying to

4          find — if I can find a survey.  I was looking for a

5          survey.  Because I said 24.  And that's my recollection

6          is 24.  But I've seen — I think the city had it appraised

7          and it was — the appraiser there said 22.4.  So I don't

8          know the exact acreage.  But my recollection is 24.

9     Q    Any reason why you would recall 24?

10    A    Just it's what I remember.  You know.  Yeah.

11    Q    Okay.  Tell me about the environmental features on that

12         property.  Are there any wetlands?

13    A    Yeah.  There's a little lake in the back center of the

14         park, which is an amenity, you know, that people love.

15         You know.  The home sites around the lake are premium.

16         And so they are quite easy to rent.  And so it's a nice

17         amenity that the park has.  We also have a clubhouse and

18         used to have a shuffle board court.  But nobody was using

19         it so it's kind of, you know, not in use anymore, still

20         there, but I don't think anybody's played it for years

21         now.

22    Q    Along the western edge of the property, is there a

23         wetland adjacent to the western —

24    A    There is to . . .  I don't know what direction, you know,

25         that is.  But if you say it's west, I'll take your word

February 4, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

000051

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 27

1    liquefaction is?

2  A  I do.

3  Q  Can you describe what that concept is?

4  A  Well, liquefaction is a phenomenon that can occur when an

5     earthquake happens.  There's a shaking that takes place.

6     And there's a layer of water underneath the ground.  And

7     when this shaking occurs, the water percolates to the

8     top, rendering the soil over it less capable of bearing

9     loads.

10 Q  Okay.  And so how does that affect development of

11    property?

12 A  Well, it's something to be concerned with.  You know.  In

13    San Francisco, when we had our earthquakes - and I'm from

14    San Francisco area - there's concerns about liquefaction

15    there.  But there's an awful lot of San Francisco that's

16    built on property where, you know, people talk about,

17    "Well, there's liquefaction here."  But you know, it

18    doesn't prevent you from putting multistory buildings up

19    and . . .  But it is something that one needs to be

20    concerned with.

21 Q  And it's then an issue of concern that requires some sort

22    of engineering mitigation to address as part of the

23    construction?  Is that a fair statement?

24 A  It can.  It can.

25 Q  Have you ever had anyone assess the soil conditions at

February 4, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

000052

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 28

1       Tumwater Mobile Estates to see whether you would need

2       engineering mitigation in a future development?

3   A   No.

4                     (Deposition Exhibit No. 6 marked

5                     for identification.)

6   Q   (BY MR. MYERS) This is a portion of a map prepared by the

7       Department of Natural Resources which identifies

8       liquefaction areas on the original map.  The red areas

9       are areas of high concern.  Is the area where this

10      sinkhole opened up part of the red area that's depicted

11      on this map?

12  A   In the back portion of the park, there appears to be an

13      area that has the red.

14  Q   Have you had anybody from the State of Washington ever

15      discuss with you the inclusion of a significant portion

16      of your property as a high liquefaction risk area?

17  A   Would you repeat that.

18  Q   Has anybody from the State of Washington ever come to you

19      and --

20  A   The government?  Say somebody - a governmental agency,

21      State of Washington?

22  Q   State of Washington.

23  A   University or not university?  I mean government versus

24      university?  I mean is that --

25  Q   Well, let's talk about the government first.  Somebody

February 4, 2010
Capitol Pacific Reporting, Inc.  (800) 407-0148

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 29

1       who has some regulatory or geologic responsibility for

2       the state, have they ever discussed with you the

3       inclusion of much of your property as part of a high

4       liquefaction risk area?

5   A   I'm pretty certain the answer to that is no.

6   Q   Let's move on to somebody who is more academic and is

7       affiliated with a university.  Has anybody ever

8       approached you to discuss that?

9   A   Again, the answer is no to the question the way you

10      phrase it.

11  Q   Have you discussed it with anybody?

12  A   Not that - not that would be included in some

13      liquefaction area, no.  Now, when the engineers were out

14      there talking with us, okay, did the subject of

15      liquefaction come up in that conversation?  I can't say

16      that it didn't.  I don't know.  I don't remember.  You

17      know.  I mean it . . .

18          When we're looking at the problems, geez, what

19      caused this problem to happen, well, it's right next to a

20      body of water.  There could be soil . . .  You know.

21      There's certainly water that enters the area from that

22      lake bed in the direction of where the failure took

23      place.  So you know, certainly we could have talked about

24      the fact that, you know, geez, there's water there and

25      that had . . .

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 30

1    Q    Have you had any investigation done to determine how far

2         down the water table is?

3    A    I have not.

4    Q    If the State of Washington prepared a map which shows the

5         red areas on your property as being high liquefaction

6         risk areas, would you have any reason to disagree with

7         that?

8    A    I have no factual reason to disagree, I mean, you know,

9         to disagree with it.  I have no facts.

10   Q    Have you done any analysis of whether any part of your

11        property is regulated by a critical area ordinance?  Do

12        you understand what a critical area ordinance is?

13   A    No.

14   Q    Which is regulated by a wetland protection ordinance.

15   A    Okay.  So repeat the question.

16   Q    My question was:  Have you done any analysis to see

17        whether or not any of your property is regulated by a

18        critical area or wetland protection ordinance?

19   A    No, I have not.

20   Q    Are you familiar with the concept of a wetland buffer?

21   A    Well, I can guess what the name means.  But I'm not . . .

22        You know.

23   Q    Let me ask you:  In your experience in owning and

24        investing in real estate, have you run across properties

25        where part of the property was not developable because it

February 4, 2010
Capitol Pacific Reporting, Inc.  (800) 407-0148

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

000055

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 31

1    was too close to a wetland?

2   A   I own two marinas.  And there's developments right up

3       next to the water, both of them.  And so I have

4       experience with, you know . . .  It can be an amenity to

5       development as well.  And I've seen - seen it done.  I

6       have heard, however, in the course of my readings about

7       real estate things in the newspapers and whatnot about

8       projects that have been impaired because of wetland

9       issues.

10  Q   And it's your understanding that if the wet - it's

11      wetland itself, that may render it undevelopable?

12  A   I don't know.

13  Q   You said you own two marinas.  Where do you own those

14      marinas?

15  A   Both in California.  One is in Stockton and one is in

16      Huntington Beach.

17  Q   Do you own any other property in the state of Washington

18      besides Tumwater Mobile Estates?

19  A   No.

20  Q   I've provided you Exhibit Number 2, which is the

21      ordinance that generated this whole lawsuit.  I want to

22      ask you how that has affected your operations at Tumwater

23      Mobile Estates.

24  A   The ordinance?

25  Q   Yes.

February 4, 2010
Capitol Pacific Reporting, Inc.  (800) 407-0148

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 34

1    property, how would you define what fair market value

2    means?

3  A    What a willing buyer will pay a willing seller.

4  Q    And do you have an opinion as to what that value would

5    have been when the property was zoned multifamily high

6    residential immediately prior to the change that the city

7    adopted in 2009?

8  A    When it was still zoned . . . I - I hadn't . . . You

9    know, I'd have to do some analysis to reach a statement

10    of what I thought it was worth at that time.  And I

11    haven't done that.  I . . . You know.  And rather than

12    throw a number out, you know, other than kind of a

13    ballpark number, then, you know, I . . . I don't.

14  Q    Okay.  How would you go about determining what the fair

15    market value was in order to answer that question before

16    the zoning ordinance was adopted?

17  A    Well, it would be - it would be based upon . . .  You

18    know, all things equal and considered, it would be based

19    upon the income of the property.  And that's, you

20    know . . . You know.  There are locational factors that

21    come into that, what kind of location it's in; you know,

22    is there going to be a premium associated with it because

23    it's, you know, got bus service out in front of it, you

24    know, got shopping across the street, that it potentially

25    has a use that could be commercial; the expiration of the

February 4, 2010
Capitol Pacific Reporting, Inc.  (800) 407-0148

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 35

1   life of the mobile homes in the commercial section of the

2   park.  Those are all factors.

3          And let me expand on that a little bit.  Because if

4   a guy's going to buy it, okay, who's a knowledgeable

5   buyer . . .  And when you're talking in the, you know,

6   $5 million range of a price for this park, then you're

7   talking about someone who's a sophisticated person.  And

8   a sophisticated person is going to look at those old

9   mobile homes and they're going to say, "What am I going

10  to do with this?  What am I going to do with this when I

11  can't buy homes to put in here, when I can't do this?"

12  And he's going to think, you know, "I gotta do something

13  because it's gonna look like a trailer park and I'm

14  buying a manufactured home park."  And there's a

15  difference between a manufactured home park and a trailer

16  park.  And a trailer park sells for a substantial

17  discount to what a manufactured home park sells for.

18  Q   Okay.

19                          (Deposition Exhibit No. 7 marked
20                          for identification.)

21  Q   (BY MR. MYERS) This is a copy of portions of the

22      appraisal that was performed in 2006.  And do you know

23      what the purpose of this appraisal was?

