# SHAPIRO

# EXHIBIT A

**SUMMARY APPRAISAL REPORT**

of

**TUMWATER ESTATES MOBILE HOME PARK
930 TROSPER ROAD SW
TUMWATER, WA**

as of

March 23rd, 2009

Prepared for

City of Tumwater
555 Israel Road SW
Tumwater, WA  98501

Prepared by

Stephen Shapiro, MAI

**RE•SOLVE**
*Real Estate Appraisal, Counseling & Mediation*
*261 Madison Avenue South, Suite 102*
*Bainbridge Island, Washington 98110*

Ref. 10004

SHAPIRO DEC.
A 2

# RE♦SOLVE

**GIBBONS & RIELY PLLC**
**Real Estate Appraisal, Counseling & Mediation**
261 Madison Avenue South, Suite 102
Bainbridge, Washington 98110-2579

Stephen Shapiro, MAI
Direct Dial 206 855-1090
Email: sshapiro@realestatesolve.com

January 6th, 2010

City of Tumwater
555 Israel Road SW
Tumwater, WA 98501

RE:     **Tumwater Estates Mobile Home Park 115 pad mobile home park in Tumwater, WA**

At the request of Jeffrey S. Myers, an attorney with the law firm of Law, Lyman, Daniel, Kamerrer and Bogdanovich, P.S. who represents the City of Tumwater; I have prepared an appraisal of the above-referenced property that is described in the attached report. As directed, I have provided an opinion of value for the subject both before and after a change in zoning that was enacted by the City of Tumwater on March 23rd, 2009. The property rights appraised are the fee simple interest in the before condition under the pre-existing zone and the fee simple interest in the after condition under the new zone. The value conclusions derived in this report are based upon certain assumptions and limiting conditions that are noted herein.

This appraisal is presented as a *summary* report, and complies with the stipulations of the Uniform Standards of Professional Appraisal Practice for such reports.

**Identity of Subject Property**

The subject of this appraisal is a 115 pad mobile home park that is covered by the Thurston County Assessor's Tax ID No. 090800-78001. The abbreviated legal description is noted as follows:

N Barnes JR DC & Tumwater Park B 18 BAP on S LN DC S 897-58 – E1232 .9F from its SW.

**Purpose of Appraisal**

The purpose of this appraisal is to estimate the market value of the subject property both before and after enactment of a zoning change by the City of Tumwater on March 23rd, 2009. The term "market value" is defined in the Uniform Appraisal Standards for Federal Land Acquisitions as:

> *Market value is the amount in cash, or on terms reasonably equivalent to cash, for which in all probability the property would have sold on the effective date of the appraisal, after a reasonable exposure time on the open competitive market, from a willing and reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with*

**SHAPIRO DEC.**
**A 3**

*neither acting under any compulsion to buy or sell, giving due consideration to all available economic uses of the property at the time of the appraisal.*

## Property Rights Appraised

The property rights appraised are the fee simple interest in the before condition under the pre-existing zone and the fee simple interest in the after condition under the new zone.

## Intended Use/User of Appraisal

The intended user is the client, the City of Tumwater, and its authorized attorneys, associates, employees, representatives or agents. This report will be used by the City of Tumwater to determine what value impacts, if any, occurred to the subject as a result of the zoning change, which is the subject of the Laurel Park Community vs. City of Tumwater litigation.

## Scope of Appraisal

The scope of work performed in this appraisal is in compliance with the specific guidelines of the Uniform Standards of Professional Appraisal Practice (USPAP) to produce a credible value opinion that meets the expectations of parties who are regularly intended users of similar appraisal assignments and is also in accord with the analysis that the appraiser's peers would perform in a similar appraisal assignment.

Assessing any value impact that may have occurred to the subject as a result of the zoning change requires utilization of the before/after methodology. Specifically, the subject is first valued in the before condition in its highest and best use under the pre-existing zone. The property is then valued in its highest and best use under the new zone. If there is any difference between the two values this would represent the market value of the impact to the subject from the zoning change.

In the valuation analysis of this report I have relied upon both the direct sales comparison approach as well as the income capitalization approach. Although the property is improved as a mobile home park I have not utilized the cost approach as it is considered to be considerably less reliable than either the sales or income approaches for this type of property.

## Report Type

This analysis is presented in a reporting format that meets the requirements for a *summary* report under USPAP guidelines. Discussions and analysis are summarized in this document, with supporting data retained in my files for reference.

## Extraordinary Assumptions/Hypothetical Conditions

I have not been provided with a title report for the subject. With this in mind, it is an extraordinary assumption that there are no covenants, conditions, restrictions or easements that would constrain the highest and best use of the property.

I have relied upon public data and maps in order to assess the subject's physical conditions including any critical areas impacts. It is an extraordinary assumption that this provides an accurate basis upon which to perform a credible highest and best determination for the property.

In the event that credible information comes to light contradicting the foregoing assumptions, I reserve the right to reconsider the conclusions stated in this report.

## Description of Subject Property

The subject is a 115 pad mobile home park that was constructed in 1965. According to the records of the Thurston County Assessor it is situated on 22.44 acres of land. The exhibits provided at the end of this report include a wetlands map and soils liquefaction map. Based upon these materials it appears that the western portion of the subject is adjacent to a wetland that would likely result in a buffer restriction on any new construction on the property. The existing mobile home park improvements were put in place prior to the City of Tumwater's Critical Area Ordinance and therefore are legally non-conforming with respect to critical areas and associated buffers. Further, my inspection of the subject indicated a large pond on the property of about an acre.

Referring to the soils liquefaction map more than half of the subject is shown as falling within a high liquefaction area. Liquefaction is a phenomenon in which the strength and stiffness of a soil is reduced by earthquake shaking or other rapid loading. Liquefaction and related phenomena have been responsible for tremendous amounts of damage in historical earthquakes around the world. When liquefaction occurs, the strength of the soil decreases and the ability of a soil deposit to support foundations for buildings is reduced. In fact, soils liquefaction caused a large area on the west side of the subject to sink during the Nisqually Earthquake in 2001.

Although the existing subject improvements within the liquefaction area of the subject are considered to be legally non-conforming, any new construction on the property would require a geotechnical survey to justify development. I am not a qualified soils engineer and therefore cannot provide any opinion with respect to the composition of the subject soils. However, based upon the property's designation within a liquefaction area as well as a history of sinking soils it is reasonable to conclude that the market would assign a very high risk with respect to being able to obtain a building permit on much of the subject property.

## Location

The subject is located in the west central portion of the City of Tumwater in an area of residential development. There is an interchange with I-5 about 1.5 miles to the south. The City of Olympia is located about five miles north of the subject.

## Access

The subject has access from Trosper Road, which is a paved two-lane local road.

## Utilities

Electricity, public water and sewer presently serve the subject.

SHAPIRO DEC.
A 5

**Zoning in the Before Condition**

In the before condition the subject was zoned Multi-Family High Density. According to the City of Tumwater's Municipal Code the stipulations of this zoning district are as follows:

The intent of the Multi-Family High Density Residential (MFH) zone district is to:

A.   Provide for a high standard of development for multi-family residential areas of high density;

B.   Provide designated areas in which a minimum net density of fourteen units per acre and a maximum net density of twenty-nine units per acre apply to promote the efficient use of land and promote mass transit opportunities;

C.   Guide high-density residential development in such a manner as to encourage and plan for the availability of public services and community facilities such as utilities, police and fire protection, streets, public transit, schools, parks and recreation.

D.   Encourage development of attractive residential areas that provide a sense of community and establish a pedestrian-friendly atmosphere.

E.   Ensure that development without municipal utilities is at a density and in a configuration that enables cost effective urban density in-fill development when municipal utilities become available.

Permitted uses in the MFH district are as follows:

A.   Multi-family dwellings;

B.   Parks, trails, open space areas, and other related recreation facilities;

C.   Support facilities;

D.   Residential planned unit developments;

E.   Family child care home; child mini-day care center, subject to review by the Development Services Director;

F.   Adult family homes, residential care facilities;

G.   Senior housing facilities of a net density of 25 dwelling units per acre or less.

H.   Any combination of the permitted uses listed in this section may be combined on one site, in accordance with the provisions of 18.16.050.

