# SHAPIRO

# EXHIBIT C

SHAPIRO DEC
C 79

# SUMMARY APPRAISAL REPORT

of

# VELKOMMEN MOBILE HOME PARK
## 2535 70th Ave SW
## TUMWATER, WA

as of

March 23rd, 2009

Prepared for

City of Tumwater
555 Israel Road SW
Tumwater, WA  98501

Prepared by

Stephen Shapiro, MAI

### RE·SOLVE
*Real Estate Appraisal, Counseling & Mediation*
*261 Madison Avenue South, Suite 102*
*Bainbridge Island, Washington 98110*

Ref. 10004

SHAPIRO DEC.
C 80

# RE♦SOLVE

**GIBBONS & RIELY PLLC**
**Real Estate Appraisal, Counseling & Mediation**
261 Madison Avenue South, Suite 102
Bainbridge, Washington 98110-2579

Stephen Shapiro, MAI
Direct Dial 206 855-1090
Email: sshapiro@realestatesolve.com

January 6th, 2010

City of Tumwater
555 Israel Road SW
Tumwater, WA 98501

RE:     **Velkommen Mobile Home Park 39 pad mobile home park in Tumwater, WA**

At the request of Jeffrey S. Myers, an attorney with the law firm of Law, Lyman, Daniel, Kamerrer and Bogdanovich, P.S. who represents the City of Tumwater; I have prepared an appraisal of the above-referenced property that is described in the attached report. As directed, I have provided an opinion of value for the subject both before and after a change in zoning that was enacted by the City of Tumwater on March 23rd, 2009. The property rights appraised are the fee simple interest in the before condition under the pre-existing zone and the fee simple interest in the after condition under the new zone. The value conclusions derived in this report are based upon certain assumptions and limiting conditions that are noted herein.

This appraisal is presented as a *summary* report, and complies with the stipulations of the Uniform Standards of Professional Appraisal Practice for such reports.

**Identity of Subject Property**

The subject of this appraisal is a 39 pad mobile home park that is covered by the Thurston County Assessor's Tax ID No. 315600-00100. The abbreviated legal description is noted as follows:

Section 04, Township 17, Range 2W, Quarter SW SE Plat Anderson PUD Div 1 Lt 1, Document 020/045 & Anderson Pub Div 2 Lot 2 021/096.

**Purpose of Appraisal**

The purpose of this appraisal is to estimate the market value of the subject property both before and after enactment of a zoning change by the City of Tumwater on March 23rd, 2009. The term "market value" is defined in the Uniform Appraisal Standards for Federal Land Acquisitions as:

> *Market value is the amount in cash, or on terms reasonably equivalent to cash, for which*
> *in all probability the property would have sold on the effective date of the appraisal, after*
> *a reasonable exposure time on the open competitive market, from a willing and*

Velkommen MHP Park
Page 2

> *reasonably knowledgeable seller to a willing and reasonably knowledgeable buyer, with*
> *neither acting under any compulsion to buy or sell, giving due consideration to all*
> *available economic uses of the property at the time of the appraisal.*

## Property Rights Appraised

The property rights appraised are the fee simple interest in the before condition under the pre-existing zone and the fee simple interest in the after condition under the new zone.

## Intended Use/User of Appraisal

The intended user is the client, the City of Tumwater, and its authorized attorneys, associates, employees, representatives or agents. This report will be used by the City of Tumwater to determine what value impacts, if any, occurred to the subject as a result of the zoning change, which is the subject of the Laurel Park Community vs. City of Tumwater litigation.

## Scope of Appraisal

The scope of work performed in this appraisal is in compliance with the specific guidelines of the Uniform Standards of Professional Appraisal Practice (USPAP) to produce a credible value opinion that meets the expectations of parties who are regularly intended users of similar appraisal assignments and is also in accord with the analysis that the appraiser's peers would perform in a similar appraisal assignment.

Assessing any value impact that may have occurred to the subject as a result of the zoning change requires utilization of the before/after methodology. Specifically, the subject is first valued in the before condition in its highest and best use under the pre-existing zone. The property is then valued in its highest and best use under the new zone. If there is any difference between the two values this would represent the market value of the damages to the subject from the zoning change.

In the valuation analysis of this report I have relied upon both the direct sales comparison approach as well as the income capitalization approach. Although the property is improved as a mobile home park I have not utilized the cost approach as it is considered to be considerably less reliable than either the sales or income approaches for this type of property.

## Report Type

At the direction of the client this analysis is presented in a reporting format that meets the requirements for a *summary* report under USPAP guidelines. Discussions and analysis are summarized in this document, with supporting data retained in my files for reference.

## Extraordinary Assumptions/Hypothetical Conditions

I have not been provided with a title report for the subject. With this in mind, it is an extraordinary assumption that there are no covenants, conditions, restrictions or easements that would constrain the highest and best use of the property.

SHAPIRO DEC.
C 82

Velkommen MHP Park
Page 3

I have relied upon public data and maps in order to assess the subject's physical conditions including any critical areas impacts. It is an extraordinary assumption that this provides an accurate basis upon which to perform a credible highest and best determination for the property.

In the event that credible information comes to light contradicting the foregoing assumptions, I reserve the right to reconsider the conclusions stated in this report.

## Description of Subject Property

The subject is a 39 pad mobile home park that was constructed in 1982. According the records of the Thurston County Assessor it is situated on 11.13 acres of land. The exhibits provided at the end of this report include a wetlands map and soils liquefaction map. Based upon these materials there do not appear to be any wetlands or soils liquefaction issues associated with the subject. Therefore all of the land is considered to be useable for development.

## Location

The subject is located in the west central portion of the City of Tumwater in an area of residential development. There is an interchange with I-5 about .5 miles to the east. The City of Olympia is located about five miles north of the subject.

## Access

The subject has access from 70th Ave SW, which is a paved two-lane local road.

## Utilities

Electricity is available to the subject. Water is provided by on-site wells and waste is handled by a community septic system. Information provided by officials with the City of Tumwater Department of Public Works indicates that water and sewer could be extended to the subject at a cost of around $175,000. However, this does not include the cost to extend water and sewer lines within the subject property.

## Zoning in the Before Condition

In the before condition the subject was zoned Multi-Family Medium Density. According to the City of Tumwater's Municipal Code the stipulations of this zoning district are as follows:

The intent of the Multi-Family Medium-Density Residential (MFM) zone district is to:
A.    Provide for a high standard of development for residential areas of medium density including both single-family and multi-family housing;
B.    Provide designated areas in which a minimum net density of nine units per acre and a maximum net density of fifteen units per acre apply to promote the efficient use of land;
C.    Guide medium-density residential development in such a manner as to encourage and plan for the availability of public services and community facilities such as utilities, police and fire protection, streets, public transit, schools, parks and recreation.
D.    Encourage development of attractive residential areas that provide a sense of community, establish a pedestrian-friendly atmosphere and contain a variety of housing types.

Velkommen MHP Park
Page 4

E. Ensure that development without municipal utilities is at a density and in a configuration that enables cost effective urban density in-fill development when municipal utilities become available.

Permitted uses in the MFM district are as follows:

A. Single-family and multi-family dwellings;

B. Duplex on at least six thousand square feet of land area;

C. Designated manufactured homes on single lots of record, and in designated manufactured home parks, in accordance with the provisions of Tumwater Municipal Code Chapter 18.48;

D. Designated manufactured home parks;

E. Parks, trails, open space areas, and other related recreation facilities;

F. Support facilities;

G. Residential planned unit developments;

H. Family child care home; child mini-day care center, subject to review by the Development Services Director;

I. Adult family homes, residential care facilities;

J. Any combination of the permitted uses listed in this section may be combined on one site, in accordance with the provisions of 18.14.050.

K. Attached wireless communication facilities, except that it is prohibited to attach a non-accessory wireless communication antenna on a single family or two-family dwelling;*

L. Bed and breakfasts.

Density regulations in the MFM zone district are as follows:

A. Site area. All residential developments must meet the following density requirements:

1. Minimum: nine dwelling units per acre;

2. Maximum: fifteen dwelling units per acre, except that any density greater than fourteen dwelling units per acre shall be obtained only by purchase of transfer of development rights in accordance with Chapter 18.57 of the Tumwater Municipal Code;

B. Density calculation. The calculation of the density requirements in Section 18.14.050(A) above is based on the portion of the site devoted to residential and associated uses (e.g., dwelling units; private community clubs, open space; stormwater detention, treatment and infiltration). The following land is excluded from density calculations:

1. Land that is required to be dedicated for public use as open space, right-of-way, or land on which development is prohibited by Tumwater Municipal Code Title 16 – Environment, and land that is to be used for private roads. Provided, that portion of open space/park areas that consists of stormwater facilities and that are designed for active and/or passive recreational purposes in accordance with the Drainage Design and Erosion Control Manual for Tumwater shall not be excluded from density calculations.

