UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LAUREL PARK COMMUNITY, LLC, a Washington limited liability company; TUMWATER ESTATES INVESTORS, a California limited partnership; VELKOMMEN MOBILE PARK, LLC, a Washington limited liability company; and MANUFACTURED HOUSING COMMUNITIES OF WASHINGTON, a Washington non-profit corporation,

Plaintiffs,

v.

CITY OF TUMWATER, a municipal corporation,

Defendant.

No. C09-05312BHS

DECLARATION OF JEANNE-MARIE WILSON IN SUPPORT OF PLAINTIFFS' RESPONSE OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Note on Motion
Calendar: April 9, 2010

(Oral Argument Requested)

Jeanne-Marie Wilson declares and states as follows:

1.    I am over the age of eighteen, competent to testify, and familiar with the facts herein based upon personal knowledge.

2.    This Supplemental Declaration is presented in response to Defendant City of Tumwater's Response to Plaintiffs' Motion for Summary Judgment.  This declaration, as well as my prior declaration dated February 11, 2010, were prepared as an appraisal practice under USPAP, which it defines as "Valuation services performed by an individual acting as an appraiser, including but not limited to appraisal, appraisal review, or appraisal consulting."  A

Supplemental Declaration of Jeanne-Marie Wilson - 1

Talmadge/Fitzpatrick
18010 Southcenter Parkway
Tukwila, Washington  98188-4630
(206) 574-6661   (206) 575-1397 Fax

000148

1   true and correct copy of the 2010-2011 USPAP Edition, Definitions section page U-1, is attached

2   as Exhibit A.

3        3.      Although I am not an MAI appraiser, I have been an Associate Member of the

4   Appraisal Institute (the body that governs MAI designations) for more than 10 years.  I am

5   qualified to provide expert testimony in this case, due in part to my experience valuing

6   manufactured housing communities during my 15-year career as a certified commercial real

7   estate appraiser.  As noted in my prior declaration, I have valued approximately 75 manufactured

8   home parks and was a specialist valuing this property type while working at PGP Valuation in

9   Seattle from 1993 until 2001.  During that time I was part of a group that published a

10  manufactured housing newsletter addressing happenings and relevant trends in the industry.  I

11  also participated in the Manufactured Housing Communities of Washington annual trade shows.

12

13  I have also worked with at least two other attorneys during their preparation for trial, but in both

14  instances, the cases were settled out of court, prior to my being documented as an expert.  One of

15  these involved a valuation dispute over a manufactured home park located in Snohomish County.

16  Since 2001, I have focused my practice in Thurston County and am very familiar with local

17  market trends, and its manufactured home parks.  I therefore have a unique perspective that

18  blends a specific valuation expertise (manufactured home parks) with the 10-year knowledge of

19  living and working in the specific market where the properties in question are located

20  (*i.e.,* Tumwater Estates, Laurel Park & Velkommen).  My resume, client list, and references

21  attest to the fact that my past and present work product provides relevant and reliable real

22

23  property valuation results.

24        4.      I have completed three assignments at the request of plaintiffs' counsel in this

25  case.  The first was a summary appraisal with an effective valuation date of 12/31/08.  I

26  Supplemental Declaration of Jeanne-Marie Wilson - 2

1  concluded that this date was both credible under USPAP, and relevant because it was *prior to*

2  adoption of the new Tumwater ordinances.  To complete the summary appraisal, the valuation

3  process[2] included a multi-step course of action, the first of which involved defining the problem.

4  The critical point here included the intended use of the appraisal, which was to establish the

5  value of the three parks under their continued use.  The purpose of my work was to establish an

6  anchor for arguing the relevant point in this case, which is whether there has been a negative

7  impact on plaintiffs' properties as a result of Tumwater's adoption of the District.  A true and

8  correct copy of my work product is attached as Exhibit B.

9

10      5.    The second assignment was an appraisal review, which was developed and

11  reported consistent with USPAP Standard 3.  This was an appraisal review assignment without

12  an opinion of value.  A true and correct copy of my work product is attached as Exhibit C.  This

13  assignment was intended only to develop an opinion as to the quality of another appraiser's

14  work, and the content of my review included information required under Standards Rules 3-5

15  (a)-(h) and the reviewer's certification shown in Standards Rule 3-6.  A true and correct copy of

16  these Standards are attached as Exhibit D.  During the review process, I found a number of errors

17  in Stephen Shapiro's reports dated January 6, 2010 that brought into question the *relevance* of

18  the data he presented and therefore the *reliability* of his value conclusions.  The most significant

19  of these was the use of comparables for *finished* lot sales to establish the value of vacant, *un-*

20  *entitled* land.  No discussion was made regarding selection of appropriate comparable data, and

21

22  Shapiro's report did not recognize that comparing a *finished* residential building lot directly to

23  *raw* land is an "apples & oranges" comparison, providing potentially unreliable and misleading

24  results.  Further, at least four of the sales occurred between two and seven months *after* the

25

26
---

[2] The Dictionary of Real Estate Appraisal, Fourth Edition, page 307 "The Valuation Process."

Supplemental Declaration of Jeanne-Marie Wilson - 3

Talmadge/Fitzpatrick
18010 Southcenter Parkway
Tukwila, Washington  98188-4630
(206) 574-6661  (206) 575-1397 Fax

1    appraiser's effective valuation date.   Sales occurring shortly after an effective date are not

2    entirely inappropriate because they could have also been listed or pending as of that date.

3    However, Shapiro uses three sales that were clearly five to seven months *after* the Tumwater

4    ordinance adoption in March 2009.   These sales occurred during a time when the local market

5    experienced a dramatic shift as a result of the recession and national economic crisis.   Further,

6    each of the three was bank-owned property (REO) which further discredits the use of the

7    comparable given the conditions of sale surrounding the transaction and yet another reason why

8    they should have been excluded.   In all, 7 of the 10 comparables presented should have been

9    excluded because they are unreliable as well as misleading in establishing value of the subject

10   "as vacant" in the before condition.   Shapiro's market analysis in the "as vacant" before

11   condition is a truncated presentation that ignores well respected market based publications such

12   as *Dupre + Scott* to establish the level of existing and proposed inventory in a given market area.

13   This type of information is critical in creating a reliable supply and demand analysis leading

14   toward a reasonable conclusion of marketability and highest and best use.

15        6.        My third assignment was my declaration, signed 2/12/10.   This also falls under

16   the definition of appraisal practice, or "Valuation services performed by an individual acting as

17   an appraiser, including but not limited to appraisal, appraisal review, or appraisal consulting."[3]

18   Under the category of appraisal practice (acting as an appraiser), the appraiser has certain

19   USPAP obligations (those portions of USPAP that apply include Definitions, Preamble, and the

20   Conduct, Management, and Confidentiality sections of the Ethics Rule, Competency Rule and

---

[3] 2010-2011 USPAP Edition, Definitions section page U-1, attached as Exhibit A.

Supplemental Declaration of Jeanne-Marie Wilson - 4

Talmadge/Fitzpatrick
18010 Southcenter Parkway
Tukwila, Washington  98188-4630
(206) 574-6661   (206) 575-1397 Fax

the Jurisdictional Exception Rule).[4]   However, my preparation of the declaration was work product that *did not* fall under the definition of an appraisal, appraisal review or appraisal consulting assignment, thus compliance with Standard 1-3 is not required, as claimed in Tumwater's response to plaintiffs' motion for summary judgment at page 5.

7.       In the declaration I prepared, I referenced the existence of a potential redevelopment premium associated with plaintiffs' properties.  This development premium was not established by me, nor was it the result of using specific appraisal methodology, but can be clearly recognized in the improved sale examples cited in the declaration at paragraphs 21 (Wildwood MHP) and 22 (Allimor Carriage Estates MHP).  The investor-buyer in both instances paid a premium that was directly tied to the redevelopment potential associated with these properties, and that was the *factual basis* of my opinion.  The other example of this premium is evidenced by a comparison of my initial value estimate of Velkommen "As Improved" ($1.4 to $1.5 million) effective December 31, 2008, in relation to offers that were received from prospective buyers at $1.75 and $1.6 million during May and September 2008, respectively.  *See* Decl. of James Anderson at 4.  My research revealed that one of those offers included a "premium" beyond the value of the existing income stream directly associated with allowed uses of the underlying MFM zone.  My investigation confirmed that one prospective buyer planned to convert the park to condominium ownership and sell individual lots to the existing tenants, and offered the "premium" in light of that objective.

---

[4] 2010-2011 USPAP Advisory Opinions, AO 21, page A-67 Lines 132–136, attached as Exhibit E.

Supplemental Declaration of Jeanne-Marie Wilson - 5

Talmadge/Fitzpatrick
18010 Southcenter Parkway
Tukwila, Washington  98188-4630
(206) 574-6661   (206) 575-1397 Fax

000152

1    I declare under penalty of perjury under the laws of the State of Washington that the

2    foregoing is true and correct.  Executed at _____Olympia'_____, this __5th__ day of

3    April, 2010.

4    

5                                    Jeanne-Marie Wilson

6    

7    

8    

9    

10   

11   

12   

13   

14   

15   

16   

17   

18   

19   

20   

21   

22   

23   

24   

25   

26   Supplemental Declaration of Jeanne-Marie Wilson - 6

000153

# EXHIBIT A

000154

# UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE

as promulgated by the
Appraisal Standards Board of
The Appraisal Foundation

## DEFINITIONS

For the purpose of the *Uniform Standards of Professional Appraisal Practice* (USPAP), the following definitions apply:

**APPRAISAL:** (noun) the act or process of developing an opinion of value; an opinion of value.
(adjective) of or pertaining to appraising and related functions such as appraisal practice or appraisal services.

> Comment: An appraisal must be numerically expressed as a specific amount, as a range of numbers, or as a relationship (e.g., not more than, not less than) to a previous value opinion or numerical benchmark (e.g., assessed value, collateral value).

**APPRAISAL CONSULTING:** the act or process of developing an analysis, recommendation, or opinion to solve a problem, where an opinion of value is a component of the analysis leading to the assignment results.

