309

**EXHIBIT F**

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 7

| | | |
|---|---|---|
| 1 | Q | Part of the LLC? |
| 2 | A | Correct. |
| 3 | Q | What's your position with the LLC? |
| 4 | A | Manager. |
| 5 | Q | Okay.  And how long have you been the manager of the |
| 6 | | LLC? |
| 7 | A | I believe the LLC came into an existence about ten |
| 8 | | years ago.  I've been managing it, though, since senior |
| 9 | | in high school. |
| 10 | Q | Do you live there? |
| 11 | A | No.  I have in the past. |
| 12 | Q | And when were you a senior in high school? |
| 13 | A | Back in '84. |
| 14 | Q | '84? |
| 15 | A | '84, '85. |
| 16 | Q | Tumwater High School? |
| 17 | A | Yep. |
| 18 | Q | And what was your education after high school? |
| 19 | A | I went to South Puget Sound for about a year and then |
| 20 | | started working for the State. |
| 21 | Q | And what's your employment history after South Puget |
| 22 | | Sound Community College? |
| 23 | A | I've worked Mervyn's for about four years and then |
| 24 | | started working for the State thereafter. |
| 25 | Q | What do you do for the State? |

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

310

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 9

1       his passing.

2   Q   Okay.  And she owned it individually prior to the

3       formation of the LLC?

4   A   Yes.

5   Q   Okay.  So Phyllis is your mother?

6   A   Correct.

7   Q   Okay.  And who owns shares in the LLC?

8   A   Just Phyllis.

9   Q   And your position with the LLC is general manager?

10  A   General manager, yeah.

11  Q   What are your duties as the general manager?

12  A   Tenant relations, water and septics, danger trees,

13      getting contracts in there to do -- whether it's drain

14      fields, tree removal.

15  Q   Would you give me a general description of the mobile

16      home park?

17  A   You bet.

18  Q   Size, number of units.

19  A   It's 11.1 acres prime flat land.  It has 39 homes on it

20      spread out over that 11.1 acres.  Built in -- I believe

21      we purchased the property in '75.  I think the new

22      homes came in -- or the first homes, I believe closer

23      to '77 was when they first started coming in.  There

24      again, I was pretty young back then, so . . .

25  Q   Right.  And when you first became the manager, was that

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

311

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 11

```
 1   A    Our zoning didn't change.
 2   Q    Okay.  Tell me about the community that you have this
 3        mobile home park located in.  What types of properties
 4        surround your mobile home park?
 5   A    Medium density.  There's three great big developments
 6        further down 70th about a block to two blocks down
 7        there where the homes are right up against each other.
 8        I forget the names.  I think one's Marset (phonetic) or
 9        something.  And anyways, it's on the same side of the
10        street, just a little bit further out of town.
11   Q    Okay.  When you say "medium density" --
12   A    The homes are about 4 feet away from each other.
13   Q    -- are you referring to the zoning code, or are you
14        talking about the property is actually built out?
15   A    I don't know what the difference is there.
16   Q    Okay.  When you say that the property surrounding your
17        mobile home park is medium density, are you referring
18        to the zoning?
19   A    Yes.
20   Q    Okay.  And there are three large subdivisions that are
21        built out in the neighborhood?
22   A    Correct.
23   Q    The property that is immediately adjacent to your
24        property, that abuts your property, is that built out?
25   A    No.  We own that.
```

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 12

1   Q    You own the adjacent property.

2        How much adjacent property do you own?

3   A    15 acres. When I say we own it, I don't own it;

4        Phyllis owns it.

5   Q    And is that owned by her individually, or is that --

6   A    Yes.

7   Q    So it's not owned by the LLC?

8   A    No.

9   Q    The LLC only owns the park?

10  A    Correct.

11  Q    Okay. Do you believe that operation of a mobile home

12       park is consistent with the surrounding medium-density

13       land uses in your community?

14  A    No.

15  Q    Why not?

16  A    Well, we have three homes per acre versus down the

17       street where there's about eight, six to eight per

18       acre. We're taxed as if we had that many on there.

19  Q    Have your taxes been reassessed since the zoning

20       change?

21  A    No.

22  Q    Have you asked the assessor to do that?

23  A    No. We're hoping we -- there won't be any need for

24       that.

25  Q    What does that mean?

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

313

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 14

1         that would force you to alter your rates?

2    A    Yes.

3    Q    Tell me what that is.

4    A    Water and sewer, in a few years it won't be

5         economically viable for it to be a park because their

6         rates to connect up to city sewer will make it so it's

7         not affordable for the tenants.

8    Q    Is it your understanding that the mobile-home-park

9         zoning ordinance compels you to connect to water and

10        sewer from the city?

11   A    We will be forced to, not due to the -- with the

12        ordinance makes it so we can't change the use.  So the

13        only alternative when the city sewer goes through

14        there, we have a bad drain field, is to connect up,

15        hence making it unaffordable for our tenants.

16   Q    You say you have a bad drain field.  What do you mean

17        by "a bad drain field"?

18   A    I didn't say I have a bad drain field.  I said when the

19        drain fields go bad, which they will.

20   Q    Okay.

21   A    There's history of the drain fields in the park going

22        bad.  They're over 30 years old.

23   Q    Tell me about the history of the drain fields going

24        bad.  When was the last time that occurred?

25   A    Two years ago.

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 18

1   Q    Curious, if the City had never adopted the

2        mobile-home-park zoning, would you be forced to at some

3        point in the future connect to water and sewer?

4                MR. OLSEN: Object to the question insofar as

5        it would require a legal conclusion.

6           But you're still free to answer.

7           THE WITNESS: We would hope before we would

8        have to connect up to city sewer that we would either

9        have sold it or developed it. It's not economically

10       viable to connect it up.

11   Q    (By Mr. Myers) But all other things being equal, if the

12        city had not adopted this new zoning, at some point in

13        the future do you believe that, for it to continue in

14        an economically viable use, you would have had to

15        connect water and sewer?

16   A    Yeah. We wouldn't have done it. We wouldn't have

17        connected up to city sewer.

18   Q    Why not?

19   A    It's not economically viable.

20   Q    What makes it --

21   A    We would have to -- if we were being -- if we were

22        forced to -- say somebody in the very back of the park

23        could not -- say their drain field goes bad. We would

24        not pay a half a million dollars to run a city sewer to

25        them for those two units. It's not economically

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 19

1       viable.

2   Q   Have you done investigations as to the cost to extend

3       city sewer?

4   A   Yes, I have.

5   Q   Okay.  What types of costs are involved in doing that?

6   A   According to your guys down here in your own office

7       here, it was about -- I believe they had said three --

8       three to -- about $300,000 for the city sewer, and

9       that's doesn't include the construction part of it.

10      Over $100,000 just to connect up to our existing water

11      lines, and that is not running meters out to

12      individuals and does not, I don't believe, include

13      running it down the street either.  And the city sewer

14      is still a ways away.  It's on the corner of Littlerock

15      Road.  So I have to pay an additional to bring it to

16      the park.

17  Q   And if you wanted to redevelop it to some other use

18      besides the mobile home park, you would have to incur

19      all of those costs, as well, would you not?

20  A   Correct, at a higher density.

21  Q   Do you know when your parents purchased the mobile home

22      park?  1977 I believe is what you said.

23  A   I believe I told you '75.

24  Q   '75.  Do you know how much they paid?

25  A   No, I don't.

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

316

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 22

1   Q   Okay.

2   A   It was during when we were getting the offers.  So we

3       wanted to make sure that was a good offer.

4   Q   Have you had any other appraisals besides the one

5       Mr. Kaiser gave you and besides the one that was

6       conducted for this litigation by Ms. Wilson and

7       Mr. Erlitz?

8   A   There may have been something back several years ago,

9       but I'm not -- I'm not too sure of it.

10  Q   What -- what type of time frame are you thinking of?

11  A   Maybe six, seven years ago.

12  Q   What would have been the context for an appraisal six

13      to seven years ago?

14  A   Well, we're always getting -- well, we used to get

15      offers on the park.  People always wanted to buy the

16      park.

17  Q   So six to seven years ago you got an offer on the park,

18      and you wanted to check it out, so you may have gotten

19      an appraisal at that time?

20  A   Yes.

21  Q   Do you know who would have performed that appraisal?

22  A   I don't recall.

23  Q   It's been somebody other than Mr. Kaiser?

24  A   Oh, yes.

25  Q   Okay.  Do you know what value that the property was

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 30

1           (Deposition Exhibit No(s). 5 marked

2                 for identification.)

3

4   Q   (By Mr. Myers) And this is a copy of the minutes of the

5       general government committee meeting from June 13,

6       2008, where you testified about the mobile-home-park

7       ordinance.  I'll let you go ahead and read that and

8       familiar yourself with the minutes.

9   A   (Perusing document).

10  Q   About two-thirds of the way down that big paragraph

11      there's a statement that "Vacancies create problems and

12      often cause the owner to sell the property."

13          You see that statement?

14  A   From me?

15  Q   Yes.  Do you recall --

16  A   "Vacancies create problems and often cause the owner to

17      sell the property."  Okay.