24  A   It was part of the refinancing appraisal.

25  Q   Okay.  On Bates page 4, there is a statement that the

February 4, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 42

1        experience that municipalities are willing to rezone

2        multifamily land for commercial land because of the tax -

3        sales tax issue.

4    Q   Is it your experience that they're willing to rezone

5        mobile home parks as commercial property in order to get

6        that sales tax?

7    A   It is.  I've seen it done, yes.  But I will confess to

8        you I've seen it resisted.  Okay.

9    Q   And then on Bates page 42, under "Subject Site 'As

10       Improved,'" Mr. Robinson's appraisal says that, "The

11       remaining option, to remain as is, is considered the best

12       option."

13           And this is under "Physically Possible Use."  Do you

14       see where he says that?

15   A   "The remaining option, to remain as is, is considered the

16       best option."  Okay.

17   Q   Yes.  Do you agree or disagree with that statement?

18   A   At the present time, I agree.

19   Q   Okay.  And do you agree with his conclusion that as

20       improved, the highest and best use of the Tumwater Mobile

21       Estates property is as a manufactured home park?

22   A   At the present time, you know, with - without the

23       presence of this ordinance, I would have concurred with

24       that.

25   Q   So let me then ask you:  Before the city adopted that

February 4, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 43

1     ordinance, is it your opinion that the highest and best

2     use of the property was as a mobile home park?

3  A  Yes.

4  Q  And after the adoption of the mobile home park ordinance,

5     do you have any opinion as to what the highest and best

6     use of the property is?

7  A  Well, if the ordinance stands, I won't have much of a

8     choice, will I?  That's what this is all about, freedom

9     of choice and, you know, the ability to change when

10    change is necessary.

11        Right now I'm able to - in the front part of my

12    park, the older part, I'm able to deal with it.  But it

13    isn't easy.  And it may not be possible at some point in

14    time.  And when that happens, then it's time to start

15    thinking about, "Okay.  When and how am I going to go

16    about changing this use?"

17  Q  Okay.  At any time, do you believe that the Tumwater

18    Mobile Estates property has been worth $26 million?

19  A  Well, if I were to think to myself, you know, "I'm not

20    getting any - I'm not getting any younger.  I want to,

21    you know, leave my kids with as much as I possibly can."

22    Therefore, I need to look at my - all my assets,

23    including the Tumwater Mobile Estates and say, "Okay.

24    How can I maximize the value of this property?  What can

25    I do to maximize the value of this property?"

February 4, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 56

1   A   I didn't have time.

2   Q   Is it your opinion that some day this property could be

3       worth $26 million?  Is that what statements on Exhibit 8

4       represent on the bottom of the first page?

5   A   Would you repeat the question.

6   Q   Down there where it says, "Total value at highest and

7       best use: $26 million," what does that mean?

8   A   Well, that means that at some point in time.  You know.

9       Whether it's right now or not, I mean it depends on what

10      your motivations are.  As I mentioned earlier about

11      maximizing the value of your assets, arguably . . .  And

12      these numbers are, you know . . .  I mean bring some

13      professionals together and we could argue about whether

14      these numbers are good numbers or not.  That's kind of

15      what your - you're sort of intimating whether or not

16      they're good numbers or not.

17          And so based on my calculations, which I thought I

18      made some adjustments to my knowledge, based on my

19      knowledge, my experience, I think 26 million is a - is a

20      reasonable estimate for the highest and best use value.

21  Q   Is that today?

22  A   Well, not today with the ordinance in place.

23  Q   Assuming that the ordinance was not in place, would it be

24      worth $26 million today?

25  A   Again, if you wanted to maximize the value of your assets

February 4, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 57

1        and you said to yourself, "I own this; I want to

2        maximize - I don't care about anything else; my one

3        objective is to maximize the value of this asset," then,

4        you know - "and I'm willing to put the time and the

5        energy and the money into realizing that value," then

6        arguably you could come up with a value that was at

7        26 million.

8    Q   So it would be worth $26 million after the time and

9        energy was put into developing the multifamily high

10       density and commercial?

11   A   To securing those property rights, yes.

12   Q   How long would it take for that development to occur?

13   A   Oh, it's probably a two or three-year process.

14   Q   And do you know whether there is a market demand for

15       conversion to those uses currently in the city of

16       Tumwater?

17   A   Well, there's a demonstrable . . .  In the past,

18       there's been a demand for commercial space.  There's been

19       a demand for housing.  And as more housing comes in,

20       there's more demand for more commercial.  So as part of

21       the developing process of the city, then you could, you

22       know, say, you know, "It looks reasonable to expect that

23       we would be able to have, you know - find tenants for the

24       commercial.  We'd be able to find occupants for the

25       multifamily in the rear."

February 4, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 58

1           And so it is . . .  You know.  This is where the

2      macroeconomy and the microeconomy all come together and

3      you percolate it around and try to figure out whether or

4      not it looks like a viable thing.  And, you know, I mean

5      people do this.  This is what real estate developers do.

6   Q   And in determining how long that would take, are you

7       familiar with the concept of an absorption rate?

8   A   Sure.

9   Q   Have you done any analysis of the absorption rate that

10      would apply to this type of development?

11  A   Well, the commercial, you know, observably quite quickly.

12      The multifamily I can't tell.  I don't know.  I mean you

13      drive by the commercial, you can see they're full.  You

14      know.  I don't know what's happening in the apartments.

15      And I've not done any research on it.

16  Q   So is it possible to tell when this property would

17      support a $26 million value?

18  A   Is it possible?  Repeating the question as I heard it, is

19      it possible to tell when this property might justify a

20      $26 million value?

21  Q   Yes.

22  A   Well, we're arguing about it as if it's right now.  We're

23      saying as of the date this ordinance passed, we used to

24      have these choices.  We used to have these options to go

25      do this, to think about doing something like this.  So

February 4, 2010
Capitol Pacific Reporting, Inc.  (800) 407-0148

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

Laurel Park Community, et al v. City of Tumwater
Deposition of William Schmicker

Page 59

1        arguably at that point in time, it had that value.  Now

2        that right's been taken away.  So you know, what happened

3        to it?

4  Q   Let me go back to that statement.  Is it your opinion

5        that before the city passed the ordinance, your property

6        had a fair market value of $26 million?

7  A   Highest and best use potential value of $26 million.

8  Q   But you wouldn't have a willing buyer actually want to

9        pay you $26 million, would you?

10  A   Nobody was offering me that amount of money or I might

11       have been a seller.

12  Q   Because you had not built out the property.

13  A   I hadn't done any of the things that would need to be

14       done to realize that value.

15  Q   Had you ever applied for permits to do any of that type

16       of development to the City of Tumwater?

17  A   Not to the City of Tumwater.

18  Q   Let's go back to the next page, which is page 4 of the

19       initial disclosures.  At the top of the page, there's a

20       statement that says, "The value . . ."  It's the next

21       page.

22  A   Oh.

23  Q   "The value of Tumwater Estates at $45,000 per space

24       equals $5,175,000."  Is that your opinion of what the

25       property is worth as a mobile home park?

February 4, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

64b8aadd-2baf-4049-ac3d-e4dc97fcd3b8

**EXHIBIT E**

000065

# Laurel Park v. City of Tumwater
## Deposition of Robert Eichler

### Page 6

1  A  About two years.
2  Q  And how was Laurel Park Mobile Home Park owned prior to
3     formation of Laurel Park Community, LLC?
4  A  By myself personally.
5  Q  What was the purpose of forming the LLC?
6  A  Basically my attorney's advice.
7  Q  What was the goal of forming the LLC?
8  A  I think LLC's are a protection for liability purposes.
9  Q  Was there any refinancing of the property involved when
10    you formed the LLC?
11  A  No.
12            (Deposition Exhibit No. 1 marked
               for identification.)
13
14  Q  (BY MR. MYERS)  Mr. Eichler, I'm handing you an aerial
15     photograph which comes out of the appraisal report done
16     by Stephen Shapiro in this matter.  I just want you to
17     take a look at it and say do you recognize that as being
18     an aerial photograph of your mobile home park?
19  A  Yes.
20  Q  Would you describe the surrounding community that abuts
21     your mobile home park.
22  A  On one side of my property is a vacant ten acres that has
23     been approved for 122 new residences.  On the other side
24     of my property is residential with several new
25     subdivisions abutting the street right across from my

### Page 7

1     property.
2  Q  Okay.  And that's --
3  A  That would be --
4  Q  Let me ask you this:  If you turned it sideways so that
5     you could read the writing on there, does that align it
6     with north and south approximately?
7  A  Yes.
8  Q  Okay.  Could you draw a north arrow on the side over here
9     in the margin just so that we're speaking correctly as
10    far as directions?  Just an arrow pointed toward the
11    north generally.  I'm not going to hold you to true
12    north.
13  A  I might say I have always had a bit of trouble with
14     directions down here so . . .
15  Q  If you drew an arrow that directly pointed at me, would
16     that be generally to the north?
17  A  Yes.
18  Q  Okay.  Why don't you go ahead and do that.  And then put
19     an "N" right at the top.  Okay.  That way we have some
20     orientation.  The property that you discussed being
21     approved for 122 new residences, is that the property to
22     the west, sort of odd-shaped piece of property
23     immediately to the west?
24  A  No.  I would say that would be to the north of me.
25  Q  To the north.  Okay.