I.   Attached wireless communication facilities, except that it is prohibited to attach a non-accessory wireless communication antenna on a single family or two-family dwelling;*

Accessory uses in the MFH district are as follows:

A.   Storage sheds, toolsheds, greenhouses;

B.   Private parking garages or carports;

C.   Home occupations, as approved by the Director of Development Services;

D.   Noncommercial recreational structures which could include but are not limited to swimming pools and recreational ball courts;

E.   Energy systems;

F.   Accessory dwelling unit, in accordance with the provisions of Tumwater Municipal Code Chapter 18.42.010, where there is an existing single-family dwelling unit which was legally established prior to January 1, 1996;

G.   Boardinghouses and roominghouses;

H.   Neighborhood community center;

I.   Accessory wireless communication antenna.*

Conditional uses in the MFH zone district are as follows:

A.   Churches;

B.   Freestanding wireless communication facilities;*

C.   Cemeteries;

D.   Child day care center;

E.   Public and/or private schools;

F.   Neighborhood community center as a primary use;

G.   Neighborhood-oriented commercial center;

H.   Private clubs and lodges;

I.   Medical clinic or hospital;

J.   The following essential public facilities:

1.   Emergency communications towers and antennae*

2.   Mental health facilities (including but not limited to congregate care facilities; adult residential treatment facilities; evaluation and treatment centers)

3.   Inpatient facilities including substance abuse facilities (including but not limited to: intensive inpatient facilities; long term residential drug treatment facilities; recovery house facilities)

K.   Group foster homes;

L.   Senior housing facilities greater than 25 but not to exceed 29 dwelling units per acre net density.

Density regulations in the MFH zone district are as follows:

A.   Site area. All residential developments must meet the following density requirements:

1.   Minimum: fourteen dwelling units per acre;

2.   Maximum: twenty-nine dwelling units per acre, except that any density greater than twenty-five dwelling units per acre shall be obtained only by purchase of transfer of development rights in accordance with Chapter 18.57 of the Tumwater Municipal Code.

B.   Density calculation. The calculation of the density requirements in Section 18.16.050(A) above is based on the portion of the site devoted to residential and associated uses (e.g., dwelling units; private community clubs, open space; stormwater detention, treatment and infiltration). The following land is excluded from density calculations:

1.   Land that is required to be dedicated for public use as open space, right-of-way, or land on which development is prohibited by Tumwater Municipal Code Title 16 – Environment, and land that is to be used for private roads. Provided, that portion of open space/park areas that consists of stormwater facilities and that are designed for active and/or passive recreational purposes in accordance with the Drainage Design and Erosion Control Manual for Tumwater shall not be excluded from density calculations.

2.   Land that is intended for future phases of development created in accordance with Section 18.16.060;

3.   Land that consists of lots devoted to uses other than residential and associated uses, including but not limited to churches, schools, and support facilities (except for stormwater detention, treatment and infiltration facilities).

C.   Division of land not on public sanitary sewer. Division of land in areas without sewer must occur in a manner that maintains long term potential to achieve minimum required densities and efficient provision of sewer once sewer becomes available. For a proposed division of land not required to be served by the extension of public sewer at the time of approval, a conversion plan shall be submitted in accordance with Section 18.16.060 for the entire property, and the proposed land division shall be subject to the following:

1.   For land division of an existing lot of record created prior to September 15, 1998:

a.   Any division creating two (2) lots shall not be subject to the minimum density requirements of Section 18.16.050(A), provided one (1) of the lots created is at least five (5) acres in size. A note must be included on the recorded land division that future land divisions shall meet minimum density requirements of Section 18.16.050(A) in each phase of development.

b.   Any division creating more than two (2) lots shall meet the minimum density requirements of Section 18.16.050(A) in each phase of development.

D.   Lot coverage, maximum for all buildings: seventy percent of the total area of the lot.

E.   Structure height: fifty feet or five stories, whichever is less; provided, however, that no structure shall penetrate imaginary airspace surfaces as defined by Title 14 of the Code of Federal Regulations, Part 77. A map that provides detailed information on ground and imaginary airspace surface elevations is available for inspection in the Development Services Department.

SHAPIRO DEC.
A 7

F.  Yards.*
1.  Front: ten feet minimum from frontage property line;
2.  Side: five feet from property line, minimum;
3.  Rear: five feet from property line, minimum.

Where any structures or portions of structures are adjacent to any single-family residential zoning district, the minimum setback shall be twenty feet. Where structures are constructed over one story, the setback from the adjacent property line or lines shall be increased by ten feet for every story above the ground level story of the proposed new building, and shall be completely screened from view in accordance with Chapter 18.47.

G.  Open space/park area. For multi-family developments, a minimum of fifteen percent (15%) of the gross site area shall be set aside and utilized as open space/park area for use and enjoyment of future residents. Such open space/park area shall at a minimum meet the following standards:

1.  For the purpose of calculation of the open space/park requirement, the open space/park area shall be separate and distinct from required yards, setbacks and landscaped areas, but may include areas of native vegetation that are allowed to fulfill the landscaping requirements of TMC 18.47. Open space/park areas may also include wetlands and their buffers, other critical areas, and stormwater facilities that are designed for active and/or passive recreation opportunities in accordance with the Drainage Design and Erosion Control Manual for Tumwater.

2.  All open space/park areas must include any two or more facilities for active and/or passive recreation from the lists below. For open space/park areas within residential developments, at least one of the required recreation facilities must be from the list of active recreation facilities (this area may include stormwater facilities that are designed for active and/or passive recreation opportunities in accordance with the Drainage Design and Erosion Control Manual for Tumwater).

Active Recreation Facilities
a.  Children's play equipment, such as slides, swings, and play structures.
b.  A paved hard court for activities such as basketball, tennis, pickleball, etc.
c.  A flat, open lawn area that may serve as a ball field for active play.
d.  Other active recreation facility if approved by the Development Services Director upon consultation with the Tumwater Parks and Recreation Director.

Passive Recreation Facilities
a.  Facilities for walking, such as trails, benches, etc.
b.  Picnicking facilities, such as picnic tables, shelters, etc
c.  Public plazas.
d.  Year-round water features such as a fountain, pond, stream, etc. These water features may be incorporated as part of a stormwater facility designed in accordance with the Drainage Design and Erosion Control Manual for Tumwater.
e.  Other passive recreation facility if approved by the Development Services Director upon consultation with the Tumwater Parks and Recreation Director.

3.  The open space/park area shall have convenient access for residences/ employees of the development and shall be consolidated to provide maximum access, visibility, usability, minimization of impacts to residential uses, and ease of maintenance. The requirement that the open space/park area be consolidated may be waived by the Director of Development Services upon a finding that the residents of the development would receive a greater benefit if the required open space/park area were provided in another configuration due to the unique topographic conditions or fish and wildlife habitat values of the site.

4.  The open space/park area shall be designed and placed in consideration of existing and potential open space/park areas on adjacent parcels to consolidate or provide future opportunities for consolidation of neighborhood open space areas.

5.  Except where removal is required to meet active recreation requirements in this chapter, existing trees and significant vegetation shall be retained in open space/park areas unless an alternate landscaping plan for such areas is required or approved by the development review committee.

6.   Cash, or like value of land area and improvements within the neighborhood parks planning area the site is located, may be donated to the City to fulfill the requirements of this section. The amount of cash required will be determined using a formula based on the cost of meeting the adopted level of service for neighborhood parks in the Tumwater Parks and Recreation Plan.

7.   Open space/park areas shall be held in single ownership where such ownership assumes full responsibility for maintenance and operation, or held in common ownership by all of the owners in the development area through a homeowners association or similar organization. The City as a condition of approval may choose to accept dedication, or the maintenance and operation responsibilities for the area, when the area to be dedicated is one or more of the following.

a.   Greater than 5 acres.

b.   Adjacent to an established or future City park or school grounds.

c.   Includes access to a body of water, wetland, important fish/wildlife habitat, or other environmentally sensitive area.

d.   If the City determines it is in the public interest to accept public dedication.

## Zoning in the After Condition

In the after condition the subject is zoned Manufactured Home Park.  According to the City of Tumwater Municipal Code the stipulations of this zoning district are as follows:

The Manufactured Home Park (MHP) zone district is established to promote residential development that is high density, single family in character and developed to offer a choice in land tenancy. The MHP zone is intended to provide sufficient land for manufactured homes in manufactured home parks.

Permitted uses within the MHP zone district are as follows:

A.   Manufactured home parks in accordance with the provisions of TMC 18.48;

B.   Designated manufactured homes on existing single lots of record, in accordance with the provisions of TMC 18.48;

C.   Mobile home parks which were legally established prior to July 1, 2008;

D.   One single family detached dwelling per existing single lot of record;

E.   Parks, trails, open space areas, and other related recreation facilities;

F.   Support facilities;

G.   Family child care home; child mini-day care center, subject to review by the Development Services Director, the Building Official, and the Fire Chief.