2. Land that is intended for future phases of development created in accordance with Section 18.14.060;

3. Land that consists of lots devoted to uses other than residential and associated uses, including but not limited to churches, schools, and support facilities (except for stormwater detention, treatment and infiltration facilities).

C. Division of land not on public sanitary sewer.

Division of land in areas without sewer must occur in a manner that maintains long term potential to achieve minimum required densities and efficient provision of sewer once sewer becomes available. For a proposed division of land not required to be served by the extension of public sewer at the time of approval, a conversion plan shall be submitted in accordance with Section 18.14.060 for the entire property, and the proposed land division shall be subject to the following:

1.   For land division of an existing lot of record created prior to September 15, 1998:

a.   Any division creating two (2) lots shall not be subject to the minimum density requirements of Section 18.14.050(A), provided one (1) of the lots created is at least five (5) acres in size. A note must be included on the recorded land division that future land divisions shall meet minimum density requirements of Section 18.14.050(A) in each phase of development.

b.   Any division creating more than two (2) lots shall meet the minimum density requirements of Section 18.14.050(A) in each phase of development.

D.   Lot coverage, maximum for all buildings: seventy percent of total area of the lot.

E.   Structure height: forty feet, maximum; provided, however, that no structure shall penetrate imaginary airspace surfaces as defined by Title 14 of the Code of Federal Regulations, Part 77. A map that provides detailed information on ground and imaginary airspace surface elevations is available for inspection in the Development Services Department.

1.   Front: ten feet minimum from frontage property line,

a.   Driveways in front yards of single family dwellings and duplexes must be a minimum of 18 feet in length as measured along the shortest edge of the driveway starting from the front property line.

2.   Side: five feet from property line, minimum; provided that side yards for single-family attached dwellings may be reduced to zero where attached.

3.   Rear: five feet from property line, minimum.

Where any structures or portions of structures are adjacent to any single-family residential zoning district, the minimum setback shall be twenty feet. Where structures are constructed over one story, the setback from the adjacent property line or lines shall be increased by ten feet for every story above the ground level story of the proposed new building, and shall be completely screened from view in accordance with Chapter 18.47;

G.   Yards Exception. Any side or rear yard, not abutting on a public or private street, may be reduced to zero, provided:

1.   That the yard area reduced by this procedure is added to the required setback on the opposite side of the site;

2.   The opposite side yard setback is no less than ten feet after the yard area has been added as described in Section 18.14.050(F)(1);

3.   Where zero yard setback is used, the abutting site must be held under the same ownership at the time of initial construction or the owners of the abutting property(ies) record agreements or deed restrictions providing maintenance access and consent in writing to such zero yard setback;

4.   The adjacent setback for such abutting property(ies) is not less than ten feet.

H.   Open space/park area. For developments in which more than one-half the dwelling units are multi-family units, a minimum of fifteen percent (15%) of the gross site area shall be set aside and utilized as open space/park area for use and enjoyment of future residents. For developments in which more than one-half the dwelling units are single-family and/or duplex units (including mobile home parks), a minimum of ten percent (10%) of the gross site area shall be set aside.

## Zoning in the After Condition

In the after condition the subject is zoned Manufactured Home Park. According to the City of Tumwater Municipal Code the stipulations of this zoning district are as follows:

The Manufactured Home Park (MHP) zone district is established to promote residential development that is high density, single family in character and developed to offer a choice in land tenancy. The MHP zone is intended to provide sufficient land for manufactured homes in manufactured home parks.

Permitted uses within the MHP zone district are as follows:

A.    Manufactured home parks in accordance with the provisions of TMC 18.48;

B.    Designated manufactured homes on existing single lots of record, in accordance with the provisions of TMC 18.48;

C.    Mobile home parks which were legally established prior to July 1, 2008;

D.    One single family detached dwelling per existing single lot of record;

E.    Parks, trails, open space areas, and other related recreation facilities;

F.    Support facilities;

G.    Family child care home; child mini-day care center, subject to review by the Development Services Director, the Building Official, and the Fire Chief.

Accessory uses within the MHP zone district are as follows:

A.    Storage sheds, tool sheds, greenhouses;

B.    Private parking garages or carports;

C.    Home occupations, as approved by the Director of Development Services;

D.    Non-commercial recreational structures which could include but are not limited to swimming pools and recreational ball courts;

E.    Clubhouses and community centers associated with manufactured home parks;

Conditional uses within the MHP zone district are as follows:

A.    Churches;

B.    Freestanding wireless communication facilities;

C.    Cemeteries;

D.    Child day care center;

E.    Public and/or private schools;

F.    Neighborhood community center;

G.    Neighborhood-oriented commercial center;

H.    The following essential public facilities;

1.    Emergency communications towers and antennae;

I.    Group foster homes;

J.    Agriculture;

K.    Bed and breakfasts.

Density regulations in the MHP zone district are as follows:

A.    Site area. All residential developments (except for the use listed in 18.49.020(D)) must meet the following density requirements:

1.    Minimum: six dwelling units per acre;

2.    Maximum: nine dwelling units per acre, except that any density greater than eight dwelling units per acre shall be obtained only by purchase of transfer of development rights in accordance with TMC 18.57.

B.    Density calculation. The calculation of the density requirements in Section 18.49.050(A) above is based on the portion of the site devoted to residential and associated uses (e.g., dwelling units; private community clubs, open space; stormwater detention, treatment and infiltration). The following land is excluded from density calculations:

1.    Land that is required to be dedicated for public use as open space, right-of-way, or land on which development is prohibited by Tumwater Municipal Code Title 16 – Environment, and land that is to be used for private roads. Provided, that portion of open space/park areas that consists of stormwater facilities and that are designed for active and/or passive recreational purposes in accordance with the Drainage Design and Erosion Control Manual for Tumwater shall not be excluded from density calculations.

2.    Land that is intended for future phases of development.

**SHAPIRO DEC.**
**C 86**

3. Land that consists of lots devoted to uses other than residential and associated uses, including but not limited to support facilities (except for stormwater detention, treatment and infiltration facilities).

C. Land coverage, maximum for all buildings: seventy percent of total area of the parcel.

D. Structure height: forty feet, maximum; provided that no structure shall penetrate imaginary airspace surfaces as defined by Title 14 of the Code of Federal Regulations, Part 77. A map that provides detailed information on ground and imaginary airspace surface elevations is available for inspection in the Development Services Department.

E. Yards.*

1. Front: ten feet minimum from frontage property line.

a. Driveways in front yards on property lines abutting a public right of way must be a minimum of 18 feet in length as measured along the shortest edge of the driveway starting from the front property line.

2. Side: five feet from property line, minimum.

3. Rear: five feet from property line, minimum.

Where structures are constructed over one story, the setback from the adjacent property line or lines shall be increased by ten feet for every story above the ground level story of the proposed new building, and shall be completely screened from view in accordance with TMC 18.47.

F. Open space/park area. To the extent necessary to reasonably mitigate direct impacts, a minimum of ten percent of the gross site area shall be set aside as open space/park area meeting the following minimum standards:

1. For the purpose of calculation of the open space/park requirement, the open space/park area shall be separate and distinct from required yards, setbacks and landscaped areas, but may include areas of native vegetation that are allowed to fulfill the landscaping requirements of TMC 18.47. Open space/park areas may also include wetlands and their buffers, other critical areas, and stormwater facilities that are designed for active and/or passive recreation opportunities in accordance with the Drainage Design and Erosion Control Manual for Tumwater.

2. All open space/park areas must include any two or more facilities for active and/or passive recreation from the lists below. At least one of the required recreation facilities must be from the list of active recreation facilities (this area may include stormwater facilities that are designed for active and/or passive recreation opportunities in accordance with the Drainage Design and Erosion Control Manual for Tumwater).

a. Active Recreation Facilities

1. Children's play equipment, such as slides, swings, and ply structures.

2. A paved hard court for activities such as basketball, tennis, pickleball, etc.

3. A flat, open lawn area that may serve as a ball field for active play.

4. Other active recreation facility if approved by the Development Services Director upon consultation with the Tumwater Parks and Recreation Director.

b. Passive Recreation Facilities

1. Facilities for walking, such as trails, benches, etc.

2. Picnicking facilities, such as picnic tables, shelters, etc.

3. Public plazas.

4. Year-round water features such as a fountain, pond, stream, etc. These water features may be incorporated as part of a stormwater facility designed in accordance with the Drainage Design and Erosion Control Manual for Tumwater.

5. Other passive recreation facility if approved by the Development Services Director upon consultation with the Tumwater Parks and Recreation Director.

3. The open space/park area shall have convenient access for residences of the development and shall be consolidated to provide maximum access, visibility, usability, minimization of impacts to residential uses, and ease of maintenance. The requirement that the open space/park area be consolidated may be

waived by the Director of Development Services upon a finding that the residents of the development would receive a greater benefit if the required open space/park area were provided in another configuration due to the unique topographic conditions or fish and wildlife habitat values of the site.