> Comment: An appraisal consulting assignment involves an opinion of value but does not have an appraisal or an appraisal review as its primary purpose.

**APPRAISAL PRACTICE:** valuation services performed by an individual acting as an appraiser, including but not limited to appraisal, appraisal review, or appraisal consulting.

> Comment: *Appraisal practice* is provided only by appraisers, while *valuation services* are provided by a variety of professionals and others. The terms *appraisal, appraisal review*, and *appraisal consulting* are intentionally generic and are not mutually exclusive. For example, an opinion of value may be required as part of an appraisal review and is required as a component of the analysis in an appraisal consulting assignment. The use of other nomenclature for an appraisal, appraisal review, or appraisal consulting assignment (e.g., analysis, counseling, evaluation, study, submission, or valuation) does not exempt an appraiser from adherence to the *Uniform Standards of Professional Appraisal Practice*.

**APPRAISAL REVIEW:** the act or process of developing and communicating an opinion about the quality of another appraiser's work that was performed as part of an appraisal, appraisal review, or appraisal consulting assignment.

> Comment: The subject of an appraisal review assignment may be all or part of a report, workfile, or a combination of these.

**APPRAISER:** one who is expected to perform valuation services competently and in a manner that is independent, impartial, and objective.

000155

# EXHIBIT B

000156



**Wilson Appraisal Service, L.L.C.**

<div style="border:1px solid;">
2962 Limited Lane N.W., Suite A
Olympia, WA 98502
360.867.0300
</div>

---

### Federal Rule 26 (a) (2) (B)

### *Preliminary* Report of Market Value from Plaintiff's Real Estate Appraiser

### Prepared December 7, 2009

---

My name is Jeanne-Marie Wilson and I make this report on behalf of plaintiff in the matter of **MHCW et al v. City of Tumwater** under my file number 09-157.

I am a WA state certified general real estate appraiser specializing in the valuation of commercial real estate. I have been licensed since February 1995 and have been actively working in WA state ever since. I went through an appraisal trainee program in the early 1990s with PGP Valuation, Inc. and continued working with the firm until February 2001. Since then I've been a principal and co-owner of Wilson Appraisal Service, LLC. We offer both residential and commercial real estate appraisal services in Washington, specifically focusing on Thurston, Lewis, Mason and Grays Harbor Counties.

During my time with PGP Valuation I was the designated specialist in valuing manufactured home parks across the state. During my tenure there I completed valuations on no less than 50 parks. At the time I was an associate member of the Manufactured Housing Communities of Washington (MHCW) and participated in writing articles for a manufactured housing publication put out by PGP Valuation for interested clients.

Since leaving PGP Valuation my practice is now as more of a generalist but I have continued to appraise MHP's but with an emphasis on those located in the South Sound Region. I have attached a listing of 75 MHP's I have valued over the last 14 years in Washington State.

A copy of my current resume, state license and education transcript from the Appraisal Institute are attached with this document. While I have never testified in court, I have worked on a few cases prior to trial that ended up settling out of court.

Walter H. Olsen, Jr. retained me on December 4, 2009 to prepare preliminary valuations on the following manufactured home parks located in Thurston County: Laurel Park, Tumwater Estates and Velkommen MHP. At the time of making this report, I have discussed the matter with plaintiff's counsel and I have reviewed the following documents:

**Federal Rule 26 (a) (2) (B), Continued**

1. 2-part profit & loss statement for Laurel Park Community LLC & 2008 Schedule E tax return *(without statement 26)*.
2. Income Statement dated 12/31/08 for Tumwater Mobile Estates
3. 2008 Schedule E tax return for Velkommen Mobile Park LLC
4. Stipulation and Protective Order
5. Due to time constraints, while I have been provided with a 2006 appraisal of Tumwater estates and other historic income and expense data for the three communities, these documents have not been reviewed in detail and were not a primary source when forming my preliminary opinion of value for these three subject properties. \

This report is **preliminary** due to a filing deadline. As such I am familiar with the case only as far as Mr. Olsen explained it to me on the phone. I would like an opportunity to review in detail the documents outlined in (5) above, as well as make a site visit to each of the communities in question and be able to interview the owner and/or on-site managers as to actual operating procedures at each of the parks.

In preparing preliminary value estimates for the identified subject properties, as an experienced real estate appraiser I would typically use one or all of the traditional valuation methods that include the Cost Approach, Income Capitalization Approach and Sales Comparison Approach. Mr. Olsen has asked me to prepare a more complete analysis of all three properties to be used at trial. Those reports will include all relevant methods of valuation, however in the interest of time this report will employ *only* the Income Capitalization Approach.

**Income Approach Methodology**--The first step in the Income Capitalization Approach is to estimate the subject's potential gross income. This process is accomplished through a comparison of the subject with rental properties in similar locations offering similar utility. Vacancy allowance and operating expenses are deducted, based on market analysis. Finally, the resulting net operating is capitalized at an appropriate supported rate. Capitalization rates are derived from recent listing, pending and closed sales of similar manufactured home parks in the market or competing markets.

For this *preliminary* report the 2008 year end operating statements have been relied on for determining income and operating expenses at each of the three parks. Comparable sales from my files are also presented for determining an appropriate and market supported cap rate.

I have completed the following descriptive information which is included as Exhibits to this report:

- Re-created the 2008 historic operating statements for each of the properties using an Excel spreadsheet, labeled *Historic Operating Statement*. I have excluded non realty and/or business income and expense items such as rent associated with "park owned" homes, mortgage payments, loan interest, repair items related to personal property, etc., which is common practice in valuing this property type. Thus, the statement includes only real property income and expenses.

<u>Federal Rule 26 (a) (2) (B), Continued</u>

- Prepared an *Income Approach Summation Table* via an Excel worksheet for each of the parks. This chart takes the income and expense information referenced above along with the appraiser's experience valuing similar properties to compile a reasonable "snapshot" of the park with the goal being an estimate of net operating income. This methodology follows that of the typical buyer or seller who is looking for a return on their real estate investment. Please note, while actual income is presented on the chart, a 3% vacancy allowance is also modeled. While many communities may experience very little or no vacancy, this allowance is intended to model the typical 5 to 10 year holding period when there will likely be some vacancy of pad sites in each community. Reserves for replacement are also included as an expense line item although they are not found to be part of the historic statements. Many owners and managers report capital improvements as part of ongoing repairs/maintenance but it is appropriate to maintain this as a separate line item for appraisal purposes.

- Prepared an *Improved Sales Summation Table* in Excel spreadsheet format. This chart gives many of the details surrounding five comparable sales located in Thurston and Pierce County that sold between June 2006 and March 2009. The chart is presented for analysis of available capitalization rates which in this group range from 5.6 to 8.1%. These sales have been either confirmed by me in the course of business or were properties actually appraised by me for lending institutions for the purpose of financing a pending sale.

  Based on a review of the sales data, a reasonable capitalization rate of **7.0 to 7.5%** is applied to the net income of the three subject properties. The estimated cap rate (range) relies on my experience valuing this property type and what I know of the three communities relative to the comparable sales presented.

On the following pages I have included the noted exhibits. For this *preliminary report* I have arrived at the following conclusions of Market Value for the subject properties.

---

**LAUREL PARK**

Fee Simple Market Value estimate effective 12/31/2008:

$3,900,000 to $4,200,000

---

**TUMWATER ESTATES**

Fee Simple Market Value estimate effective 12/31/2008:

$3,700,000 to $4,000,000

---

**VELKOMMEN MHP**

Fee Simple Market Value estimate effective 12/31/2008:

$1,400,000 to $1,500,000

---

**Federal Rule 26 (a) (2) (B), Continued**

Please note, this appraisal is intended to conform to the 2008-09 Uniform Standards of Professional Appraisal Practice (USPAP) as adopted and may be amended by the Appraisal Foundation. The subject properties are identified as follows:

❖ Laurel Park
   3244 66th Ave SW
   Tumwater, WA
   Tax Parcel #7990-00-02200
   73 pad sites situated on 11.73 acres
   No sales history in the past 3 years

❖ Tumwater Estates
   930 Trosper Rd. SW
   Tumwater, WA
   Tax Parcel #0908-00-78001
   115 pad sites situated in 22.44 acres
   No sales history in the past 3 years

❖ Velkommen MHP
   2535 70th Ave SW
   Tumwater, WA
   Tax Parcel #3156-00-00100
   39 pad sites situated in 11.13 acres
   No sales history in the past 3 years

I am prepared to testify to these opinions in deposition or at trial, if called upon to do so. If I am provided with further documentation to review, I may have additional opinions.

Jeanne-Marie Wilson
Wilson Appraisal Service, LLC
WA State License #1100250
Expires 12/12/10

000160

# REPORT EXHIBITS

**LAUREL PARK:**
Historic Operating Statement
Income Approach Summation Table

**TUMWATER ESTATES:**
Historic Operating Statement
Income Approach Summation Table

**VELKOMMEN MHP:**
Historic Operating Statement
Income Approach Summation Table

❖ **SUPPLEMENTAL REPORT INFORMATION**

❖ **ASSUMPTIONS & LIMITING CONDITIONS**

❖ **CERTIFICATION OF APPRAISAL**

**Federal Rule 26 (a) (2) (B), Continued**

## HISTORIC OPERATING STATEMENT - Laurel Park

| | 2008 Actual ** | | |
|---|---|---|---|
| # of Spaces 73 | AMOUNT | % OF EGI | $/SPACE |
| **INCOME** | | | |
| Rental Income | $416,993 | 100.0% | $5,712 |
| Miscellaneous | $0 | 0.0% | $0 |
| EGI | $416,993 | 100.0% | $5,712 |
| **EXPENSES** | | | |
| Real Estate Taxes | $24,828 | 6.0% | $340 |
| Insurance | $2,503 | 0.6% | $34 |
| Utilities | $22,836 | 5.5% | $313 |
| Professional Management | $7,426 | 1.8% | $102 |
| Salaries/Benefits | $30,361 | 7.3% | $416 |
| Maint Supplies & Repairs | $7,772 | 1.9% | $106 |
| Landscaping | $0 | 0.0% | $0 |
| Telephone/Advertising | $949 | 0.2% | $13 |
| Admin / Office Supplies | $4,375 | 1.0% | $60 |
| Professional Services | $5,172 | 1.2% | $71 |
| Miscellaneous | $590 | 0.1% | $8 |
| Reserves for Replacement | $0 | 0.0% | $0 |
| **TOTAL EXPENSES** | **$106,813** | **25.6%** | **$1,463** |
| NOI | $310,180 | | $4,249 |