18  Q   Was one of your concerns about the mobile-home-park

19      zoning that it would result in higher vacancy rates at

20      mobile home parks?

21  A   When you have to raise the rates up to accommodate

22      utilities, there's going to be vacancies.

23  Q   And so your concern was that this ordinance would force

24      you to raise the rates because it would force you to

25      connect to the --

January 29, 2010

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 31

1  A    It would force to us keep it as a mobile home park

2       instead of developing it.  Hence, keeping it is a park,

3       the only thing you can do is connect up to city sewer

4       when it comes through.  Otherwise, it's a vacant piece

5       of property with no septics.

6  Q    Okay.  At the end of this Commissioner Stanley [sic]

7       responds and notes that when a property becomes

8       unusable, "the owner would have the right to request a

9       rezone."  Do you see that?

10          When this meeting occurred, had you read a draft

11      ordinance at that point in time?

12  A   I believe so.

13  Q   Did it have a right of the property owner to request a

14      rezone or a reversion to the existing or the previous

15      zoning because the property was not economically

16      viable?

17  A   We told them that it was economically not viable for us

18      to be connected up.

19  Q   But I'm asking:

20          At the time you made this statement, was there a

21      provision in the proposed ordinance that said if you

22      have a use that is no longer economically viable, you

23      have the right to ask for a rezone?

24  A   Yeah.  And that didn't make any sense because it's when

25      your property is going to be taken away from you from

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

319

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 32

1    not being able to make payments or be able to keep

2    running the park, pay the taxes on the park, then you

3    can get rid of it.  Doesn't make any sense.

4  Q  So it's your understanding that the provision that

5    allows you to request a rezone means that you are

6    essentially in default and are about to lose your

7    property?

8  A  I believe that the City is making it extremely

9    difficult for me to do with my property of what I'm

10   entitled to be able to do with it.  It's taking one of

11   my rights away.

12 Q  Okay.  What property right is that that's being taken

13   away?

14 A  To buy or sell or use my property as I see fit.

15 Q  Okay.  Can you use your property now to build a

16   Wal-Mart, or could you do that under the prior zoning?

17 A  No.

18 Q  So the zoning code does limit your right to use the

19   property as you see fit in some -- in some fashion,

20   even under the prior zoning?

21 A  We bought our property for residential.  When we would

22   develop it, it would still remain residential.  We're

23   not changing it to a commercial big-box-store style.

24 Q  Okay.

25 A  You basically did away with all the tax money that

January 29, 2010

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 35

1    Q    And is there anything in the ordinance that limits your

2         ability to raise the rent if you have to incur those

3         costs?

4    A    There's nothing in the ordinance that doesn't say that

5         we can't raise the rent.  However, there's tenants in

6         there that can't afford to have their rates raised.

7         We've been providing low-income housing or affordable

8         housing for the City of Tumwater and Thurston County

9         for over 30 years.  It's Tumwater that has taken that

10        away.  It's not us.

11   Q    Okay.  Has this ordinance imposed any costs upon

12        Velkommen Mobile Home Park in its operations?

13   A    Currently, no.  In the future, absolutely.

14   Q    What are those costs that it's going to impose in the

15        future?

16   A    When we have to connect up to city sewer, city water.

17   Q    And that, in your estimate, is the $300,000 for --

18   A    Over $300,000 for sewer.

19   Q    -- for sewer and $100,000 for water?

20   A    Over $100,000 for water because that was just the

21        initial trunk line into the park for one meter, one

22        supply meter that doesn't go into account connecting up

23        every single unit that's utilizing our existing trunk

24        lines in the park.

25   Q    And that presumes that your existing drain fields will

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 36

```
 1      at some point fail in the future?

 2   A  They will fail.

 3   Q  Okay.  Do you know when they're going to fail?

 4   A  No.

 5   Q  Is it possible that they'll continue in use for another

 6      20 years?

 7   A  No.

 8   Q  It's not possible?  So it's sometime between now and 20

 9      years?

10   A  I would say we'll probably have another drain field

11      probably now in five years.

12   Q  How do you know that?

13   A  Just being in the background that I have been working

14      with septics and drain fields.  If you baby a drain

15      field, you do everything you can, you can get a lot of

16      life out of these gravity feed systems, the old style.

17      When you have tenants in there, a lot of times they

18      flush cigarette butts, grease down the line.  They

19      don't take care of it as a typical homeowner that owns

20      their own stuff.  So I don't -- I don't have any doubts

21      in my mind that within the next five years we're going

22      to have another bad drain field.

23   Q  Have you consulted with anybody to evaluate the future

24      life of your existing drain fields?

25   A  We have put them on a pumping system as far as a
```

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 67

```
 1        prefer whoever buys the park to connect up to city
 2        water, but we would -- we would continue to serve it as
 3        far -- serve them water -- we hadn't actually given a
 4        time frame.  We hadn't gotten to that point.  But we
 5        had contacted water attorneys downtown Olympia so we
 6        could get an agreement set up.
 7   Q    Did you contact attorneys in response to Mr. Nissing's
 8        offer to set up an agreement to continue to provide
 9        water --
10   A    With our -- go ahead.
11   Q    -- for Washington Street Properties if they bought the
12        property?
13   A    Our initial conversation with our water attorney --
14        apologize for not knowing his name -- that was
15        originally set up and the document done for the first
16        offer with the one that was in May.
17   Q    The Fenton Properties offer?
18   A    Correct, yeah.
19   Q    Okay.  Do you have any opinions as to the fair market
20        value of Velkommen Park prior to the adoption of the
21        City's zoning ordinance?
22   A    1.8.
23   Q    How did you arrive at that?
24   A    Past offers and then Brad Kaiser.
25   Q    Does that include with water?
```

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 68

1    A    Yes.

2    Q    Do you have any experience in establishing the value of

3         real property?

4    A    I have several properties of my own.  I have a

5         commercial property.  And I have -- I have rentals.

6         I've done pretty -- I've been pretty successful with

7         them.

8    Q    Okay.  Is there a particular methodology that you think

9         is appropriate to arrive at a value of $1.8 million?

10   A    You look at the -- the property's value as far as what

11        is being sold around it, the zoning, the potential

12        growth that its going to exhibit in the near future.

13        That all plays into it.

14   Q    Okay.

15   A    What's being built up around it.

16   Q    Did you conduct any calculations or analysis that led

17        you to conclude that the property's value was

18        $1.8 million independently of the offers that you had

19        received or Mr. Kaiser's opinion?

20   A    Did I do something independent?  I wouldn't say

21        anything was independent there.  It was all based on

22        the offers that we were receiving, information that I

23        get from fliers that come through the mail on parks

24        that are selling, the value of them.

25   Q    Okay.  So the opinion that you have that before the

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 75

1   called page 2 of a document called "Plaintiffs' Initial

2   Disclosures."

3        Have you ever seen this document before?

4   A   I can't recall.  I don't think so.

5   Q   The purpose of initial disclosures in a lawsuit in

6       federal court is to provide an initial statement of

7       evidence that is discoverable by the other party and

8       identify witnesses and summarize what they may testify

9       to.  Paragraph three lists you as a witness on behalf

10      of Velkommen Mobile Park, LLC.

11  A   Correct.

12  Q   Do you see that?

13· A   Yep.

14  Q   Did you review this description prior to the submission

15      of the initial disclosures?

16  A   Did I review the description of the property?

17  Q   The description that appears here at the bottom of the

18      page after your name and identity, did you review that?

19  A   No.  I don't believe so.  I can't recall.  I've seen so

20      many things.

21  Q   Okay.  Do you believe that if the City had not enacted

22      the mobile-home-park ordinance, that your property

23      would be worth $10,752,000?

24  A   If it was developed, yes.

25  Q   What date would that value have accrued to Velkommen

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 76

1       Mobile Park, LLC?

2   A   Why would I think it would have -- could have come up

3       that high?

4   Q   No.  My question is:

5          When would it have been worth ten million seven

6       hundred and fifty-two?

7   A   Once it is developed.

8   Q   When would that be?

9   A   Now or never.

10   Q   No.  If the City had not passed the mobile-home-park

11       ordinance, when would it be worth $10,752,000?

12   A   I would guess it would probably be, today's value.

13       $65,000 per lot.  To me that's pretty cheap for around

14       here.

15   Q   Would that $65,000 per unit, then, be for a

16       single-family lot?

17   A   Correct.

18   Q   Do you have any familiarity with valuing multifamily

19       development?

20   A   I know how to -- I know how to times.  So if I have

21       11 acres, I can put so many spaces on there.

22   Q   Okay.  Have you ever done any evaluation to see whether

23       Velkommen's 11 acres could physically accommodate 15

24       units per acre?

25   A   No, I did not.

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 78

1   Q   Okay.  Do you believe that operation of a mobile home

2       park on your property is an economically viable use

3       today?

4   A   I think it's a ticking time bomb.

5   Q   My question is today.

6   A   No.

7   Q   Why not?

8   A   Because it's not economically feasible because

9       tomorrow, tonight when I get home, when I answer my

10      cell phone, if I got a bad drain field, I'm one --

11      potentially one drain field away of having to connect

12      up to city sewer.