### Page 8

1  A  Shown in this with one lone tree in the middle of the
2     property.
3  Q  The property that's immediately to the west, is that
4     currently vacant?  And I'm referring to this piece of
5     property here (indicating).
6  A  I don't know.  I haven't taken . . . I haven't really
7     looked lately so . . . If this is a current map, then
8     it's currently vacant.
9  Q  Okay.  It looks like there is a house on the far western
10    portion of that property.
11  A  Yes.
12  Q  Other than that, are you aware of any development in the
13    majority of that block that abuts your property?
14  A  I'm not aware of any.
15  Q  Okay.  Are you aware of whether there's any development
16    approvals pending for that property?
17  A  I heard that all of this property is going to be
18    developed.
19  Q  Have you received any notice of pending development for
20    that property?
21  A  Not that I'm aware of.
22  Q  Okay.  Do you know what the status of the 122 homes is on
23    the property immediately to the north?
24  A  No, I don't.
25  Q  And would that be single-family development, a

### Page 9

1     subdivision?
2  A  As I understand it.  Yes.
3  Q  Is there any multifamily development surrounding your
4     property?
5  A  I haven't investigated by driving around, so I don't
6     believe I can answer that question.
7  Q  Have you done any investigation as to whether there's any
8     multifamily development planned adjacent to or nearby
9     your property?
10  A  No.
11  Q  Okay.  How many acres do you have?
12  A  11.7.
13  Q  And how many spaces do you have in the two phases?
14  A  73.
15  Q  And do you know how - what the zoning is on the property
16    surrounding your mobile home park?
17  A  No, I don't.
18  Q  Okay.  Do you believe that operating the mobile home park
19    is consistent with the surrounding uses in the community?
20  A  No, I don't believe it's consistent with the surrounding
21    properties.
22  Q  Why don't you believe it's consistent with the
23    surrounding community?
24  A  Because the surrounding community is obviously going
25    single-family residential with a much higher density than

3 (Pages 6 to 9)

# Laurel Park v. City of Tumwater
## Deposition of Robert Eichler

**Page 10**

1  my mobile home park.
2  Q  Do you believe that the mobile home park is, in any way,
3      detrimental to the surrounding community?
4  A  Yes, I do.  I think that mobile home parks normally are
5      considered depreciative of values.  It's always been an
6      old joke.  Nobody wants to live next to an old mobile
7      home park.
8  Q  Is your mobile home park detrimental to the surrounding
9      community?
10  A  I don't know.
11  Q  Do you believe that maintaining affordable housing is a
12      legitimate goal for the City of Tumwater?
13  A  Yes.
14  Q  And do you believe that manufactured housing parks
15      provide a source of affordable housing compared to other
16      housing types?
17  A  Yes.
18  Q  Okay.  When did you purchase Laurel Park?
19  A  In September of 1991.
20  Q  How much did you pay?
21  A  A million three.
22  Q  And did you finance the property at that time?
23  A  Yes.
24  Q  And was an appraisal done of the property?
25  A  Not to my knowledge.

**Page 11**

1  Q  Okay.  When you purchased Laurel Park, was the park in
2      existence?
3  A  Yes.
4  Q  Okay.  Were both phases in existence when you purchased
5      the park?
6  A  Yes.
7  Q  And were there all 73 spaces when you purchased the park?
8  A  Yes.
9  Q  After you purchased the park, was there a time when you
10      looked at expansion of the park?
11  A  Well, I've always . . . Excuse me.  Expansion of the
12      park as a mobile home park?
13  Q  As a mobile home park.
14  A  Yes.
15  Q  Okay.  And when did you begin looking at potential
16      expansion?
17  A  Within two or three years after I purchased the property.
18  Q  Okay.  And what plans did you evaluate as far as the
19      expansion of the existing mobile home park?
20  A  I owned the ten acres north of me and looked into the
21      fact about expanding the mobile home park onto that
22      additional ten acres.
23  Q  And that's the piece of property that we identified as a
24      possible 122-unit development?
25  A  Yes.

**Page 12**

1  Q  Okay.  Do you still own that property?
2  A  No.
3  Q  When did you sell that property?
4  A  In probably the late '90's, although I'd have to check my
5      figures for sure on that.
6  Q  Okay.  Did the buyer express concern about buying
7      property next to a mobile home park?
8  A  No.
9  Q  What were the results of your evaluation of possibly
10      expanding onto that property?
11  A  It was not economically viable to do so because I would
12      have to put in - use over half that property for septic
13      fields.
14  Q  And at the time you made that evaluation, you were
15      located in unincorporated Thurston County?
16  A  I don't understand unincorporated Thurston County.
17  Q  You were located outside the city limits at that point in
18      time?
19  A  I was located in Thurston County.
20  Q  Right.  But not within a city at the time?
21  A  That's right.  In the county, not the city.
22  Q  You mentioned septics was an issue there.  What is the
23      type of septic systems that Laurel Park has?
24  A  We have numerous systems with about three homes per
25      system generally, three homes per drainfield.  I believe

**Page 13**

1      there may be one or two that have four homes per
2      drainfield, maybe one that has two homes per drainfield.
3  Q  Okay.  And all of those drainfields are located within
4      the property limits that are set forth here in red?
5  A  Yes.
6  Q  And have you had any problems with the operation of your
7      drainfields on site?
8  A  Yes.
9  Q  What type of problems have you had?
10  A  We've had several failures.
11  Q  When was the last failure you had?
12  A  I'd have to check my records.
13  Q  Have you ever had a drainfield failure that could not be
14      rehabilitated?
15  A  No.
16  Q  Generally speaking, is there a cause of the drainfield
17      failures, to your knowledge?
18  A  I'm not knowledgeable enough about the details of that.
19  Q  Do you know whether Laurel Park has adopted any programs
20      to prolong the life of the drainfield?
21  A  Yes.
22  Q  What type of programs have you implemented at
23      Laurel Park?
24  A  We're very serious about trying to maintain our septic
25      system, because that's the lifeblood of the property.  We

4  (Pages 10 to 13)

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

Page 14

1   have a scheduled pumping program. And it's looked after
2   by a licensed septic company.
3   Q  Okay. What other things does your drainfield and septic
4   program involve?
5   A  We advise our residents from time to time on what they
6   should be and what they shouldn't be putting down their
7   systems.
8   Q  Do you restrict use of garbage disposals?
9   A  I don't have that information at my fingertips right now.
10  Q  Okay. Have you had any discussions with your septic
11  system company concerning the expected life of your
12  existing drainfields?
13  A  No.
14  Q  What's the current space rent that you charge your
15  tenants?
16  A  $460 per month.
17  Q  Is that the 2010 rate?
18  A  It's the current rate.
19  Q  Okay. Was that the rate in 2009?
20  A  For part of 2009.
21  Q  Okay. So you raised your rent at some point in 2009?
22  A  Yes.
23  Q  What was the increase from?
24  A  $430.
25  Q  And when did you raise that?

Page 15

1   A  Without checking in my records, I think the rent went up
2   on June 1st.
3   Q  Do you normally raise the rents or evaluate rental
4   increases on an annual basis?
5   A  Yes.
6   Q  And did you raise the rent from 2008 to 2009?
7   A  Yes.
8   Q  Okay. What was the rent in 2008?
9   A  I don't have that information exactly.
10  Q  Okay. Did Laurel Park make a profit in 2009?
11  A  Yes.
12  Q  And did it make a profit in 2008?
13  A  Yes.
14  Q  2007?
15  A  Yes.
16  Q  Have there been any years since you owned it that it did
17  not make a profit?
18  A  No.
19  Q  Have you had any . . . What type of water system does
20  Laurel Park have?
21  A  Well water.
22  Q  Have you had any problems providing water to your
23  tenants?
24  A  No.
25  (Deposition Exhibit No. 2 marked

Page 16

1   Q  (BY MR. MYERS) Mr. Eichler, handing you page 3 of the
2   Plaintiffs' Initial Disclosures in this case, which was
3   provided by legal counsel. And this is only page 3. Did
4   you review the initial disclosures when they were made
5   last September?
6   A  I don't understand the —
7   Q  This page I'm representing to you is page 3 of some
8   disclosures that were made in the course of this
9   litigation under the Federal Rules of Civil Procedure.
10  My question is: Did you have a chance to review the
11  disclosure that was made concerning your testimony, which
12  is shown on this page?
13  A  I looked at a lot of things. And I can't say absolutely
14  that I looked - reviewed this or not.
15  Q  Okay. In this disclosure, it states that you will
16  testify concerning the liability and damages that are
17  sought in this lawsuit. And it makes a statement that
18  the land under appropriate zoning would be valued in a
19  couple of different ways. My first question has to do
20  with what do you consider appropriate zoning to be for
21  your property?
22  A  The zoning that was in effect when I purchased it, which
23  was medium density multifamily.
24  Q  Okay. And did the county ever have different zoning than
25  what ultimately became the city's zoning designation of