Accessory uses within the MHP zone district are as follows:

A.   Storage sheds, tool sheds, greenhouses;

B.   Private parking garages or carports;

C.   Home occupations, as approved by the Director of Development Services;

D.   Non-commercial recreational structures which could include but are not limited to swimming pools and recreational ball courts;

E.   Clubhouses and community centers associated with manufactured home parks;

Conditional uses within the MHP zone district are as follows:

A.   Churches;

B.   Freestanding wireless communication facilities;

C.   Cemeteries;

D.   Child day care center;

E.   Public and/or private schools;

F.   Neighborhood community center;

G.   Neighborhood-oriented commercial center;

**SHAPIRO DEC.**
**A 9**

H.   The following essential public facilities;

1.   Emergency communications towers and antennae;

I.   Group foster homes;

J.   Agriculture;

K.   Bed and breakfasts.

Density regulations in the MHP zone district are as follows:

A.   Site area. All residential developments (except for the use listed in 18.49.020(D)) must meet the following density requirements:

1.   Minimum: six dwelling units per acre;

2.   Maximum: nine dwelling units per acre, except that any density greater than eight dwelling units per acre shall be obtained only by purchase of transfer of development rights in accordance with TMC 18.57.

B.   Density calculation. The calculation of the density requirements in Section 18.49.050(A) above is based on the portion of the site devoted to residential and associated uses (e.g., dwelling units; private community clubs, open space; stormwater detention, treatment and infiltration). The following land is excluded from density calculations:

1.   Land that is required to be dedicated for public use as open space, right-of-way, or land on which development is prohibited by Tumwater Municipal Code Title 16 – Environment, and land that is to be used for private roads. Provided, that portion of open space/park areas that consists of stormwater facilities and that are designed for active and/or passive recreational purposes in accordance with the Drainage Design and Erosion Control Manual for Tumwater shall not be excluded from density calculations.

2.   Land that is intended for future phases of development.

3.   Land that consists of lots devoted to uses other than residential and associated uses, including but not limited to support facilities (except for stormwater detention, treatment and infiltration facilities).

C.   Land coverage, maximum for all buildings: seventy percent of total area of the parcel.

D.   Structure height: forty feet, maximum; provided that no structure shall penetrate imaginary airspace surfaces as defined by Title 14 of the Code of Federal Regulations, Part 77. A map that provides detailed information on ground and imaginary airspace surface elevations is available for inspection in the Development Services Department.

E.   Yards.*

1.   Front: ten feet minimum from frontage property line.

a.   Driveways in front yards on property lines abutting a public right of way must be a minimum of 18 feet in length as measured along the shortest edge of the driveway starting from the front property line.

2.   Side: five feet from property line, minimum.

3.   Rear: five feet from property line, minimum.

Where structures are constructed over one story, the setback from the adjacent property line or lines shall be increased by ten feet for every story above the ground level story of the proposed new building, and shall be completely screened from view in accordance with TMC 18.47.

F.   Open space/park area. To the extent necessary to reasonably mitigate direct impacts, a minimum of ten percent of the gross site area shall be set aside as open space/park area meeting the following minimum standards:

1.   For the purpose of calculation of the open space/park requirement, the open space/park area shall be separate and distinct from required yards, setbacks and landscaped areas, but may include areas of native vegetation that are allowed to fulfill the landscaping requirements of TMC 18.47. Open space/park areas may also include wetlands and their buffers, other critical areas, and stormwater facilities that are

SHAPIRO DEC.
A 10

designed for active and/or passive recreation opportunities in accordance with the Drainage Design and Erosion Control Manual for Tumwater.

2.    All open space/park areas must include any two or more facilities for active and/or passive recreation from the lists below. At least one of the required recreation facilities must be from the list of active recreation facilities (this area may include stormwater facilities that are designed for active and/or passive recreation opportunities in accordance with the Drainage Design and Erosion Control Manual for Tumwater).

a.    Active Recreation Facilities

1.    Children's play equipment, such as slides, swings, and ply structures.

2.    A paved hard court for activities such as basketball, tennis, pickleball, etc.

3.    A flat, open lawn area that may serve as a ball field for active play.

4.    Other active recreation facility if approved by the Development Services Director upon consultation with the Tumwater Parks and Recreation Director.

b.    Passive Recreation Facilities

1.    Facilities for walking, such as trails, benches, etc.

2.    Picnicking facilities, such as picnic tables, shelters, etc.

3.    Public plazas.

4.    Year-round water features such as a fountain, pond, stream, etc. These water features may be incorporated as part of a stormwater facility designed in accordance with the Drainage Design and Erosion Control Manual for Tumwater.

5.    Other passive recreation facility if approved by the Development Services Director upon consultation with the Tumwater Parks and Recreation Director.

3.    The open space/park area shall have convenient access for residences of the development and shall be consolidated to provide maximum access, visibility, usability, minimization of impacts to residential uses, and ease of maintenance. The requirement that the open space/park area be consolidated may be waived by the Director of Development Services upon a finding that the residents of the development would receive a greater benefit if the required open space/park area were provided in another configuration due to the unique topographic conditions or fish and wildlife habitat values of the site.

4.    The open space/park area shall be designed and placed in consideration of existing and potential open space/park areas on adjacent parcels to consolidate or provide future opportunities for consolidation of neighborhood open space areas.

5.    Except where removal is required to meet active recreation requirements in this chapter, existing trees and significant vegetation shall be retained in open space/park areas unless an alternate landscaping plan for such areas is required or approved by the Development Services Director.

6.    Cash, or like value of land area and improvements located within the appropriate neighborhood parks planning area, may be donated to the City to fulfill the requirements of this section. The amount of cash required will be determined using a formula based on the cost of meeting the adopted level of service for neighborhood parks in the Tumwater Parks and Recreation Plan.

7.    Open space/park areas shall be held in single ownership where such ownership assumes full responsibility for maintenance and operation, or held in common ownership by all of the owners in the development area through a homeowners association or similar organization. The City as a condition of approval may choose to accept dedication, or the maintenance and operation responsibilities for the area, when the area to be dedicated is one or more of the following.

a.    Greater than 5 acres.

b.    Adjacent to an established or future City park or school grounds.

c.    Includes access to a body of water, wetland, important fish/wildlife habitat, or other environmentally sensitive area.

d.    If the City determines it is in the public interest to accept public dedication.

**SHAPIRO DEC.**
**A 11**

Use exceptions in the MHP zone district are as follows:

1. A mobile/manufactured home park owner may request a use exception or modification from the application of the MHP zoning to their property as set forth below.

2. The property owner shall submit an application on forms prepared by the Development Services Department, with documentation demonstrating that application of the MHP zoning meets the criteria below.

3. The City Council may approve the property owner's request for a use exception if the property owner demonstrates:

a. they do not have reasonable use of their property under the MHP zoning; or

b. the uses authorized by the MHP zoning are not economically viable at the property's location.

If the request is granted by the City Council, the property shall revert to its previous zoning designation without further action by the Council.

4. In addition to the application, a relocation plan must be submitted detailing, at a minimum, the pertinent laws (City, County, or State), an explanation of tenants rights according to State law, a list of sources of assistance (governmental, financial, etc), available vacant spaces within the mobile/manufactured home park, a list of nearby parks with available spaces, and a list of companies that move manufactured or mobile homes.

5. Except as otherwise provided herein, the application shall be reviewed consistent with Title 14, and the Council's decision may be appealed to the Thurston County Superior Court.

**Area Data and Market Analysis**

The subject property is situated in the north western portion of Thurston County in the city of Tumwater, which is about five miles south of Olympia, the capitol of Washington. Along with the nearby city of Lacey and the greater surrounding urban growth areas, about 140,000 people live in this concentrated area. This region is well served by major transportation arteries including I-5, which runs just south of Olympia and Lacey, and through Tumwater. This is the premier freeway serving the west coast of the U.S. and provides easy access to the more populous Tacoma/Seattle/Bellevue/Everett metropolitan area to the north. Olympia has a mid-sized port relative to the 12 port cities in the state, with a 60-acre full-service terminal located on Budd Inlet. Tumwater is home to the Olympia Regional Airport.

Notwithstanding the recent downward economic trend which has resulted in a rise in the unemployment rate in this area from 4.2% in September of 2007 to 7.1% in September of 2009, the long term prospects for this area are considered good. Not only is this the major metropolitan area and commercial hub of the south Puget Sound region, it is also the hub of state government. These factors help to ensure that the economy will thrive into the future.