4.   The open space/park area shall be designed and placed in consideration of existing and potential open space/park areas on adjacent parcels to consolidate or provide future opportunities for consolidation of neighborhood open space areas.

5.   Except where removal is required to meet active recreation requirements in this chapter, existing trees and significant vegetation shall be retained in open space/park areas unless an alternate landscaping plan for such areas is required or approved by the Development Services Director.

6.   Cash, or like value of land area and improvements located within the appropriate neighborhood parks planning area, may be donated to the City to fulfill the requirements of this section. The amount of cash required will be determined using a formula based on the cost of meeting the adopted level of service for neighborhood parks in the Tumwater Parks and Recreation Plan.

7.   Open space/park areas shall be held in single ownership where such ownership assumes full responsibility for maintenance and operation, or held in common ownership by all of the owners in the development area through a homeowners association or similar organization. The City as a condition of approval may choose to accept dedication, or the maintenance and operation responsibilities for the area, when the area to be dedicated is one or more of the following.

a.   Greater than 5 acres.

b.   Adjacent to an established or future City park or school grounds.

c.   Includes access to a body of water, wetland, important fish/wildlife habitat, or other environmentally sensitive area.

d.   If the City determines it is in the public interest to accept public dedication.

Use exceptions in the MHP zone district are as follows:

1.   A mobile/manufactured home park owner may request a use exception or modification from the application of the MHP zoning to their property as set forth below.

2.   The property owner shall submit an application on forms prepared by the Development Services Department, with documentation demonstrating that application of the MHP zoning meets the criteria below.

3.   The City Council may approve the property owner's request for a use exception if the property owner demonstrates:

a.   they do not have reasonable use of their property under the MHP zoning; or

b.   the uses authorized by the MHP zoning are not economically viable at the property's location.

If the request is granted by the City Council, the property shall revert to its previous zoning designation without further action by the Council.

4.   In addition to the application, a relocation plan must be submitted detailing, at a minimum, the pertinent laws (City, County, or State), an explanation of tenants rights according to State law, a list of sources of assistance (governmental, financial, etc), available vacant spaces within the mobile/manufactured home park, a list of nearby parks with available spaces, and a list of companies that move manufactured or mobile homes.

5.   Except as otherwise provided herein, the application shall be reviewed consistent with Title 14, and the Council's decision may be appealed to the Thurston County Superior Court.

**Area Data and Market Analysis**

The subject property is situated in the north western portion of Thurston County in the city of Tumwater, which is about five miles south of Olympia, the capitol of Washington. Along with the nearby city of

Lacey and the greater surrounding urban growth areas, about 140,000 people live in this concentrated area. This region is well served by major transportation arteries including I-5, which runs just south of Olympia and Lacey, and through Tumwater. This is the premier freeway serving the west coast of the U.S. and provides easy access to the more populous Tacoma/Seattle/Bellevue/Everett metropolitan area to the north. Olympia has a mid-sized port relative to the 12 port cities in the state, with a 60-acre full-service terminal located on Budd Inlet. Tumwater is home to the Olympia Regional Airport.

Notwithstanding the recent downward economic trend which has resulted in a rise in the unemployment rate in this area from 4.2% in September of 2007 to 7.1% in September of 2009, the long term prospects for this area are considered good. Not only is this the major metropolitan area and commercial hub of the south Puget Sound region, it is also the hub of state government. These factors help to ensure that the economy will thrive into the future.

The Northwest Multiple Listing Service compiles annual statistics for home sales in Thurston County. While the MLS does not track unimproved land sales over time, in general price trends for residential land would be expected to track fairly closely with home prices in a given market area since they are ultimately used for the same purpose and are purchased by similar types of market participants. Data provided on the following page shows large increases in housing prices for the Olympia area in 2004, 2005, and 2006, and the market was still characterized as active with positive appreciation of around 5.3% throughout 2007. However, in 2008 the Thurston County market fell by 4.4% and has fallen a further 8% through November of 2009.

### Average House Price Trend Analysis

### Olympia/Tumwater Area Home Sales

Average House Prices

| Area | Name | Dec-02 | Dec-03 | Dec-04 | Dec-05 | Dec-06 | Dec-07 | Dec-08 | Nov-09 |
|------|------|--------|--------|--------|--------|--------|--------|--------|--------|
| 443 | Tumwater | $176,711 | $190,339 | $227,227 | $261,736 | $283,936 | $317,994 | $310,405 | $281,272 |
| 444 | Olympia Westside | $219,255 | $232,716 | $255,489 | $321,516 | $344,320 | $364,904 | $372,060 | $296,324 |
| 447 | Olympia North | $159,489 | $166,008 | $192,911 | $231,916 | $257,072 | $268,893 | $262,212 | $237,736 |
| 448 | Olympia South | $190,569 | $206,303 | $217,323 | $276,104 | $299,117 | $314,652 | $320,629 | $294,320 |
| 449 | East Olympia | $240,081 | $264,365 | $301,118 | $350,190 | $416,303 | $410,471 | $373,420 | $317,615 |
| 450 | Lacey | $200,500 | $164,567 | $185,685 | $224,594 | $249,027 | $258,421 | $247,823 | $229,030 |
| | County Average | $178,046 | $187,317 | $208,187 | $251,592 | $282,044 | $296,967 | $284,041 | $261,458 |

Increases in value

| Area | Name | "02-03 | "03-04 | "04-05 | "05-06 | "06-07 | "07-08 | 08-09 | Over 7 years |
|------|------|--------|--------|--------|--------|--------|--------|-------|--------------|
| 443 | Tumwater | 7.7% | 19.4% | 15.2% | 8.5% | 12.0% | -2.4% | -9.4% | 8.5%/yr or 59% total |
| 444 | Olympia Westside | 6.1% | 9.8% | 25.8% | 7.1% | 6.0% | 2.0% | -20.4% | 7.9%/yr or 35% total |
| 447 | Olympia North | 4.1% | 16.2% | 20.2% | 10.8% | 4.6% | -2.5% | -9.3% | 7.4%/yr or 49% total |
| 448 | Olympia South | 8.3% | 5.3% | 27.0% | 8.3% | 5.2% | 1.9% | -8.2% | 7.8%/yr or 54% total |
| 449 | East Olympia | 10.1% | 13.9% | 16.3% | 18.9% | -1.4% | -9.0% | -14.9% | 6.6%/yr or 32% total |
| 450 | Lacey | -17.9% | 12.8% | 21.0% | 10.9% | 3.8% | -4.1% | -7.6% | 3.1%/yr or 14% total |
| | County average | 5.2% | 11.1% | 20.8% | 12.1% | 5.3% | -4.4% | -8.0% | 7.0%/yr or 47% total |



While Puget Sound's overall real estate market remains recessionary, there are some signs that it may be stabilizing, particularly in less expensive markets that would include much of Tumwater. Gardner Land Use Economics publishes research on the Western Washington real estate market, and its second quarter 2009 report indicates that inventory reduction, a precondition for a recovery in the housing market, is occurring across most of the Puget Sound region. Also, about half of the areas surveyed showed price improvement over the first quarter of this year, a tangible sign of stability. These gains may be partly due to the availability of the federal tax credit and to the historically low mortgage rates.

Another factor that has tended to maintain relatively affordable single family housing in the area is an oversupply of dwelling units relative to demand. This is illustrated in the following table that was provided by the Buildable Lands Report of Thurston County 2007.



Historically, multi-family housing has captured only a small portion of the housing market in Thurston County as a whole. According to Pete Swenson of the Thurston Regional Planning Council, this is partly due to the relative affordability of the Thurston County market compared to that of Pierce and King County. Although construction costs are similar, land costs are still significantly lower in Thurston County, leading to an overall lower price for residential sales and a strong predominance of single family housing. A buyer that might qualify only for a condo or townhome in the Seattle or Tacoma area has typically found it easier to obtain financing for a single family home in Thurston County, especially outside of Olympia. In 2008, multi-family housing accounted for only 15% of the market share in cities and urban growth areas in Thurston County. This sales trend is closely matched by the trend in numbers of permitted residential units for the county. In 2008, permits were issued for 1,099 single family

SHAPIRO DEC.
C 91

Velkommen MHP Park
Page 12

residences and for only 161 multi-family units, or 14.6% of the total (data from The Profile November 2009 of the Thurston Regional Planning Council).