*\*\* Compiled from '08 tax return, Jan - June report & Profit & Loss Stmt for July -Dec*

000162

## INCOME APPROACH SUMMATION TABLE
### Laurel Park

| RENTAL INCOME | # Units | | Market Rent | | Monthly Income | Annual Income |
|---|---|---|---|---|---|---|
| **Laurel Park** | 73 | Pad Sites | $476 | /Space/Mth. | $34,750 | $417,000 |
| Total Units | 73 | | | | | |

| | | Monthly Income | Annual Income |
|---|---|---|---|
| **GROSS RENTAL INCOME** | | $34,750 | $417,000 |
| Less: Vacancy, Concession and Credit Loss | 3.00% | ($1,043) | ($12,510) |
| **EFFECTIVE GROSS RENTAL INCOME** | | $33,708 | $404,490 |
| RV Storage | | $0 | $0 |
| **TOTAL EFFECTIVE GROSS INCOME** | | $33,708 | $404,490 |

LESS: OPERATING EXPENSES

| | Amount | Per Pad | % of EGI | |
|---|---|---|---|---|
| Real Estate Taxes | $24,820 | $340 | 6.1% | |
| Insurance | $2,555 | $35 | 0.6% | |
| Total Utilities | $22,995 | $315 | 5.7% | |
| Professional Management | $8,090 | $111 | 2.0% | |
| On Site Management Fees | $30,295 | $415 | 7.5% | |
| Maint. Supplies and Repair | $7,300 | $100 | 1.8% | |
| Telephone/Advert. | $1,095 | $15 | 0.3% | |
| Office Supplies/Admin. | $4,380 | $60 | 1.1% | |
| Professional Services | $5,110 | $70 | 1.3% | |
| Miscellaneous | $730 | $10 | 0.2% | |
| Replacement Reserves | $5,475 | $75 | 1.4% | |
| **Total** | $112,845 | $1,546 | 27.9% | ($112,845) |

| | | | |
|---|---|---|---|
| **Net Operating Income** | | | $291,645 |
| Net Income Per Space | 49978 | $3,995 | |

VALUATION OF INCOME

| Net Operating Income | = | Value | | | |
|---|---|---|---|---|---|
| Overall Rate | | | $291,645 | = | $3,888,603 |
| | | | 7.50% | | |
| | | | $291,645 | = | $4,166,360 |
| | | | 7.00% | | |

| | | |
|---|---|---|
| **VALUE RANGE VIA INCOME APPROACH, RD** | $3,900,000 to | $4,200,000 |
| **Value Per Space** | $53,425 to | $57,534 |

000163

## HISTORIC OPERATING STATEMENT - Tumwater Estates

| | 2008 Actual | | |
| | AMOUNT | % OF EGI | $/SPACE |
| --- | --- | --- | --- |
| # of Spaces          115 | | | |
| **INCOME** | | | |
| Rental Income | $444,381 | 78.7% | $3,864 |
| Reimbursed Utility Expenses | $120,579 | 21.3% | $1,049 |
| EGI | $564,960 | 100.0% | $4,913 |
| **EXPENSES** | | | |
| Real Estate Taxes | $36,124 | 6.4% | $314 |
| Insurance | $6,971 | 1.2% | $61 |
| Utilities | $134,899 | 23.9% | $1,173 |
| Professional Management | $22,235 | 3.9% | $193 |
| Salaries/Benefits | $22,608 | 4.0% | $197 |
| Maint Supplies & Repairs | $26,160 | 4.6% | $227 |
| Landscaping | $0 | 0.0% | $0 |
| Telephone/Advertising | $2,257 | 0.4% | $20 |
| Admin / Office Supplies | $3,135 | 0.6% | $27 |
| Professional Services | $4,008 | 0.7% | $35 |
| Miscellaneous | $1,564 | 0.3% | $14 |
| Reserves for Replacement | $0 | 0.0% | $0 |
| **TOTAL EXPENSES** | **$259,961** | **46.0%** | **$2,261** |
| NOI | $304,999 | | $2,652 |

000164

## INCOME APPROACH SUMMATION TABLE
### Tumwater Estates

| RENTAL INCOME | # Units | | Market Rent | | Monthly Income | Annual Income |
|---|---|---|---|---|---|---|
| **Tumwater Estates** | 115 | Pad Sites | $322 | /Space/Mth. | $37,033 | $444,400 |
| Total Units | 115 | | | | | |
| Reimbursed Utility Expenses | | | | | $10,050 | $120,600 |
| **GROSS RENTAL INCOME** | | | | | $37,033 | $565,000 |
| Less: Vacancy, Concession and Credit Loss | | | 3.00% | | ($1,111) | ($16,950) |
| **TOTAL EFFECTIVE GROSS INCOME** | | | | | **$35,922** | **$548,050** |

**LESS: OPERATING EXPENSES**

| | Amount | Per Pad | % of EGI | |
|---|---|---|---|---|
| Real Estate Taxes | $36,225 | $315 | 6.6% | |
| Insurance | $6,900 | $60 | 1.3% | |
| Total Utilities | $135,125 | $1,175 | 24.7% | |
| Professional Management | $21,922 | $191 | 4.0% | |
| On Site Management Fees | $21,922 | $191 | 4.0% | |
| Maint. Supplies and Repair | $25,875 | $225 | 4.7% | |
| Landscape Maint. | $0 | $0 | 0.0% | |
| Telephone/Advert. | $2,300 | $20 | 0.4% | |
| Office Supplies/Admin. | $2,875 | $25 | 0.5% | |
| Professional Services | $4,025 | $35 | 0.7% | |
| Miscellaneous | $1,725 | $15 | 0.3% | |
| Replacement Reserves | $8,625 | $75 | 1.6% | |
| **Total** | **$267,519** | **$2,326** | **48.8%** | **($267,519)** |

| | | |
|---|---|---|
| **Net Operating Income** | | $280,531 |
| Net Income Per Space | $2,439 | |

**VALUATION OF INCOME**

| | | | |
|---|---|---|---|
| Net Operating Income = Value | | $280,531 | = $3,740,413 |
| Overall Rate | | 7.50% | |
| | | $280,531 | = $4,007,586 |
| | | 7.00% | |

| | | | |
|---|---|---|---|
| **VALUE RANGE VIA INCOME APPROACH, RD** | $3,700,000 | to | $4,000,000 |
| **Value Per Space** | $32,174 | to | $34,783 |

## HISTORIC OPERATING STATEMENT - Velkommen MHP

| | 2008 Actual | | |
|---|---|---|---|
| **# of Spaces  39** | AMOUNT | % OF EGI | $/SPACE |
| **INCOME** | | | |
| Rental Income | $153,438 | 100.0% | $3,934 |
| Miscellaneous | $0 | 0.0% | $0 |
| EGI | $153,438 | 100.0% | $3,934 |
| **EXPENSES** | | | |
| Real Estate Taxes | $15,075 | 9.8% | $387 |
| Insurance | $6,636 | 4.3% | $170 |
| Utilities | $1,647 | 1.1% | $42 |
| Professional Management | $0 | 0.0% | $0 |
| Salaries/Benefits | $0 | 0.0% | $0 |
| Maint Supplies & Repairs | $25,370 | 16.5% | $651 |
| Landscaping | $0 | 0.0% | $0 |
| Telephone/Advertising | $0 | 0.0% | $0 |
| Admin / Office Supplies | $1,793 | 1.2% | $46 |
| Professional Services | $490 | 0.3% | $13 |
| Miscellaneous | $1,210 | 0.8% | $31 |
| Reserves for Replacement | $0 | 0.0% | $0 |
| **TOTAL EXPENSES** | **$52,221** | **34.0%** | **$1,339** |
| NOI | $101,217 | | $2,595 |

## INCOME APPROACH SUMMATION TABLE
### Velkommen MHP

**RENTAL INCOME**

| | # Units | Market Rent | | Monthly Income | Annual Income |
|---|---|---|---|---|---|
| **Velkommen MHP** | **39** | $328 | /Space/Mth. | $12,792 | $153,500 |
| Total Units | 39 | | | | |

| | | | | Monthly Income | Annual Income |
|---|---|---|---|---|---|
| **GROSS RENTAL INCOME** | | | | $12,792 | $153,500 |
| Less: Vacancy, Concession and Credit Loss | | 3.00% | | ($384) | ($4,605) |
| **EFFECTIVE GROSS RENTAL INCOME** | | | | $12,408 | $148,895 |
| Miscellaneus Income | | | | $0 | $0 |
| **TOTAL EFFECTIVE GROSS INCOME** | | | | $12,408 | $148,895 |

**LESS: OPERATING EXPENSES**

| | Amount | Per Pad | % of EGI | |
|---|---|---|---|---|
| Real Estate Taxes | $15,093 | $387 | 10.1% | |
| Insurance | $6,630 | $170 | 4.5% | |
| Total Utilities | $1,638 | $42 | 1.1% | |
| Professional Management | $0 | $0 | 0.0% | |
| On Site Management Fees | $3,900 | $100 | 2.6% | |
| Maint. Supplies and Repair | $9,750 | $250 | 6.5% | |
| Landscape Maint. | $0 | $0 | 0.0% | |
| Telephone/Advert. | $0 | $0 | 0.0% | |
| Office Supplies/Admin. | $1,755 | $45 | 1.2% | |
| Professional Services | $585 | $15 | 0.4% | |
| Miscellaneous | $1,170 | $30 | 0.8% | |
| Replacement Reserves | $2,925 | $75 | 2.0% | |
| **Total** | $43,446 | $1,114 | 29.2% | ($43,446) |

| | | | | |
|---|---|---|---|---|
| **Net Operating Income** | | | | $105,449 |
| Net Income Per Space | | $2,704 | | |

**VALUATION OF INCOME**

| | | | |
|---|---|---|---|
| $\underline{\text{Net Operating Income}}$ = Value | $\underline{\$105,449}$ | = | $1,405,987 |
| Overall Rate | 7.50% | | |
| | $\underline{\$105,449}$ | = | $1,506,414 |
| | 7.00% | | |

| | | | |
|---|---|---|---|
| **VALUE RANGE VIA INCOME APPROACH, RD** | $1,400,000 | to | $1,500,000 |
| **Value Per Space** | $35,897 | to | $38,462 |

## SUPPLEMENTAL REPORT INFORMATION

### Scope of Work

This appraisal is presented in a Summary Appraisal format and is intended to conform with USPAP Standards 2-2 (b).   However, at the request of the client the report is formatted to conform to Federal Rule 26 (a) (2) (B) as the report will be filed with the court.  *Due to time constraints, the client requested that at this juncture the appraiser only consider the income approach to value.* This limiting of the typical course of valuation may compromise the value conclusion.