13  Q   If it's not an economically viable use, why haven't you

14      asked the city to redesignate your property to the

15      prior zoning as the City's mobile-home-park ordinance

16      allows you?

17  A   I thought that's what we're doing right here.

18  Q   Go to . . .

19                      (Deposition Exhibit No(s). 13 marked

20                      for identification.)

21

22              THE WITNESS:  I shouldn't have to ask to get

23      my rights brought back.

24  Q   (By Mr. Myers) Have you read the new zoning provisions

25      for the manufactured-home-park district that -- is

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 81

1   A   Where it's affordable for the property owner and the

2       tenants, so currently what we have going on on the

3       park.

4           You know, ten years ago it was still viable.  If

5       somebody came and bought the park, there was still

6       that -- if the parks started making it so it wasn't

7       able to maintain a park, drain fields failing or

8       whatever, you still have that light at the end of the

9       tunnel where you could go and develop it, just like

10      anything.  You go out there and buy a house, if the

11      house is all worn down but it comes with acreage but

12      the house is -- you can live in it for a while and it

13      makes the rent, it's land banking.

14  Q   If --

15  A   Buy now so you can have good money down the road.

16  Q   If your septic systems were not failing, would

17      operation of a mobile home park on your property be an

18      economically viable use?

19  A   Not in the future.

20  Q   Why not?

21  A   Because also we're restricted how many units we have in

22      that park because of the drain fields.  Drain field's

23      taken up a lot of the open space.  We can't go and put

24      more homes in there.

25  Q   Why then have -- have you never filed any application

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

328

ba67d02b-5f11-4596-816a-85438585f2b5

**EXHIBIT G**

8

1    you to get an answer on the record.

2         MR. OLSEN:   Thank you, counsel.

3    Q   (By Mr. Olsen) As you know, what brings us here today is an

4        ordinance that is related to manufactured housing

5        communities within the City of Tumwater, correct?

6    A   Yes.

7    Q   And as I understand the record as it relates to the

8        promulgation of that ordinance, the first minutes that I was

9        able to identify in which this topic was raised occurred in

10       2007; is that something you would agree or disagree with?

11   A   That sounds right.

12   Q   In fact, while there are some minutes dated October 11,

13       2007, that served as record number 3 in the related growth

14       management hearing boards proceeding -- and I'm not

15       intending to put words in your mouth, but as I read the

16       minutes it looks like some residents of Tumwater attended a

17       council meeting and mentioned the idea of an ordinance that

18       was intended to preserve manufactured housing; is that

19       fairly accurate?

20   A   That's correct.

21   Q   And at that point, I understand that council member Stanley

22       asked the staff to begin researching zoning ordinance for

23       manufactured housing; is that your understanding?

24   A   I can't recall who made the initial motion.  I do know it

25       was the council action to direct staff to begin working on

Van Pelt, Corbett, Bellows

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

1      2008, and at that meeting there was an agenda that was

2      prepared?

3  A   That's correct.

4  Q   Is the agenda something that you would prepare or someone

5      else prepared?

6  A   It would depend.  In this instance, most of the agenda items

7      were prepared by David Heathrow and my staff.  And I would

8      look at those before they go out to committee or council.

9  Q   Before we talk about that meeting, for purposes of the

10     record, perhaps you could generally describe what the

11     relationship between the staff, the general government

12     committee, and the City Council.

13  A   Sure.  We provide advice and research for them and make

14     staff recommendations, typically, that they consider as part

15     of their action.  And part of the situation here would

16     involve planning commission as well, not just general

17     council.

18  Q   And so sometime before January 24, 2008, did the city

19     council or the GGC -- I'll abbreviate for purposes of the

20     general government committee -- direct staff to consider the

21     issue of manufactured housing communities and zoning?

22  A   They did.

23  Q   And from the record, I can see that in December, 2007, City

24     Administrator Baker advised that the GGC would be discussing

25     this in their January meeting.  How was it that staff was

12

1  directed to actually consider the idea of manufactured

2  housing, community zoning?

3  A   I'm not sure I understand your question just yet.

4  Q   Simplified, who directed staff to consider the issue of

5  manufactured housing for purposes of the GGC meeting on

6  January 24, 2008?

7  A   That emanated from the council direction.

8  Q   And, as I understand the record, you prepared a memo in

9  January of 2008 which is both included in the record as

10  Exhibit 12, part of Exhibit 12.  And then, for purposes of

11  your deposition, I've also identified the specific

12  memorandum as Exhibit 1.  Is this the work product by which

13  you provided the general government committee with staff's

14  advice as it relate to zoning and manufactured housing

15  communities?

16  A   This is a portion of that.  This is really the beginning of

17  our advice to them.

18  Q   This was the starting point?

19  A   Yes.  At their request.

20  Q   And was this memorandum then presented by yourself to the

21  GGC on January 24, 2008?

22  A   It was.

23  Q   And do you have an independent recollection of that meeting

24  that occurred, now, two years ago?

25  A   Not particularly, no.

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

13

1  Q   How does the committee actually work?  Are you provided an

2      opportunity to introduce things like this memorandum to the

3      committee and explain it and answer any questions they might

4      have?

5  A   Yes.

6  Q   And did that actually occur at this meeting as well?

7  A   Yes, I believe so.  That's my memory.

8  Q   Did any of the committee members have any questions about

9      your memorandum?

10  A   I can't recall specifically.  I would find it unusual if

11     they did not have questions.

12  Q   How was the memorandum received by the committee members?

13     Was there a positive reaction to the memorandum that you

14     prepared or a negative reaction?

15         MR. MYERS:  I'm going to object on the grounds

16            that it calls for speculation.  I'm also going to

17            object on the grounds that legislative motives and

18            legislative intents are privileged.  I don't know that

19            he's gotten into that in particular at this point in

20            time; but to the extent that there were discussions in

21            open session, the witness can answer the question.

22  A   The memo was presented to them and was in regard to a fairly

23     narrow question.  And they received the memo, and they

24     considered it, and then they broadened the discussion and

25     went forward.

Van Pelt, Corbett, Bellows

*333*

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

14

1    Q    (By Mr. Olsen) As it relates to what would be in the public

2         record, did any of the committee members comment that, You

3         know, Michael, this was a good memo?

4    A    No.

5    Q    Did they comment that this was a bad memo?

6    A    No, not that I recall.

7    Q    Let me just be candid and cut to the chase of the purpose of

8         this line of questioning.  My take, which might not be your

9         take, of the record is that this memorandum was received in

10        such a way by the committee members that -- and I'll

11        paraphrase.  I don't have staff to tell me what I can or

12        cannot do.  I have staff to tell me how to do what I want to

13        do.  Would you agree or disagree with that proposition?

14             MR. MYERS:  Same objections as before.

15   A    I can't really speak to that.  Always, as staff, we provide

16        them advice.  And they are the elected officials.  They are

17        free to take that advice or not take it.  It's part of what

18        we expect going in.

19   Q    (By Mr. Olsen) Agreed.  And in some respects, that is part

20        of my job as well, to provide advice.  And it's up to the

21        decision maker to decide how to use that advice.  But as

22        regards this memorandum, did the committee members follow

23        your advice as identified in the memorandum?

24   A    I think they did because the question they asked was very

25        narrow, which was, Can we pass an ordinance that restricts

Van Pelt, Corbett, Bellows

334

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

15

1    zoning to one use.  And my recommendation was that they not

2    do that.  And they expanded the uses significantly as a

3    result -- I can't say as a result of my advice, but they did

4    do that.

5  Q  Now, did your memorandum suggest anything in regard to

6    expanding the uses of the zoning that was being contemplated

7    by the manufactured housing communities?

8  A  I'd have to review it.  Would you like me to do that?

9  Q  Please.

10 A  No, it does not.

11 Q  Is that advice that you provided the committee on the public

12   record at the meeting of January 24, 2008?

13 A  Not that I recall.

14 Q  Was it one of the committee members' idea to broaden the

15   uses that would be contemplated in the manufactured housing

16   community zoning?

17 A  You know, I don't recall where that came about.  There's a

18   lot.  We had a lot of meetings on this issue.  It would have

19   emanated from planning commission or general government

20   community council.

21 Q  At that meeting on January 24, 2008, was the topic of

22   manufactured housing overlays discussed?

23 A  I don't recall.

24 Q  At any point in the process that followed January 24, 2008,

25   was the topic of overlays discussed as a potential option to

Van Pelt, Corbett, Bellows

335

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

18

```
1        people that are for a proposition and people that are
2        against a proposition?
3    A   Yes.
4    Q   Is it your perception that City Council demonstrated an open
5        hostility to the mobile home park owners during this
6        process?
7                  MR. MYERS:  Objection, calls for speculation.
8                  MR. OLSEN:  You can answer the question.
9                  MR. MYERS:  To the extent that he's asking about
10            their reaction in open session.
11   A   Reaction in open session.  I don't know that I would
12       characterize it as open hostility.  I would characterize it
13       as disagreement, I think.
14   Q   (By Mr. Olsen) Did you attend each of the council meetings
15       regarding the ordinance?
16   A   Most likely.
17   Q   And if you attended, your name would appear?
18   A   It would show in the record.
19   Q   Did you attend a council meeting in which council member
20       Stanley announced that the ordinance was necessary to keep
21       unscrupulous property owners from requesting conversion of
22       mobile home parks based on their own needs?
23   A   Yes, I did.
24   Q   Did you hear that statement on the public record?
25   A   Yes, I did.
```

Van Pelt, Corbett, Bellows

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

21

1          the council to avoid taking this issue.