Page 17

1   multifamily medium density residential?
2   A  Not while I owned the property.
3   Q  Okay. The statement here says that the land - with that
4   appropriate zoning, for uses currently taking place in
5   the immediate area, would value Laurel Park as follows.
6   What do you mean "value" in the context . . . Do you
7   know what that term would mean?
8   A  Would you ask the question again.
9   Q  Okay. In the last portion of the paragraph after your
10  office address information, you see the sentence that
11  reads, "The land under appropriate zoning"? It says,
12  "would value Laurel Park as follows." What is your
13  understanding of what "value" means?
14  A  "Value" would mean the price that a willing buyer and a
15  willing seller were able to reach for the highest and
16  best use of the property.
17  Q  Okay. In the next sentence down, it says medium density
18  12 acres at 15 units per acre at 50,000 per unit equals
19  $9,000,000 total value at highest and best use. My first
20  question is: What is your understanding of the meaning
21  of the term "highest and best use"?
22  A  Meaning of the term "highest and best use" would be the
23  medium density multifamily zoning.
24  Q  Okay. How would you go about determining what the
25  highest and best use of property is?

5 (Pages 14 to 17)

# Laurel Park v. City of Tumwater
## Deposition of Robert Eichler

### Page 18

1  A  Highest and best use is what the demand is for the
2     property at any special time.
3  Q  Has there ever been demand for your property for - to
4     purchase it for redevelopment into medium density
5     multifamily housing?
6  A  No.
7  Q  Do you have an opinion that the fair market value of your
8     property before the adoption of the city's zoning
9     ordinance was ever $9,000,000?
10 A  If I understand your question, I believe it was a minimum
11    of $9,000,000.  I believe $50,000 per unit was the least
12    that the property would have been worth.
13 Q  And how did you go about determining that?
14 A  From discussions with people over the period of time and
15    from some of my own conclusions.  In Seattle, Auburn
16    area, for example, lots were a hundred to hundred and
17    twenty-five thousand dollars.  I assumed that - my
18    assumption myself that lots in Tumwater were not going to
19    be worth the same as in the Seattle area.  And I've
20    always thought that the value would be somewhere between
21    60 and 80 thousand dollars per lot to a
22    builder/developer.
23 Q  Would that be for single-family lots or multifamily?
24 A  Single-family.
25 Q  How was it you arrive at the number 50,000 per unit?  Or

### Page 19

1     let me ask you this:  Do you agree with the initial
2     disclosure that at a medium density multifamily
3     development, it should be valued at 50,000 per unit?
4  A  I have probably said that it's never - I never believed
5     it was worth less than 50,000.
6  Q  And how would you go about determine that 50,000 per
7     unit?
8  A  As I just told you, I think it's worth 60 to 80 thousand
9     dollars a unit.  And as a conservative figure, I would
10    have said I'm sure not less than 50 thousand.
11 Q  Is it your understanding then that in this Initial
12    Disclosure, you are valuing medium density as a
13    single-family use?
14 A  Yes.
15 Q  Are you aware of any developments that have developed 15
16    units - or 15 lots per acre of single-family development
17    in Tumwater?
18 A  No.
19 Q  Are you aware of any developments that have had 15 units
20    of single-family development anywhere in Thurston County?
21 A  I've never done any research, so I don't know.
22 Q  When you mentioned the lots in Auburn and King County, do
23    you know what density the $125,000 lots were being
24    developed at?
25 A  I don't have that information at my fingertips.  No.

### Page 20

1  Q  When you say that you believe that the lots should be
2     worth 60 to 80 thousand, is that ready for building the
3     house, including the infrastructure necessary to improve
4     the property?
5  A  I believe I made that valuation on having the building
6     permit in hand and ready to build.  I don't remember
7     whether that included roads.
8  Q  Okay.  Before the property would have that value, do you
9     believe you'd incur the costs of building the roads and
10    putting in water and sewer?
11 A  Yes.
12 Q  Okay.  Have you done any analysis to determine how much
13    that would cost for your property?
14 A  Some analysis was done on the property in about 2006 by a
15    developer consultant, and I don't remember if they did a
16    figure on that.
17 Q  Okay.  Have you done any analysis to determine whether
18    the market demand exists to develop 15 units per acre on
19    your property?
20 A  Would you ask me that again, please.
21 Q  Have you done any analysis to determine whether there is
22    a market demand to redevelop your property at 15 units
23    per acre?
24 A  I haven't personally.
25 Q  Okay.  Have you had someone else do that analysis?

### Page 21

1  A  There was an analysis done in about 2006.
2  Q  And who did that analysis?
3  A  Century Pacific Realty.
4                (Deposition Exhibit No. 3 marked
                    for identification.)
5
6  Q  (BY MR. MYERS)  Mr. Eichler, this is a declaration that
7     has been submitted by your legal counsel to me.  And I
8     want to refer you to Exhibit B, which has a letter dated
9     December 13th, 2006 and a memorandum dated April 2nd,
10    2007.
11 A  Okay.
12 Q  Century Pacific, is this the demand analysis that you
13    were referring to?
14 A  What?
15 Q  Does this document, either the December 13th, 2006 or the
16    April 2nd, 2007 memoranda, do they discuss the market
17    demand for your property?
18 A  Yes.
19 Q  Okay.  Can you show me where that is discussed in these
20    documents?
21 A  The discussion of 15 units per acre?
22 Q  The discussion of the market demand to redevelop your
23    property at 15 units per acre.
24 A  I don't . . .
25                (Deposition Exhibit No. 4 marked

6 (Pages 18 to 21)

000589

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

### Page 22

1  Q  (BY MR. MYERS)  Mr. Eichler, I'm going to show you
2      another exhibit, which has been marked as Exhibit 4.  And
3      this is a letter from Century Pacific dated March 9,
4      2007.  Does this letter contain the market analysis we
5      were just discussing?
6  A  Yes.
7  Q  Okay.  And on the first page, which has a number in the
8      corner of 222, there is a statement there which said,
9      "These numbers suggest that it may make more sense to
10      continue operating this property as a mobile home park
11      and/or taking it to market on the basis of a mobile home
12      park and not a development opportunity."  Do you see that
13      statement?
14  A  I remember it.  Yes.
15  Q  Okay.  Did you agree with that statement?
16  A  Yes.
17  Q  So based on the analysis that Century Pacific did in
18      early 2007, you agreed that, at that point in time, the
19      highest and best use of the property was as a mobile home
20      park?
21  A  Yes.
22  Q  Has there been any change in conditions since March of
23      2007 that would create demand for redevelopment of the
24      property?
25  A  I believe if I have my dates right, that there was a

### Page 23

1      housing boom that hit Tumwater after that period and a
2      lot of new houses started to be built, which showed there
3      was a demand for higher and better use of the property.
4      And that had not the recession come, with all the housing
5      going on - particularly with the property right next to
6      me with a permit for 122 houses.  And if you drive around
7      the area, you'll see lots of new houses and developments.
8      It was clear to me that after this period, there was a
9      building boom that had started to happen down in that
10      area.
11  Q  Okay.  Can you tell me when this boom approximately was
12      occurring?  I take it there was a window of opportunity
13      that you would call the boom period before the recession
14      hit.  Is that a fair way to characterize what you just
15      told me?
16  A  Yes, I think there was.
17  Q  Okay.  Can you tell me approximately when this window
18      began and when the recession hit that closed that window?
19  A  I don't have those facts at my fingertips.
20  Q  Okay.  After March of 2007, did you make any effort to
21      sell your property for redevelopment purposes?
22  A  No.
23                  (Deposition Exhibit No. 5 marked
                      for identification.)
24
25  Q  (BY MR. MYERS)  Exhibit 5 is a document that was provided

### Page 24

1      through your legal counsel, which appears to be an offer
2      to purchase the Laurel Park Mobile Home Park by West
3      Pinnacle Investments, LLC.
4  A  Yes.
5  Q  Is that your understanding of what this document is?
6  A  Yes.
7  Q  Okay.  And you received this in October of 2007?
8  A  Yes.
9  Q  And West Pinnacle Investments, the individual who was
10      representing them was John Dunham.  Do you know
11      Mr. Dunham?
12  A  .I may have met him.
13  Q  Do you know whether he owns the Allimor Mobile Home Park
14      in the city of Tumwater?
15  A  No, I don't.
16  Q  This offer is for $4,000,000.  Did you accept this offer?
17  A  No.
18  Q  Why not?
19  A  Because I didn't think this was anywhere near the
20      developmental price of the property.  This was more a
21      price for a mobile home park.  I had no desire to sell my
22      mobile home park at mobile home park prices.
23  Q  In your declaration, Exhibit 3, going back to the letters
24      from Century Pacific, the very last page of that is the
25      April 2nd, 2007 memorandum from Century Pacific.  Do you