The Northwest Multiple Listing Service compiles annual statistics for home sales in Thurston County. While the MLS does not track unimproved land sales over time, in general price trends for residential land would be expected to track fairly closely with home prices in a given market area since they are ultimately used for the same purpose and are purchased by similar types of market participants. Data provided on the following page shows large increases in housing prices for the Olympia area in 2004, 2005, and 2006, and the market was still characterized as active with positive appreciation of around 5.3% throughout 2007. However, in 2008 the Thurston County market fell by 4.4% and has fallen a further 8% through November of 2009.

### Average House Price Trend Analysis

### Olympia/Tumwater Area Home Sales

Average House Prices

| Area | Name | Dec-02 | Dec-03 | Dec-04 | Dec-05 | Dec-06 | Dec-07 | Dec-08 | Nov-09 |
|------|------|--------|--------|--------|--------|--------|--------|--------|--------|
| 443 | Tumwater | $176,711 | $190,339 | $227,227 | $261,736 | $283,936 | $317,994 | $310,405 | $281,272 |
| 444 | Olympia Westside | $219,255 | $232,716 | $255,489 | $321,516 | $344,320 | $364,904 | $372,060 | $296,324 |
| 447 | Olympia North | $159,489 | $166,008 | $192,911 | $231,916 | $257,072 | $268,893 | $262,212 | $237,736 |
| 448 | Olympia South | $190,569 | $206,303 | $217,323 | $276,104 | $299,117 | $314,652 | $320,629 | $294,320 |
| 449 | East Olympia | $240,081 | $264,365 | $301,118 | $350,190 | $416,303 | $410,471 | $373,420 | $317,615 |
| 450 | Lacey | $200,500 | $164,567 | $185,685 | $224,594 | $249,027 | $258,421 | $247,823 | $229,030 |
|  | County Average | $178,046 | $187,317 | $208,187 | $251,592 | $282,044 | $296,967 | $284,041 | $261,458 |

Increases in value

| Area | Name | '02-03 | '03-04 | '04-05 | '05-06 | '06-07 | '07-08 | 08-09 | Over 7 years | |
|------|------|--------|--------|--------|--------|--------|--------|--------|--------------|---|
| 443 | Tumwater | 7.7% | 19.4% | 15.2% | 8.5% | 12.0% | -2.4% | -9.4% | 8.5%/yr | or 59% total |
| 444 | Olympia Westside | 6.1% | 9.8% | 25.8% | 7.1% | 6.0% | 2.0% | -20.4% | 7.9%/yr | or 35% total |
| 447 | Olympia North | 4.1% | 16.2% | 20.2% | 10.8% | 4.6% | -2.5% | -9.3% | 7.4%/yr | or 49% total |
| 448 | Olympia South | 8.3% | 5.3% | 27.0% | 8.3% | 5.2% | 1.9% | -8.2% | 7.8%/yr | or 54% total |
| 449 | East Olympia | 10.1% | 13.9% | 16.3% | 18.9% | -1.4% | -9.0% | -14.9% | 6.6%/yr | or 32% total |
| 450 | Lacey | -17.9% | 12.8% | 21.0% | 10.9% | 3.8% | -4.1% | -7.6% | 3.1%/yr | or 14% total |
|  | County average | 5.2% | 11.1% | 20.8% | 12.1% | 5.3% | -4.4% | -8.0% | 7.0%/yr | or 47% total |



Tumwater Estates MHP Park
Page 12

While Puget Sound's overall real estate market remains recessionary, there are some signs that it may be stabilizing, particularly in less expensive markets that would include much of Tumwater. Gardner Land Use Economics publishes research on the Western Washington real estate market, and its second quarter 2009 report indicates that inventory reduction, a precondition for a recovery in the housing market, is occurring across most of the Puget Sound region. Also, about half of the areas surveyed showed price improvement over the first quarter of this year, a tangible sign of stability. These gains may be partly due to the availability of the federal tax credit and to the historically low mortgage rates.

Another factor that has tended to maintain relatively affordable single family housing in the area is an oversupply of dwelling units relative to demand. This is illustrated in the following table that was provided by the Buildable Lands Report of Thurston County 2007.



Supply vs Demand for Dwelling Units in Thurston County Urban Areas

|  | Lacey & UGA | Olympia & UGA | Tumwater & UGA | Yelm & UGA |
|---|---|---|---|---|
| Demand | 16,600 | 13,000 | 8,200 | 7,300 |
| Supply | 20,600 | 15,800 | 10,400 | 9,900 |

|  | Bucoda & UGA | Rainier & UGA | Tenino & UGA | Grand Mound |
|---|---|---|---|---|
| Demand | 140 | 500 | 760 | 740 |
| Supply | 240 | 590 | 860 | 860 |

* Assumes 2/3 Buildout of the Thurston Highlands Master Planned Community.

Historically, multi-family housing has captured only a small portion of the housing market in Thurston County as a whole. According to Pete Swenson of the Thurston Regional Planning Council, this is partly due to the relative affordability of the Thurston County market compared to that of Pierce and King County. Although construction costs are similar, land costs are still significantly lower in Thurston County, leading to an overall lower price for residential sales and a strong predominance of single family housing. A buyer that might qualify only for a condo or townhome in the Seattle or Tacoma area has typically found it easier to obtain financing for a single family home in Thurston County, especially outside of Olympia. In 2008, multi-family housing accounted for only 15% of the market share in cities and urban growth areas in Thurston County. This sales trend is closely matched by the trend in numbers of permitted residential units for the county. In 2008, permits were issued for 1,099 single family

Tumwater Estates MHP Park
Page 13

residences and for only 161 multi-family units, or 14.6% of the total (data from The Profile November 2009 of the Thurston Regional Planning Council).

According to Chris Carlson, Planning Manager of the City of Tumwater, apartments have historically represented the bulk of the multi-family market in the area. Mr. Carlson has provided the following figures in order to assess the rate of absorption of multi-family units over the past four decades:

| Historic MF Absorption - Tumwater | | |
|---|---|---|
| Apartment Complex Name | Year Built | # Units |
| Hearthstone | 2007 | 125 |
| Tabula Rosa | 2007 | 118 |
| | subtotal | **243** |
| The Waterford | 1995 | 26 |
| Breckenridge Phase 1 | 1991 | 186 |
| Breckenridge Phase 2 | 1994 | 250 |
| Westridge | 1990 | 80 |
| Capitol Heights | 1990 | 115 |
| Montair | 1990 | 370 |
| | subtotal | **1027** |
| | | |
| Meadowwood | 1983 | 104 |
| Country Court | 1980 | 24 |
| | | |
| Suncrest | 1969-71 | 65 |
| Falls Pointe | 1970 | 108 |
| Alpine Village | 1970 | 196 |
| | subtotal | **369** |

A total of 369 units were built between 1969 and 1971, 128 units in the eighties, 1,027 units were built between 1990 and 1995, and most recently, 243 units were constructed in 2007. This is a total of 1,767 units over almost forty years, which averages about 45 units per year. However, it appears that in general multi-family development in Tumwater experiences surges followed by periods of in which there is little or no construction of this type of housing. With this in mind it is reasonable to consider whether the multi-family housing market is ready for another burst of activity in the near future, and if so, whether the subject property might be a viable candidate for such development. The central question is whether such development of the subject would meet with sufficient market demand to absorb the units constructed within an economically feasible time frame in order to be more economically viable than the current use of the property improved as a mobile home park. In other words, would the property owner make more money evicting the existing mobile home tenants and tearing out the mobile home park infrastructure that presently provides a steady income stream, and could continue to do so well into the future, in order to speculate on construction of multi-family housing?