According to Chris Carlson, Planning Manager of the City of Tumwater, apartments have historically represented the bulk of the multi-family market in the area.  Mr. Carlson has provided the following figures in order to assess the rate of absorption of multi-family units over the past four decades:

| Historic MF Absorption - Tumwater | | |
|---|---|---|
| Apartment Complex Name | Year Built | # Units |
| Hearthstone | 2007 | 125 |
| Tabula Rosa | 2007 | 118 |
| | subtotal | **243** |
| The Waterford | 1995 | 26 |
| Breckenridge Phase 1 | 1991 | 186 |
| Breckenridge Phase 2 | 1994 | 250 |
| Westridge | 1990 | 80 |
| Capitol Heights | 1990 | 115 |
| Montair | 1990 | 370 |
| | subtotal | **1027** |
| Meadowwood | 1983 | 104 |
| Country Court | 1980 | 24 |
| Suncrest | 1969-71 | 65 |
| Falls Pointe | 1970 | 108 |
| Alpine Village | 1970 | 196 |
| | subtotal | **369** |

A total of 369 units were built between 1969 and 1971, 128 units in the eighties, 1,027 units were built between 1990 and 1995, and most recently, 243 units were constructed in 2007.  This is a total of 1,767 units over almost forty years, which averages about 45 units per year.  However, it appears that in general multi-family development in Tumwater experiences surges followed by periods of in which there is little or no construction of this type of housing.  With this in mind it is reasonable to consider whether the multi-family housing market is ready for another burst of activity in the near future, and if so, whether the subject property might be a viable candidate for such development.  The central question is whether such development of the subject would meet with sufficient market demand to absorb the units constructed within an economically feasible time frame in order to be more economically viable than the current use of the property improved as a mobile home park.  In other words, would the property owner make more money evicting the existing mobile home tenants and tearing out the mobile home park infrastructure that presently provides a steady income stream, and could continue to do so well into the future, in order to speculate on construction of multi-family housing?

One observation is that there is no multi-family housing currently under construction in Tumwater.  This apparently represents a judgment on the part of developers regarding both the availability of financing and current and near-future market demand for such housing.  However, even in the event of a positive change in the economy that resulted in increased demand for multi-family housing, it must be recognized

Velkommen MHP Park
Page 13

that there are a number of projects already either approved or undergoing permit reviews that would most likely fulfill that demand (see chart below), and would be able to offer units on the market before the subject would be in a position to do so.

| MF Housing in the Pipeline - Tumwater | | |
|---|---|---|
| Name of Project | # Units | Status |
| 80 West Apts | 80 | no permit in hand |
| Summitt at Hills | 47 | no permit in hand |
| Bradbury Estates | 108 | prelim. plat approval |
| Kirsop | 96 | prelim plat aporoval |
| Doelman Urban V | 280 | no application on file yet |
| Briggs Village | 286 | Approved |
| The Overlook | 123 | Recorded plat |
| Camden Landing | 28 | Approved 3/5/08 |
| Total | 1048 | |

The Buildable Lands Report 2007 data supports the view that there is insufficient potential demand in the Tumwater area to encourage redevelopment of the subject into multi-family housing. The report states that in 2006 there were 3,210 units of multi-family housing in Tumwater and its UGA (which has a total population of 21,700), and it forecasts that 6,010 units of multi-family housing will be required by the population in 2030 (for a total forecast population of 41,960). This represents an increase of 2,800 units over a period of 24 years. However, as shown in the table above there are already 1,048 multi-family units currently in some phase of the permit process or already approved. Thus, 37% of the projected demand for multi-family housing in Tumwater for the next quarter century is already in the pipeline. These factors suggest that it is very unlikely that the cost of removing the existing mobile home park infrastructure combined with the high risk associated with demand for multi-family housing in Tumwater would result in a greater return to the subject than continued operation of the subject's very viable mobile home park improvements.

**Larger Parcel Determination**

The concept of the larger parcel is useful in the appraisal of any property, but it is essential for valuations involving a change in a property from the before to the after condition, as is the case for the subject. The purpose of this determination is to ensure that the conclusion of value (in this case resulting from a change in zoning over the subject) reflects any impacts to the remainder property.

The *larger parcel* is defined as that portion of a property that has unity of ownership, contiguity and unity of use. In this instance the entire subject is contiguous and is held by a common owner. In the before condition the entire property has unity of use for continued use as a mobile home park or residential development, as is further discussed below. With the foregoing factors in mind, it is my conclusion that the entire property constitutes a larger parcel.

**Highest and Best Use**

"Highest & Best Use" is defined by The Appraisal Institute as:

> *"The reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible and that results in the highest*

> *value. The four criteria the highest and best use must meet are: legal permissibility, physical possibility, financial feasibility and maximum profitability."*

Source: The Dictionary of Real Estate Appraisal, Fourth Edition, Copyright 2002, published by the Appraisal Institute.

The highest and best use analysis provides the foundation for a value conclusion by identifying the specific market position of a subject and thereby specifying appropriate market comparisons for it, as well as the relevant approaches to value. It is governed by consideration of the property's legal, physical and economic potential. If the property is improved, the process requires separate analysis of the land as though vacant and the land as improved. This provides the basis for a conclusion as to whether the improvements adequately contribute to overall value as to continue to be the preferred use, or whether an alternate use would better support the land value. Given the appraisal problem at hand, it is also necessary to consider the subject's highest and best use in both the before and after conditions.

It should be noted that the highest and best use analysis does not specifically evaluate all permitted and conditional uses allowed under the Tumwater Municipal Code, but it has considered typically recognized uses within the subject's market area.

### Before Condition as if Vacant

The subject's zone in the before condition as if vacant is multi-family medium density that nominally allows for 9-15 units per acre. However, this density can only be achieved with sewer in place, which the subject property lacks. The municipal code has a provision to accommodate this situation. Basically, it requires a property owner to submit a conversion plan showing how the required density level may be achieved in the event that sewer is extended to the site. This would result in the number of platted lots within the stipulated density range, which however would be too small to support septic systems. The developer would then be allowed to combine several platted lots into parcels large enough to accommodate homes with septic systems. Discussion with county officials indicates that it typically requires around half an acre to accommodate a septic system in this area owing to a high water table. Thus, at around 11 acres the subject could be developed with 22 single family residences.

Development of the subject as if vacant would incur costs through the need to remove the existing mobile home park tenants as well as removing unusable infrastructure associated with the existing mobile home park. This would very likely include the disposal of older mobile homes that would be abandoned by some owners. This total cost of razing the unwanted infrastructure is estimated at a minimum of $100,000.

Alternately, it is reasonable to consider development of the subject as if vacant after an extension of water and sewer to the site. This could facilitate either higher density single family or multi-family residential development, which are both allowed under this zone. However, such development would incur the costs noted above as well as the additional cost to extend water and sewer to the property. This has been estimated at around $175,000 just to bring this infrastructure to the subject's boundary. More significantly with respect to multi-family development, however, is the very high risk associated with the low demand for multi-family housing compared to single family housing. This has been well documented in the market analysis section of this report.

Given that single family residential development is the most common land use in the area and development to this end carries relatively low cost and risk compared to multi-family development this is

considered to the highest and best use of the subject as if vacant in the before condition. As will be shown in the valuation section of this report, single family development with sewer brings a higher economic return than with septic systems.

### Before Condition as Improved

Use of the subject as improved as a mobile home park is an allowable use under the multi-family medium density zoning designation. The existing improvements remain in serviceable condition for this use and there is a demonstrated economic return to the property from the rental of mobile home pads. Thus, the utilization of the existing improvements remains feasible for the foreseeable future.

### Before Condition Conclusion of Highest and Best Use

As noted above, removal of the existing improvements for single family development of the land and continued utilization of the existing mobile home park would both generate a positive economic return to the subject property. However, the highest and best use is defined as that use which garners the maximally productive economic return. As is illustrated in the valuation analysis that follows, the value of the subject as developed with single family residences with sewer is somewhat higher than the value as improved and would be considered the highest and best use.

### After Condition as if Vacant

The subject's zone in the after condition as if vacant is manufactured home park, which allows for mobile home parks at a density of 6-9 units per acre. Discussion with Michael Matlock, Planning and Facilities Director for the City of Tumwater, indicates that the minimum density cannot be achieved without sewer. However, unlike the provision in the multi-family medium density zone that allows for development of lower density with septic systems under a conversion plan, there is no such stipulation for the manufactured home park zone. Mr. Matlock noted that the city would require extension of the sewer to develop the subject as if vacant. As previously discussed that would cost around $175,000. In that event it would be possible to develop the subject for mobile home park at a density of 6-9 units per acre. It should be noted that the only detached single family residential development allowed in this zone is one single family detached dwelling per existing single lot of record. Since the subject consists of a single tax parcel only one detached single family residence would be permitted.

### After Condition as Improved

Use of the subject as improved as a mobile home park is an allowable use under the manufactured home park designation. The existing improvements remain in serviceable condition for this use and there is a demonstrated economic return to the property from the rental of mobile home pads. Thus, the utilization of the existing improvements remains feasible for the foreseeable future.

### After Condition Conclusion of Highest and Best Use

The manufactured home park zone allows for mobile home park use but not for platting of detached single family use. Since the subject is already improved as a mobile home park, continued use of the existing improvements is obviously the highest and best use of the subject.