### Purpose, Intended Use, and Users of the Appraisal

The purpose of this appraisal is to estimate the As-Is, Fee Simple Market Value of the identified manufactured home parks described herein.   The intended use is for compliance with filing of Federal Rule 26 (a) (2) (B) in the cause MHCW et al v. City of Tumwater.  Intended users include plaintiff's counsel.

### Value Definitions

**Market Value -** The following definition has been adopted by the Appraisal Standards Board of The Appraisal Foundation and the Appraisal Institute.

**Market value** means the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- a.  buyer and seller are typically motivated;
- b.  both parties are well informed or well advised, and acting in what they consider their best interests;
- c.  a reasonable time is allowed for exposure in the open market;
- d.  payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
- e.  the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.[1]

### Value Scenarios Defined

**As–Is Market Value** refers to the scenario under which a property is evaluated in the condition observed upon inspection as then existing under legal allowed uses without hypothetical conditions, assumptions or qualifications as of the relevant date

---

[1] Office of Comptroller of the Currency (OCC), Title 12 of the Code of Federal Regulation, Part 34, Subpart C - Appraisals, 34.42 (g); Office of Thrift Supervision (OTS), 12 CFR 564.2 (g); This is also compatible with the RTC, FDIC, FRS and NCUA definitions of market value.

000168

Supplemental Report Information, Continued

## Property Rights Appraised

The property rights appraised constitute the fee simple interest.

## Subject Property Inspection

The subject property manufactured home parks were not physically inspected for this preliminary report.   However, I have visited each of these properties during prior assignments when identifying competitive market inventory and have valued many similar manufactured home parks in the Thurston county market.

## Appraisal Development and Reporting Process

Preparation of this appraisal did not include an inspection of the subject property but did include a review of assessor's maps and review of 2008 income and expense information as well as review of current and historic taxes and assessments.   It also included application of the income approach to value to arrive at an indication of value for each of the subject properties.

## Sources of Information

The relevant market data was obtained from the client, Walter Olsen, Jr. as well comparable sales retained in my files.

## Disclosure of Competency

I am aware of the competency provision of USPAP and the author of this report meets the standards.

## Exposure Time

Exposure time is defined as "the estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective opinion based on an analysis of past events assuming a competitive and open market."

Reasonable exposure time is impacted by the aggressiveness and effectiveness of a property's exposure to market participants, availability and cost of financing, and demand for similar investments.

Exposure time is best established upon the experience of recent comparable sales and discussions with market participants. Comparable market sales indicate exposure times of less than one year.  The location, physical characteristics and available financing are important factors relative to the marketing period.  There is ready investor demand in the Lacey / Thurston County area for manufactured home parks, assuming realistic pricing by sellers.  However, financing has become more difficult of late, as a result of the recession and financial crisis.

## ASSUMPTIONS AND LIMITING CONDITIONS

This report is subject to the following assumptions and limiting conditions:

**Extraordinary Assumptions--None**

**Hypothetical Conditions— None**

**General Assumptions and Conditions**

I assume no responsibility for matters legal in character, nor do I render any opinion as to title, which is assumed to be marketable. All existing liens, encumbrances, and assessments have been disregarded, unless otherwise noted, and the property is appraised as though free and clear, under responsible ownership, and competent management.

The exhibits in this report are included to assist the reader in visualizing the property. I have made no survey of the property and assume no responsibility in connection with such matters.

Unless otherwise noted herein, it is assumed that there are no encroachments, zoning, or restrictive violations existing in the subject property.

The appraisers assume no responsibility for determining if the property requires environmental approval by the appropriate governing agencies, nor if it is in violation thereof, unless otherwise noted herein.

Information presented in this report has been obtained from reliable sources, and it is assumed that the information is accurate.

This report shall be used for its intended purpose only, and by the party to whom it is addressed. Possession of this report does not include the right of publication.

The appraisers may not be required to give testimony or to appear in court by reason of this appraisal, with reference to the property in question, unless prior arrangements have been made therefore.

The statements of value and all conclusions shall apply as of the dates shown herein.

The appraiser has no present or contemplated future interest in the property which is not specifically disclosed in this report.

Neither all, nor any part of, the contents of this report shall be conveyed to the public through advertising, public relations, news, sales, or other media without the written consent or approval of the authors. This applies particularly to value conclusions and to the identity of the appraisers and the firm with which he or she is connected.

This report must be used in its entirety. Reliance on any portion of the report independent of others, may lead the reader to erroneous conclusions regarding the property values. No portion of the report stands alone without approval from the authors.

The valuation stated herein assumes professional management and operation of the buildings throughout the lifetime of the improvements, with an adequate maintenance and repair program.

Assumptions & Limiting Conditions (continued)

The liability of Wilson Appraisal Service, LLC, its principals, agents, and employees is limited to the client. Further, there is no accountability, obligation, or liability to any third party. If this report is placed in the hands of anyone other than the client, the client shall make such party aware of all limiting conditions and assumptions of the assignment and related discussions. The appraisers are in no way responsible for any costs incurred to discover or correct any deficiency in the property.

The appraisers are not qualified to detect the presence of toxic or hazardous substances or materials which may influence or be associated with the property or any adjacent properties, has made no investigation or analysis as to the presence of such materials, and expressly disclaims any duty to note the degree of fault. Wilson Appraisal Service, LLC and its principals, agents, employees, shall not be liable for any costs, expenses, assessments, or penalties, or diminution in value, property damage, or personal injury (including death) resulting from or otherwise attributable to toxic or hazardous substances or materials, including without limitation hazardous waste, asbestos material, formaldehyde, or any smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids, solids or gasses, waste materials or other irritants, contaminants or pollutants.

The appraiser assumes no responsibility for determining if the subject property complies with the Americans with Disabilities Act (ADA). Wilson Appraisal Service, LLC, its principals, agents, and employees, shall not be liable for any costs, expenses, assessments, penalties or diminution in value resulting from non-compliance. This appraisal assumes that the subject meets an acceptable level of compliance with ADA standards; if the subject is not in compliance, the eventual renovation costs and/or penalties would negatively impact the present value of the subject. If the magnitude and time of the cost were known today, they would be reduced from the reported value conclusion.

An on-site inspection of the subject property was not conducted. It is unknown if there is evidence of asbestos materials on-site. A Phase 1 Environmental Assessment was not provided for this analysis. This analysis assumes that no asbestos or other hazardous materials are stored or found in or on the subject property. If evidence of hazardous materials of any kind occur, the reader should seek qualified professional assistance. If hazardous materials are discovered and if future market conditions indicate an impact on value and increased perceived risk, a revision of the concluded values may be necessary.

A detailed soils study was not provided for this analysis. The subject's soils and sub-soil conditions are assumed to be suitable based upon a visual inspection, which did not indicate evidence of excessive settling or unstable soils. No certification is made regarding the stability or suitability of the soil or sub-soil conditions.

This analysis assumes that the financial information provided for this appraisal, including rent rolls and historical income and expense statements, accurately reflect the current and historical operations of the subject property.

## CERTIFICATION OF APPRAISAL

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is the signers' personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- The signer of this report has no present or prospective interest in the property that is the subject of this report, and no personal interest with respect to the parties involved.

- The signer has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- The engagement in this assignment was not contingent upon developing or reporting predetermined results.

- The compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- The analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the *Code of Professional Ethics* and *Standards of Professional Appraisal Practice* of the Appraisal Institute, and the *Uniform Standards of Professional Appraisal Practice*, as set forth by the Appraisal Standards Board of the Appraisal Foundation.

- Jeanne-Marie Wilson has not made a personal inspection of the properties that are the subject of this report.

The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

Jeanne-Marie Wilson                    December 7, 2009
Certified General Real Estate Appraiser
State of Washington License #1100250

000172

# ADDENDA

❖ Resume

❖ Appraisal Institute Education Transcript

❖ List of Manufactured Home Parks Appraised

❖ State License

## PROFESSIONAL QUALIFICATIONS - JEANNE-MARIE WILSON

jmwilson@wilsonappraisal.com
www.wilsonappraisal.com

**LICENSES AND CERTIFICATES**

State of Washington Certified General Appraiser, Certification No. 1100250.　　　Expiration 12/12/10

**EMPLOYMENT HISTORY**

**WILSON APPRAISAL SERVICE, LLC**　　　　　　　　　　February, 2001 - Present
2962 Limited Lane N.W., Suite A
Olympia, Washington 98502
360.867.0300 PH.
360.867.0303 FX
360.791.2240 CELL

Principal & commercial analyst specializing in all types of commercial property valuation.

**PGP VALUATION, INC. (Formerly Palmer, Groth & Pietka).**　　1991 - January, 2001
1325 4th Avenue, Suite 500
Seattle, Washington 98101

Senior appraiser with the PGP Valuation.  Specialized in multi-family and hospitality appraisal.