2     Q    And did staff then investigate the idea of an overlay as an

3          alternative or an option to manufactured housing community

4          zoning?

5     A    I've already said that I don't recall specifically

6          investigating an overlay.  What we did was we investigated

7          that issue and determined what the best course of action

8          would be to go forward based on that recommendation.

9     Q    So you investigated how to do what the city council wanted

10         to do?

11    A    Yes.

12    Q    Now, to preserve affordable housing in Tumwater, would you

13         agree that the ordinance creates stringent rezone standards?

14    A    No, I don't think I would agree that it necessarily creates

15         stringent rezone standards.  It creates a zone that is more

16         tailored to manufactured home products, though.  I guess you

17         could say it's more stringent that the preponderance of

18         zoning classifications that were on the properties prior to

19         that as measured by permitted uses.

20    Q    Wasn't the whole purpose of the ordinance to prevent the

21         future conversion of mobile home parks in Tumwater?

22    A    That was one of the main purposes, yes.

23    Q    Do you know how many mobile home parks are in Tumwater?

24    A    I believe there are seven as we really define them.  And

25         that can be kind of a squishy number.  It depends.  There

22

1      are several that have three units or so in them that

2      technically could meet the state definition of a

3      manufactured home park.  They didn't meet the definition of

4      what we considered a manufactured home park as we set it up

5      for ourselves.  They didn't rise to the level of community.

6  Q   What factors did you consider in determining whether a

7      mobile home park was a mobile home park for purposes of

8      Tumwater?

9  A   It was primarily based on size.  And that was probably the

10     main factor, was the size.  You know, two manufactured home

11     parks, or I think three is maybe the state definition.  And

12     it just didn't seem to rise to the level of what we would

13     consider a manufactured home park when you drive by and look

14     at it.

15  Q  Somewhere in the 240 records I think I recall a memo from

16     you answering one of the council member's email questions.

17     And the memorandum identified 10 mobile home parks inside

18     their urban growth boundary, though, that were of size 10

19     spaces or more.  Do you recall doing that research?

20  A   No, I don't.  I believe David on my staff did that research.

21  Q  Regardless of the number of communities in Tumwater, I

22     understand that this ordinance applies to six of those

23     communities; is that correct?

24  A   That's correct.

25  Q  And it's these six communities who are directed to shoulder

Van Pelt, Corbett, Bellows

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

26

1       involved with the process by which this ordinance was

2       enacted, is it your understanding based on the public record

3       that council member Valenzuela was in disagreement with the

4       position stated by the mobile home park owners?

5   A   Yes.

6   Q   And would that answer also be true for planning commissioner

7       Mandeville?

8   A   Yes.

9   Q   In the 20 years that you've been in Tumwater, how many

10      mobile home parks have closed?

11  A   I don't believe any have closed.

12  Q   And during your participation in the process by which this

13      ordinance was enacted, was there anything in the record that

14      you reviewed which would indicate that any of the six mobile

15      home parks intended to close?

16  A   No.

17  Q   Were you at a city council meeting in which Council Member

18      Valenzuela said, It's fair to say that it's likely the

19      owner's chances for a rezone would be questionable?

20  A   Yes.

21  Q   And do you recall the context by which that statement was

22      made?

23  A   Other than it was at a council meeting, no, I don't.

24  Q   I'm showing you what's identified as record 46 for purposes

25      of the GMHB administrative proceeding.  It's hard to pull

Van Pelt, Corbett, Bellows

339

## DEPOSITION OF MICHAEL MATLOCK, 02-09-10

28

1   Stanley indicated that the draft voluntary zoning ordinance

2   is not acceptable?

3 A Yes.

4 Q And I think that was at record 40 of the notebook that

5   remains in front of you, specifically page 4.  Does that

6   refresh your memory, if it needs to be refreshed, in regards

7   to the context in which that statement was made?

8 A Yes, somewhat.  It would be easier if I could see our staff

9   record to the general government committee.  But yes, it

10   refreshes, somewhat.

11 Q I think your staff report should be somewhere around that

12   record number 40, record number 39, which happens to be in

13   another book.  That looks like an agenda to me.  Would that

14   be what you're referring to as your report?

15 A That's it.  Okay.

16 Q So what was going on at this time when Council Member

17   Stanley indicated the voluntary zoning ordinance was not

18   acceptable?

19 A We had put forward for consideration a more voluntary

20   classification, staff had.

21 Q Was that one of the first options that staff proposed to the

22   council?

23 A That was early in the process, yes.

24 Q And was it accepted by the council?

25 A No, it was not.  Not ultimately.

Van Pelt, Corbett, Bellows

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

30

1    Q    Did staff have any private meetings with Ms. Dickens of
2         Columbia Legal Services?
3    A    Not that I recall.
4    Q    Did Ms. Dickens participate in the drafting of the revised
5         ordinance when it became mandatory?
6    A    No.
7    Q    At some point the ordinance was rewritten to be mandatory,
8         not voluntary, right?
9    A    Yes.
10   Q    And in that record 51, do you recall Council Member Stanley
11        commenting that staff and the subcommittee have done a
12        wonderful job working with Ms. Dickens of Columbia Legal
13        Services?
14   A    Yes, I recall that.
15   Q    I'm trying to nail down what involvement did Ms. Dickens
16        have that council member Stanley was referring to.  Do you
17        know?
18   A    No, I don't.
19   Q    At some point, is it your understanding that the council and
20        Ms. Dickens were on a first-name basis?
21   A    Perhaps some of the council members.
22   Q    At record 60, at page 4, I understand that there is a
23        definition of affordable housing on that page.  First of
24        all, what is record 60?
25   A    It's a Tumwater planning commission meeting of September 23,

Van Pelt, Corbett, Bellows

341

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

34

1       than it was before?

2    A  In the draft docket, yes, it changed that priority level.

3    Q  What was the priority level before?

4    A  The minutes indicate it was number 18.

5    Q  And how was it that it was assigned that priority to begin

6       with?

7    A  That was a staff recommendation based on our professional

8       recommendation on the items that were before us.  We have,

9       obviously, a finite amount of resources that we can devote

10      to anything.

11   Q  And as it relates to the priority, how does that affect the

12      amendment process for the year 2008?  Do you only get to the

13      top 10, or how does that work?

14   A  It depends on our estimates for how long each item will

15      take.  In this particular instance, it appears that the top

16      10 are the ones that we are going to work on.

17   Q  Was it the staff's recommendation that the mobile home park

18      issue be moved to the top 10?

19   A  It doesn't appear so.  And also, city council will be

20      considering a recommendation on this from the planning

21      commission.  So the planning commission gets a crack at it

22      first.

23   Q  Is it your understanding that the planning commission agreed

24      that the mobile home park issue should be identified as one

25      of the top 10 issues?

Van Pelt, Corbett, Bellows

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

35

1   A   I'm sorry. Say that one more time?

2   Q   Is it your understanding that the planning commission agreed

3       that this mobile home park issue should receive a higher

4       priority?

5   A   No. If it's gone to council, planning commission would not

6       have made a recommendation different than this.

7   Q   After this issue was reprioritized by the city council, did

8       the staff then focus its attention on redrafting the zoning

9       yet another time?

10   A   When it's on the docket, then we would begin working on the

11       comprehensive plan amendments and associated zoning code

12       amendments, yes.

13   Q   And was the product of that reprioritization a revised

14       ordinance as it related to mobile home parks?

15   A   Yes.

16   Q   Showing you record 59. Is this the staff report and

17       attachments to the planning commission for a meeting on

18       September 23, 2008?

19   A   Yes.

20   Q   And does the report and attachment include draft zoning

21       commission code amendments for 2008-009?

22   A   Yes.

23   Q   Was this the draft in which other permitted uses were

24       included with the ordinance?

25   A   That looks about right. It's always hazardous for planners

Van Pelt, Corbett, Bellows

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

38

1   A   One more time?

2   Q   (By Mr. Olsen) Was the reason this list was added, or one

3       reason, the fact that staff believe council directed it to

4       add more residential characteristics to the zoning

5       classification?

6   A   No, I don't believe so.  It was really reflecting our staff

7       belief that it is a residential use.

8   Q   Now, you'd agree that these other uses identified on page 5

9       of record 59 are uses that are unrelated to the issue of

10      affordable housing?

11  A   Speaking regarding family child care homes and the like?

12  Q   Yes.

13  A   Parks and trails, yes.  I would say they're unrelated to

14      providing affordable housing.