### Page 25

1      know, was this from Mr. Mathewson?
2  A  It was from his company.
3  Q  Okay.  This appears to be a redacted document.  Did you
4      see a full version of this document?
5  A  Yes.
6  Q  The portion which is disclosed in this document states
7      that the value - under A, says 11.73 acres MF, medium
8      density residential, nine to 15 units per acre,
9      3.7 million.
10  A  ·Yes.
11  Q  Was it your understanding that that was Century Pacific's
12      opinion as to the value for redevelopment purposes?
13  A  Yes.
14  Q  And under B, it says, "NOI $250,000."  Is it your
15      understanding that that means net operating income 250,000?
16  A  Yes.
17  Q  Is that a correct approximation of your net operating
18      income in 2007?
19  A  An approximation.  Yes.
20  Q  They rounded it; correct?
21  A  (Nods head.)
22  Q  You have to respond audibly so she can take down a word.
23  A  Oh, I'm sorry.  Yes.
24  Q  Okay.  And that the value they were placing on your
25      property was 3.3 million using a cap rate of 7.5 percent?

7 (Pages 22 to 25)

February 15, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148



Laurel Park v. City of Tumwater
Deposition of Robert Eichler

### Page 30

1  A  No. The... If I'm looking at this correctly and
2  understand your question, the 7 percent cap rate yields a
3  3.6 million dollar value.
4  Q  Thank you. And the value of the property at 14 units per
5  acre would be 3.7 million; correct?
6  A  That's what they say. Yes.
7  Q  Okay. And it would take a certain number of expenditures
8  to be able to create 14 units per acre; correct?
9  A  I don't have their thinking at my fingertips here, so I
10  don't know whether that was based on raw land or
11  developed land. I don't believe it says here.
12  Q  Okay. Go back to Exhibit Number 3. I'd like to ask you
13  about paragraph number 5. Paragraph number 5, it states
14  that you did not oppose annexation into the City of
15  Tumwater in reliance on Tumwater's assurance that it
16  would not change the underlying residential zoning of the
17  park. My question is: Who gave you assurance from the
18  City of Tumwater that there would not be a change in the
19  underlying zoning?
20  A  David Ginther and others that I've talked to about the
21  zoning.
22  Q  When did Mr. Ginther tell you that there would not be a
23  zoning change?
24  A  I should clarify that I did not hear that directly from
25  David Ginther. That was my professional person that I

### Page 31

1  had to give me the opinion. It was told to me that
2  David Ginther had said that there would not be a change
3  in the annexation.
4  Q  Would that have been Mr. Mathewson?
5  A  No.
6  Q  Would that have been Mr. Wood?
7  A  No.
8  Q  Who relayed the information that Mr. Ginther said there
9  would not be a change in zoning?
10  A  My land use attorney at that time, Scott Missall.
11  Q  Did Mr. Missall get any representations to you in
12  writing?
13  A  Yes.
14  Q  What written representations . . . Did he provide a
15  written representation from the City of Tumwater to you
16  that Mr. Ginther had signed?
17  A  No.
18  Q  So Mr. Missall wrote to you to tell you that Mr. Ginther
19  had made this statement; correct?
20  A  Yes.
21  Q  There's no written documents from anyone in the City of
22  Tumwater that Mr. Ginther - from Mr. Ginther concerning
23  that; correct?
24  A  I don't have that information.
25  Q  So you have never seen a written document signed by

### Page 32

1  Mr. Ginther saying that the zoning would not change?
2  A  That's right.
3  Q  Did Mr. Missall tell you that the zoning would not change
4  for any given period of time?
5  MR. OLSEN: Object to the form of the question
6  if it requires privileged communications between
7  Mr. Missall and Mr. Eichler.
8  Q  (BY MR. MYERS) Okay. Let me ask you this: Did
9  Mr. Missall relate to you a statement from David Ginther
10  as to whether or not Mr. Ginther had used a period of
11  time in that representation? I'm not necessarily saying
12  what Mr. Missall might have believed or advised you.
13  What I want to know is: Did he tell you that Ginther
14  said it will be for "X" period of time?
15  A  There was no mention of any - of any length of time.
16  Q  Okay.
17  A  It had always been my understanding from - and I believe
18  from others, that there was no period of time that . . .
19  I didn't oppose the annexation because I heard that
20  Tumwater would not change their zoning. And I relied on
21  that.
22  Q  Okay. Was it your understanding that the city had
23  committed never to rezone that property in perpetuity?
24  A  My understanding was that they were not going to change
25  the zoning. And I assumed they were going to stick with

### Page 33

1  the county zoning. And I assumed that they agreed with
2  the county zoning and they wanted a higher and better use
3  for the property.
4  Q  And did you have any understanding as to how long that
5  would be the case?
6  A  No.
7  Q  Did you assume that that would be the case in perpetuity?
8  A  Yes.
9  Q  Have you ever owned property that has been downzoned?
10  A  Yes.
11  Q  What's your experience with downzoning?
12  A  Would you restate that, because I don't know how to
13  answer what my experience --
14  Q  I just asked you whether you had any experience with
15  property that you owned being downzoned. Where was that
16  property?
17  A  Oh, I've had property downzoned, and it was in Auburn.
18  Q  What was the change that Auburn enacted for your
19  property?
20  A  I don't remember the exact technical county zoning, but
21  they changed the county high density zoning to mobile
22  home park only or some call it a mobile home park
23  overlay. I'm not... My only memory is that - about
24  that, that I know I lost any development rights for that
25  higher and better use.

9 (Pages 30 to 33)

February 15, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

2e06875b-f20b-4e20-bd0f-2c2176867ae2

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

## Page 34

1  Q  Okay. So when did Auburn change the zoning from high
2     density to mobile home park zoning?
3  A  Within the last three years, if I recall correctly.
4  Q  Did you do any analysis to determine whether that
5     impacted the value of your property in Auburn?
6  A  Yes. I had some professionals do an analysis of that.
7  Q  And what was the results of that analysis?
8  A  That it severely restricted the value of my property for
9     its highest and best use.
10 Q  Did you have them do a before-and-after analysis of the
11    value of your property in Auburn?
12 A  I don't recall the details of the analysis.
13 Q  Do you recall approximately how much value impact was
14    made by Auburn's zoning?
15 A  Yes.
16 Q  What do you recall?
17 A  These figures are my recollection, and if there was some
18    papers that showed restrictions, because there's always
19    discussions. But my recollection was that my mobile home
20    park was worth approximately $6,000,000 and the value of
21    my land as vacant land was approximately worth
22    14,200,000.
23 Q  How did you determine . . . How was the property worth
24    14,200,000 as vacant? How was that determined?
25 A  I don't recall. But I don't have that information at my

## Page 35

1     fingertips to be able to tell you that.
2  Q  Is that your opinion as the owner as to what it was worth
3     if it was vacant? Or is that something someone else has
4     told you?
5  A  I believe that came from a real estate professional, but
6     not a real estate appraiser.
7  Q  A broker?
8  A  Yes.
9  Q  Do you know how the broker would have determined the
10    14.2 million dollar value?
11 A  I don't have that information at my fingertips. No.
12 Q  Do you know how he would have valued your mobile home
13    park at $6,000,000?
14 A  Yes, by the cap rate analysis that I discussed earlier
15    with you.
16 Q  Do you know if the 14.2 million dollar value was an
17    opinion as to the value if it was fully developed as high
18    density development?
19 A  Yes. I believe that value was with - after having
20    obtained a building permit and . . . You'll have to
21    excuse me. I'm not a developer, so I am a little unclear
22    on what development stages there are in development. But
23    I know that it included obtaining a building permit, and
24    it may have included the next step for it. It did not
25    include getting ready - having the property ready for

## Page 36

1     sale to a builder. And I've always said so the builder
2     can come in and start digging the next day, but I don't
3     know exactly how far that is.
4  Q  Let's go back to your declaration. And in paragraph 5,
5     where you were talking about expectation that you could
6     redevelop the property if another viable opportunity
7     presented itself. What did you mean by the statement
8     that you wanted to preserve your reasonable expectation
9     that you could redevelop it if another viable opportunity
10    presented itself?
11 A  I meant that I was hoping to develop it to the zoning
12    capabilities that were on the property when I purchased
13    it, the medium density, single slash multifamily,
14    whatever it is, the zoning that was on the property when
15    I purchased it.
16 Q  Okay. Let me ask you a bit about this declaration. Did
17    you draft the language that is found here in this
18    declaration?
19 A  No.
20 Q  Okay. So this was drafted by someone else and then you
21    reviewed it; correct?
22 A  That's correct.
23 Q  Did you have any time frame in which you expected this
24    other viable opportunity to present itself?
25 A  Time frame from when?