One observation is that there is no multi-family housing currently under construction in Tumwater. This apparently represents a judgment on the part of developers regarding both the availability of financing and current and near-future market demand for such housing. However, even in the event of a positive change in the economy that resulted in increased demand for multi-family housing, it must be recognized

Tumwater Estates MHP Park
Page 14

that there are a number of projects already either approved or undergoing permit reviews that would most likely fulfill that demand (see chart below), and would be able to offer units on the market before the subject would be in a position to do so.

| MF Housing in the Pipeline - Tumwater | | |
|---|---|---|
| Name of Project | # Units | Status |
| 80 West Apts | 80 | no permit in hand |
| Summitt at Hills | 47 | no permit in hand |
| Bradbury Estates | 108 | prelim. plat approval |
| Kirsop | 96 | prelim plat aporoval |
| Doelman Urban V | 280 | no application on file yet |
| Briggs Village | 286 | Approved |
| The Overlook | 123 | Recorded plat |
| Camden Landing | 28 | Approved 3/5/08 |
| Total | 1048 | |

The Buildable Lands Report 2007 data supports the view that there is insufficient potential demand in the Tumwater area to encourage redevelopment of the subject into multi-family housing. The report states that in 2006 there were 3,210 units of multi-family housing in Tumwater and its UGA (which has a total population of 21,700), and it forecasts that 6,010 units of multi-family housing will be required by the population in 2030 (for a total forecast population of 41,960). This represents an increase of 2,800 units over a period of 24 years. However, as shown in the table above there are already 1,048 multi-family units currently in some phase of the permit process or already approved. Thus, 37% of the projected demand for multi-family housing in Tumwater for the next quarter century is already in the pipeline. These factors suggest that it is very unlikely that the cost of removing the existing mobile home park infrastructure combined with the high risk associated with demand for multi-family housing in Tumwater would result in a greater return to the subject than continued operation of the subject's very viable mobile home park improvements.

**Larger Parcel Determination**

The concept of the larger parcel is useful in the appraisal of any property, but it is essential for valuations involving a change in a property from the before to the after condition, as is the case for the subject. The purpose of this determination is to ensure that the conclusion of value (in this case resulting from a change in zoning over the subject) reflects any impacts to the remainder property.

The *larger parcel* is defined as that portion of a property that has unity of ownership, contiguity and unity of use. In this instance the entire subject is contiguous and is held by a common owner. In the before condition the entire property has unity of use for continued use as a mobile home park or residential development, as is further discussed below. With the foregoing factors in mind, it is my conclusion that the entire property constitutes a larger parcel.

**Highest and Best Use**

"Highest & Best Use" is defined by The Appraisal Institute as:

> *"The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible and that results in the highest*

> value. The four criteria the highest and best use must meet are: legal permissibility, physical possibility, financial feasibility and maximum profitability."

Source: The Dictionary of Real Estate Appraisal, Fourth Edition, Copyright 2002, published by the Appraisal Institute.

The highest and best use analysis provides the foundation for a value conclusion by identifying the specific market position of a subject and thereby specifying appropriate market comparisons for it, as well as the relevant approaches to value. It is governed by consideration of the property's legal, physical and economic potential. If the property is improved, the process requires separate analysis of the land as though vacant and the land as improved. This provides the basis for a conclusion as to whether the improvements adequately contribute to overall value as to continue to be the preferred use, or whether an alternate use would better support the land value. Given the appraisal problem at hand, it is also necessary to consider the subject's highest and best use in both the before and after conditions.

It should be noted that the highest and best use analysis does not specifically evaluate all permitted and conditional uses allowed under the Tumwater Municipal Code, but it has considered typically recognized uses within the subject's market area.

### Before Condition as if Vacant

The subject's zone in the before condition as if vacant is multi-family high density that nominally allows for 14-29 units per acre. Development to such a high degree of density requires sewer, which is available to the subject. While this would imply that the subject has the potential for high density development as if vacant under this zone, the physical characteristics of the property do not appear to allow such development over much of the property owing to the significant encumbrance of wetlands and the high potential for liquefied soils. Although the services of a soils engineer would be required to actually determine that impact of these critical areas, it is very reasonable to suggest that prospective buyers of development land would assign a high discount to the value of this property owing to the risk that much of the land may not prove to be developable. With this in mind, the highest and best use of the subject in the before condition as if vacant is concluded to be for multi-family residential development of any portion of the property that has suitable characteristics. Based upon existing information it is reasonable to conclude that no more than half the subject, or about 11 acres would be considered useable area for development. It should also be noted that the City of Tumwater does not allow portions of a property falling within critical areas or buffers to be counted toward the development density allowance.

### Before Condition as Improved

Use of the subject as improved as a mobile home park is an allowable use under the multi-family high density zoning designation. The existing improvements remain in serviceable condition for this use and there is a demonstrated economic return to the property from the rental of mobile home pads. Additionally, this use is a legally non-conforming use with respect to the extensive critical areas on the subject. Thus, the utilization of the existing improvements remains feasible for the foreseeable future.

### Before Condition Conclusion of Highest and Best Use

As noted above, removal of the existing improvements in order to facilitate multi-family development of the land and continued utilization of the existing mobile home park would both generate a positive economic return to the subject property. However, the highest and best use is defined as that use which

garners the maximally productive economic return. As is illustrated in the valuation analysis that follows, the value of the subject as improved is considerably higher than the value of the land as if vacant. This is primarily owing to the fact that the existing improvements are a grandfathered use within the wetland and soils liquefaction areas of the subject whereas any new development on the property would almost certainly not be permitted there.

### *After Condition as if Vacant*

The subject's zone in the after condition as if vacant is manufactured home park, which allows for mobile home parks at a density of 6-9 units per acre. Utilization to that purpose would require sewer, which is available to the subject. With this in mind the highest and best use of the subject as if vacant is for development of a mobile home park.

### *After Condition as Improved*

Use of the subject as improved as a mobile home park is an allowable use under the manufactured home park designation. The existing improvements remain in serviceable condition for this use and there is a demonstrated economic return to the property from the rental of mobile home pads. Thus, the utilization of the existing improvements remains feasible for the foreseeable future.

### *After Condition Conclusion of Highest and Best Use*

The manufactured home park zone allows for mobile home park use but not for detached single family or multi-family use. Since the subject is already improved as a mobile home park, continued use of the existing improvements is obviously the highest and best use of the subject.

### **Property Valuation**

### *Value in the Before Condition as if Vacant*

In the before condition as if vacant the potential use of the subject is for multi-family development over approximately 11 acres. Multi-family residential development on the subject would require extension of water and sewer in order to support the higher density. The MFH zone nominally allows for 14-29 dwelling units per acre. It is very unusual to achieve the upper end of the range after undergoing the permitting process. Referring to the multi-family sales comparables noted on the table that follows, the range of units per acre achieved were all near the middle of the allowable density of the respective zones. With this in mind, I have assumed that the subject would be approved for a density of 21 units per acre, which is the mid-point in the MFM zone.

The range of unit value among the sales comparables is from around $13,000/unit to $26,250/unit. I have concluded with a unit value for the subject at $17,000/unit, which is the sales price for comparable 3 that is presently being developed as a 233 unit apartment.. Applying this unit value to the subject's 231 potential units results in a value indication of $3,927,000. This value indication does not include an estimated $100,000 cost of removing the existing mobile home park infrastructure. Deducting this results in a rounded value indication of $3,825,000.

Tumwater Estates MHP Park
Page 17



## MULTI-FAMILY SALES COMPARABLES MAP

Tumwater Estates MHP Park
Page 18

## MULTI-FAMILY LAND SALE COMPARISONS

| No. | Address | Parcel # | Improvements | Sale Date | Zone | Units | Area | Units/Ac | Sale Price | $/Ac | $/Unit Per Median Unit | Conditions of Sale |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3600 SW 5th Ave, Olympia | 12816310800 | Raw land | Feb-08 | PRO-Office, MF | 80 | 9.40 ac | 8.51 du/ac | $2,100,000 | $223,404/ac | $26,250/unit | Arms Length |
| 2 | 1328 Fones Rd, Olympia | 11819110600 | Raw land/identified | Sep-09 | RM24, 18-30, Olympia | 56 | 2.60 ac | 21.54 du/ac | $730,000 | $280,769/ac | $13,036/unit | Arms Length |
| 3 | 3509-3544 Lanelview Dr, Olympia | 83758022500, multiple | Raw land/identified | Mar-08 | R 4-8; RM 8-24, Olympia | 91 | 6.85 ac | 13.28 du/ac | $1,643,719 | $239,959/ac | $18,063/unit | Arms Length |
|  | 3590 SE Dunham Dr, Olympia | 83758022200, multiple | Raw land/identified | Mar-08 | R 4-8; RM 8-24, Olympia | 142 | 9.85 ac | 14.42 du/ac | $2,355,719 | $239,159/ac | $16,598/unit | Arm's Length |
|  |  |  |  |  |  | 233 | 16.70 ac | 13.95 du/ac | $3,999,438 | $239,487 | $17,164.97 |  |
|  | Tumwater Estates MHP | 90800278001 | Not Entitled, Has wtr & sewer | Appraisal | MFHD 14-29 | 231 | 11.00 ac Useable | 21.00 du/ac | $3,927,000 | $357,000 | $17,000/ac |  |

SHAPIRO DEC.
A 20

*Value in the Before Condition as Improved*

In the before condition as improved the subject is utilized as a 115 space mobile home park. I have performed both a direct sales comparison approach and an income capitalization approach, as these methodologies are both typically relied upon by buyers and sellers of mobile home parks.