Velkommen MHP Park
Page 16

## Property Valuation

### *Value in the Before Condition as if Vacant*

In the before condition as if vacant the potential uses of the subject include both single family and multi-family development. Therefore it is appropriate to provide valuation analyses for both potential scenarios.

Owing to the fact that the subject lacks water and sewer to the site there are two options with regard to single family residential development. One is to use on site wells and septic systems. As previously discussed in this report that would allow for development of half acre lots owing to the need for adequate ground for drainfields. Alternately, water and sewer could be extended to the subject site at an estimated cost of $175,000. This would allow for more intense development at an anticipated density of 6 units per acre, which is based upon the lot yield of nearby single family subdivisions. This would result in 66 single family units on the site.

The table and map on the following pages show data for 10 sales comparables of single family development land in the Tumwater-Olympia-Lacey area. The size of the properties ranges from 1.2 acres to 127 acres and the lot yield ranges from around 2du/ac to 12.5du/ac. At the bottom of the table are analyses of the two possible scenarios for the subject under single family development. The first shows the subject as developed into half acre lots with septic systems under the Conversion Plan variance allowed under the MFM zone. Based on the sales comparables I have applied a unit value of $50,000/unit to the 22 units that could be achieved under this scenario. This results in an indicated land value of $1,100,000. It should be noted, however, that this value indication does not include the cost of removing the existing mobile home park infrastructure, which has been estimated at $100,000. Accounting for this results in a value indication of $1,000,000.

The second scenario at the bottom of the table analyzes the subject's development potential after extending water and sewer to the property. This would allow for an estimated 66 units on the site. Based upon the sales comparables I have concluded with a value of $45,000/unit. This is somewhat lower than the unit value under the previous scenario owing to the fact that there are nearly three times as many units and therefore a marginal diminution in the unit price is warranted (and is support by the sales data that shows the larger comparables selling for lower unit values). After deducting the $175,000 cost of extending water and sewer the indicated land value is $2,795,000. Once again, this value indication does not include the estimated $100,000 cost of removing the existing mobile home park infrastructure. Deducting this results in a value indication of $2,695,000 or a rounded value of $2,700,000.

Velkommen MHP Park
Page 17

## SINGLE FAMILY RESIDENTIAL LAND SALE COMPARISONS

| No. | Address | Parcel # | Improvements | Sale Date | Zone | Units | Area | | Sale Price | $/Ac | $/Unit Per Median Unit | Conditions of Sale |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1690-1620 93rd Ave SE, Tumwater | 12713240190, multiple | Raw land | Feb-97 | SFM 6-9, Tumwater | 600 | 127.18 ac | 4.72 du/ac | $7,000,000 | $55,040/ac | $11,667/unit | Arm's Length |
| 2 | 3211 SW Sharp Rd, Tumwater | 12832110190, multiple | Raw land | Apr-07 | SFL 4-7, Tumwater | 59 | 12.85 ac | 4.59 du/ac | $1,122,001 | $87,315/ac | $19,017/unit | Arms Length |
| 3 | Barnes Blvd & Ridgeview, Tumwater | 54310000002 | Raw land | Jan-07 | MFM 9-15, Tumwater | 138 | 20.54 ac | 6.72 du/ac | $6,000,000 | $292,113/ac | $43,478/unit | Arms Length |
| 4 | 2706 Hidden Springs Loop, Lacey | 58630002800, multiple | Raw Land | Jan-08 | Mod Density 6-12, Lacey | 18 | 1.44 ac | 12.50 du/ac | $960,000 | $666,667/ac | $53,333/unit | Arm's Length |
| 5 | 6652 Stone St SE, Lacey | 55290070000, multiple | Raw land | Oct-09 | LD 3-6, Lacey | 12 | 1.20 ac | 10.00 du/ac | $636,000 | $530,000/ac | $53,000/unit | Bank was seller |
| 6 | 6715 Bailey St, SE, Lacey | 55290065200, multiple | Finished lots | May-09 | LD 3-6, Lacey | 12 | 1.20 ac | 10.00 du/ac | $636,100 | $530,083/ac | $53,008/unit | Bank was seller |
| 7 | 6654-6825 Blade St,SE, Lacey | 55299930068400, multiple | Finished Lots | Aug-09 | LD 3-6, Lacey | 12 | 1.22 ac | 9.84 du/ac | $636,000 | $521,311/ac | $53,000/unit | Bank was seller |
| 8 | 6876 Breeze Dr. SE, Lacey | 55290036500, multiple | Finished & entitled | Sep-09 | LD 3-6, Lacey | 24 | 2.40 ac | 10.00 du/ac | $1,248,000 | $520,000/ac | $52,000/unit | Bank was seller |
| 9 | 3827 Crosby Blvd. SW, Tumwater | 43290026700, multiple | Raw land | Jan-08 | SFL 4-7, Tumwater | 27 | 4.38 ac | 6.16 du/ac | $1,417,500 | $323,630/ac | $52,500/unit | Arm's Length |
| 10 | 7730 Trails End Dr SE, Olympia | 12712230202 | Raw land | Dec-07 | SFL 4-7, Tumwater | 19 | 9.41 ac | 2.02 du/ac | $633,333 | $67,304/ac | $33,333/unit | Arm's Length |
| | Velkommen Mobile Home Park | 31560000100 | Raw Land | Appraisal | MFMD-9-15 | 22 | 11.13 ac | 1.98 du/ac | $1,100,000 | $98,832/ac | $50,000/unit | Conversion Plan |
| | Velkommen Mobile Home Park | 31560000100 | Raw Land | Appraisal | MFMD-9-15 | 66 | 11.13 ac | 5.93 du/ac | $2,970,000 ($175,000) $2,795,000 | $266,846/ac | $45,000/unit | 6 du/ac SFR w/ extension of water & sewer Extension |

Indicated Value w/ Water & Sewer Extension

Velkommen MHP Park
Page 18



**SFR SALES COMPARABLES MAP**

Multi-family residential development on the subject would require extension of water and sewer in order to support the higher density. The MFM zone nominally allows for 9-15 dwelling units per acre. It is very unusual to achieve the upper end of the range after undergoing the permitting process. Referring to the multi-family sales comparables noted on the table that follows, the range of units per acre achieved were all near the middle of the allowable density of the respective zones. With this in mind, I have assumed that the subject would be approved for a density of 12 units per acre, which is the mid-point in the MFM zone.

The range of unit value among the sales comparables is from around $13,000/unit to $26,250/unit. I have concluded with a unit value for the subject in the middle of the range at $20,000/unit. Applying this to the 134 potential units results in a value indication of $2,680,000. From this it is necessary to subtract the $175,000 estimated cost to bring water and sewer to the site. Thus, the resulting estimated land value amounts to $2,505,000. This value indication does not include the estimated $100,000 cost of removing the existing mobile home park infrastructure. Deducting this results in a rounded value indication of $2,400,000.



# MULTI-FAMILY SALES COMPARABLES MAP

Velkommen MHP Park
Page 20

## MULTI-FAMILY LAND SALE COMPARISONS

| No. | Address | Parcel # | Improvements | Sale Date | Zone | Units | Area | Units/Ac | Sale Price | $/Ac | $/Unit Per Median Unit | Conditions of Sale |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3600 SW 5th Ave, Olympia | 12816510800 | Raw land | Feb-08 | PRO-Office, MF | 80 | 9.40 ac | 8.51 du/ac | $2,100,000 | $223,404/ac | $26,250/unit | Arms Length |
| 2 | 1328 Fones Rd., Olympia | 11819110800 | Raw land/entitled | Sep-09 | RM24, U8-30, Olympia | 56 | 2.60 ac | 21.54 du/ac | $730,000 | $280,769/ac | $13,036/unit | Arms Length |
| 3 | 3509-3541 Lanchview Dr, Olympia | 87750022500, multiple | Raw land | Mar-08 | R 4-8; RM 8-24, Olympia | 91 | 6.85 ac | 13.28 du/ac | $1,643,719 | $239,959/ac | $18,063/unit | Arms Length |
|  | 3590 SE Durham Dr, Olympia | 87750022200, multiple | Raw land | Mar-08 | R 4-8; RM 8-24, Olympia | 142 | 9.85 ac | 14.42 du/ac | $2,355,719 | $239,159/ac | $16,590/unit | Arms Length |
|  |  |  |  |  |  | 233 | 16.70ac | 13.95 du/ac | $3,999,438 | $239,487 | $17,164.97 |  |
|  | Velkommen Mobile Home Park | 31560000100 | Raw Land | Appraisal | MFMD-9-15 | 134 | 11.13 ac | 12.04 du/ac | $2,680,000 ($175,000) $2,505,000 | $240,791 | $20,000/ac w/ extension of water& sewer |  |

Indicated Value w/ Water & Sewer Extension

Velkommen MHP Park
Page 21

*Value in the Before Condition as Improved*

In the before condition as improved the subject is utilized as a 39 space mobile home park. I have performed both a direct sales comparison approach and an income capitalization approach, as these methodologies are both typically relied upon by buyers and sellers of mobile home parks.