**GEOGRAPHIC AREA SERVED**

State of Washington, focusing on counties in the South Puget Sound region

**PROFESSIONAL AFFILIATIONS/DESIGNATIONS**

Associate Member, Appraisal Institute
Thurston County Chamber of Commerce

**APPRAISAL AND RELATED EDUCATION**

University of Washington, Seattle, Washington, 1987
Bachelor of Arts degree

**Appraisal Courses**

Principles of Real Estate Appraisal
Standards of Professional Appraisal Practice
Real Estate Law
Real Estate Appraisal Applications
Appraising Small Income Properties (2-4 units)
Principles of Income Capitalization
Univ. of WA Extension- Certificate Program-Commercial R.E., Property Development
Technical Inspection of Real Estate
Appraisal Institute - USPAP, Part A, B & C
Appraisal Institute - Basic Income Capitalization
Appraisal Institute - Advanced Income Capitalization
Appraisal Institute - Advanced Sales Comparison & Cost Approaches
Appraisal Institute - General Demonstration Report Writing Seminar
Appraisal Institute - South Sound Subdivision Seminar
Appraisal Institute - Highest & Best Use & Market Analysis
Appraisal Institute – Report Writing & Valuation Analysis
Appraisal Institute – 2008 Fall Real Estate Conference
Appraisal Institute – "Webinar", Appraising Distressed Commercial Real Estate
Appraisal Institute – 2009 Fall Real Estate Conference

**AREAS OF SPECIALTY:**  Experienced in all areas of commercial real estate, including vacant land, subdivision analysis, general commercial, retail, professional office, light industrial, multi-family apartments, limited service hotels and manufactured home communities.

## MANUFACTURED HOME PARK APPRAISALS *

| | Park Name | Total | | Park Name | Total |
|---|---|---|---|---|---|
| | **KING COUNTY** | | | **THURSTON COUNTY** | |
| 1 | Tip Top Trailer Ct | | 1 | Mountain Greens | |
| 2 | Pantera Lago | | 2 | South Fork | |
| 3 | Park Place | | 3 | Eagles Landing | |
| 4 | Mountain Meadows | | 4 | Tony's Trailer Ct | |
| 5 | Charwood MHP | | 5 | 3 C's MHP | |
| 6 | Auburn Hills | | 6 | Edgelake MHP | |
| 7 | Water Gardens | | 7 | Prairie Park | |
| 8 | Parkwood Lane | | 8 | Lilly Rd | |
| 9 | Bonel Mobile Manor | | 9 | Rainier Estates | |
| 10 | Clark's Glen | | 10 | Tanglewood | |
| 11 | Auburn Green | | 11 | Klahowya Est | |
| 12 | Sound Vista | | 12 | Velkommen | |
| 13 | Valley View | | 13 | Sunrise Vista | |
| 14 | Cedar Grove | | 14 | Alpine Mobile Est | |
| 15 | Soos Creek | | 15 | Coach Post MHP | |
| 16 | Benson Village | | 16 | Thunderbird Village | |
| 17 | Lauralwood | | | SubTotal | 16 |
| 18 | College Place | | | **EASTERN WA COUNTIES** | |
| 19 | Canyon Terrace | | 1 | Grove Terrace | |
| 20 | Valley View MHP | | 2 | Riverview | |
| 21 | Kloshe Ilahee | | 3 | Whispering Winds | |
| 22 | Dittmer Shim | | 4 | Sundance | |
| | SubTotal | 22 | 5 | Bridgewater Est | |
| | **PIERCE COUNTY** | | 6 | Pathfinder | |
| 1 | Cherrywood | | 7 | Diamond MHP | |
| 2 | Mountain View | | 8 | Desert Oasis | |
| 3 | Fir Lane Valley | | 9 | Columbia Village | |
| 4 | Azalea Gardens | | 10 | Prairie Park | |
| 5 | Woodbrook MHP | | 11 | Columbia Mobile Village | |
| 6 | Village Green | | 12 | Desert Pines | |
| 7 | Golden Horseshoe | | | SubTotal | 12 |
| 8 | Canyon Meadows | | | **LEWIS COUNTY** | |
| 9 | Twin Oaks | | 1 | Jackson MHP | |
| 10 | Park Place | | 2 | Coffee Creek Est | |
| 11 | Country West | | 3 | Centralia MHP | |
| 12 | Golden Village | | 4 | Society Place | |
| 13 | Fir Acres | | | SubTotal | 4 |
| 14 | Summerville Est | | | **SKAGIT COUNTY** | |
| 15 | Acorn Meadows | | 1 | Country Court | |
| 16 | Sunrise Terrace | | 2 | Riverbend RV | |
| 17 | Karwan Village | | 3 | Little Mtn Est | |
| 18 | The Buttes | | | SubTotal | 3 |
| | SubTotal | 18 | | | |

**Total MHP Appraisals    75**

*\* Completed by Jeanne-Marie Wilson*

## STATE OF WASHINGTON

DEPARTMENT OF LICENSING -- BUSINESS AND PROFESSIONS DIVISION
THIS CERTIFIES THAT THE PERSON NAMED HEREON IS AUTHORIZED, AS PROVIDED BY LAW, AS A
CERTIFIED GENERAL REAL ESTATE APPRAISER

JEANNE-MARIE WILSON
2962 LIMITED LANE NW
#A
OLYMPIA  WA  98502

| Cert/Lic No. | Issued Date | Expiration Date | |
|---|---|---|---|
| 1100250 | 02/17/1995 | 12/12/2010 | *Elizabeth A. Luce* |
| | | | Director |

PL-630-159 (R/2/04)

# EXHIBIT C

000177



**Wilson Appraisal Service, L.L.C.**

2962 Limited Lane N.W., Suite A
Olympia, WA 98502
360.867.0300

February 7, 2010

Walt Olsen
Olsen Law Firm

RE:   Review of Appraisal completed by Stephen Shapiro, MAI, File #10004

Mr. Olsen,

As requested I have reviewed the appraisal completed by the above named appraiser under his reference number 10004.   You are identified as the client and intended user of this review report.  The intended use is for help with preparing for Mr. Shapiro's deposition in the MHCW et al. V. City of Tumwater, No. C09-05312BHS.  The purpose of the review is to identify substantial errors of omission or commission that would have a significant effect on the credibility of the assignment results.   I reviewed the report for methods inconsistent with typical appraisal practice and that may have led to incorrect or faulty conclusions on the part of the original appraiser.  The effective date of this review is February 5, 2010.

Mr. Shapiro prepared Summary Appraisal Reports for the following three properties:  Tumwater Estates, Laurel Park and Velkommen Park.  These three manufactured home communities are located in Tumwater, Washington and have been stable, income producing properties for many years.  The purpose of his appraisal work was "to estimate the market value of the subject property both before and after enactment of a zoning change by the City of Tumwater on March 23, 2009."  His report is dated January 6, 2010 but the effective date of value is stated as March 23, 2009, which is the date when the zoning change was approved by the City of Tumwater.

My scope of work included reading Mr. Shapiro's reports.  I visited each of the subject properties and viewed the existing manufactured home park improvements and also drove through the surrounding neighborhoods, being mindful of recent or proposed construction projects.  I am very familiar with the Thurston County market and recognized many of the land sales the appraiser presented.  As part of the review process I researched each individually and confirmed the sale through at least two public record sources.  I did not call or confirm these sales with either buyer / seller but may have done so under prior assignments in my office.  I did not further research or confirm any of the improved sales or capitalization rate indicators presented in the report but am familiar with many of them, having used them in my practice over the last several years.

I have written up individual reviews of each appraisal but please note several similarities between Laurel Park and Velkommen as it relates to value conclusions in the "before" as vacant scenario and again between Tumwater Estates and Velkommen in the "after" as improved valuation via Income Capitalization and Sales Comparison.

000178

**Mr. Walt Olsen**

If any questions arise concerning this report, please contact the undersigned.

Sincerely,

**WILSON APPRAISAL SERVICE, LLC**

Jeanne-Marie Wilson
WA State Appraiser Certification
No. 1100250
Expires 12/12/2010

*JMW/jmw*
*09-157 – Shapiro Review*

000179

**Shapiro Review – "Laurel Park"**

The presentation is generally logical, well written and consistent with other Summary Appraisal reports I have read.  However, there are areas I noted that could be misleading and / or don't necessarily represent typical valuation methods or processes.  Starting with the **Laurel Park** appraisal I would make the following comments:

- On page 12, paragraph after the table, the author is totaling new apartment units added to the market since the late 1960s and includes 243 apartments constructed in 2007. However, he does not include inventory added in 2008 of another 222 units (Hearthstone II & Tabula Rasa).  This would change the total to 1,989 units over almost 40 years, or an average of 50 units per year, not 45 as noted by the author.  Not a significant difference, but this brings into question the tallying of inventory.

- Although not referenced by the author, I reviewed *Dupre + Scott Apartment Advisors* October 2008 Vacancy Report that shows Tumwater as having 2,222 units in projects with 20 units or more which would indicate 55 units per year and 10 more than the appraiser noted.

- The table on page 13 showing potential future inventory is not sourced and the last known date of activity (with the city) should be noted so the reader could determine if the project was likely to be developed during the next business cycle.  Many times developments will go through the permitting process but for a variety of different reasons don't ever get built.  The 1,048 units noted from eight different projects may in fact be far fewer, potentially changing the appraiser's conclusion that there is not adequate demand for new multi-family housing and thus the subject's continued use provides a greater return and should remain.

- Briggs Village is noted as being in Tumwater but is actually in the city limits of Olympia.  This reduces the total unit count by 286 to 762 or only 27% of the projected demand.  The locations of the other projects are not known and may further reduce the 1,048 unit number stated on the table, page 13.

- I reviewed the September 2008 *Apartment Development Report* produced by Dupre + Scott Apartment Advisors and they do not show *any potential inventory* in Tumwater.  Their report includes projects that are finished, under construction, planned, existing or proposed condominium and hotel, retirement or tax credit projects.  This would directly conflict with the appraiser's data and put in question his conclusion of highest and best use in the "before" situation.