15  Q   And the accessory uses identified in the next session, is

16      there any accessory use that is identified there that has

17      anything to do with affordable housing?

18  A   Yes.  Club houses and community centers associated with

19      manufactured home parks would be an ancillary use that would

20      support affordable housing.

21  Q   Other than that, are there other classifications of

22      accessory uses that would touch on the issues of affordable

23      housing?

24  A   No.

25  Q   Okay.  And as it relates to the accessory uses, how is it

Van Pelt, Corbett, Bellows

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

39

|  |  |  |
|---|---|---|
| 1 |  | that this list, A through E, came to be included in the |
| 2 |  | revisions through the iterative process that you mentioned? |
| 3 |  | Who wrote the first draft? |
| 4 | A | The staff. |
| 5 | Q | And likewise as it relates to the accessory uses, are these |
| 6 |  | uses common to residential zoning classifications? |
| 7 | A | Yes.  Not all residential zoning classifications are going |
| 8 |  | to have clubhouses and community centers, especially with |
| 9 |  | manufactured home parks, but yes. |
| 10 | Q | And as it relates to the conditional uses at the bottom of |
| 11 |  | page 5 of record 59, do any of those conditional uses relate |
| 12 |  | to the issue of affordable housing? |
| 13 | A | Not directly. |
| 14 | Q | There is a use exception included in this draft of the |
| 15 |  | ordinance; is that correct? |
| 16 | A | Yes. |
| 17 | Q | What is the purpose of the use exception? |
| 18 | A | I'm looking for it. |
| 19 | Q | I may be misleading you.  Why don't we look at a different |
| 20 |  | exhibit.  I know the use exception exists. |
| 21 | A | I don't see it here.  I know what you're referring to.  I |
| 22 |  | just don't see it here. |
| 23 | Q | What is your general understanding of that? |
| 24 | A | My general understanding is that it is a mechanism that |
| 25 |  | would be reflective of changing circumstances that would |

Van Pelt, Corbett, Bellows

345

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

42

1        It would be submitted to the City by the property owner.

2        And it includes some language regarding an exception that

3        the planning commission city council would consider.

4    Q   In order to be qualified or entitled to this rezone, what

5        would an owner need to show or prove to the city council?

6    A   It would have to show that they do not have reasonable use

7        of their property under the manufactured home park zoning or

8        the uses authorized by the manufactured home park zoning are

9        not economically viable at the property's location.

10   Q   So earlier, when we were talking about the 23 different

11       permitted uses, accessory uses, and conditional uses, would

12       you agree that it would be the owner's burden to show that

13       none of the 23 different permitted accessory or conditional

14       uses are reasonable or economically viable?

15   A   The language as written here says "the uses".  So that would

16       lead me to believe that that's what the language says.

17       However, in practice, that's not going to be very feasible.

18       And that's something that staff and the planning commission

19       city council, I believe, would take into consideration when

20       one of these came in.  I know staff would.

21   Q   When you said that isn't feasible, what did you mean by

22       that?

23   A   Well, I think it's going to become unworkable to have the

24       property owners show that storage sheds, for example, are

25       not feasible.  I don't think that makes a lot of sense.  I

Van Pelt, Corbett, Bellows

DEPOSITION OF MICHAEL MATLOCK, 02-09-10

43

1       don't think that was really the intent of this language.

2   Q   Would your characterize this language as the saving grace

3       for the ordinance?

4   A   No, I wouldn't.  I would characterize this, rather, as a

5       response by the council to concerns from the manufactured

6       home park owners.

7   Q   Showing you what I've identified as Exhibit 2 for purposes

8       of this deposition, this is actually an email from me to the

9       city council members.  Is this an email that you recall

10      reviewing in the record?

11  A   Give me a moment.

12  Q   Please.

13

14                              [A brief recess was taken]

15

16  Q   (By Mr. Olsen) You have in front of you the record and

17      formal Exhibit 2.  I just took a copy of the double-sided

18      exhibit or record 97 for the GMHB.  And I think my question

19      was do you remember reading the email?

20  A   I don't know that I can say -- I believe I read them all.

21      We received a lot of emails, a lot of correspondence from

22      both sides of the issue, so I can't recall it specifically.

23      But I'm sure that I read it.

24  Q   And this was an email from me to an email address of

25      council@ci.tumwater.wa.us.  Is that a group email to city



G.

B

## Memorandum

January 24, 2008

TO:        General Government Committee

FROM:    Michael Matlock, Planning and Facilities Director

RE:        Manufactured Home Zoning

The General Government Committee requested staff research the issue of establishing a new zoning classification that would allow manufactured/mobile homes as the only allowed use. Staff contacted a number of sources for this research including the City Attorney and attorneys with Municipal Research and Services Center (MRSC). In addition, some research was done regarding other jurisdictions that have taken a similar action.

Through research in conjunction with MRSC, staff was only able to locate one city, Auburn, that has a zone exclusively for manufactured homes in manufactured home parks. This zone (Residential Manufactured Home Park District) was put in place in 1988, so it clearly was not established as a result of the more recent conversion trend for manufactured home parks in the Puget Sound area. This zone allows only manufactured homes and accessory uses to those homes in this zone. The intent section of the zone only allows manufactured home parks is areas that are "....bordered on, contain physical features, or shall be planned and designed as part of a larger development incorporating other housing types in a manner which limits further expansion into adjacent areas". It would appear this zone was created to limit the expansion of manufactured home parks rather than protect them.

Snohomish County last year passed an ordinance that allows mobile home parks as its only use. This action was in response to the same concerns regarding mobile home park conversion that have recently been expressed here. The program is voluntary and is intended to reduce the taxes assessed on the property in order to encourage the continuation of mobile home parks. At this time, no requests for a voluntary rezone for mobile home park zoning have been received by Snohomish County.

PLANNING AND FACILITIES DEPARTMENT

173                                                                                    173

348

G

Jim Doherty, an attorney with MRSC was contacted regarding the legal viability of a zone classification that allows manufactured homes exclusively. Mr. Doherty had reservations on any proposal to limit property to only one use in that such a regulation could be vulnerable to a takings challenge. In particular because in manufactured home parks because the number of manufactured homes in a given park could gradually decrease over time. Because a property owner has the right to reasonable use of their property, to not allow compatible residential uses could be successfully challenged. City Attorney Kirkpatrick was consulted as well. Much like Mr. Doherty, Attorney Kirkpatrick has reservations with this approach for the same reasons. The City Attorney views this idea as difficult to defend legally because it would severely restrict the property owners' ability to make use of and dispose of the property.

From a planning staff viewpoint, there are reservations as well. To begin, the proposal may not be entirely consistent with the comprehensive plan. Objective 3.1.1 of the Housing Plan, pg. 17 states "The Zoning Code, allows manufactured homes on single family lots in all residential zones. It is not the intent of this plan to promote the development of traditional manufactured home parks; but rather, to recognize that modular/manufactured housing is a viable form of housing construction."

In addition, if a zone was created allowing only manufactured home parks was applied to existing manufactured home parks, it would certainly reduce property values and would be vigorously opposed by the majority of manufactured home park property owners. A protracted planning process would be expected and possible legal challenges as well.

As discussed previously, there are already fairly substantial protections for residents of manufactured home parks provided in state and federal law. Those protections include:

1.   If a park is to be closed, the landlord must notify the tenants at lease 12 months before the closure date.

2.   Relocation assistance in amounts up to $12,000.00 may be available through the Washington State Department of Trade and Economic Development. This program is funded by the legislature.

3.   Manufactured homes must be allowed in all residential zones.

4.   Many aspects of manufactured home regulations are preempted by federal law.

PLANNING AND FACILITIES DEPARTMENT

174                                                                                                    174

349

$G_1$

In summary, staff recommends that the City not pursue a zoning classification that allows only one use, manufactured homes. Instead, staff would expect this to be an issue in the current legislative session. It may be more effective to lobby area legislators for additional protections on a state-wide level to address this urgent and important issue.

PLANNING AND FACILITIES DEPARTMENT

175

175

350

351

**EXHIBIT H**

17

1   Q  It is for that.

2   A  Okay.

3   Q  But I'm drawing a blank.  Did you describe both of the other

4      reports?

5   A  No, I didn't.  I'm sorry.  A restricted use report is an

6      extremely brief report that may be even a short letter that

7      essentially states the conclusions of a report, and still

8      requires the appraiser to do everything necessary, but that will

9      not all -- will not all be described in the report.

10         A summary report requires what is termed a degree of

11     summary discussion; and a self-contained report requires a

12     higher degree of discussion, although in practice, summary

13     reports and self-contained reports tend to be pretty close in

14     terms of the depth of reporting, whereas a restricted use report

15     will be much, much briefer.

16  Q  I'm referring to Exhibit 3, specifically page 12 of Exhibit 3.

17     This page is a table that's titled, Historic MF Absorption

18     hyphen Tumwater.  Are you familiar --

19  A  Yes, I am.

20  Q  What does it intend to provide by way of information?

21  A  It shows kind of a snapshot history regarding how multifamily

22     housing units have been created and absorbed over time in

23     Tumwater.

24  Q  In the paragraph following the table is some narrative that in

25     the first sentence, anyway, reads, "A total of 369 units were

18

1      built between 1969 and 1971; 128 units in the '80s; 1,027 units

2      were built between 1990 and 1995; and most recently, 243 units

3      were constructed in 2007.  What was the source of this

4      information?