## Page 37

1  Q  Well, you've drafted this and signed it on January 25th,
2     2010. And this talks about your expectations in 2008
3     when the annexation was pending. At that point in time,
4     did you have a plan to redevelop the property within any
5     certain time period?
6  A  My only plan to redevelop the property was when the time
7     came that the highest and best use - demand for the
8     property would be for the higher and better use. And I
9     really didn't know if it was next year, two years from
10    now, five years from now. I bought the property in 1991
11    knowing that the highest and best use, value at that time
12    was a mobile home park. And I looked to the future and
13    hoped for the future that in my lifetime, the demand for
14    that property would be for me to develop it into the
15    zoning that was on the property. I've never had an exact
16    time and date, because I've had to wait for the
17    opportunity to present itself.
18 Q  Okay. The last sentence of paragraph 5, you discussed
19    the city had begun a process to rezone the park in 2007.
20    When did you first become aware that Tumwater was in the
21    process to rezone mobile home parks?
22 A  I don't know that I can pin down any date, but certainly
23    after the annexation. And I think the annexation was in
24    December of 2007. And I wasn't aware of that - anything
25    they were going to do to change the ordinance until

10 (Pages 34 to 37)

February 15, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

2e06875b-f20b-4e20-bd0f-2c2176867ae2

Laurel Park v. City of Tumwater
Deposition of Robert Eichler

**Page 42**

1  2006.
2  Q  Okay. And do you recall approximately when you had
3     purchased that property?
4  A  I don't recall the exact time.
5  Q  When you sold that property, did the buyer purchase it to
6     change it to a use other than a mobile home park?
7  A  I believe they bought it initially to preserve it as a
8     mobile home park. And I also believe . . . I also
9     believe that they had long-range values to redevelop it
10    into affordable housing.
11 Q  Do you know who the buyer was for Wonderland Estates?
12 A  Yes. King County Housing Authority.
13 Q  Do you recall how much you paid for Wonderland Estates
14    when you bought it?
15 A  Approximately 3.9 million dollars.
16 Q  And how much did you sell it for?
17 A  Approximately 8.6 million.
18 Q  Can you give me an estimate of the time period that you
19    held that property in terms of number of years?
20 A  My estimate and my recollection only is 10 years or less.
21 Q  Approximately 10 years. Do you know how the 8.6 million
22    dollar sale price was arrive at?
23 A  Yes, I do.
24 Q  Can you describe that for me?
25 A  Yes. I entered into negotiations with the county. Go

**Page 43**

1     back. I was going to develop that property under county
2     high density zoning. And again, I'm only trying to
3     recall from memory. I'm not the best at my memory. And
4     I believe we even got a permit to begin the development
5     process. I gave notice to the tenants that we were going
6     to close the community. And King County Housing
7     Authority indicated an interest in buying it from me. I
8     told them I'd be willing to sell it to them for my
9     developmental - for a developmental value as opposed to a
10    mobile home park value.
11 Q  How did you arrive at the developmental value of
12    $8.6 million?
13 A  Actually not arrived at the developmental value of the
14    park. The arrived . . . The arrived-at value I believe
15    was about $10,000,000, which was a discount from
16    what . . . If I recall, we believed the property to be
17    worth about $12,000,000. And I felt it was very exciting
18    that King County Housing Authority would come in and do
19    what they - the public should be doing to preserve mobile
20    home parks. They were willing to buy it from me to
21    preserve the mobile home park and pay me my developmental
22    value, which is exactly the way I think cities should be
23    doing it if they want to preserve mobile home parks or
24    preserve affordable housing.
25    So I was willing to discount my price to them

**Page 44**

1     because they were willing to pay - do a - again, this is
2     from memory - a 30-day contingency and a 30-day all-cash
3     deal. So I was able to sell the property to the county
4     at a better - a discount from what we believed the
5     developmental price was. And in turn for that, I was
6     able to get my cash now. And so we agreed upon a
7     $10,000,000 value subject to an appraisal.
8        That agreement was made I believe in August. And in
9     between the time that we . . . And the county agreed
10    that they would pay me the $10,000,000 subject to an
11    appraisal showing it having a value of $10,000,000. And
12    at that point, no one was in disagreement that the
13    property was worth $10,000,000. However, the county was
14    happy with the price, I was happy with the price, whoever
15    was my - I believe it was Century Pacific, but I don't
16    remember, was happy with the price. It was all subject
17    to an appraisal.
18       Within that time period . . . Within the 30-day
19    period of that date, the market crashed and just wiped
20    out that value from 10 million down to the 8.6. And it
21    was nobody two weeks later or whatever the time period
22    was - it was in their contingency period - there was
23    nobody in that short time that would agree it was worth
24    $10,000,000. And the county was willing to pay me what
25    an appraised price would be.

**Page 45**

1  Q  Okay. You mentioned that this - you had an agreement
2     essentially on $10,000,000 in August, I believe. Do you
3     recall what you had that agreement in August? Was
4     that --
5  A  I've told you it was 2006.
6  Q  2006?
7  A  But --
8  Q  Because my recollection is that the economy had a
9     significant downturn in 2008. Or . . . I'm just
10    wondering if you're certain that it was 2006 that we had
11    this agreement for $10,000,000.
12 A  Clearly I said I'm not certain. My recall of dates . . .
13    I have no notes. My recall of dates . . . And the time
14    goes by so fast that I want to make clear I'm not certain
15    about these dates. They're all obtainable.
16 Q  Sure. You mentioned in that particular case, you had
17    taken out permits to redevelop the property. What
18    redevelopment project were you planning on implementing
19    at the King County site, the Wonderland site?
20 A  We were in the application stage. Again, I have to -
21    counting on my memory. I have no notes. I can get you
22    any information that you'd like to know at another time
23    if you'd like to know it. But I can't absolutely stand
24    by it. Would you like me to commit on it if I can't
25    stand by the date absolutely here?

12 (Pages 42 to 45)

February 15, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

2e06875b-f20b-4e20-bd0f-2c2176867ae2



CenturyPacific, L.P.

Campbell Mathewson
Vice President

March 9, 2007

Mr. Robert M. Eichler
Lake-Land Investments
3455 Hunts Point Road
Bellevue, WA 98004

Re:   Summary of real estate issues

Dear Bob:

Thank you again for the opportunity to allow CenturyPacific to assist you with the development
and sale options of your various mobile home parks.  This letter is for the purpose of providing
you with an overview of real estate issues in regards to your mobile home parks located in
▮▮▮▮▮▮▮▮▮ Tumwater and ▮▮▮▮▮▮▮▮▮▮▮.  We look forward to an opportunity to
discuss these matters with you at your convenience.

Tumwater (3244 66ᵗʰ Avenue S.W., Olympia, WA  98512)
This 11.73 acre property is zoned Multi-Family Medium Density Residential (MFM) in Thurston
County with a density of 9 to 15 units per acre.  Since the county requires a minimum of 9 units
per acre which would provide relatively small 3,700 square foot lots, we believe that the zoning
of this property forces a more dense multi-family product.  At 14 units per acre (i.e., one less
than the maximum), the value of the Tumwater site today is **$3.7 million** (see attached).
However, since you currently yield approximately $250,000 per year in net operating income,
using a 7.0% capitalization rate yields a value of $3.6 million; at a 7.5% cap rate the value is
$3.3 million.  These numbers suggest that it may make more sense to continue operating this
property as a mobile home park and/or taking it to market on the basis of a mobile home park
and not a development opportunity.  You will notice that the value of this park is a relatively low
$23,000 per zoned lot.  We believe the reason is due to the lack of market acceptance for smaller
dense townhome units in Thurston County which are reflected in relatively low sales prices.