The sales approach is based upon the 9 comparables shown on the map below. The table on the following page provides details of the sale properties relative to the characteristics of the subject. The range of value is $22,619/space to $77,260/space. Based upon the data I have concluded with a value opinion for the subject at $55,000. In arriving at this opinion I would note that the subject is an older park constructed in 1965 and also a larger park that would be expected to show some marginal diminution in unit price compared to a smaller mobile home park. Applying this unit value to the subject's 115 spaces results in a value indication of $6,325,000.



# MOBILE HOME PARK SALES COMPARABLES MAP

Tumwater Estates MHP Park
Page 20

## MOBILE HOME PARK SALES COMPARISONS

| No. | Property | Area | Land Use Zoning | Yr. Built Spaces | Spaces/Ac SF/Space | Date | Price $/Space |
|---|---|---|---|---|---|---|---|
| 1 | Alpine Mobile Home Park<br>7300 32nd Ave NE<br>Olympia | 9.6ac | MD 6-12<br>Residential | 1972<br>50 spaces | 5.2 spaces/ac<br>8,381 sf/space | 27-Mar-09 | $1,700,000<br>$34,000 |
| 2 | Hidden Village<br>4600 17th Lane NE<br>Olympia | 5.0ac | LD 0-4<br>Residential | Unknown<br>22 spaces | 4.4 spaces/ac<br>9,841 sf/space | 16-Sep-08 | $1,699,719<br>$77,260 |
| 3 | Totem Mobile Home Com.<br>5615 Blake Lake Belmore Rd<br>Olympia | 3.5ac | MFM<br>Residential | Unknown<br>12 spaces | 3.4 spaces/ac<br>12,632 sf/space | 30-Oct-09 | $482,700<br>$40,225 |
| 4 | Western Plaza MHP<br>1841 Trosper Rd SW<br>Tumwater | 10.8ac | MFM<br>Residential | 1973<br>66 spaces | 6.1 spaces/ac<br>7,135 sf/space | 15-Feb-08 | $4,059,000<br>$61,500 |
| 5 | Allimor Carriage Estates<br>5705 Littlerock Rd SW<br>Tumwater | 7.1ac | GC<br>Commercial | 1943<br>50 spaces | 7.0 spaces/ac<br>6,186 sf/space | 16-Jul-07 | $1,500,000<br>$30,000 |
| 6 | Fairwind Community<br>2805 76th Ave SW<br>Olympia | 4.0ac | MFM<br>Residential | 1980<br>42 spaces | 10.5 spaces/ac<br>4,149 sf/space | 11-Oct-07 | $950,000<br>$22,619 |
| 7 | Rainier Terrace MHP<br>3800 Sleater Kinney Rd NE<br>Olympia | 9.3ac | RRR 1/5<br>Residential | 1968<br>46 spaces | 4.9 spaces/ac<br>8,807 sf/space | 31-Jul-07 | $1,150,000<br>$25,000 |
| 8 | Martin Way MHP<br>2640 Martin Way E<br>Olympia | 0.9ac | HDC-4<br>Commercial | 1953<br>21 spaces | 22.3 spaces/ac<br>1,950 sf/space | 4-Nov-08 | $580,000<br>$27,619 |
| 9 | Lily Place MHP<br>3227 78th Ave SE<br>Olympia | 2.2ac | RL 1/1<br>Residential | 1976<br>9 spaces | 4.1 spaces/ac<br>10,696 sf/space | 6-Nov-07 | $509,000<br>$56,556 |
|  | Tumwater Estates MHP | 22.4ac | MFHD 14-29<br>Residential | 1965<br>115 spaces | 5.1 spaces/ac<br>8,500 sf/space | Appraisal | **$6,325,000**<br>**$55,000** |

The purpose of the income capitalization approach is to provide an estimate of the subject's value through the measurement and capitalization of future income benefits. Proper application of this approach assumes that the subject would be operated as a passive investment opportunity on the part of a buyer. The underlying basis of this analysis is the stream of income and expenses associated with the subject. The analysis period is the first twelve months of operation for a prospective buyer. Thus, I have projected operations from April 2009 through March 2010. The first step in this process is to assess whether the subject is performing to market expectations. Therefore I have compared the reported income of the subject to income appropriate comparison properties in order to project a stabilized market operating statement. The resulting net income is capitalized into value through the use of a direct capitalization procedure.

The subject's reported income from space rent is $328/mo. The table below shows space rent at mobile home parks ranging from $325/mo to $570/mo. Comparing the subject's characteristics to the rent comparables leads me to conclude that the subject is operating at below market rent. I have concluded that a stabilized market rent for the subject's spaces would be around the average at $425/mo and have applied this to the analysis. This results in stabilized net operating income of $586,500.

| MHP Rental Comparisons | |
|---|---|
| **Mobile Home Park** | **Rent/Mo** |
| 1 Friendly Village Olympia | $570 |
| 2 Martin Way MHP Lacey | $505 |
| 3 Mountain Green Lacey | $475 |
| 4 Western Plaza Tumwater | $470 |
| 5 Edgelake Lacey | $450 |
| 6 Alpine Mobile Estates Lacey | $450 |
| 7 De Trays MHP Olympia | $434 |
| 8 Flying Carpet Lacey | $420 |
| 9 Crestwood Lacey | $367 |
| 10 Claudia's Mobile Estates Olympia | $350 |
| 11 Melody Pines Estates Olympia | $325 |

The appropriate selection of a capitalization rate is fundamental to the direct capitalization analysis. The table that follows shows rates obtained from the sales of mobile home parks throughout Puget Sound. All were considered to be at market rent and occupancy at the time of sale.

The data in the table shows a range of 6.1%-7.9% for overall rates of return on mobile home parks. In general, rates of return reflect the risk associated with a particular property as well as the buyer's desired return relative to other investment opportunities at a particular point in time. Mobile home parks are perceived by investors as stable properties with low maintenance costs and relatively little tenant turnover. As such, they are perceived as being rather low risk investments.

I have concluded with an appropriate capitalization rate for the subject of 7% under the conditions of stabilized market rent. Applying this to the market net operating income results in a value indication of $6,260,000 or about $54,500/space.

Reconciling the value indications of the sales and income approaches indicates a value conclusion for the subject as improved of $6,300,000.

## Capitalization Rate Comparables

| No. | Property | Sale Date | Price | # Spaces | Vacancy at Time of Sale | Pro Forma NOI | Overall Rate of Return |
|-----|----------|-----------|-------|----------|------------------------|---------------|------------------------|
| 1 | Westview Estates Everett | 26-Jul-07 | $5,000,000 | 82 | 0% | $305,000 | 6.10% |
| 2 | Westhill Mobile Manor Kent | 22-May-08 | $3,500,000 | 64 | 0% | $227,500 | 6.50% |
| 3 | Firlane Village Spanaway | 3-Apr-07 | $1,150,000 | 19 | 0% | $74,750 | 6.50% |
| 4 | Highway 99 MHP Edmonds | 8-Jan-08 | $1,800,000 | 27 | 0% | $125,640 | 6.98% |
| 5 | Meridian MHP Lynden | 9-May-08 | $1,891,295 | 104 | 5% | $161,598 | 7.03% |
| 6 | Maplewood Bellingham | 23-Oct-09 | $375,000 | 11 | 0% | $28,529 | 7.60% |
| 7 | Bright Hope Des Moines | 7-May-07 | $3,981,500 | 75 | 5% | $307,928 | 7.73% |
| 8 | Meridian Mobile Estates Puyallup | 30-Mar-09 | $2,652,000 | 52 | 0% | $209,508 | 7.90% |