The sales approach is based upon the 9 comparables shown on the map below. The table on the following page provides details of the sale properties relative to the characteristics of the subject. The range of value is $22,619/space to $77,260/space. Based upon the data I have concluded with a value opinion for the subject at $65,000. In arriving at this opinion I would note that the subject is newer than all of the comparables and has lower density than any of the comparables. Applying this unit value to the subject's 39 spaces results in a value indication of $2,535,000.



# MOBLIE HOME PARK SALES COMPARABLES MAP

Velkommen MHP Park
Page 22

## MOBILE HOME PARK SALES COMPARISONS

| No. | Property | Area | Land Use Zoning | Yr. Built Spaces | Spaces/Ac SF/Space | Date | Price $/Space |
|---|---|---|---|---|---|---|---|
| 1 | Alpine Mobile Home Park<br>7300 32nd Ave NE<br>Olympia | 9.6ac | MD 6-12<br>Residential | 1972<br>50 spaces | 5.2 spaces/ac<br>8,381 sf/space | 27-Mar-09 | $1,700,000<br>$34,000 |
| 2 | Hidden Village<br>4600 17th Lane NE<br>Olympia | 5.0ac | LD 0-4<br>Residential | Unknown<br>22 spaces | 4.4 spaces/ac<br>9,841 sf/space | 16-Sep-08 | $1,699,719<br>$77,260 |
| 3 | Totem Mobile Home Com.<br>5615 Blake Lake Belmore Rd<br>Olympia | 3.5ac | MFM<br>Residential | Unknown<br>12 spaces | 3.4 spaces/ac<br>12,632 sf/space | 30-Oct-09 | $482,700<br>$40,225 |
| 4 | Western Plaza MHP<br>1841 Trosper Rd SW<br>Tumwater | 10.8ac | MFM<br>Residential | 1973<br>66 spaces | 6.1 spaces/ac<br>7,135 sf/space | 15-Feb-08 | $4,059,000<br>$61,500 |
| 5 | Allimor Carriage Estates<br>5705 Littlerock Rd SW<br>Tumwater | 7.1ac | GC<br>Commercial | 1943<br>50 spaces | 7.0 spaces/ac<br>6,186 sf/space | 16-Jul-07 | $1,500,000<br>$30,000 |
| 6 | Fairwind Community<br>2805 76th Ave SW<br>Olympia | 4.0ac | MFM<br>Residential | 1980<br>42 spaces | 10.5 spaces/ac<br>4,149 sf/space | 11-Oct-07 | $950,000<br>$22,619 |
| 7 | Rainier Terrace MHP<br>3800 Sleater Kinney Rd NE<br>Olympia | 9.3ac | RRR 1/5<br>Residential | 1968<br>46 spaces | 4.9 spaces/ac<br>8,807 sf/space | 31-Jul-07 | $1,150,000<br>$25,000 |
| 8 | Martin Way MHP<br>2640 Martin Way E<br>Olympia | 0.9ac | HDC-4<br>Commercial | 1953<br>21 spaces | 22.3 spaces/ac<br>1,950 sf/space | 4-Nov-08 | $580,000<br>$27,619 |
| 9 | Lily Place MHP<br>3227 78th Ave SE<br>Olympia | 2.2ac | RL 1/1<br>Residential | 1976<br>9 spaces | 4.1 spaces/ac<br>10,696 sf/space | 6-Nov-07 | $509,000<br>$56,556 |
| | Velkommen MHP | 11.1ac | MFMD-9-15<br>Residential | 1982<br>39 spaces | 3.5 spaces/ac<br>12,431 sf/space | Appraisal | **$2,535,000**<br>$65,000 |

Velkommen MHP Park
Page 23

The purpose of the income capitalization approach is to provide an estimate of the subject's value through the measurement and capitalization of future income benefits. Proper application of this approach assumes that the subject would be operated as a passive investment opportunity on the part of a buyer. The underlying basis of this analysis is the stream of income and expenses associated with the subject. The analysis period is the first twelve months of operation for a prospective buyer. Thus, I have projected operations from April 2009 through March 2010. The first step in this process is to assess whether the subject is performing to market expectations. Therefore I have compared the reported income of the subject to income appropriate comparison properties in order to project a stabilized market operating statement. The resulting net income is capitalized into value through the use of a direct capitalization procedure.

The subject's reported income from space rent is $328/mo. The table below shows space rent at mobile home parks ranging from $325/mo to $570/mo. Comparing the subject's characteristics to the rent comparables leads me to conclude that the subject is operating at below market rent. I have concluded that a stabilized market rent for the subject's spaces would be around the average at $450/mo and have applied this to the analysis. This results in stabilized net operating income of $210,600.

| MHP Rental Comparisons | | |
|---|---|---|
| | Mobile Home Park | Rent/Mo |
| 1 | Friendly Village Olympia | $570 |
| 2 | Martin Way MHP Lacey | $505 |
| 3 | Mountain Green Lacey | $475 |
| 4 | Western Plaza Tumwater | $470 |
| 5 | Edgelake Lacey | $450 |
| 6 | Alpine Mobile Estates Lacey | $450 |
| 7 | De Trays MHP Olympia | $434 |
| 8 | Flying Carpet Lacey | $420 |
| 9 | Crestwood Lacey | $367 |
| 10 | Claudia's Mobile Estates Olympia | $350 |
| 11 | Melody Pines Estates Olympia | $325 |

Velkommen MHP Park
Page 24

The appropriate selection of a capitalization rate is fundamental to the direct capitalization analysis. The table that follows shows rates obtained from the sales of mobile home parks throughout Puget Sound. All were considered to be at market rent and occupancy at the time of sale.

The data in the table shows a range of 6.1%-7.9% for overall rates of return on mobile home parks. In general, rates of return reflect the risk associated with a particular property as well as the buyer's desired return relative to other investment opportunities at a particular point in time. Mobile home parks are perceived by investors as stable properties with low maintenance costs and relatively little tenant turnover. As such, they are perceived as being rather low risk investments.

I have concluded with an appropriate capitalization rate for the subject of 7% under the conditions of stabilized market rent. Applying this to the market net operating income results in a value indication of $2,260,000 or about $58,000/space.

Reconciling the value indications of the sales and income approaches indicates a value conclusion for the subject as improved of $2,400,000.

## Capitalization Rate Comparables

| No. | Property | Sale Date | Price | # Spaces | Vacancy at Time of Sale | Pro Forma NOI | Overall Rate of Return |
|-----|----------|-----------|-------|----------|-------------------------|---------------|------------------------|
| 1 | Westview Estates Everett | 26-Jul-07 | $5,000,000 | 82 | 0% | $305,000 | 6.10% |
| 2 | Westhill Mobile Manor Kent | 22-May-08 | $3,500,000 | 64 | 0% | $227,500 | 6.50% |
| 3 | Firlane Village Spanaway | 3-Apr-07 | $1,150,000 | 19 | 0% | $74,750 | 6.50% |
| 4 | Highway 99 MHP Edmonds | 8-Jan-08 | $1,800,000 | 27 | 0% | $125,640 | 6.98% |
| 5 | Meridian MHP Lynden | 9-May-08 | $1,891,295 | 104 | 5% | $161,598 | 7.03% |
| 6 | Maplewood Bellingham | 23-Oct-09 | $375,000 | 11 | 0% | $28,529 | 7.60% |
| 7 | Bright Hope Des Moines | 7-May-07 | $3,981,500 | 75 | 5% | $307,928 | 7.73% |
| 8 | Meridian Mobile Estates Puyallup | 30-Mar-09 | $2,652,000 | 52 | 0% | $209,508 | 7.90% |