- Vacancy rates and absorption rates of the newest multi-family inventory was not discussed. The Dupre + Scott *Apartment Vacancy Report* for Fall 2008 shows the following inventory and vacancy rate trends (see table below).  Absorption of new product should at a minimum be discussed to show whether or not new inventory is leasing up at a reasonable pace consistent with developer expectations.

| Area | Inventory (20+ Unit Bldgs) | Vacancy Rate Fall '08 | Vacancy Rate Spring '08 | 5-Year Avg Vacancy | Avg Rent |
|------|------|------|------|------|------|
| **Tumwater** | **2,222 Units** | **5.2%** | **3.3%** | **5.2%** | **$763** |
| Lacey | 3,484 Units | 3.3% | 3.9% | 3.9% | $807 |
| Olympia | 4,952 Units | 2.5% | 2.6% | 4.0% | $780 |
| Thurston Cty | 10,658 Units | 3.4% | 3.2% | 4.3% | $810 |

000180

**Shapiro Review – "Laurel Park" (continued)**

- On page 17 the appraiser presents a chart entitled *"Single Family Residential Land Sale Comparisons"*. He is presenting comparable data to arrive at an appropriate unit value conclusion for the subject as raw land with the potential for either 24 lots (half acre with private septic systems) or possibly 70 lots, assuming sewer is extended to the site. The appraiser does not provide any individual discussion of the comparable sales. Further, there are a number of inconsistencies with this data set, summarized as follows:

  o The appraiser includes closed sales occurring *after* the effective date of his valuation (March 23, 2009). Sales 5 – 8 should not be considered as relevant comparables in the analysis.

  o Comparable 10 incorrectly puts the unit count at 19. The warranty deed shows title transferred for 6 lots which would revise the $ per unit upward to $90,000 from that noted on the original chart of $33,333.

  o Comparable sales 4 – 10 all represent *finished lots* that are typically purchased by a builder who would then begin vertical construction on a home. It is not appropriate to use finished lot sales when trying to establish the value of the subject "as if vacant" under the prior MFM zoning. He is comparing apples to oranges and is implying that vacant land with no entitlements or infrastructure improvements is equal to that of a finished lot with all entitlements in place, public utilities stubbed to the site and paved ingress/egress to the plat.

  o Sale 9 was a distressed transaction that included not only 27 finished lots but also no less than six partially built single-family homes. The sale is not a relevant comparable for the subject and should have been excluded.

  o Sale 3 was a "future development tract" within the Highlands at Somerset Hill development. The price included entitlements running with the land. However, no discussion is given as to the value associated with these entitlements compared to vacant "raw" land.

  If sales 4 – 10 are excluded (because they represent finished lots and are not comparable to the subject as raw land), then the appraiser is left with Sales 1 – 3 or a range of $11,667 to $43,478/unit. No. 3 has some value to the entitled land but there is no discussion of this impact or associated downward adjustment to the subject as raw land. In summary, using this narrow data set it is very unlikely the appraiser would have concluded his original value of $45,000 to $50,000/unit for the subject under either scenario, with 24 or 70 residential lots. The data was misleading and brings into question the appraiser's final value conclusion for the subject in the "before" scenario with MFM zoning.

- On page 20 the appraiser presents a chart entitled *"Multi-Family Land Sale Comparisons"*. He is presenting comparable data to arrive at an appropriate unit value conclusion for the subject as raw land with the potential for 140 apartment units, assuming sewer is extended to the site. The appraiser does not provide any individual discussion of the comparable sales. Further, there are a number of inconsistencies with this data set, summarized as follows:

  o Sale 2 transferred in Sept 2009, after the March 2009 effective date of the appraisal. Further, no discussion is given as to the value associated with the comparable's "entitled" status. Prior to sale the property had been used as a mobile home park and also had older stick built improvements on the site. No discussion is made for adjusting the cost of vacating the prior use and demolishing the old

**Shapiro Review – "Laurel Park" (continued)**

improvements to make way for the proposed 56-unit apartment. At a minimum the date of sale should exclude the comparable from the data set.

- On page 24 the appraiser presents eight capitalization rate comparables located throughout the Puget Sound region, from Spanaway to Bellingham but none from Thurston County. On page 22 he presents nine improved sales to estimate the value of the subject under continued use as a mobile home park, all are located in Thurston County. Why did he not show the accompanying cap rates for the nine improved sales on Page 22? In my opinion they would be very relevant indicators for concluding a cap rate for the subject. The sales on page 24 are relevant but provide *secondary support* in relation to sales that have taken place in the immediate market.

- Again, on both charts (pages 22, 24) several sales and cap rate indicators are included with dates *after* the appraiser's March 23, 2009 effective date of value.

- On page 25 the appraiser presents a *Stabilized Operating Statement – At Market Rent* for Laurel Park. Absolutely no discussion or reference is made to his conclusions of vacancy rate, variable and fixed operating expenses. Typically three years of detailed income and expense operating statements are reviewed before estimating stabilized operations. A discussion of the expense conclusion on a per unit and percent of effective gross income is also typically discussed in relation to subject historic and comparables in the market place. Some discussion is necessary to inform the reader of the source of these conclusions and how they relate to the surrounding market.

<u>Conclusion</u>

I believe the value conclusion of the property "as vacant" in the before situation is based on inappropriate comparable data. I am also not convinced that the Market Analysis leads to a sound conclusion of the subject's highest and best use "as vacant" in the before condition.

000182

## Shapiro Review – "Tumwater Estates"

The presentation is generally logical, well written and consistent with other Summary Appraisal reports I have read. The appraiser uses the same format for all three reports so much of the comparable data presented is the same. However, there are areas I noted that could be misleading and / or don't necessarily represent typical valuation methods or processes. The following includes review comments for **Tumwater Estates**:

- Same comment from Laurel Park report, regarding table on page 14 of Tumwater Estates. In the paragraph after the table, the author is totaling new apartment units added to the market since the late 1960s and includes 243 apartments constructed in 2007. However, he does not include inventory added in 2008 of another 222 units (Hearthstone II & Tabula Rasa). This would change the total to 1,989 units over almost 40 years, or an average of 50 units per year, not 45 as noted by the author. Not a significant difference, but this brings into question the tallying of inventory.

- Although not referenced by the author, I reviewed *Dupre + Scott Apartment Advisors* October 2008 Vacancy Report that shows Tumwater as having 2,222 units in projects with 20 units or more which would indicate 55 units per year and 10 more than the appraiser noted.

- The table shows Briggs Village as being in Tumwater but it is actually in the city limits of Olympia. This reduces the total unit count in the pipeline by 286 to 762 or only 27% of the projected demand. The locations of the other projects are not known and may further reduce the number of units in the pipeline as stated on the table.

- The table on page 13 showing potential future inventory is not sourced and the last known date of activity (with the city) should be noted so the reader could determine if the project was likely to be developed during the next business cycle. Many times developments will go through the permitting process but for a variety of different reasons don't ever get built. The 1,048 units noted from eight different projects may in fact be far fewer, potentially changing the appraiser's conclusion that there is not adequate demand for new multi-family housing and thus the subject's continued use provides a greater return and should remain.

- I reviewed the September 2008 *Apartment Development Report* produced by Dupre + Scott Apartment Advisors and they do not show *any potential inventory* in Tumwater. Their report includes projects that are finished, under construction, planned, existing or proposed condominium and hotel, retirement or tax credit projects. They show two projects recently completed in Tumwater but none in the pipeline. This would directly conflict with the appraiser's data and put in question his conclusion of highest and best use in the "before" situation.

- Vacancy rates and absorption rates of the newest multi-family inventory was not discussed. The Dupre + Scott *Apartment Vacancy Report* for Fall 2008 shows the following inventory and vacancy rate trends (see table below). Absorption of new product should at a minimum be discussed to show whether or not new inventory is leasing up at a reasonable pace consistent with developer expectations.

000183

**Shapiro Review – "Tumwater Estates" (continued)**

| Area | Inventory (20+ Unit Bldgs) | Vacancy Rate Fall '08 | Vacancy Rate Spring '08 | 5-Year Avg Vacancy | Avg Rent |
|---|---|---|---|---|---|
| *Tumwater* | *2,222 Units* | *5.2%* | *3.3%* | *5.2%* | *$763* |
| Lacey | 3,484 Units | 3.3% | 3.9% | 3.9% | $807 |
| Olympia | 4,952 Units | 2.5% | 2.6% | 4.0% | $780 |
| Thurston Cty | 10,658 Units | 3.4% | 3.2% | 4.3% | $810 |

- On page 18 the appraiser presents a chart entitled *"Multi-Family Land Sale Comparisons"*. He is presenting comparable data to arrive at an appropriate unit value conclusion for the subject as raw land with the potential for 231 apartment units, assuming the subject site has 11 acres usable land.  The appraiser does not provide any individual discussion of the comparable sales.  Further, there are a number of inconsistencies with this data set:

    o  Sale 2 transferred in Sept 2009, after the March 2009 effective date of the appraisal. Further, no discussion is given as to the value associated with the comparable's "entitled" status.  Prior to sale the property had been used as a mobile home park and also had older stick built improvements on the site.  No discussion is made for adjusting the cost of vacating the prior use and demolishing the old improvements to make way for the proposed 56-unit apartment.  At a minimum the date of sale should exclude the comparable from the data set.

- On page 22 the appraiser presents eight capitalization rate comparables located throughout the Puget Sound region, from Spanaway to Bellingham but none from Thurston County.  On page 20 he presents nine improved sales to estimate the value of the subject under continued use as a mobile home park, all are located in Thurston County.  Why did he not show the accompanying cap rates for the nine improved sales on Page 22?  In my opinion they would be very relevant indicators for concluding a cap rate for the subject.  The cap rate sales on page 22 are relevant but provide *secondary support* in relation to sales that have taken place in the immediate market.

- Again, on both charts (pages 20, 22) several sales and cap rate indicators are included with dates *after* the March 23, 2009 effective date of value.