5  A  In the paragraph above it on top of the chart, it says that

6      according to Chris Carlson, Planning Manager of the City of

7      Tumwater.

8  Q  Did you rely on any other independent source for this

9      information, other than Mr. Carlson?

10  A  I would have to refer to the Market Analysis Data Folder, but I

11      attempted to research as many different available sources of --

12      of creation and absorption of housing units in Tumwater as

13      possible.  And I specifically asked Mr. Carlson to provide me

14      that.

15  Q  Did you ask Mr. Carlson about absorption in the year 2008?

16  A  I asked Mr. Carlson about absorption all the way up to the

17      present time.

18  Q  Is there a reason why the year 2008 is not included in the

19      table?

20  A  The only reason that I can imagine is that Mr. Carlson did not

21      have record of any units having been built at that time.

22  Q  Are you familiar with units built in the Tumwater area in 2008?

23  A  I am -- not to the extent that -- that it's not represented in

24      my report.

25  Q  Do you know of an apartment complex named Hearthstone II?

353

19

1   A   I see that Mr. Carlson provided information regarding

2       Hearthstone here, and without looking at my notes that you're

3       copying, I can't answer that.   I -- I'm . . .

4   Q   So it was Mr. Carlson that you relied on primarily for this

5       data?

6   A   That would be correct.

7   Q   Have you ever heard of a complex called Tabula Rasa, T-A-B-U-L-A

8       R-A-S-A?

9   A   Once again, I see that that's represented in the table.

10  Q   Do you have any data about other absorptions of those two

11      communities, Hearthstone II and Tabula Rasa in 2008?

12  A   Apparently if I did, I would have represented it in this table.

13  Q   Are you familiar with Dupré and Scott Apartment Advisors?

14  A   Yes, I am.

15  Q   How is it that you're familiar with them?

16  A   I have read their reports from time to time.

17  Q   Are you a subscriber of their reports?

18  A   Yes, I am.

19  Q   Would you have read the October 2008 vacancy report?

20  A   I may have, but I don't recall that at this time.

21  Q   Do you recall whether they represented that Tumwater had 2,222

22      units in projects with 20 units or more, which would indicate

23      55 units per year, and ten more than you noted in your report

24      here?

25  A   I am not aware of that.

354

20

1  Q  Would you consider that Dupré and Scott would be something

2      required by USPAP, insofar as it requires that you do whatever

3      you need to do to produce a credible report?

4  A  USPAP requires you to collect information to the best of your

5      ability and to produce a credible report insofar as -- so

6      there's no -- there's no requirement to use any particular

7      source of information.

8  Q  Do you consider Dupré and Scott to be a credible source?

9  A  Yes, I do.

10  Q  Moving on to page 13 of the appraisal for Laurel Park, there is

11      another table at the top of the page identified as MF Housing in

12      the Pipeline hyphen Tumwater.  What is the source of the

13      information contained in this table?

14  A  I would need to refer to my notes in order to accurately answer

15      that question.

16  Q  The source of this information isn't cited in the report, is it?

17  A  It appears not to be.  I'm just reading my notes.  I think that

18      that is correct, but I would need to refer to the folder that

19      you're copying, the Market Analysis.

20  Q  What does this table intend to provide by way of information to

21      the reader?

22  A  That is discussed in the paragraph above the table.  It

23      essentially shows the number of projects or a number of

24      different projects that have begun the entitlement process to

25      provide multifamily housing in the area.

21

1   Q   Did you intend the table to also include information regarding

2       the last known development activity in Tumwater?

3   A   The last known completed activity?  I'm not sure what you mean.

4   Q   No.  Any development activity, whether it means completed or

5       applications for development approval.  Did you intend for this

6       table to be exhaustive of -- for prior and more current

7       activity?

8   A   I intended the two tables, the one on page 12 and page 13 to be

9       as exhaustive as I could be, given my ability to, you know,

10      research that.  I certainly did not purposely leave any out.

11  Q   Would you agree that the last development activity that would be

12      application for completion, that would be relevant to this

13      analysis?

14  A   Yes, I would agree with that.

15  Q   Would you agree with the proposition that many times

16      developments will go through the permitting process, but for a

17      variety of different reasons don't ever get built?

18  A   Yes, I would agree with that.

19  Q   On page 13, the total number of units identified in the table as

20      1,048 from eight different projects, and the status on the

21      right-hand column of the table indicates that -- well, perhaps

22      you can tell me what you meant by the status column on the

23      table.

24  A   The status shows the state of the progression of these projects

25      towards entitlement.

356

22

1    Q   Insofar as some projects never get built, would you agree that
2        insofar as these projects were not completed or built, the
3        number would be lower?  I'll end with that.
4    A   I'm sorry?  I don't understand.
5    Q   To the extent that any one of these eight projects were not
6        built out, would you agree that the number of units should be
7        lower in your analysis?
8    A   No.  It's not intended to show the number of units that are
9        built out.
10   Q   Isn't this table a source for your conclusions regarding the
11       demand for new multifamily housing?
12   A   It is not a source for the demand, specifically.  It is intended
13       to show the extent to which there are potential projects
14       available to fulfill demand should that demand become evident.
15   Q   Do you know whether Briggs Village, one of the communities
16       identified in this table, is in Tumwater or Olympia?
17   A   I can't answer that exactly.  I would have to look at the map.
18   Q   If it was in Olympia or the city limits of Olympia, should that
19       be removed from your table?
20   A   No, not necessarily.
21   Q   Why?
22   A   Market demand does not specifically accord to political boundary
23       lines.  And if there -- if -- if, for example, I'm not sure
24       exactly where this is, but if this or any other project was very
25       near to the political boundary of Tumwater and happened to fall

357

23

1    in -- within an area that was logically within the demand area

2    for housing of Tumwater, it should be included.

3    Q   As part of your analysis and appraisal of each of the three

4        communities, did you rely on any information from Dupré and

5        Scott Apartment Advisors?

6    A   No, I did not.

7    Q   Did you receive a copy of the September 2008 apartment

8        development report?

9    A   It is possible that I did.

10   Q   Would you agree that Dupré and Scott's apartment development

11       reports include projects that are finished, under construction,

12       planned, existing, period?

13   A   I would have to look at the report in order to answer that

14       question.

15   Q   Do you know whether their September 2008 report showed any

16       potential inventory in Tumwater?

17   A   I can't answer that question without looking at the report.

18   Q   Did your analysis include any consideration of vacancy rates and

19       absorption rates of the newest multifamily inventory?

20   A   I'm not entirely sure what you're asking me.  Could you rephrase

21       that.

22   Q   Sure.  Let's start with the vacancy rates.  Did your analysis in

23       any of the three communities include any consideration of

24       vacancy rates?

25   A   Vacancy rates in . . .

24

1  Q  The mobile home parks.  Lots that weren't rented to tenants?

2  A  Within the mobile home parks?

3  Q  Yes.

4  A  Did -- I'm having trouble making the -- can -- did I con- --

5     you're --

6  Q  Oh, I am confusing you.  I'm sorry.  Let me strike that.

7         When I said mobile home parks, I should have said

8     multifamily inventory.  Did your analysis regarding the

9     multifamily inventory on pages 12 and 13 include any

10    consideration of vacancy rates?

11 A  Vacancy rates?  Existing vacancy rates in apartments?

12 Q  Yes.

13 A  In general, I -- to the extent that it's represented in the

14    report.  I mean, the answer -- the answer is, I -- yes, but I do

15    not know that I specifically cited vacancy rates in apartments

16    in the report.

17 Q  Is it your understanding that Dupré and Scott publishes an

18    apartment vacancy report and did so in the fall of 2008?

19 A  I believe that they do and did.

20 Q  Moving on to page 17 of your report, this is a tabled titled,

21    Single Family Residential Land Sale Comparisons.  What

22    information were you intending to provide the reader as it

23    relates to this table on page 17 of Exhibit 3?

24 A  That is explained on page 16 in the third paragraph.  Shall I

25    just, I mean, I cite that paragraph?  Shall I read it or --

359

25

1    Q   No, you need not do that.  I understand the table to be the

2        comparables that you used in your appraisal of each of these

3        three communities, correct?

4    A   Comparables of single family development land in the Tumwater,

5        Olympia leasing area.

6    Q   Is there something in your files or this report that includes an

7        individual discussion of each of these ten comparables of single

8        family residential land sales?

9    A   There are data sheets that you have, actually, for each of them.

10   Q   Did those data sheets get summarized or referenced in any way to

11       the report that's being provided and that we've identified as

12       Exhibits 3, 4 and 5 to this deposition?

13   A   They are not individually specifically discussed.  Is that what

14       you're asking me?