EXHIBIT NO. __4__   Date 2/15/10
Deposition Of *Robert Eichler*
CONNIE CHURCH, Court Reporter

Real Estate Investment Bankers · Advisors · Developers
2140 Century Square · 1501 Fourth Avenue · Seattle, Washington 98101
(206) 689-7203  ·  FAX (206) 689-7210  ·  E-MAIL cmathewson@dwt.com
www.centurypacificlp.com

–222–

000074

**SUMMARY**
Tumwater
**RESIDUAL LAND VALUE CALCULATION**

| | | | | |
|---|---|---|---|---|
| Gross Land Area | 11.73 acres | 510,959 square feet | | |
| Net Developable Land Area | 9.03 acres | 393,438 square feet | 77% | |
| # of Lots | 164 lots (at 14/acre) | Zoning: Multi-Family Medium Density Residential 9-15 du/acre | | |
| Lot sizes | 2,396 square feet | 393,438 of lot sf | | |
| # of months for Preliminary Plat Approval | 18 months | | | |
| # of months for Final Plat Approval | 18 months | | | |

**AS-IS VALUE**

| | | | | | |
|---|---|---|---|---|---|
| Land Value As-Is | | $ 3,707,207 | $ 22,575 per lot | $9.42 per land square foot |
| Cost of Sales | 7% | $ (259,504) | $ (1,580) per lot | ($0.66) per land square foot |
| | | $ 3,447,703 | $ 20,994 per lot | $8.76 per land square foot |
| Original Cost | | $ (0) | $ (0) per lot | |
| Profit | | $ 3,447,702 | $ 20,994 per lot | |

**PAPER PLAT VALUE**

| | | | | | |
|---|---|---|---|---|---|
| Land Value As-Is | | $3,707,207 | $ 22,575 per lot | $9.42 per land square foot |
| Plus Pre Plat Cost Including Profit | | $2,233,997 | $ 13,604 per lot | $5.68 per land square foot |
| Paper Plat Value including Cost & Profit | | $5,941,204 | $ 36,178 per lot | $15.10 per land square foot |
| Cost of Sales | 7% | ($415,884) | $ (2,532) per lot | ($1.06) per land square foot |
| Paper Plat Value including Cost | | $5,525,320 | $ 33,646 per lot | $14.04 per land square foot |
| Cost of Preliminary Plat | | ($862,950) | $ (5,255) per lot | |
| Paper Plat Value Net of Cost but incl. Profit | | $4,662,370 | $ 28,391 per lot | |
| Value increase over As-Is | | $1,214,667 | $ 7,397 per lot | $3.09 per land square foot |
| Cash on cash return | | 141% | | |

**FINAL PLAT VALUE**

| | | | | | |
|---|---|---|---|---|---|
| Pre Plat Value Before Sales Costs | | $ 5,941,204 | $36,178 per lot | $15.10 per land square foot |
| Plus Final Plat Cost & Profit | | $ 7,196,396 | $43,822 per lot | $18.29 per land square foot |
| Final Plat Value Before Sales Costs | | $ 13,137,600 | $80,000 per lot | $33.39 per land square foot |
| Cost of Sales | 7% | $ (919,632) | ($5,600) per lot | ($2.34) per land square foot |
| Final Plat Value including Cost | | $ 12,217,968 | $74,400 per lot | $31.05 per land square foot |
| Cost of Final Plat | | $ (6,841,247) | ($41,650) per lot | |
| Final Plat Value Net of Cost but incl. Profit | | $ 5,376,721 | $32,741 per lot | |
| Value increase over Paper Plat | | $ 714,351 | $4,350 per lot | $1.82 per land square foot |
| Cash-on-cash return (before tax) | | 10% | | |

000075

NPV
Tumwater
RESIDUAL LAND VALUE CALCULATION

| | | | | |
|---|---|---|---|---|
| Gross Land Area | 11.73 acres | | 510,959 square feet | |
| Net Developable Land Area | 9.03 acres | | 393,438 square feet | |
| # of Lots | 164 lots | | | |
| Lot sizes | 2396 square feet | | 393,438 of lot sf | 77% |
| # of months for Preliminary Plat Approval | 18 months | | | |
| # of months for Final Plat Approval | 18 months | | | |

| | | | | |
|---|---|---|---|---|
| Land Purchase | $0 | | $0 per unit land cost | |
| Sales Price Per Home | $225,000 | | | |
| Sales Price (Final Plat Value) | $80,000 per lot | | 36% of Final Plat Value | |
| Absorption Period | 3 years | | | |
| Inflation | 4% per year | | | |
| Cost of Sales | 7% | | | |
| Permitting Costs (excludes profit) | $ 862,950 | $ 5,255 | | |
| Development Costs (excludes profit) | $ 7,704,197 | $ 46,914 | | |
| | $ 8,567,147 | $ 52,169 per lot cost | | |

| Year | 2006 | 2007 | 2008 | TOTAL |
|---|---|---|---|---|
| Inflation Factor | | | | |
| Lot Development Rate | 100% | 104% | 108% | |
| % of Lot Sales | 33% | 33% | 33% | 100% |
| # of Lots Sold | 0% | 50% | 50% | 100% |
| # of Lots Sold | 0 | 82 | 82 | 164 |
| Gross Sales Price Per Lot | $80,000 | $83,200 | $86,528 | |
| Total Gross Sales Per Year | $ - | $ 6,822,400 | $ 7,095,296 | $ 13,917,696 |
| Less Cost of Sales | $ - | $ (477,568) | $ (496,671) | |
| Net Sales | $ - | $ 6,344,832 | $ 6,598,625 | $ 12,943,457 |
| Land Cost | $ (0) | $0 | $0 | $ (0) |
| Permitting Costs | $ (862,950) | $0 | $0 | $ (862,950) |
| Development Costs | $ (2,568,065) | $ (2,670,788) | $ (2,773,511) | $ (8,012,364) |
| NET OPERATING INCOME | $ (3,431,015) | $ 3,674,044 | $ 3,825,115 | |

| | | |
|---|---|---|
| NPV | 6% | $3,244,719 |
| IRR | 72% | |

Tumwater
RESIDUAL LAND VALUE CALCULATION

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Gross Land Area | 11.73 | acres | 510,959 | square feet | | | |
| Net Developable Land Area | 9.03 | acres | 393,438 | square feet | 77% | | |
| of Lots | 164 | lots | | | | | |
| t sizes | 2396 | square feet | 393,438 | of lot sf (based on Net Developable) | | | |
| # of months for Preliminary Plat Approval | 18 | months | | | | | |
| # of months for Final Plat Approval | 18 | months | | | | | |

| Description | Quantity | Unit | Cost/Unit | | Total | Notes | Cost/Lot | |
|---|---|---|---|---|---|---|---|---|
| **HARD COSTS** | | | | | | | | |
| Demo bldgs / Dispose junk & concrete | 1 | each | $ | 20,000 | $ | 20,000 | $ | 122 |
| Asbestos removal | 1 | each | $ | 15,000 | $ | 15,000 | $ | 91 |
| Asphalt removal (pulverize and use for fill) | 4,000 | tons | $ | 13 | $ | 52,000 | $ | 317 |
| Clear 50 trees | 9.0 | ac | $ | 400 | $ | 3,613 | $ | 22 |
| Erosion control | 164 | lots | $ | 800 | $ | 131,376 | $ | 800 |
| Grading import | 50,000 | cy | $ | 8 | $ | 400,000 | $ | 2,436 |
| Production screened topsoil | 5,000 | cy | $ | 8 | $ | 40,000 | $ | 244 |
| Rockeries | 10,000 | sf | $ | 2 | $ | 20,000 | $ | 122 |
| Sanitary sewer | 5,000 | lf | $ | 40 | $ | 200,000 | $ | 1,218 |
| Force main | 2,000 | lf | $ | 12 | $ | 24,000 | $ | 146 |
| Lift station | 1 | lump sum | $ | 200,000 | $ | 200,000 | $ | 1,218 |
| Offsite storm | 1,000 | lf | $ | 25 | $ | 25,000 | $ | 152 |
| Offsite water | 1,000 | lf | $ | 58 | $ | 58,000 | $ | 353 |
| Offsite paving | 1,000 | lf | $ | 180 | $ | 180,000 | $ | 1,096 |
| Underground / Overhead - fiber | 1,000 | lf | $ | 200 | $ | 200,000 | $ | 1,218 |
| Offsite street lights | 10 | each | $ | 6,000 | $ | 60,000 | $ | 365 |
| Storm drainage | 5000 | lf | $ | 40 | $ | 200,000 | $ | 1,218 |
| Lot drainage system | 5000 | lf | $ | 11 | $ | 55,000 | $ | 335 |
| Water system | 5000 | lf | $ | 40 | $ | 200,000 | $ | 1,218 |
| Trench import | 12,500 | tons | $ | 10 | $ | 125,000 | $ | 761 |
| Flexible fittings | 1 | lump sum | $ | 20,000 | $ | 20,000 | $ | 122 |
| Dynamic consolidation or preload | 1 | lump sum | $ | 120,000 | $ | 120,000 | $ | 731 |
| Curbs and gutters | 5,000 | lf | $ | 25 | $ | 125,000 | $ | 761 |
| Onsite base and pave | 5,000 | lf | $ | 65 | $ | 325,000 | $ | 1,979 |
| Dry utilities trenching | 8,500 | lf | $ | 15 | $ | 127,500 | $ | 776 |
| Sidewalks | 5,000 | lf | $ | 22 | $ | 110,000 | $ | 670 |
| tboxes | 20 | each | $ | 2,000 | $ | 40,000 | $ | 244 |
| dscape common areas | 1 | lump sum | $ | 200,000 | $ | 200,000 | $ | 1,218 |
| Wetland/creek mitigation | 1 | lump sum | $ | 40,000 | $ | 40,000 | $ | 244 |
| Box culvert(s) | 0 | each | $ | 18,000 | $ | - | | |
| Geotech piling: pin piles | 0 | lots | $ | 35,000 | $ | - | | |
| Entry monument | 1 | lump sum | $ | 100,000 | $ | 100,000 | $ | 609 |
| On-site Street lights | 20 | each | $ | 4,000 | $ | 80,000 | $ | 487 |
| Plat fencing | 2,500 | lf | $ | 22 | $ | 55,000 | $ | 335 |
| | | | Subtotal of hard construction costs | | $ | 3,551,489 | $ | 21,626 |
| Contingency (as % of hard costs) | 15% | | | | $ | 532,723 | $ | 3,244 |