# TUMWATER MHP - BEFORE CONDITION
## Stabilized Operating Statement At Market Rent
### Analysis Period: April 2009 - March 2010

| INCOME FROM 115 SPACES | $/yr | $/space/mo | %EGI |
|---|---|---|---|
| Space Rent (Avg) | $586,500 | $425/ Space | |
| Reimbursed utilities | $120,600 | $87/ Space | |
| Potential Gross Income | $707,100 | $512/ Space | |
| Vacancy @ 2% | -$14,142 | $0/ Space | |
| EGI | $692,958 | $502/ Space | 100% |
| Variable Expenses | | | |
| Mgmt (incl. Payroll, taxes, benefits) | $17,723 | $13/ Space | 2.6% |
| On site Mgmt | $22,235 | $16/ Space | 3.2% |
| Repairs and Maintenance | $26,160 | $19/ Space | 3.8% |
| Supplies/Equipment Rental | $1,300 | $1/ Space | 0.2% |
| Utilities: | $137,156 | $99/ Space | 19.8% |
| Advertising | $0 | $0/ Space | 0.0% |
| Office | $1,893 | $1/ Space | 0.3% |
| Legal/Professional | $4,008 | $3/ Space | 0.6% |
| Sub-total Variable | $210,475 | $153/ Space | 30.4% |
| Fixed Expenses | | | |
| Property Taxes | $36,124 | $26/ Space | 5.2% |
| Insurance | $7,907 | $6/ Space | 1.1% |
| Sub-total Fixed | $44,031 | $32/ Space | 6.4% |
| TOTAL EXPENSES | $254,506 | $184/ Space | 36.7% |
| NET OPERATING INCOME | $438,452 | $318/ Space | 63.3% |

| | | | |
|---|---|---|---|
| Direct Capitalization Rate Applied | | 7.00% | |
| | | Total | $/space |
| Indicated Value by Direct Capitalization | | $6,263,600 | $54,466 |

| ROUNDED VALUE | | $6,260,000 | $54,435 |
|---|---|---|---|

**Reconciliation and Final Value Estimate**

The subject has been valued in the before condition as if vacant and also as improved.   The value estimates under these circumstances are noted below:

| | |
|---|---|
| *As if Vacant for Multi-Family Development* | *$3,825,000* |
| *As Improved for as a Mobile Home Park* | *$6,300,000* |

The analysis shows that the highest and best use of the subject is for continued operation of the existing improvements as a mobile home park.   This is largely owing to the fact that this is a legally non-conforming use with respect to occupying critical areas that would not be available for development in the vacant condition.

In the after condition the subject's zone is changed to manufactured home park.  While this alters the subject's development potential as if vacant, it does not change its potential use at all as improved.  Thus, the after condition highest and best use and value conclusion as improved would therefore be identical to the before condition.  Based upon this analysis it is my conclusion that the impact to the subject as a result of the zoning change is as follows.

| | |
|---|---|
| **VALUE OF SUBJECT IN BEFORE CONDITION** | **$6,300,000** |
| **VALUE OF SUBJECT IN AFTER CONDITION** | **$6,300,000** |
| **VALUE IMPACT OF ZONING CHANGE** | **$0** |

**Effective Date of Value**

The effective date of value is March 23rd, 2009, which is the date upon which the zoning change was approved by the City of Tumwater.

**Date of Appraisal**

This appraisal was performed in December of 2009 and January of 2010.

**Closing**

If you have any further questions or concerns, please do not hesitate to call.

Sincerely,

Stephen Shapiro, MAI

Ref:  10004

Tumwater Estates MHP Park
Page 25

Attached Exhibits:

Aerial Photograph
Area Map
Wetland Map
Soils Liquefaction Map
Zoning Map



# AERIAL PHOTOGRAPH



**AREA MAP**



# TUMWATER MOBILE&MANUFACTURED HOME PARKS
## HIGH GROUNDWATER FLOODING AND WETLANDS

**Legend**
- TUMWATER CITY LIMITS
- MOBILE&MANUFACTURED PARKS
- URBAN GROWTH BOUNDARY
- HIGH GROUNDWATER AREAS
- wetlands

CITY OF TUMWATER PLANNING AND FACILITIES DEPARTMENT
June 11, 2009  Mobile&Manufactured Home Parks Tum&UGA.MXD
Liquifaction data obtained from the Washington
State  Department  of  Natural  Resources.

DISCLAIMER: The City of Tumwater does not warrant,
guarantee, or accept any liability for the accuracy,
precision, or completeness of any information shown
hereon  or  for  any  inferences  made  therefrom.

# WETLAND MAP



# SOILS LIQUEFACTION MAP



**ZONING MAP**

# RE♦SOLVE

*Real Estate Appraisal, Counseling & Mediation*

STEPHEN L. SHAPIRO, MAI

Stephen Shapiro graduated in June 1986 from the University of Washington in Seattle, Washington. He was awarded an Honors Degree as Bachelor of the Arts in Communications with a major in Journalism and a minor in Economics. Since that time he has worked as a writer, editor and research consultant specializing in land and marine resource issues. Mr. Shapiro was asked to join the firm of **Wronsky, Gibbons & Riely** in March of 1999 by Anthony Gibbons. In July of 1999 Mr. Gibbons formed Anthony Philip Gibbons PLLC, doing business under the new company name of **RE♦SOLVE** – a company providing Real Estate Appraisal, Counseling and Mediation services. Mr. Shapiro joined Mr. Gibbons in his company at that time.

In his capacity as an appraiser for **Wronsky, Gibbons & Riely** and **RE♦SOLVE**, Mr. Shapiro has developed a broad range of experience over a wide variety of property types. Appraisals have been performed on office and industrial buildings; commercial and industrial land; residential subdivision property; natural resource and habitat land, including timberland and wetland property; and high-end estate homes. In addition, he has provided mediation and expert witness services for legal purposes.

Mr. Shapiro is licensed as a certified general real estate appraiser by the State of Washington (license no. 1101561) and is listed on the Washington State Department of Transportation's Approved List of Appraisers and Reviewers. He was awarded the highly regarded MAI designation of the Appraisal Institute in June 2006 (member no. 12394). He has successfully completed the following Appraisal Institute courses, as well as numerous additional professional seminars:

- Appraisal Principles
- Appraisal Procedures
- Standards of Professional Appraisal Practice, Parts A and B
- Highest and Best Use and Market Analysis
- Basic Income Capitalization
- General Applications
- Advanced Sales Comparison and Cost Approaches
- Report Writing and Valuation Analysis
- Advanced Applications
- Advanced Income Capitalization
- Uniform Appraisal Standards for Federal Land Acquisitions
- Condemnation Appraising: Advanced Topics and Applications
- Attacking and Defending an Appraisal in Litigation
- Forestland Road Cost Obligations

Mr. Shapiro has performed appraisal services for a wide variety of clients, and a brief client list follows.

- City of Bainbridge Island
- WA State Dept. of Natural Resources
- Bainbridge Island Parks and Recreation
- Group Health Cooperative of Puget Sound
- Port of Seattle
- Cascade Land Conservancy
- U.S. Forest Service
- NC Power Systems Co.
- City University
- Trust For Public Land
- Bainbridge Island Land Trust
- The Mark A. Robinson Trusts
- Commerce Bank
- First American Title Insurance Co.
- Tulalip Tribes
- Tousley Brain Stephens PLLC
- Ryan, Swanson and Cleveland, PLLC
- Pope Resources, Inc.
- Hockett & Olsen Brothers, Inc.
- Great Peninsula Conservancy
- Central Kitsap School District
- Riddell Williams P.S.
- Whidbey Camano Land Trust
- Michael A. Goldfarb Law Office
- Lawler Burroughs & Baker, P.C.
- Harnish Group, Inc
- Development Services of America
- Preston Gates & Ellis LLP
- Pacific Investment Co.
- Column Financial
- GVA Kidder Mathews
- American Marine Bank
- Batavia Holdings LLC
- Kinzer Real Estate Services
- Knowles/Turner Real Estate Group
- Warren G. Harding Temple Board Assoc.
- GEM1 LLC
- Kitsap County Dept. of Public Works
- Washington State Parks Commission
- Livengood, Fitzgerald & Alskog PLLC
- American Eagle Communities
- McGavick Graves Attorneys at Law
- Wal-Mart
- Black Equities Group LTD
- Methow Conservancy
- Seattle Yacht Club
- Northwest Watershed Institute
- Williams Kastner, Attorneys at Law
- City of Port Townsend
- City of Eatonville
- Kitsap Bank
- Transnation Title Insurance Co.
- The Ketcham Family
- City of Burien
- Open Space Resources
- Kitsap Conservation District
- Lawyers Title Insurance Corp.
- Kitsap County Dept. Parks and Recreation
- McCormick Land Company
- Trammell Crow Co.
- Pike Place Market PDA
- City of Edmonds Parks and Recreation
- WA State Department of Transportation
- MacMillan-Piper, Inc.
- Port of Allyn
- Pacific Medical Center and Clinics
- Commonwealth Land Title Insurance
- Port Gamble S'Kllallam Tribe
- Madison Ave Real Estate, LLC
- Kitsap County Dept. of Admin. Services
- Olympic Property Group
- Prosperity Treatment Center
- Old Republic Title Co.
- Cullen Law Office LLP
- Port of Olympia
- Washington First International Bank
- Rodgers Deutsch & Turner
- Frontier Bank
- Credit Suisse First Boston
- The Mountaineers
- Bainbridge Public Library
- GMAC Commercial Mortgage
- Farm Bureau Life Insurance Co.
- Starbucks
- Seattle Automotive Dist., Inc.
- Pacific Northwest Title Insurance Co.
- WA State Office of the Attorney General
- Aoki Sakamoto and Grant LLP
- AnMarCo
- King Count Dept. Natural Resources & Parks
- Montgomery Purdue Blankinship & Austin PLLC
- Ogden Murphy Wallace PLLC
- Puget Sound Energy
- Kenyon P. Kellogg, Attorney at Law
- Mundt MacGregor PLLC
- City of Poulsbo
- JWJ Group
- Olympic Resource Management
- Pioneer Human Services
- Capitol Land Trust
- Oldfield & Helsdon, PLLC
- Miller-Nicholson, Inc.