Velkommen MHP Park
Page 25

# VELKOMMEN - BEFORE CONDITION
## Stabilized Operating Statement At Market Rent
## Analysis Period: April 2009 - March 2010

| INCOME FROM 39 SPACES | $/yr | $/space/mo | %EGI |
|---|---|---|---|
| Space Rent (Avg) | $210,600 | $450/ Space | |
| Misc Income & Fees | $0 | $0/ Space | |
| | | | |
| Potential Gross Income | $210,600 | $450/ Space | |
| | | | |
| Vacancy @ 2% | -$4,212 | $0/ Space | |
| EGI | $206,388 | $441/ Space | 100% |
| | | | |
| Variable Expenses | | | |
| Mgmt (incl. Payroll, taxes, benefits) | $0 | $0/ Space | 0.0% |
| On site Mgmt | $2,000 | $4/ Space | 1.0% |
| Repairs and Maintenance | $21,000 | $45/ Space | 10.2% |
| Supplies/Equipment Rental | $0 | $0/ Space | 0.0% |
| Utilities: | $1,650 | $4/ Space | 0.8% |
| Advertising | $0 | $0/ Space | 0.0% |
| Office | $1,000 | $2/ Space | 0.5% |
| Legal/Professional | $500 | $1/ Space | 0.2% |
| Sub-total Variable | $26,150 | $56/ Space | 12.7% |
| | | | |
| Fixed Expenses | | | |
| Property Taxes | $15,093 | $32/ Space | 7.3% |
| Insurance | $6,900 | $15/ Space | 3.3% |
| Sub-total Fixed | $21,993 | $47/ Space | 10.7% |
| | | | |
| TOTAL EXPENSES | $48,143 | $103/ Space | 23.3% |
| | | | |
| NET OPERATING INCOME | $158,245 | $338/ Space | 76.7% |

| | | | |
|---|---|---|---|
| Direct Capitalization Rate Applied | | 7.00% | |
| | | Total | $/space |
| Indicated Value by Direct Capitalization | | $2,260,643 | $57,965 |

| | | | |
|---|---|---|---|
| **ROUNDED VALUE** | | **$2,260,000** | **$57,949** |

**Reconciliation and Final Value Estimate**

The subject has been valued in the before condition under two potential uses as if vacant and also as improved. The value estimates under these circumstances are noted below.

| | |
|---|---|
| *As if Vacant for Single Family Development without Sewer* | *$1,000,000* |
| *As if Vacant for Single Family Development with Sewer* | *$2,700,000* |
| *As if Vacant for Multi-Family Development with Sewer* | *$2,400,000* |
| *As Improved for as a Mobile Home Park* | *$2,400,000* |

The analysis shows that the highest and best use of the subject as if vacant is for development of single family residential units with sewer. The value under this use at $2,700,000 is somewhat higher than the value as improved at $2,400,000. Therefore the highest and best use of the subject in the before condition is considered to be for single family residential development after extension of water and sewer to the property.

In the after condition the subject's zone is changed to manufactured home park. While this alters the subject's development potential as if vacant, it does not change its potential use at all as improved. Thus, the after condition highest and best use and value conclusion as improved would therefore be identical to the before condition. Based upon this analysis it is my conclusion that the impact to the subject as a result of the zoning change is as follows.

| | |
|---|---|
| **VALUE OF SUBJECT IN BEFORE CONDITION** | **$2,700,000** |
| **VALUE OF SUBJECT IN AFTER CONDITION** | **$2,400,000** |
| **VALUE IMPACT OF ZONING CHANGE** | **$300,000** |

**Effective Date of Value**

The effective date of value is March 23rd, 2009, which is the date upon which the zoning change was approved by the City of Tumwater.

**Date of Appraisal**

This appraisal was performed in December of 2009 and January of 2010.

Velkommen MHP Park
Page 27

**Closing**

If you have any further questions or concerns, please do not hesitate to call.

Sincerely,

Stephen Shapiro, MAI

Ref:  10004

Attached Exhibits:

  Aerial Photograph
  Area Map
  Wetland Map
  Soils Liquefaction Map
  Zoning Map



**AERIAL PHOTOGRAPH**



**AREA MAP**

# TUMWATER MOBILE&MANUFACTURED HOME PARKS
# HIGH GROUNDWATER FLOODING AND WETLANDS

## WETLAND MAP



**SOILS LIQUEFACTION MAP**

SHAPIRO DEC.
C 111



**ZONING MAP**

# RE◆SOLVE

*Real Estate Appraisal, Counseling & Mediation*

STEPHEN L. SHAPIRO, MAI

Stephen Shapiro graduated in June 1986 from the University of Washington in Seattle, Washington. He was awarded an Honors Degree as Bachelor of the Arts in Communications with a major in Journalism and a minor in Economics. Since that time he has worked as a writer, editor and research consultant specializing in land and marine resource issues. Mr. Shapiro was asked to join the firm of **Wronsky, Gibbons & Riely** in March of 1999 by Anthony Gibbons. In July of 1999 Mr. Gibbons formed Anthony Philip Gibbons PLLC, doing business under the new company name of **RE◆SOLVE** – a company providing Real Estate Appraisal, Counseling and Mediation services. Mr. Shapiro joined Mr. Gibbons in his company at that time.

In his capacity as an appraiser for **Wronsky, Gibbons & Riely** and **RE◆SOLVE**, Mr. Shapiro has developed a broad range of experience over a wide variety of property types. Appraisals have been performed on office and industrial buildings; commercial and industrial land; residential subdivision property; natural resource and habitat land, including timberland and wetland property; and high-end estate homes. In addition, he has provided mediation and expert witness services for legal purposes.

Mr. Shapiro is licensed as a certified general real estate appraiser by the State of Washington (license no. 1101561) and is listed on the Washington State Department of Transportation's Approved List of Appraisers and Reviewers. He was awarded the highly regarded MAI designation of the Appraisal Institute in June 2006 (member no. 12394). He has successfully completed the following Appraisal Institute courses, as well as numerous additional professional seminars:

- Appraisal Principles
- Appraisal Procedures
- Standards of Professional Appraisal Practice, Parts A and B
- Highest and Best Use and Market Analysis
- Basic Income Capitalization
- General Applications
- Advanced Sales Comparison and Cost Approaches
- Report Writing and Valuation Analysis
- Advanced Applications
- Advanced Income Capitalization
- Uniform Appraisal Standards for Federal Land Acquisitions
- Condemnation Appraising: Advanced Topics and Applications
- Attacking and Defending an Appraisal in Litigation
- Forestland Road Cost Obligations

Mr. Shapiro has performed appraisal services for a wide variety of clients, and a brief client list follows.

- City of Bainbridge Island
- WA State Dept. of Natural Resources
- Bainbridge Island Parks and Recreation
- Group Health Cooperative of Puget Sound
- Port of Seattle
- Cascade Land Conservancy
- U.S. Forest Service
- NC Power Systems Co.
- City University
- Trust For Public Land
- Bainbridge Island Land Trust
- The Mark A. Robinson Trusts
- Commerce Bank
- First American Title Insurance Co.
- Tulalip Tribes
- Tousley Brain Stephens PLLC
- Ryan, Swanson and Cleveland, PLLC
- Pope Resources, Inc.
- Hockett & Olsen Brothers, Inc.
- Great Peninsula Conservancy
- Central Kitsap School District
- Riddell Williams P.S.
- Whidbey Camano Land Trust
- Michael A. Goldfarb Law Office
- Lawler Burroughs & Baker, P.C.
- Harnish Group, Inc
- Development Services of America
- Preston Gates & Ellis LLP
- Pacific Investment Co.
- Column Financial
- GVA Kidder Mathews
- American Marine Bank
- Batavia Holdings LLC
- Kinzer Real Estate Services
- Knowles/Turner Real Estate Group
- Warren G. Harding Temple Board Assoc.
- GEM1 LLC
- Kitsap County Dept. of Public Works
- Washington State Parks Commission
- Livengood, Fitzgerald & Alskog PLLC
- American Eagle Communities
- McGavick Graves Attorneys at Law
- Wal-Mart
- Black Equities Group LTD
- Methow Conservancy
- Seattle Yacht Club
- Northwest Watershed Institute
- Williams Kastner, Attorneys at Law
- City of Port Townsend
- City of Eatonville
- Kitsap Bank

- Transnation Title Insurance Co.
- The Ketcham Family
- City of Burien
- Open Space Resources
- Kitsap Conservation District
- Lawyers Title Insurance Corp.
- Kitsap County Dept. Parks and Recreation
- McCormick Land Company
- Trammell Crow Co.
- Pike Place Market PDA
- City of Edmonds Parks and Recreation
- WA State Department of Transportation
- MacMillan-Piper, Inc.
- Port of Allyn
- Pacific Medical Center and Clinics
- Commonwealth Land Title Insurance
- Port Gamble S'Kllallam Tribe
- Madison Ave Real Estate, LLC
- Kitsap County Dept. of Admin. Services
- Olympic Property Group
- Prosperity Treatment Center
- Old Republic Title Co.
- Cullen Law Office LLP
- Port of Olympia
- Washington First International Bank
- Rodgers Deutsch & Turner
- Frontier Bank
- Credit Suisse First Boston
- The Mountaineers
- Bainbridge Public Library
- GMAC Commercial Mortgage
- Farm Bureau Life Insurance Co.
- Starbucks
- Seattle Automotive Dist., Inc.
- Pacific Northwest Title Insurance Co.
- WA State Office of the Attorney General
- Aoki Sakamoto and Grant LLP
- AnMarCo
- King Count Dept. Natural Resources & Parks
- Montgomery Purdue Blankinship & Austin PLLC
- Ogden Murphy Wallace PLLC
- Puget Sound Energy
- Kenyon P. Kellogg, Attorney at Law
- Mundt MacGregor PLLC
- City of Poulsbo
- JWJ Group
- Olympic Resource Management
- Pioneer Human Services
- Capitol Land Trust
- Oldfield & Helsdon, PLLC
- Miller-Nicholson, Inc.