- Regarding the value in the "before" condition, As Improved via comparable sales; no individual discussion is made of the comparable sales or bracketing the subject within the range of unit values between $22,619 and $77,260/space.  The appraiser concluded $55,000/space, well above the median ($34,000/space) and average ($41,600/space) of the data set but without further explanation or comparison of the subject in relation to the nine sales.  *This unit value conclusion is not well supported and likely inflates the value of the subject via the Sales Comparison Approach.*

- On page 23 the appraiser presents a *Stabilized Operating Statement – At Market Rent* for Tumwater Estates.  The concluded market rent of $425 is **a full $100 higher per pad than actual rents in the park** ($328/month).  However, there is no discussion or reconciliation between concluded market rent and actual rent.  Will the increase to market result in increased vacancy at the subject?  How quickly can ownership pass through a $100 per pad rent increase to a tenant base of 55+ individuals?  There are laws surrounding proper notice

## Shapiro Review – "Tumwater Estates" (continued)

of rental increases and if tenants have existing leases then they are exempt until the lease expires.

- Finally, if market rent is used in the analysis, the resulting value should be labeled "Prospective Market Value" because it reflects a future event when all tenants are paying "market" and not an "as is" value, which refers to the scenario under which a property is evaluated in the condition observed upon inspection as then existing under legal allowed uses without hypothetical conditions, assumptions or qualifications as of the relevant date. The appraiser assumes rents are at market when in fact they are not.  There are necessary deductions / discounts to arrive at the "as is" value.

- Absolutely no discussion or reference is made to conclusions of vacancy rate, variable and fixed operating expenses.  Typically three years of detailed income and expense operating statements are reviewed before estimating stabilized operations.  A discussion of the expense conclusion on a per unit and percent of effective gross income is also typically discussed in relation to comparables in the market place as well as historic operations at the subject.  Some discussion is necessary to inform the reader of the source of these conclusions and how they relate to the surrounding market.

### Conclusion

I believe the value conclusion for the property in the "after" condition as improved via the Sales Comparison Approach and Income Capitalization Approach are inflated and not representative of the property "as is".  This inflated value, when compared to the value in the before situation "as vacant" clearly shows no impact from the zone change.  I believe the value in the before "as vacant" and the after "as improved" are likely much more similar to each other, which could lead the appraiser to conclude a different highest and best use conclusion for the property and likely suggest there in fact is damage to the property value as a result of the zone change.

000199

**Shapiro Review – "Velkommen"**

The presentation is generally logical, well written and consistent with other Summary Appraisal reports I have read. However, there are areas I noted that could be misleading and / or don't necessarily represent typical valuation methods or processes. Regarding the *Velkommen* appraisal I would make the following comments:

- On page 13, paragraph after the table, the author is totaling new apartment units added to the market since the late 1960s and includes 243 apartments constructed in 2007. However, he does not include inventory added in 2008 of another 222 units (Hearthstone II & Tabula Rasa). This would change the total to 1,989 units over almost 40 years, or an average of 50 units per year, not 45 as noted by the author. Not a significant difference, but this brings into question the tallying of inventory.

- Although not referenced by the author, I reviewed Dupre + Scott Apartment Advisors *October 2008 Vacancy Report* that shows Tumwater as having 2,222 units in projects with 20 units or more which would indicate 55 units per year and 10 more than the appraiser noted.

- The table shows Briggs Village as being in Tumwater but it is actually in the city limits of Olympia. This reduces the total unit count in the pipeline by 286 to 762 or only 27% of the projected demand. The locations of the other projects are not known and may further reduce the number of units in the pipeline as stated on the table.

- Further, the table showing potential future inventory is not sourced and the last known date of activity (with the city) should be noted so the reader could determine if the project was likely to be developed during the next business cycle. Many times developments will go through the permitting process but for a variety of different reasons don't ever get built. The 1,048 units noted from eight different projects may in fact be far fewer, potentially changing the appraiser's conclusion that there is not adequate demand for new multi-family housing and thus the subject's continued use provides a greater return and should remain.

- I reviewed the September 2008 *Apartment Development Report* produced by Dupre + Scott Apartment Advisors and they do not show *any potential inventory* in Tumwater. Their report includes projects that are finished, under construction, planned, existing or proposed condominium and hotel, retirement or tax credit projects. This would directly conflict with the appraiser's data and put in question his conclusion of highest and best use in the "before" situation.

- Vacancy rates and absorption rates of the newest multi-family inventory was not discussed. The Dupre + Scott *Apartment Vacancy Report* for Fall 2008 shows the following inventory and vacancy rate trends (see table below). Absorption of new product should at a minimum be discussed to show whether or not new inventory is leasing up at a reasonable pace consistent with developer expectations.

| Area | Inventory (20+ Unit Bldgs) | Vacancy Rate Fall '08 | Vacancy Rate Spring '08 | 5-Year Avg Vacancy | Avg Rent |
|------|---------------------------|----------------------|-------------------------|--------------------|----------|
| *Tumwater* | *2,222 Units* | *5.2%* | *3.3%* | *5.2%* | *$763* |
| Lacey | 3,484 Units | 3.3% | 3.9% | 3.9% | $807 |
| Olympia | 4,952 Units | 2.5% | 2.6% | 4.0% | $780 |
| Thurston Cty | 10,658 Units | 3.4% | 3.2% | 4.3% | $810 |

000186

**Shapiro Review – "Velkommen" (continued)**

- On page 17 the appraiser presents a chart entitled *"Single Family Residential Land Sale Comparisons".* He is presenting comparable data to arrive at an appropriate unit value conclusion for the subject as raw land with the potential for either 22 lots (half acre with private septic systems) or possibly 66 lots, assuming sewer is extended to the site. The appraiser does not provide any individual discussion of the comparable sales. Further, there are a number of inconsistencies with this data set, summarized as follows:

  o The appraiser includes closed sales occurring *after* the effective date of his valuation (March 23, 2009). Sales 5 – 8 should not be considered as relevant comparables in the analysis.

  o Comparable 10 incorrectly puts the unit count at 19. The warranty deed shows title transferred for 6 lots which would revise the $ per unit upward to $90,000 from that noted on the original chart of $33,333.

  o Comparable sales 4 – 10 all represent *finished lots* that are typically purchased by a builder who would then begin vertical construction on a home. It is not appropriate to use finished lot sales when trying to establish the value of the subject "as if vacant" under the prior MFM zoning. He is comparing apples to oranges and is implying that vacant land with no entitlements or infrastructure improvements is equal to that of a finished lot with all entitlements in place, public utilities stubbed to the site and paved ingress/egress to the plat.

  o Sale 9 was a distressed transaction that included not only 27 finished lots but also no less than six partially built single-family homes. The sale is not a relevant comparable for the subject and should have been excluded.

  o Sale 3 was a "future development tract" within the Highlands at Somerset Hill development. The price included entitlements running with the land. However, no discussion is given as to the value associated with these entitlements compared to vacant "raw" land.

  If sales 4 – 10 are excluded (because they represent finished lots and are not comparable to the subject as raw land), then the appraiser is left with Sales 1 – 3 or a range of $11,667 to $43,478/unit. No. 3 has some value to the entitled land but there is no discussion of this impact or associated downward adjustment to the subject as raw land. In summary, using this narrow data set it is very unlikely the appraiser would have concluded his original value of $45,000 to $50,000/unit for the subject under either scenario, with 22 or 66 residential lots. The data was misleading and brings into question the appraiser's final value conclusion for the subject in the "before" scenario with MFM zoning.

- On page 20 the appraiser presents a chart entitled *"Multi-Family Land Sale Comparisons".* He is presenting comparable data to arrive at an appropriate unit value conclusion for the subject as raw land with the potential for 134 apartment units, assuming sewer is extended to the site. The appraiser does not provide any individual discussion of the comparable sales. Further, there are a number of inconsistencies with this data set, summarized as follows:

  o Sale 2 transferred in Sept 2009, after the March 2009 effective date of the appraisal. Further, no discussion is given as to the value associated with the comparable's "entitled" status. Prior to sale the property had been used as a mobile home park and also had older stick built improvements on the site. No discussion is made for adjusting the cost of vacating the prior use and demolishing the old improvements to make way for the proposed 56-unit apartment. At a minimum the date of sale should exclude the comparable from the data set.

000137

**Shapiro Review – "Velkommen" (continued)**

- On page 24 the appraiser presents eight capitalization rate comparables located throughout the Puget Sound region, from Spanaway to Bellingham but none from Thurston County. On page 22 he presents nine improved sales to estimate the value of the subject under continued use as a mobile home park, all are located in Thurston County. Why did he not show the accompanying cap rates for the nine improved sales on Page 22? In my opinion they would be very relevant indicators for concluding a cap rate for the subject. The sales on page 24 are relevant but provide *secondary support* in relation to sales that have taken place in the immediate market.

- Again, on both charts (pages 22, 24) several sales and cap rate indicators are included with dates *after* the March 23, 2009 effective date of value.

- Regarding the value in the "before" condition, as improved via comparable sales; no individual discussion is made of the comparable sales or bracketing the subject within the range of unit values between $22,619 and $77,260/space. The appraiser concluded $65,000/space, well above the median ($34,000/space) and average ($41,600/space) of the data set but without further explanation or comparison of the subject in relation to the nine sales. *This unit value conclusion is not well supported and likely inflates the value of the subject via the Sales Comparison Approach.*

- On page 25 the appraiser presents a *Stabilized Operating Statement – At Market Rent* for Velkommen. The concluded market rent of $450 is **a full $125 higher per pad than actual rents in the park** ($328/month). However, there is no discussion or reconciliation between concluded market rent and actual rent. Will the increase to market result in increased vacancy at the subject? How quickly can ownership pass through a $100 per pad rent increase to the existing tenants? There are laws surrounding proper notice of rental increases and if tenants have existing leases then they are exempt until their lease expires.

- Finally, if market rent is used in the analysis, the resulting value should be labeled "Prospective Market Value" because it reflects a future event when all tenants are paying "market" and not an "as is" value, which refers to the scenario under which a property is evaluated in the condition observed upon inspection as then existing under legal allowed uses without hypothetical conditions, assumptions or qualifications as of the relevant date. The appraiser assumes rents are at market when in fact they are not. There are necessary deductions / discounts to arrive at the "as is" value.