15   Q   Yes.

16   A   No, they're not -- well, that's not true in any great depth.

17       They're discussed collectively on page 16 and on page 17 --

18       actually, that's not true at all.  On page 17, I provide summary

19       information about all of them that shows their address, parcel

20       number, if there's improvements on them, sale date, the zoning,

21       the potential number of units, the size of the property, units

22       per acre sale price, dollar per acre, dollar per unit,

23       conditions of sale.  And on the following page, I provide a map

24       that shows where they are.  So there is -- I misspoke when I

25       said that earlier.  I did not provide a written discussion, per

26

1    se, but I definitely provide information about all of them.

2    Yes, I do.

3  Q  Fair enough.  My staff has just completed the copying of the

4    file folder titled Market Analysis Data.  Would this include the

5    data sheets that you've referenced as it relates to the table on

6    page 17?

7  A  No.

8  Q  That's in the other file folder?

9  A  It's in the other file folder, right.

10 Q  Now, as it relates to each of the three appraisals, I understand

11   that you identified the effective date of the evaluation as

12   being March 23, 2009, correct?

13 A  That's correct.

14 Q  And why is it that you picked that date as the effective date?

15 A  I did not pick that date.

16 Q  Who picked that date as the effective date?

17 A  Mr. Myers instructed me to use that date.

18 Q  Do you believe that there's a significant difference in an

19   effective date of March 23, 2009, or December 31, 2008, as it

20   relates to your analysis or appraisal of the three communities?

21 A  I could only fairly answer that question by doing the analysis

22   for the current time.

23 Q  I'm referring to page 17, specifically the column, Sale Date.

24   It appears that sales 5 through 8 occurred after the effective

25   date of your appraisals, correct?

361

27

1    A   Five through eight?  Just a minute.  Not -- oh, 5 through 8,

2        yes, that appears to be the case.

3    Q   Do comparables that occur after the effective date have any

4        relevance to appraisals as of the effective date?

5    A   Certainly.

6    Q   Why?

7    A   They are as reflected -- to the extent that any sale can reflect

8        the condition of a subject that should be used, and I believe

9        the question you appear to be asking me is, you're pointing out

10       that there is a difference in date, that these sales occurred

11       some months after the date of values in your report.  And I

12       would counter that by suggesting that the other sale comparables

13       occurred before.

14              And so in both cases, whether before or after the date of

15       value, there is a requirement for consideration of a market

16       conditions adjustment, not necessarily the making of one, but

17       the consideration of one.  And it doesn't make any difference

18       whether it's before or after.  If the market conditions have

19       changed in time or are different in time, you need to consider

20       that.

21              So no, I think they're both extremely relevant, or the

22       ones after the date are extremely relevant.

23   Q   I think your report refers to a conclusion that our recessionary

24       times may be stabilizing as it relates to the real estate

25       market.  Is that an opinion that you still have?

362

29

1   A   Were there other comparables that I could have selected?   I

2       selected the ones that I felt were most indicative of the value.

3       So the answer is, if you're asking me:   Are there other sales

4       out there?   The answer is yes.   If you're asking me:   Are there

5       others that I would have selected?   The answer is, if I felt

6       they were relevant I would have selected them.

7   Q   So the selection of comparables is a bit of a subjective

8       concept?

9   A   The selection of comparables is a process by which the appraiser

10      tries to find properties, sale properties, that provide a

11      credible opinion of value for a subject.

12  Q   With regard to Comparable 10, what was the source of the

13      information provided for 7730 Trails End Drive Southeast in

14      Olympia?

15  A   I would have to look in the data sheets that you have.

16  Q   As it relates to your selection of comparables, did you

17      corroborate the information against the public record, perhaps a

18      warranty deed or something on the county's Web site that

19      identifies the number of units for the property?

20  A   The number of units on the property?   The answer to the question

21      is, typically I do corroborate.   Again, I would have to look at

22      my data sheets, but typically I look to numerous sources to try

23      and corroborate the data with -- you asked me specifically about

24      the units and the units that I used, I refer to -- again, you

25      asked me specifically about units, right?

30

1  Q  Correct.

2  A  I believe --. I'm trying to find what I wrote in here

3     specifically.  Take a second to look.  [Reviewing.]

4        I believe that the process by which I derived the number

5     of units -- actually, I shouldn't speak without referring to the

6     data sheets.  I would give you a better answer if I could refer

7     to the data sheets.

8  Q  Did you review any warranty deed as it related to any comparable

9     numbers, one through ten?

10 A  Did I review the warranty deeds?  If I did, it would -- it would

11    be included in the data sheets.

12 Q  Do you know whether the warranty deed for comparable ten

13    actually identifies the number of units as six instead of 19?

14 A  I cannot say.

15 Q  The number of units totaled in this table on page 17 is relevant

16    to the value per unit analysis that you completed in your

17    report, correct?

18 A  The number of units stated for each individual property?  Is

19    that --

20 Q  No.

21 A  -- what you're asking me?  I'm sorry.

22 Q  The total number of units.  For instance -- well, let me back

23    up.  Let's start with that.

24       Comparable ten shows the total number of units at 19.

25    And how is it that you used that number, 19, in your analysis

364

31

```
 1        and appraisal of each of the three communities?
 2    A   I cannot answer that without referring to the data sheets.
 3    Q   Comparables 4 through 10 on page 17, with regard to those
 4        comparables, do you know whether they represent finished lots or
 5        not?
 6    A   If -- when you look under the column that says, Improvements,
 7        you'll note that I have indicated that.  So for -- I'm sorry,
 8        you said four through ten?
 9    Q   Right.
10    A   Six is finished lots, seven is finished lots, eight is finished
11        lots.
12    Q   Do you know whether four and five are actually finished lots at
13        this point?
14    A   At this point I don't know.  This table is reflective of the
15        condition of these properties at the time of their sale.
16    Q   Is it appropriate to use finished lots when trying to establish
17        the value of the subject as if vacant under the prior MFM
18        zoning?
19    A   It is appropriate to use any sales that can provide a credible
20        indication of value for sale.
21    Q   You don't believe that finished lots, as it relates to as if
22        vacant analysis, is like comparing apples to oranges?
23    A   I do not believe that that is the case.
24    Q   With regard to Comparable 9, do you know whether this comparable
25        was a distressed transaction?
```

34

1    Q   You say you went off the data sheets --

2    A   The data sheets.  I'm sorry.  This data sheet.  It's a service

3        called CoStar, and CoStar is a research firm that provides

4        extensive data about sales and conditions of properties.  So

5        it's a subscription database that is commonly used to define

6        sales.

7    Q   Now, as it relates to each of your three reports for the three

8        communities at issue in this case, so far, anyway, I believe

9        that we've been talking about tables and portions of your report

10       that are common to all three, correct?

11   A   If you're talking about the single family residential sale

12       comparison table in particular.

13   Q   Yes.

14   A   I believe that this one is common to Laurel Park and Velkommen,

15       and I believe that I did not use it, although I'm going to check

16       and make certain I didn't use it in Tumwater.  So let's check.

17       [Reviewing.]  And that is correct.

18   Q   What is correct?

19   A   What is correct that there is no -- there is no single family

20       residential land sale comparable analysis in Tumwater Estates.

21   Q   Why was that?

22   A   My conclusion of highest and best use for that property was that

23       it would be very unlikely to be developed as single family

24       residential property.

25   Q   As relates to the table that we discussed on page 13 as well as

366

35

1  the table on page 12, are these tables that would be common to

2  Laurel Park and Velkommen?

3 A I know the answer is yes, but I'm not going to answer yes

4  without looking.

5 Q Don't blame you.  And the next question would be:  Did you use

6  these tables on Tumwater Estates as well?

7 A Yes.  They're in all three of them.

8 Q So your responses to my prior question, as related to the tables

9  on page 12 and 13, would be the same for the other two

10  communities?

11 A Yes, they would.

12 Q And as it relates to the table on page 17, your answers would be

13  the same for Velkommen Park, but not Tumwater Estates?

14 A That is correct.

15 Q Now, is page 20 a multifamily land sales comparison --

16 A And you're still on --

17 Q -- referring to the appraisal for Laurel Park, which is

18  identified as Exhibit 3?

19 A Okay.  I'm sorry.  What page?

20 Q Page 20.

21 A Okay.

22 Q What is it that you intended the reader to take from this table?

23 A This is a table that shows three sales of land with the highest

24  and best use for multifamily residential development, and their

25  use for sales comparables under a condition assuming a similar

1   highest and best use for the subject.

2  Q  So would this table then apply, or your responses to my

3     questions, be the same for Laurel Park and Velkommen, but not

4     Tumwater Estates?

5  A  No, I believe -- I'm sorry.  I'm going to look.  The answer

6     should be that it's the same for all of them.  So it's on

7     page 18 of Tumwater Estates; and it's on page 20 of Velkommen.

8  Q  Now, with regard to the Sale Date column on the multifamily land

9     sale comparisons for Laurel Park, Exhibit 3, it, too, includes

10     one comparable after the effective date of your appraisal on

11     March, or in March of 2008; is that right?

12  A  March of --

13  Q  Oh, I'm sorry.  Your effective date was 2009?

14  A  2009.

15  Q  But the same question would still apply.  Looks like there's a

16     September 2009 for comparable, too, that is after March of 2009?

17  A  That is correct.

18  Q  And your prior response, as it relates to whether that's

19     appropriate or not, would apply to this table as well?