**SOFT COSTS, FEES, ETC.**
*Preliminary Plat Approval*
Preliminary Engineering

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Civil | 9 1/2 | PP months | $ | 10,000 | $ | 90,000 | $ | 548 |
| Traffic | 9 1/2 | PP months | $ | 5,000 | $ | 45,000 | $ | 274 |
| Wetlands/Wildlife | 9 1/2 | PP months | $ | 3,000 | $ | 27,000 | $ | 164 |
| Hydraulic/Flood | 9 1/2 | PP months | $ | - | $ | - | $ | - |
| Fisheries | 9 1/2 | PP months | $ | - | $ | - | $ | - |
| Pre Plat App Fees | 1 | lump sum | $ | 15,000 | $ | 15,000 | $ | 91 |
| City Review Fees | 9 1/2 | PP months | $ | 3,500 | $ | 31,500 | $ | 192 |
| SEPA Review | 1 | lump sum | $ | 1,200 | $ | 1,200 | $ | 7 |
| EIS Fees | 1 | lump sum | $ | 200,000 | $ | 200,000 | $ | 1,218 |
| Development Management Fee (Pre Plat) | 18 | Pre Plat months | $ | 10,000 | $ | 180,000 | $ | 1,096 |
| Public Relations | 9 | Pre Plat months | $ | 5,000 | $ | 45,000 | $ | 274 |
| Legal Fees (Pre Plat) | 18 | Pre Plat months | $ | 5,000 | $ | 90,000 | $ | 548 |
| Marketing of Pre Plat Fee | 4.5 1/4 | PP months | $ | 12,500 | $ | 56,250 | $ | 343 |
| Subtotal Preliminary Plat Approval Fees | | | | | $ | 780,950 | $ | 4,756 |
| Bank Charges, Loan Fee, Appraisal Fee, Etc. | 1% | PP Fees/PP Period | $ | 1,171,425 | $ | 11,714 | | |
| Interest Paid on Loan for Pre Plat Approval | 6% | PP Fees/PP Period | $ | 1,171,425 | $ | 70,286 | | |
| Developer's Profit on Preliminary Plat | 30% | PP+Bank+i+Land | $ | 4,570,157 | $ | 1,371,047 | | |
| | | | | | $ | 2,233,997 | $ | 13,604 |

*Final Plat Approval*

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Final Engineering | 164 | lots | $ | 2,000 | $ | 328,440 | $ | 2,000 |
| paction Testing | 3,500 | lf | $ | 18 | $ | 63,000 | $ | 384 |
| ey and Final Plat | 164.22 | lots | $ | 1,500 | $ | 246,330 | $ | 1,500 |
| Public Works Plan Review & Inspection Fees | $ 1,775,744 | 1/2 const value | 3% | $ | 53,272 | $ | 324 | |
| Final Plat Review Fees: City | 1 | lump sum | $ | 20,000 | $ | 20,000 | $ | 122 |
| Fire fee | 164 | lot | $ | 400 | $ | 65,688 | $ | 400 |
| Traffic fee | 164 | lot | $ | 933 | $ | 153,217 | $ | 933 |

-525-

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Parks fee | 164 lot | $ | 400 | $ | 65,688 | $ | 400 |
| School fee | 164 lot | | | $ | $0 | $ | - |
| Stormwater development charges | 164 lot | $ | 800 | $ | 131,376 | $ | 800 |
| Waste water fee | 164 lot | $ | 900 | $ | 147,798 | $ | 900 |
| Sewer latecomers frontage fee | 0 lf | $ | 45 | $ | - | $ | - |
| Water system development charge | 164 each | $ | 1,525 | $ | 250,436 | $ | 1,525 |
| Water latecomers charges | 1,500 lf | $ | - | $ | - | $ | - |
| Grading license fee | 1 each | $ | 2,000 | $ | 2,000 | $ | 12 |
| Bond fees | 164 lots | $ | 1,100 | $ | 180,642 | $ | 1,100 |
| Development Management Fee | 10% Hard Costs | $ | 3,551,489 | $ | 355,149 | $ | 2,163 |
| Legal Fees | 18 Final Plat Months | $ | 2,500 | $ | 45,000 | $ | 274 |
| Developer's Profit | 10% Hard Costs | $ | 3,551,489 | $ | 355,149 | $ | 2,163 |
| **Other Soft Costs** | | | | | | | |
| Real Estate Taxes | 18 Final Plat Months | $ | 126,122 | $ | 189,183 | $ 2,652,368 $ | 1,152 |
| **FINANCING** | | | | | | | |
| Interest | 2% %*(FP Time) | $ | 19,706,400 | $ | 394,128 | $ | 2,400 |
| Loan Fee & Closing Costs | 0.50% | $ | 13,137,600 | $ | 65,688 | $ 459,816 $ | 400 |
| **Building Lot Development Costs** | 164 lots | | (57,425) | $ | (9,430,393) $ | 9,430,393 $ | (57,425) |
| Final Plat / Retail Land Value | 164 lots | | $80,000 | $ | $13,137,600 | $ | 80,000 |
| Raw Land Value AS-IS - Cost/lot | 164 lots | | $22,575 | $ | 3,707,207 | $ | 22,575 |

| **AS-IS VALUE** | | | | | | |
|---|---|---|---|---|---|---|
| Land Value As-Is | | $ | 3,707,207 | $ | 22,575 | per lot | $7.26 per land square foot |
| Cost of Sales | 7% | $ | (259,504) | $ | (1,580) | per lot | ($0.51) per land square foot |
| | | $ | 3,447,703 | $ | 20,994 | per lot | $6.75 per land square foot |
| Original Cost | | $ | (0) | $ | (0) | per lot | |
| Profit | | $ | 3,447,702 | $ | 20,994 | per lot | |

| **PAPER PLAT VALUE** | | | | | | |
|---|---|---|---|---|---|---|
| Land Value As-Is | | $3,707,207 | $ | 22,575 | per lot | $7.26 per land square foot |
| Plus Pre Plat Cost Including Profit | | $ 2,233,997 | $ | 13,604 | per lot | $4.37 per land square foot |
| Paper Plat Value including Cost & Profit | | $ 5,941,204 | $ | 36,178 | per lot | $11.63 per land square foot |
| Cost of Sales | 7% | $ (415,884) | $ | (2,532) | per lot | ($0.81) per land square foot |
| Paper Plat Value including Cost | | $ 5,525,320 | $ | 33,646 | per lot | $10.81 per land square foot |
| Cost of Preliminary Plat | | $ (862,950) | $ | (5,255) | per lot | |
| Paper Plat Value Net of Cost but incl. Profit | | $ 4,662,370 | $ | 28,391 | per lot | |
| Value increase over As-Is | | $ 1,214,667 | $ | 7,397 | per lot | $2.38 per land square foot |
| Cash on cash return | | 141% | | | | |

| **FINAL PLAT VALUE** | | | | | | |
|---|---|---|---|---|---|---|
| Pre Plat Value Before Sales Costs | | $ 5,941,204 | $36,178 | per lot | $11.63 per land square foot |
| Plus Final Plat Cost & Profit | | $ 7,196,396 | $43,822 | per lot | $14.08 per land square foot |
| Final Plat Value Before Sales Costs | | $ 13,137,600 | $80,000 | per lot | $25.71 per land square foot |
| Cost of Sales | 7% | $ (919,632) | ($5,600) | per lot | ($1.80) per land square foot |
| Final Plat Value including Cost | | $ 12,217,968 | $74,400 | per lot | $23.91 per land square foot |
| Cost of Final Plat | | $ (6,841,247) | ($41,659) | per lot | |
| Final Plat Value Net of Cost but incl. Profit | | $ 5,376,721 | $32,741 | per lot | |
| Value increase over Paper Plat | | $ 714,351 | $4,350 | per lot | $1.40 per land square foot |
| Cash-on-cash return (before tax) | | 10% | | | |

000079

-226-

**Disclaimer**
Please note that Washington law generally prohibits any person except a licensed appraiser from providing an estimate of value for real property. One exception to this prohibition is a broker's opinion of value to be utilized to provide acquisition and disposition advice (See RCW 18.140.020(1)). The estimates provided in this report are offered in the context of a broker's opinion of value.

Thank you again for the opportunity to assist you with your various real estate holdings. Please let us know if you have any further questions.

Sincerely,

Campbell Mathewson
Vice President & Designated Broker

CRE 4485v1 28149-28149-1
Seattle

3

000079