# RE♦SOLVE

## Real Estate Appraisal, Counseling & Mediation

### EXPERT TESTIMONY & LITIGATION SUPPORT

### STEPHEN SHAPIRO, MAI

Mr. Shapiro has served as an expert witness or provided litigation support in the following cases.

| **Date** | **Proceeding** | **Client** |
|---|---|---|
| October 2005 | Sound Transit vs. TeGantvoort<br>Provided expert testimony in Washington<br>Superior Court, Pierce County | Paul TeGantvoort |
| March 2006 | Sound Transit vs. Hoang<br>Provided mediation services | Denise Tran , Atty:  Aoki Sakamoto and<br>Grant LLP |
| June 2006 | WA State Dept Transportation vs. Coffey<br>Provided mediation services | Douglas Shaftel, Atty: WA State Attorney<br>General's Office |
| August 2006 | IRS vs. Laws<br>Provided mediation services | James Minorchio, Atty:  Riddell<br>Williams P.S. |
| January 2007 | WA State Dept Transportation vs. Coffey<br>Provided expert testimony in Washington<br>Superior Court, Whatcom County | Douglas Shaftel, Atty: WA State Attorney<br>General's Office |
| June 2007 | Fox vs. John L. Scott<br>Deposed as expert witness | Michael Babcock, Atty:  Schiffrin Olson<br>Schlemlein & Hopkins |
| July 2007 | Jurkovich vs. Island County Hospital<br>Deposed as expert witness | James Haney, Atty:  Ogden Murphy<br>Wallace PLLC |
| November 2007 | Puget Sound Energy vs. Kirchhofer<br>Provided mediation services | Philip Havers, Atty:  Buskirk Havers<br>Lindsay Olsen PLLC |
| April 2008 | WSDOT vs. AnMarCo<br>Deposed as expert witness | James Fitzgerald, Atty: Livengood,<br>Fitzgerald & Alskog PLLC |
| February 2009 | Kitsap County Dept of Public Works<br>Provided mediation services | Neil Wachter, Deputy Prosecuting<br>Attorney for Kitsap County |
| March 2009 | Labounty Road LID Proceedings<br>Provided expert testimony to the Blaine<br>City Council | Alan Wallace, Williams Kaster |

## General Assumptions and Limiting Conditions

*This appraisal report has been made with the following general assumptions:*

1.  No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2.  The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.  Responsible ownership and competent property management are assumed.

4.  The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

5.  All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the property.

6.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.

7.  It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the appraisal report.

8.  It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a non-conformity has been identified, described, and considered in this appraisal report.

9.  It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in this report is based.

10. It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

11. Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired.

*This appraisal report has been made with the following general limiting conditions:*

1.  If the subject is improved: Any allocation of the total value estimated in this report between the land and the improvements applies only under the stated program of utilization. The separate

values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

2. Possession of this report, or a copy thereof, does not carry with it the right of publication.

3. The appraiser, by reason of this appraisal, is not required to give further consultation or testimony or to be in attendance in court with reference to the property in question unless arrangements have been previously made.

4. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent of the appraiser

*The following assumptions and limiting conditions may apply to this assignment:*

1. Any opinions of value provided in the report apply to the entire property, and any proration or division of the total into fractional interests will invalidate the opinion of value, unless such proration or division of interests has been set forth in the report.

2. In the case of proposed developments: If only preliminary plans and specifications were available for use in the preparation of this appraisal; the analysis, therefore, is subject to a review of the final plans and specifications when available.

3. In the case of proposed developments, and the assignment of values to a property at the completion of construction, all proposed improvements are assumed to have been completed unless otherwise stipulated, so any construction is assumed to conform with the building plans referenced in the reports.

4. In the case of improved property: The appraiser assumes that the reader or user of this report has been provided with copies of available building plans and all leases and amendments, if any, that encumber the property.

5. If no legal description or survey was furnished, the appraiser used the county tax plat to ascertain the physical dimensions and acreage of the property. Should a survey prove this information to be inaccurate, it may be necessary for this appraisal to be adjusted. If a legal description has been provided, the appraiser is not responsible for the accuracy of the description. The property appraised is assumed to be as delineated on county maps, as noted in this appraisal.

6. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

7. If the subject is improved: The Americans with Disabilities Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey or analysis of any improvements on the property to determine whether or not it is in conformity with the various detailed requirements of ADA. It is possible that a compliance survey of the property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative impact upon the value of the property. Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

## Certification

I certify that, to the best of my knowledge and belief:

◆ The statements of fact contained in this appraisal are true and correct;
◆ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conclusions, and are my personal, unbiased professional analyses, opinions, and conclusions;
◆ I have no present or prospective interest in the property that is the subject of this appraisal, and I have no personal interest or bias with respect to the parties involved;
◆ My engagement in this assignment was not contingent upon developing or reporting predetermined results. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the obtainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
◆ My analyses, opinions, and conclusions were developed, and this appraisal has been prepared, in conformity with the Uniform Standards of Professional Appraisal.
◆ I have made a personal inspection of the property that is the subject of this report.
◆ I have afforded the owner or a designated representative of the property that is the subject of this appraisal the opportunity to accompany me on the inspection of the property.
◆ Persons providing significant professional assistance to the persons signing this report are identified herein.
◆ I have disregarded any increase in Market Value caused by the proposed public improvement or its likelihood prior to the date of valuation.  I have disregarded any decrease in Market Value caused by the proposed public improvement or its likelihood prior to the date of valuation, except physical deterioration within the reasonable control of the owner;
◆ This appraisal has been made in conformity with the appropriate State and Federal laws and requirements, and complies with the contract between the agency and the appraiser;
◆ I certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by authorized representatives.
◆ As of the date of this report, I have completed the requirements under the continuing education program of the Appraisal Institute.

RESTRICTION UPON DISCLOSURE & USE:
Disclosure of the contents of this appraisal report is governed by the By-Laws & Regulations of the Appraisal Institute.
Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser or the firm with which (s)he is connected, or any reference to the Appraisal Institute or to the MAI designation) shall be disseminated to the public through advertising media, public relations media, news media, sales media or any other public means of communication without the prior written consent and approval of the undersigned.  No part of this report or any of the conclusions may be included in any offering statement, memorandum, prospectus or registration without the prior written consent of the appraiser.

The property has been appraised for its fair market value as though owned in fee simple, or as encumbered only by the existing easements as described in the title report in the addenda.

The opinion of value expressed below is the result of, and is subject to the data and conditions described in detail in this report.

I made a personal inspection of the property that is the subject of this report on December 21, 2009, in the accompaniment of Jeffrey Myers, an attorney with the firm of Law, Lyman, Daniel, Kamerrer & Bogdanovich P.S., Karen Kirkpatrick, attorney for the City of Tumwater, Michael Matlock, City of Tumwater Planning & Facilities Direct.

The date of value for the property that is the subject of this appraisal March 23rd, 2009, which is the date upon which the zoning change became effective.

Per the MARKET VALUE definition herein, the value conclusions for the property that is the subject of this appraisal are on a cash basis and are:

**VALUE OF SUBJECT IN BEFORE CONDITION**          **$6,300,000**

**VALUE OF SUBJECT IN AFTER CONDITION**           **$6,300,000**

**VALUE IMPACT OF ZONING CHANGE**                      **$0**

Name: _____**Stephen Shapiro, MAI**_____          Signature: _____
WS Cert # 1101561

Date Signed: <u>January 6, 2010</u>
m:forms\nonFIRREA