# RE•SOLVE

### Real Estate Appraisal, Counseling & Mediation

## EXPERT TESTIMONY & LITIGATION SUPPORT

### STEPHEN SHAPIRO, MAI

Mr. Shapiro has served as an expert witness or provided litigation support in the following cases.

| Date | Proceeding | Client |
|---|---|---|
| October 2005 | Sound Transit vs. TeGantvoort<br>Provided expert testimony in Washington<br>Superior Court, Pierce County | Paul TeGantvoort |
| March 2006 | Sound Transit vs. Hoang<br>Provided mediation services | Denise Tran , Atty:  Aoki Sakamoto and<br>Grant LLP |
| June 2006 | WA State Dept Transportation vs. Coffey<br>Provided mediation services | Douglas Shaftel, Atty: WA State Attorney<br>General's Office |
| August 2006 | IRS vs. Laws<br>Provided mediation services | James Minorchio, Atty:  Riddell<br>Williams P.S. |
| January 2007 | WA State Dept Transportation vs. Coffey<br>Provided expert testimony in Washington<br>Superior Court, Whatcom County | Douglas Shaftel, Atty: WA State Attorney<br>General's Office |
| June 2007 | Fox vs. John L. Scott<br>Deposed as expert witness | Michael Babcock, Atty:  Schiffrin Olson<br>Schlemlein & Hopkins |
| July 2007 | Jurkovich vs. Island County Hospital<br>Deposed as expert witness | James Haney, Atty:  Ogden Murphy<br>Wallace PLLC |
| November 2007 | Puget Sound Energy vs. Kirchhofer<br>Provided mediation services | Philip Havers, Atty:  Buskirk Havers<br>Lindsay Olsen PLLC |
| April 2008 | WSDOT vs. AnMarCo<br>Deposed as expert witness | James Fitzgerald, Atty: Livengood,<br>Fitzgerald & Alskog PLLC |
| February 2009 | Kitsap County Dept of Public Works<br>Provided mediation services | Neil Wachter, Deputy Prosecuting<br>Attorney for Kitsap County |
| March 2009 | Labounty Road LID Proceedings<br>Provided expert testimony to the Blaine<br>City Council | Alan Wallace, Williams Kaster |

## General Assumptions and Limiting Conditions

*This appraisal report has been made with the following general assumptions:*

1.  No responsibility is assumed for the legal description provided or for matters pertaining to legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2.  The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.  Responsible ownership and competent property management are assumed.

4.  The information furnished by others is believed to be reliable, but no warranty is given for its accuracy.

5.  All engineering studies are assumed to be correct. The plot plans and illustrative material in this report are included only to help the reader visualize the property.

6.  It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for obtaining the engineering studies that may be required to discover them.

7.  It is assumed that the property is in full compliance with all applicable federal, state, and local environmental regulations and laws unless the lack of compliance is stated, described, and considered in the appraisal report.

8.  It is assumed that the property conforms to all applicable zoning and use regulations and restrictions unless a non-conformity has been identified, described, and considered in this appraisal report.

9.  It is assumed that all required licenses, certificates of occupancy, consents, and other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the opinion of value contained in this report is based.

10. It is assumed that the use of the land and improvements is confined within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

11. Unless otherwise stated in this report, the existence of hazardous materials, which may or may not be present on the property, was not observed by the appraiser. The appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation and other potentially hazardous materials may affect the value of the property. The value estimated is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for such conditions or for any expertise or engineering knowledge required to discover them. The intended user is urged to retain an expert in this field, if desired.

*This appraisal report has been made with the following general limiting conditions:*

1.  If the subject is improved: Any allocation of the total value estimated in this report between the land and the improvements applies only under the stated program of utilization. The separate

values allocated to the land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

2. Possession of this report, or a copy thereof, does not carry with it the right of publication.

3. The appraiser, by reason of this appraisal, is not required to give further consultation or testimony or to be in attendance in court with reference to the property in question unless arrangements have been previously made.

4. Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent of the appraiser

### *The following assumptions and limiting conditions may apply to this assignment:*

1. Any opinions of value provided in the report apply to the entire property, and any proration or division of the total into fractional interests will invalidate the opinion of value, unless such proration or division of interests has been set forth in the report.

2. In the case of proposed developments: If only preliminary plans and specifications were available for use in the preparation of this appraisal; the analysis, therefore, is subject to a review of the final plans and specifications when available.

3. In the case of proposed developments, and the assignment of values to a property at the completion of construction, all proposed improvements are assumed to have been completed unless otherwise stipulated, so any construction is assumed to conform with the building plans referenced in the reports.

4. In the case of improved property: The appraiser assumes that the reader or user of this report has been provided with copies of available building plans and all leases and amendments, if any, that encumber the property.

5. If no legal description or survey was furnished, the appraiser used the county tax plat to ascertain the physical dimensions and acreage of the property. Should a survey prove this information to be inaccurate, it may be necessary for this appraisal to be adjusted. If a legal description has been provided, the appraiser is not responsible for the accuracy of the description. The property appraised is assumed to be as delineated on county maps, as noted in this appraisal.

6. The forecasts, projections, or operating estimates contained herein are based on current market conditions, anticipated short-term supply and demand factors, and a continued stable economy. These forecasts are, therefore, subject to changes with future conditions.

7. If the subject is improved: The Americans with Disabilities Act (ADA) became effective January 26, 1992. The appraiser has not made a specific compliance survey or analysis of any improvements on the property to determine whether or not it is in conformity with the various detailed requirements of ADA. It is possible that a compliance survey of the property and a detailed analysis of the requirements of the ADA would reveal that the property is not in compliance with one or more of the requirements of the act. If so, this fact could have a negative impact upon the value of the property. Since the appraiser has no direct evidence relating to this issue, possible noncompliance with the requirements of ADA was not considered in estimating the value of the property.

## Certification

I certify that, to the best of my knowledge and belief:

◆ The statements of fact contained in this appraisal are true and correct;
◆ The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conclusions, and are my personal, unbiased professional analyses, opinions, and conclusions;
◆ I have no present or prospective interest in the property that is the subject of this appraisal, and I have no personal interest or bias with respect to the parties involved;
◆ My engagement in this assignment was not contingent upon developing or reporting predetermined results. My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the obtainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
◆ My analyses, opinions, and conclusions were developed, and this appraisal has been prepared, in conformity with the Uniform Standards of Professional Appraisal.
◆ I have made a personal inspection of the property that is the subject of this report.
◆ I have afforded the owner or a designated representative of the property that is the subject of this appraisal the opportunity to accompany me on the inspection of the property.
◆ Persons providing significant professional assistance to the persons signing this report are identified herein.
◆ I have disregarded any increase in Market Value caused by the proposed public improvement or its likelihood prior to the date of valuation. I have disregarded any decrease in Market Value caused by the proposed public improvement or its likelihood prior to the date of valuation, except physical deterioration within the reasonable control of the owner;
◆ This appraisal has been made in conformity with the appropriate State and Federal laws and requirements, and complies with the contract between the agency and the appraiser;
◆ I certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by authorized representatives.
◆ As of the date of this report, I have completed the requirements under the continuing education program of the Appraisal Institute.

RESTRICTION UPON DISCLOSURE & USE:
Disclosure of the contents of this appraisal report is governed by the By-Laws & Regulations of the Appraisal Institute.
Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser or the firm with which (s)he is connected, or any reference to the Appraisal Institute or to the MAI designation) shall be disseminated to the public through advertising media, public relations media, news media, sales media or any other public means of communication without the prior written consent and approval of the undersigned. No part of this report or any of the conclusions may be included in any offering statement, memorandum, prospectus or registration without the prior written consent of the appraiser.

The property has been appraised for its fair market value as though owned in fee simple, or as encumbered only by the existing easements as described in the title report in the addenda.

The opinion of value expressed below is the result of, and is subject to the data and conditions described in detail in this report.

I made a personal inspection of the property that is the subject of this report on December 21, 2009, in the accompaniment of Jeffrey Myers, an attorney with the firm of Law, Lyman, Daniel, Kamerrer & Bogdanovich P.S., Karen Kirkpatrick, attorney for the City of Tumwater, Michael Matlock, City of Tumwater Planning & Facilities Direct.

The date of value for the property that is the subject of this appraisal March 23rd, 2009, which is the date upon which the zoning change became effective.

Per the MARKET VALUE definition herein, the value conclusions for the property that is the subject of this appraisal are on a cash basis and are:

**VALUE OF SUBJECT IN BEFORE CONDITION**          **$2,700,000**

**VALUE OF SUBJECT IN AFTER CONDITION**          **$2,400,000**

**VALUE IMPACT OF ZONING CHANGE**          **$300,000**

Name: _____**Stephen Shapiro, MAI**_____          Signature: _____
WS Cert # 1101561

Date Signed: January 6, 2010
m:forms\nonFIRREA