- Absolutely no discussion or reference is made to conclusions of vacancy rate, variable and fixed operating expenses. Typically three years of detailed income and expense operating statements are reviewed before estimating stabilized operations. A discussion of the expense conclusion on a per unit and percent of effective gross income is also typically discussed in relation to comparables in the market place as well as historic operations at the subject. Some discussion is necessary to inform the reader of the source of these conclusions and how they relate to the subject's historic performance and that of the surrounding market.

## Shapiro Review – "Velkommen" (continued)

<u>Conclusion</u>

I believe the value conclusion for the property in the "after" condition as improved via the Sales Comparison Approach and Income Capitalization Approach are inflated and not representative of the property "as is".  This inflated value, when compared to the value in the before situation "as vacant" shows only nominal damages of $300,000.  However, I believe there would be a much wider gap in the "after" value as improved and the "before" value as vacant, which would then indicate greater damages as a result of the zoning change.

## CERTIFICATION OF APPRAISAL

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and is my personal, impartial, and unbiased professional analyses, opinions, and conclusions.
- I have no present or prospective personal interest in the property that is the subject of this review, and no personal interest with respect to the parties involved.
- I have no bias with respect to the property that is the subject of the work under review or to the parties involved with this assignment.
- My engagement in this assignment was not contingent upon developing or reporting predetermined results.
- My compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in this review or from its use.
- My compensation for completing this assignment is not contingent upon the development or reporting of predetermined assignment results or assignment results that favors the cause of the client, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal review.
- My analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the *Uniform Standards of Professional Appraisal Practice.*
- I, Jeanne-Marie Wilson, have made a personal inspection of the subject of the work under review.
- No one provided significant appraisal, appraisal review, or appraisal consulting assistance to the person signing this certification.

The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

February 7, 2010

Jeanne-Marie Wilson
WA License 270-11 1100250
Expires 12/12/2010

Date

000190

# EXHIBIT D

000191

## STANDARD 3

**Standards Rule 3-4**

Each written or oral Appraisal Review Report must be separate from the work under review and must:

(a) clearly and accurately set forth the appraisal review in a manner that will not be misleading;

(b) contain sufficient information to enable the intended users of the appraisal review to understand the report properly; and

(c) clearly and accurately disclose all assumptions, extraordinary assumptions, hypothetical conditions, and limiting conditions used in the assignment.

Comment: An Appraisal Review Report communicates the results of an appraisal review, which can have as its subject another appraiser's work in an appraisal, appraisal review, or appraisal consulting assignment.

The report content and level of information in the Appraisal Review Report is specific to the needs of the client, other intended users, the intended use, and requirements applicable to the assignment. The reporting requirements set forth in this Standard are the minimum for an Appraisal Review Report.

**Standards Rule 3-5**

The content of an Appraisal Review Report must be consistent with the intended use of the appraisal review and, at a minimum:

(a) state the identity of the client and any intended users, by name or type;

(b) state the intended use of the appraisal review;

(c) state the purpose of the appraisal review;

(d) state information sufficient to identify:

(i) the work under review, including any ownership interest in the property that is the subject of the work under review;

(ii) the date of the work under review;

(iii) the effective date of the opinions or conclusions in the work under review; and

(iv) the appraiser(s) who completed the work under review, unless the identity is withheld by the client.

Comment: If the identity of the appraiser(s) in the work under review is withheld by the client, that fact must be stated in the appraisal review report.

(e) state the effective date of the appraisal review;

(f) clearly and conspicuously:

- state all extraordinary assumptions and hypothetical conditions; and
- state that their use might have affected the assignment results.

(g) state the scope of work used to develop the appraisal review;

Comment: Because intended users' reliance on an appraisal review may be affected by the scope of work, the appraisal review report must enable them to be properly informed and not

USPAP 2010-2011 Edition
©The Appraisal Foundation

1106  misled.  Sufficient information includes disclosure of research and analyses performed and
1107  might also include disclosure of research and analyses not performed.

1108  When any portion of the work involves significant appraisal, appraisal review, or appraisal
1109  consulting assistance, the reviewer must state the extent of that assistance.  The signing
1110  reviewer must also state the name(s) of those providing the significant assistance in the
1111  certification, in accordance with Standards Rule 3-6.

1112  (h)  state the reviewer's opinions and conclusions about the work under review, including the reasons
1113  for any disagreement;

1114  Comment: The report must provide sufficient information to enable the client and intended users to
1115  understand the rationale for the reviewer's opinions and conclusions.

1116  (i)  when the scope of work includes the reviewer's development of an opinion of value, review
1117  opinion, or real property appraisal consulting conclusion related to the work under review, the
1118  reviewer must:

1119  (i)  state which information, analyses, opinions, and conclusions in the work under review
1120  that the reviewer accepted as credible and used in developing the reviewer's opinion and
1121  conclusions;

1122  (ii)  at a minimum, summarize any additional information relied on and the reasoning for
1123  the reviewer's opinion of value, review opinion, or real property appraisal consulting
1124  conclusion related to the work under review;

1125  (iii)  clearly and conspicuously:

1126  •  state all extraordinary assumptions and hypothetical conditions connected with the
1127  reviewer's opinion of value, review opinion, or real property appraisal consulting
1128  conclusion related to the work under review; and

1129  •  state that their use might have affected the assignment results.

1130  Comment: The reviewer may include his or her own opinion of value, review opinion, or
1131  appraisal consulting conclusion related to the work under review within the appraisal review
1132  report itself without preparing a separate report.  However, data and analyses provided by the
1133  reviewer to support a different opinion or conclusion must match, at a minimum, except for
1134  the certification requirements, the reporting requirements for a:

1135  •  Summary Appraisal Report for a real property appraisal (Standards Rule 2-2(b));
1136  •  Summary Appraisal Report for a personal property appraisal (Standards Rule 8-2(b));
1137  •  Appraisal Review Report for an appraisal review (Standards Rule 3-5);
1138  •  Appraisal Consulting Report for real property appraisal consulting (Standards Rule
1139  5-2);
1140  •  Mass Appraisal Report for mass appraisal (Standards Rule 6-8); and
1141  •  Appraisal Report for business appraisal (Standards Rule 10-2(a)).

1142  Standards Rule 3-6

1143  Each written Appraisal Review Report must contain a signed certification that is similar in content to the
1144  following form:

1145  I certify that, to the best of my knowledge and belief:

1146  —  the statements of fact contained in this report are true and correct.

USPAP 2010-2011 Edition
©The Appraisal Foundation

U-35

000193

## STANDARD 3

the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

— I have no (or the specified) present or prospective interest in the property that is the subject of the work under review and no (or the specified) personal interest with respect to the parties involved.

— I have no bias with respect to the property that is the subject of the work under review or to the parties involved with this assignment.

— my engagement in this assignment was not contingent upon developing or reporting predetermined results.

— my compensation is not contingent on an action or event resulting from the analyses, opinions, or conclusions in this review or from its use.

— my compensation for completing this assignment is not contingent upon the development or reporting of predetermined assignment results or assignment results that favors the cause of the client, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal review.

— my analyses, opinions, and conclusions were developed and this review report was prepared in conformity with the *Uniform Standards of Professional Appraisal Practice.*

— I have (or have not) made a personal inspection of the subject of the work under review. (If more than one person signs this certification, the certification must clearly specify which individuals did and which individuals did not make a personal inspection of the subject of the work under review.) (For reviews of a business or intangible asset appraisal assignment, the inspection portion of the certification is not applicable.)

— no one provided significant appraisal, appraisal review, or appraisal consulting assistance to the person signing this certification. (If there are exceptions, the name of each individual(s) providing appraisal, appraisal review, or appraisal consulting assistance must be stated.)

Comment: A signed certification is an integral part of the Appraisal Review Report. A reviewer who signs any part of the appraisal review report, including a letter of transmittal, must also sign the certification.

Any reviewer who signs a certification accepts responsibility for all elements of the certification, for the assignment results, and for the contents of the Appraisal Review Report.

Appraisal review is distinctly different from the cosigning activity addressed in Standards Rules 2-3, 5-3, 6-9, 8-3, and 10-3. To avoid confusion between these activities, a reviewer performing an appraisal review must not sign the work under review unless he or she intends to accept responsibility as a cosigner of that work.

When a signing appraiser has relied on work done by appraisers and others who do not sign the certification, the signing appraiser is responsible for the decision to rely on their work. The signing appraiser is required to have a reasonable basis for believing that those individuals performing the work are competent. The signing appraiser also must have no reason to doubt that the work of those individuals is credible.

The names of individuals providing significant appraisal, appraisal review, or appraisal consulting assistance who do not sign a certification must be stated in the certification. It is not required that the description of their assistance be contained in the certification, but disclosure of their assistance is required in accordance with Standards Rule 3-5(g).

U-36

USPAP 2010-2011 Edition
©The Appraisal Foundation

000194

# EXHIBIT E

000195

128   **Relationships and Application**

129   The relationship between valuation services and appraisal practice can be illustrated as follows.



130   Valuation Services (large light-shaded oval): When providing valuation services, the obligation for an
131   individual recognized in some circumstances as an appraiser is not to misrepresent his or her role.

132   Appraisal Practice (dotted-line oval): Within valuation services is appraisal practice (i.e., valuation services
133   provided by an individual acting as an appraiser). All services performed as part of appraisal practice must
134   comply with USPAP. The portions of USPAP that apply generally to appraisal practice include the
135   DEFINITIONS, PREAMBLE, the Conduct, Management, and Confidentiality sections of the ETHICS RULE,
136   the COMPETENCY RULE, and the JURISDICTIONAL EXCEPTION RULE.

137   Appraisal, Appraisal Review, Appraisal Consulting (dark-shaded oval within Appraisal Practice oval): Within
138   appraisal practice, there are requirements that apply to developing and communicating appraisal, appraisal
139   review, or appraisal consulting assignments in addition to those that apply to all appraisal practice. These
140   requirements are described by STANDARDS 1 – 10, the SCOPE OF WORK RULE, and the Record Keeping
141   section of the ETHICS RULE.

000196