20  A  Yes, it would.

21  Q  Have you ever appraised a mobile home park before?

22  A  Yes, I have.

23  Q  How many?

24  A  I'm guessing at least 10.

25  Q  Okay.

37

1   A   Probably more than 10.  More than 10, I believe.

2   Q   Less than 50?

3   A   Less than 50.

4   Q   Less than 20?

5   A   Probably less than 20; but maybe 15.

6   Q   On page 24 of Exhibit 3 is a table titled, Capitalization Rate

7       Comparables.

8   A   Yes.

9   Q   What is it that you intended the reader to take from this table?

10  A   This is a table that shows the capitalization rates, direct

11      capitalization rates, that were applied to the eight sales of

12      the properties listed in that table.

13  Q   And these capitalization rates are identified in the furthest

14      right column as ranging from -- it looks like 6.1 percent to 7.9

15      percent, correct?

16  A   That is correct.

17  Q   And as I understand it, the capitalization rate that you

18      calculated and shows for purposes of your appraisal dealt within

19      that range?

20  A   That is correct.

21  Q   Is it your understanding that the capitalization rates, like if

22      I -- either Joel Erlitz or Jeanne-Marie Wilson also fell within

23      that range?

24  A   I -- I, again, feel confident in my answer, but I should look.

25      I believe that that is correct.

38

1    Q    I won't hold you to it.

2    A    I believe it is correct.

3    Q    These capitalization rate comparables also range in geographic

4         vicinity from Everett to Kent, Spanaway, Edmonds, Lynden,

5         Bellingham, Des Moines, and Puyallup, correct?

6    A    That's correct.

7    Q    How is it that you selected these comparables in order to arrive

8         at your capitalization rate?

9    A    The requirement -- the requirement for selection of a

10        capitalization rate is to find a sale in which you actually can

11        verify the capitalization rate.  So you are limited to ones

12        where you can actually verify that.  In other words, there are

13        many, many sales where you will have trouble and may not be able

14        to derive a capitalization rate.  You need to be able to have

15        the information to get that.

16   Q    Refer to page 22 of your report in Exhibit 3.

17   A    [Witness complies.]  Yes.

18   Q    Here are -- there's a table titled, Mobile Home Park Sales

19        Comparisons, One Through Nine.  What is it that you intended the

20        reader to take from this table?

21   A    This is a table that shows sales of mobile homes, and they are

22        intended to be good direct sales comparisons for the subject.

23   Q    Did you look for capitalization rates in comparables one through

24        nine on page 22 of Exhibit 3?

25   A    Yes, I did.

370

48

1      correct.  The four of us.

2  Q  And did you actually go inside the community to drive around the

3      interior roads?  Or was your review limited to the exterior?

4  A  No.  On both occasions, I drove around the interior.

5  Q  Did you have any contact with anyone there while you were

6      visiting the site either the first time or the second time?

7  A  I did not.

8  Q  How long were you at the site last week?

9  A  Each of the sites?

10  Q  Yes.

11  A  Fifteen-odd minutes, maybe.

12  Q  Did you limit your visit to driving around the community in your

13      automobile?  Or did you actually get out at any point?

14  A  I got out, I think, at several points to take pictures.

15  Q  Have you ever owned a mobile home park?

16  A  I have not.

17  Q  Have you ever managed a mobile home park?

18  A  I have not.

19  Q  Have you ever been involved with the sale of a mobile home park?

20  A  I have not.

21  Q  Do you have any position, one way or another, as it relates to

22      whether the owner of a mobile home park would be in a unique

23      perspective to value the owner's property?

24  A  Whether the owner would be in a position to value his own

25      property?

50

1   property for flood control.

2   Q   Would that be Cedar Grove Mobile Homes?

3   A   Cedar Grove.   Thank you.

4   Q   Have you ever been involved with a mobile home park closure in

5       which the property was intended to be redeveloped for another

6       purpose, other than Cedar Grove or Port of Seattle?

7   A   No.

8   Q   At some point I would presume, but correct me if I'm wrong, you

9       were asked to prepare a summary report as opposed to one of the

10      other two reports that you know the name of better than I?

11  A   Yes.   I'm certain that -- that we discussed the type before.

12  Q   And do you know why Tumwater selected a summary report as

13      opposed to one of the other types of reports?

14                      MR. MYERS:   Object.   Assumes facts not in

15          evidence.   You can answer the question.

16  A   I do not know.

17  Q   (By Mr. Olsen) With regard to each of your reports, there is a

18      section titled, Extraordinary Assumptions.   What is an

19      Extraordinary Assumption?   By way of example, not to hide the

20      ball from you or anything, but Laurel Park, it's a narrative on

21      page 2 under a caption titled, Extraordinary Assumptions

22      Hypothetical Conditions?

23  A   Oh, yeah.   Yes.

24  Q   What is an extraordinary assumption?

25  A   An extraordinary assumption is an assumption that an appraiser

51

1   can make under the standards of USPAP that allows him to assume

2   conditions that seem reasonable, that have a likelihood of being

3   reasonable, but which he cannot actually attest to.

4   Q   Is there a reason why you were not provided with a title report

5       for any of the three properties?

6   A   I can't answer that question.

7   Q   Why is it that you can't answer that question?

8   A   Oh, I'm sorry.  I mean -- I mean, I don't know, is what I mean

9       to say.  I'm sorry.  I can't answer the question.  I don't know.

10      I apologize for that.

11  Q   No worries.  Do you have any opinion as it relates to whether a

12      mobile home park has a fixed life or not?

13  A   Gen- -- yes, I have an opinion.

14  Q   What is that opinion?

15  A   The opinion is that the extent of life is based upon the ability

16      to maintain its physical condition in order to, you know,

17      provide a viable economic return, and also to maintain a -- the

18      highest and best use that will support, you know, continued use

19      of the mobile home park for that purpose.

20  Q   Do you have any opinion as to the duration of fixed life for a

21      mobile home park?

22  A   The duration could be quite -- not specifically, no, I do not.

23  Q   Have you ever appraised a mobile home park that was 100 years

24      old?

25  A   I believe that I have not.

52

1   Q  How about 50 years old?

2   A  I believe that I have.

3   Q  Would you agree or disagree that the shelf life for a mobile

4      home park is somewhere between 50 and 100 years?

5   A  I would agree that that's a reasonable assertion.

6   Q  Do you have an opinion as to whether the real estate market will

7      remain recessionary in perpetuity?

8   A  In perpetuity?

9   Q  Forever?

10  A  I have an opinion about that.

11  Q  What is that opinion?

12  A  I believe that it will not remain recessionary in perpetuity.

13  Q  Do you have an opinion as to the length of time before inventory

14     reduction is over?

15  A  I do not have a -- I have a very general opinion, not a specific

16     opinion.

17  Q  What is your general opinion?

18  A  I -- generally speaking, and I would -- I would never want to be

19     held to this, because it's -- I intend it to be very general --

20  Q  Sure.

21  A  -- is that I expect that real estate markets for residential,

22     probably commercial property as well, will probably remain

23     recessionary for several some length of time, in a specific

24     length of time, and then stabilize.  And then we'll see a

25     resurgence in appreciation in real estate, but I would not want

374

**EXHIBIT I**

375

Velkommen MHP Park
Page 26

**Reconciliation and Final Value Estimate**

The subject has been valued in the before condition under two potential uses as if vacant and also as improved. The value estimates under these circumstances are noted below.

| | |
|---|---|
| *As if Vacant for Single Family Development without Sewer* | *$1,000,000* |
| *As if Vacant for Single Family Development with Sewer* | *$2,700,000* |
| *As if Vacant for Multi-Family Development with Sewer* | *$2,400,000* |
| *As Improved for as a Mobile Home Park* | *$2,400,000* |

The analysis shows that the highest and best use of the subject as if vacant is for development of single family residential units with sewer. The value under this use at $2,700,000 is somewhat higher than the value as improved at $2,400,000. Therefore the highest and best use of the subject in the before condition is considered to be for single family residential development after extension of water and sewer to the property.

In the after condition the subject's zone is changed to manufactured home park. While this alters the subject's development potential as if vacant, it does not change its potential use at all as improved. Thus, the after condition highest and best use and value conclusion as improved would therefore be identical to the before condition. Based upon this analysis it is my conclusion that the impact to the subject as a result of the zoning change is as follows.

| | |
|---|---|
| **VALUE OF SUBJECT IN BEFORE CONDITION** | **$2,700,000** |
| **VALUE OF SUBJECT IN AFTER CONDITION** | **$2,400,000** |
| **VALUE IMPACT OF ZONING CHANGE** | **$300,000** |

**Effective Date of Value**

The effective date of value is March 23rd, 2009, which is the date upon which the zoning change was approved by the City of Tumwater.

**Date of Appraisal**

This appraisal was performed in December of 2009 and January of 2010.