1
2
3
4
5
6

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT TACOMA

7

8 | LAUREL PARK COMMUNITY, LLC, a
Washington limited liability company;
9 | TUMWATER ESTATES INVESTORS, a
California limited partnership; VELKOMMEN
10 | MOBILE PARK, LLC, a Washington limited
liability company; and MANUFACTURED
11 | HOUSING COMMUNITIES OF
WASHINGTON, a Washington non-profit
12 | corporation,

No. C09-05312BHS

DECLARATION OF
WALTER H. OLSEN, JR. IN SUPPORT
OF PLAINTIFFS' REPLY RE:
PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT

Note on Motion
Calendar: April 9, 2010

(Oral Argument Requested)

13

Plaintiffs,

14

v.

15 | CITY OF TUMWATER, a municipal
corporation,

16

17

Defendant.

18        Walter H. Olsen, Jr. declares as follows:

19        1.        I am one of the attorneys representing Laurel Park Community, LLC, Tumwater

20   Estates Investors, Velkommen Mobile Park, LLC, and Manufactured Housing Communities of

21   Washington in the instant case.  I am over the age of eighteen, competent to testify, and familiar

22   with the facts herein based upon personal knowledge.

23   / / /

24   / / /

25

26   Declaration of Walter H. Olsen, Jr. - 1

Talmadge/Fitzpatrick
18010 Southcenter Parkway
Tukwila, Washington  98188-4630
(206) 574-6661   (206) 575-1397 Fax

426

2.      Attached hereto as Exhibit A are true and correct copies of excerpts from the written transcript of the deposition of Jeanne-Marie Wilson which I defended on February 15, 2010.

3.      Attached hereto as Exhibit B are true and correct copies of excerpts from the written transcript of the deposition of James Andersen which I defended on January 29, 2010.

4.      I represented Laurel Park Community with regard to its building permit appeal. Tumwater correctly notes that Laurel Park agreed to toll its appeal of the ordinance provision governing replacement of mobile homes, TMC 18.04, but neglects to mention that both parties expressly reserved their legal rights related to that. *See* Decl. of Chris Carlson in Response to Motion for Summary Judgment at Ex. A.  In any event, Carlson admitted to me that the City Attorney agreed the ordinance was illegal, but he repeatedly stated he could not guarantee that the City Council would accept the staff's recommendation that the provision be amended to cure its illegality.  At the time the park owners filed their summary judgment motion, Laurel Park did not then know whether the City Council would reject or accept the advice of its staff and attorney.  When the Council amended the ordinance, Laurel Park withdrew its appeal as moot. Attached as Exhibit C is a true and correct copy of Laurel Park's email to Mr. Carlson which withdrew the appeal with a reservation of rights.

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON AND THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.

Executed at Puyallup, Washington, this 9th day of April, 2010.

Walter H. Olsen, Jr.

Declaration of Walter H. Olsen, Jr. - 2

427

Talmadge/Fitzpatrick
18010 Southcenter Parkway
Tukwila, Washington  98188-4630
(206) 574-6661   (206) 575-1397 Fax

**EXHIBIT A**

## Laurel Park v. City of Tumwater
## Deposition of Jeanne-Marie Wilson

**Page 6**

1  multifamily properties, hospitals. We all had certified
2  specialties there so . . .
3  Q  Is the certified specialty program something that they
4  have in-house, or is that --
5  A  Sure, it's in-house.
6  Q  So there is no recognized certification by the State of
7  Washington --
8  A  Correct.
9  Q  -- or any particular appraisal group?
10  A  Correct. We just specialized in certain property types.
11  Q  In the three-year training program, was that before you
12  got your license?
13  A  Yes.
14  Q  So it would be from '92 to '95?
15  A  Right.
16  Q  When you left Palmer Groth Pietka, where did you go to
17  work?
18  A  My husband's a residential real estate appraiser, and he
19  already had a practice established in Olympia. And I
20  joined him.
21  Q  And that's Wilson Appraisal Service?
22  A  Right.
23  Q  What's your husband's name?
24  A  Scott Wilson.
25  Q  What professional associations do you have memberships

**Page 7**

1  with?
2  A  I'm an associate member of the Appraisal Institute,
3  working towards the MAI designation.
4  Q  So you are not an MAI?
5  A  I am not.
6  Q  Can you tell me what the difference is between an
7  associate and an MAI?
8  A  MAI has taken a significant level of courses as well as
9  completed a demonstration report and experience credits,
10  which are checked by the institute, and sat for the test
11  basically.
12  Q  Okay. How many credits are necessary to get to the MAI
13  status?
14  A  Well, there's a course of classes. I have one more class
15  to take there and then the demo and sit for the test.
16  Q  Okay. And so you have one more class to take?
17  A  Right.
18  Q  Are you a member of any other professional associations?
19  A  Chamber of Commerce, Thurston County.
20  Q  Are you a member of any other associations concerning the
21  real estate business?
22  A  No.
23  Q  Are you a member of the Manufactured Housing Communities
24  of Washington?
25  A  No. I was when I was with PGP. Or rather the firm was a

**Page 8**

1  member and I was their representative.
2  Q  So you have not been a member or a participant in the
3  Manufactured Housing Communities of Washington since
4  1995?
5  A  Right. No. Since I left the firm in 2001.
6  Q  2001.
7  A  Right.
8  Q  Okay. So after your completion of the three-year
9  training program, you continued on at Palmer Groth and
10  Pietka?
11  A  Right.
12  Q  And was that as an analyst and then a senior analyst?
13  A  Right.
14  Q  What's the difference between an analyst and a senior
15  analyst?
16  A  Experience.
17  Q  When did you formally become a senior analyst?
18  A  I don't recall.
19  Q  How are you being compensated for your services in this
20  lawsuit?
21  A  At this point, these - work up to this point has been on
22  an hourly basis.
23  Q  What's your rate?
24  A  250.
25  Q  Have you ever provided services in lawsuits before?

**Page 9**

1  A  I was in discussions with another attorney at one point
2  in a trial that actually ended up settling out of court,
3  so I never did any depositions or prepared any work
4  product.
5  Q  What was the nature of that lawsuit?
6  A  It was a manufactured housing community in Snohomish
7  County. It was a familial disagreement.
8  Q  So it was a dispute between family members, and the value
9  of the mobile home park was --
10  A  Right.
11  Q  -- an asset they were arguing about?
12  A  An issue. Right.
13  Q  Have you had any other lawsuits that you've had
14  experience with?
15  A  No.
16  Q  Have you ever been qualified to testify as an expert
17  witness?
18  A  No.
19  Q  Have you authored any publications in the last 10 years?
20  A  When I was with PGP, they put together a newsletter, a
21  manufactured housing community newsletter, for interested
22  clients and investors. And we discussed various topics
23  surrounding manufactured home communities and the
24  ownership. We put that out on a quarterly basis. And I
25  worked with a team of appraisers out of the Sacramento

3  (Pages 6 to 9)

## Laurel Park v. City of Tumwater
## Deposition of Jeanne-Marie Wilson

### Page 10

1  office in California who were the specialists in their
2  office for manufactured housing communities.
3  Q  Okay. Were any of the articles that you prepared . . .
4    Do you know how many you prepared?
5  A  Maybe two or three.
6  Q  Do you know what the topics specifically were on those
7    articles?
8  A  One of the articles was surrounding RCW 59.23, when the
9    State of Washington - the law regarding tenants' first
10   right of refusal.
11 Q  And what was your analysis or discussion in that article
12   concerning the right of first refusal?
13 A  We were just discussing if it had an impact on value and
14   the concerns of the investor versus the tenant base.
15 Q  Do you know if that was before or after the Supreme Court
16   decided the constitutionality of that statute?
17 A  Before, I believe.
18 Q  Any other articles that you recall the topics?
19 A  No.
20 Q  Do you know whether that article was published in the
21   last 10 years?
22 A  Probably - probably not.
23                 (Deposition Exhibit No. 1 marked
                   for identification.)
24
25 Q  (BY MR. MYERS) This is a copy of Exhibit 1, which is a

### Page 11

1  copy of the report that you prepared dated December 7th,
2  2009. Are you familiar with your report?
3  A  Yes.
4  Q  Okay. What was the nature of the appraisal problem you
5    were asked to address?
6  A  It was my understanding that plaintiff's counsel needed
7    to establish me as an expert witness in a short period of
8    time. And so we limited the scope of work to include
9    valuation of the parks or the subject properties by the
10   income approach under continued use with the
11   understanding that I would be completing a
12   before-and-after analysis prior to trial.
13 Q  Did you complete that before-and-after analysis as part
14   of your December 7th report?
15 A  No.
16 Q  What type of report is your preliminary report?
17 A  Well, I was asked to model it after the Federal
18   26(a)(2)(B), and I called it a Summary Appraisal Report
19   under USPAP for compliance purposes.
20 Q  On page 1, it notes that you were retained on
21   December 4th, 2009.
22 A  Mm-hmm.
23 Q  And your report was due on December 7th?
24 A  Right.
25 Q  Mr. Olsen was the one who retained you?

### Page 12

1  A  Yes.
2  Q  What instructions did Mr. Olsen give you?
3  A  We discussed the case, MHCW versus the City of Tumwater.
4    And as I just said, we talked about establishing the
5    value of the parks under continued use as - under
6    continued use so that I could be I guess put in as an
7    expert witness. And because of the short time frame, we
8    limited the scope of the assignment at that time.
9  Q  Okay. When you discussed the appraisal project under
10   continued use, was that instruction that Mr. Olsen gave
11   to you?
12 A  It was a scope of work that we decided upon in the
13   interest of time.
14 Q  So that was a mutual decision between yourself and
15   Mr. Olsen?
16 A  I did not have a problem valuating it under continued
17   use. It was a valuation assignment that was acceptable
18   to me, yes.
19 Q  Did you discuss deadlines for this approach?
20 A  December 7th was the deadline. Right.
21 Q  Was three days sufficient amount of time for you to
22   prepare your opinions in this case?
23 A  Under our limited scope of work, I felt that it was.
24 Q  Okay. Did Mr. Olsen discuss with you why he was
25   approaching you only three days before the deadline?

### Page 13

1  A  He said that the other appraiser was not available to do
2    the work, the original.
3  Q  Was three days sufficient to do a before-and-after
4    analysis?
5  A  No.
6  Q  Did you discuss with Mr. Olsen the need to do a before
7    analysis?
8  A  Yes.
9  Q  Tell me what your discussions were with him.
10 A  Well, obviously the case centers around the before and
11   after values of these properties. So that would, of
12   course, have to be established prior to trial.
13 Q  What was the effective date of value for the analysis
14   that you gave in Exhibit Number 1?
15 A  December 31st, 2009 (sic).
16 Q  Why did you select that date?
17 A  We discussed the fact that because we were valuing it
18   under continued use, it would be appropriate to use a
19   date prior to Tumwater's ordinance change and the zoning,
20   which was, I believe, March.
21 Q  So the opinions that you gave --
22 A  Oh, I'm sorry. Did I say . . . December 31, 2008.
23 Q  2008. So the opinions of value that you have on page 3
24   reflect a value before the city adopted the mobile home
25   park ordinance?

4 (Pages 10 to 13)

February 15, 2010
Capitol Pacific Reporting, Inc. (800) 407-0148

45cd0080-d094-4a76-8a10-84ece3848415

**EXHIBIT B**

431

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 7

1  Q   Part of the LLC?

2  A   Correct.

3  Q   What's your position with the LLC?

4  A   Manager.

5  Q   Okay.  And how long have you been the manager of the

6      LLC?

7  A   I believe the LLC came into an existence about ten

8      years ago.  I've been managing it, though, since senior

9      in high school.

10 Q   Do you live there?

11 A   No.  I have in the past.

12 Q   And when were you a senior in high school?

13 A   Back in '84.

14 Q   '84?

15 A   '84, '85.

16 Q   Tumwater High School?

17 A   Yep.

18 Q   And what was your education after high school?

19 A   I went to South Puget Sound for about a year and then

20     started working for the State.

21 Q   And what's your employment history after South Puget

22     Sound Community College?

23 A   I've worked Mervyn's for about four years and then

24     started working for the State thereafter.

25 Q   What do you do for the State?

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

432

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 9

1    his passing.

2  Q   Okay.  And she owned it individually prior to the

3      formation of the LLC?

4  A   Yes.

5  Q   Okay.  So Phyllis is your mother?

6  A   Correct.

7  Q   Okay.  And who owns shares in the LLC?

8  A   Just Phyllis.

9  Q   And your position with the LLC is general manager?

10  A   General manager, yeah.

11  Q   What are your duties as the general manager?

12  A   Tenant relations, water and septics, danger trees,

13      getting contracts in there to do -- whether it's drain

14      fields, tree removal.

15  Q   Would you give me a general description of the mobile

16      home park?

17  A   You bet.

18  Q   Size, number of units.

19  A   It's 11.1 acres prime flat land.  It has 39 homes on it

20      spread out over that 11.1 acres.  Built in -- I believe

21      we purchased the property in '75.  I think the new

22      homes came in -- or the first homes, I believe closer

23      to '77 was when they first started coming in.  There

24      again, I was pretty young back then, so . . .

25  Q   Right.  And when you first became the manager, was that

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 34

1       you recall?

2   A   I don't recall.  It depends on if I first saw it in the

3       paper versus if it was a notice.

4   Q   Do you recall when you first found out about the

5       proposal?

6   A   I believe it was in 2008.

7   Q   Do you recall what month in 2008?

8   A   No, I don't.

9   Q   But by June 2008 you certainly knew that there was a

10      proposal --

11  A   Absolutely.

12  Q   -- being considered.

13          Now that the city council has adopted that

14      proposal, how has it affected your operation of the

15      mobile home park?

16  A   The operation hasn't -- the operating it hasn't changed

17      as far as the regular maintenance of the park.  The

18      value of the park, I believe, has changed.

19  Q   Does the zoning constrict your ability to charge the

20      rent that you see fit?

21  A   It will.

22  Q   How?

23  A   If we're forced to keep it as a park, we'll be forced

24      to connect up to city sewer down the road and then

25      having to raise the rates to accommodate that.

January 29, 2010
Capitol Pacific Reporting. 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 39

1        anything like that.

2    Q   Who's your drain-field specialist?

3    A   We have all sorts of them.  The one on 93rd, Jim

4        Hunter.  Our soils are not good drain-field material.

5    Q   What type of soils do you have there?

6    A   Loam.

7    Q   Is it -- is any of the soils there fill?

8    A   No.

9    Q   It's all naturally occurring?

10        Have you ever had anybody evaluate the suitability

11        of your soils for -- to accommodate future development

12        other than a mobile home park?

13   A   I imagine.

14   Q   What did they -- what did they say?

15   A   I didn't speak to them.  That would be my father.  He

16        was a developer.

17   Q   And he would have spoken to them prior to his death in

18        1985?

19   A   I would assume.

20   Q   So not for the last 25 years?

21   A   Correct.

22   Q   Okay.  Does Velkommen have any plans to convert this

23        property to any use other than a mobile home park at

24        any point in the future?

25   A   Currently we're not allowed to.

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 40

1   Q   At the time the zoning ordinance was under

2       consideration, did Velkommen have any plans to convert

3       to any other use?

4   A   I believe early on, when my father was around, with the

5       initial, was to be able to convert it.

6   Q   So 25 years ago your father had plans to convert it?

7   A   Sure.  He developed two of the -- some -- two of the

8       developments right down the street from us.

9   Q   Okay.  Why didn't he convert this park --

10          Do you know why he didn't convert this park before

11      he died?

12  A   It was -- let's see -- '77 to '84.  I was pretty young.

13      All the infrastructure he had just put in that would be

14      viable.

15  Q   Okay.

16  A   Usually would wait about 20 years or so, 20 to 30

17      years.

18  Q   Do you know whether there were any time tables or

19      written plans for when that conversion would occur?

20  A   Nope.

21  Q   Just something he was thinking of at some point in the

22      future?

23  A   I believe so, keeping his options open, putting the

24      land in the bank.

25  Q   When you first learned that this city ordinance was

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 41

1    being considered, did you have any specific plans to

2    propose conversion of the Velkommen park?

3  A   I wanted to get rid of it.

4  Q   Why?

5  A   Because I know what -- I know what's right down the

6    road, and I don't want to see the people's faces when

7    their rates go up or when they're forced to move out of

8    the homes because of the ordinance the city has

9    imposed.

10  Q   Okay.  So your plan was to sell it at -- at that point,

11    correct?

12  A   We have entertained a couple offers throughout the

13    years.  And in 2008 -- well, I shouldn't say

14    "entertained."  We had gotten several offers prior to

15    2008.  When we saw the ordinance, we decided enough's

16    enough; you know, we weren't going to hold out any

17    longer, wanted to get rid of the park --

18  Q   Okay.

19  A   -- 'Cause the value's just going to be shooting down.

20  Q   So prior to the time the City adopted this ordinance,

21    is it fair to say you did not have plans to convert the

22    park to a different use under your ownership?

23  A   I don't own it.

24  Q   Or under the LLC's ownership.

25  A   I believe -- I believe we have looked -- or I believe

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

437

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 42

1    the idea was entertained to develop it.

2  Q    What does it mean that the idea was entertained?  I

3       don't understand what you mean.

4  A    How could you not know what it means?  I mean, we

5       thought of developing.  If you have a 5-acre chunk with

6       a little beat-up house, you're entertaining the idea of

7       some day maybe there would be more than just a house.

8  Q    Okay.  When did you entertain those ideas?

9  A    I didn't entertain it.  I think the family as a whole

10      entertained it.

11  Q   Okay.  Tell me about the decision-making structure

12      within Velkommen Mobile Park, LLC.

13         Who has the authority to make decisions within

14      that entity?

15  A   I would say I've got the decision-making.  I believe

16      Phyllis has the decision-making.  Well, I know she's

17      got it 'cause she's the owner.

18  Q   And she owns 100 percent of the shares?

19  A   She owns 100 percent.

20  Q   Do you discuss with her her plans for the property?

21  A   Yes.

22  Q   Did you ever discuss with her a plan to redevelop the

23      property under the existing ownership?

24  A   I believe the family has entertained the idea of

25      developing it.

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

438

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 48

```
 1        every year, but we've just always had kind of pretty
 2        much dismissed them.
 3    Q   Okay.  What made -- what caused Velkommen Mobile Park,
 4        LLC, to offer the property for sale with NW Park
 5        Brokerage in 2008?
 6    A   We got frustrated with our property rights being taken
 7        away from us.
 8    Q   Now, the beginning date on this is May 9, 2008.
 9    A   Uh-huh.
10    Q   At the time that this was entered into, I take it then
11        you knew that the City was proposing a mobile-home-
12        park --
13    A   It was --
14    Q   -- ordinance.
15    A   It was in that time frame there.
16    Q   Okay.
17    A   I believe we must have gotten something -- like I said,
18        either something was in the paper or something in --
19        came through in the mail.
20            But there's just things that are happening within
21        the park; things are getting old.  And we just want to
22        make sure that, you know, if we're going to be selling
23        it, we're selling it while it's still functionable.
24    Q   Okay.  How was it you arrived at the $1.8 million
25        price?
```

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 49

| | | |
|---|---|---|
| 1 | A | Like I said, NW Park Brokers told us 1.8 would be a |
| 2 | | very good price.  Also from past offers from preceding |
| 3 | | years. |
| 4 | Q | Okay.  How many offers had you had in the year |
| 5 | | preceding, say, beginning January 1, 2007, through |
| 6 | | May 9, 2008? |
| 7 | A | Significant ones, we had one significant one. |
| 8 | Q | Who was that from? |
| 9 | A | Mark Valko, commercial realtor. |
| 10 | Q | Is that V-a-l-c-o? |
| 11 | A | V-a-l-k-o, I believe it is.  You see signs down south. |
| 12 | | He had a local businessman that wanted the park. |
| 13 | Q | Who was the -- |
| 14 | A | Wanted it also the previous year, in 2006. |
| 15 | Q | Who was that local businessman? |
| 16 | A | He's an insurance guy right down the street here on |
| 17 | | Capitol Boulevard.  Ingram, I believe his name is. |
| 18 | Q | Lee Ingram? |
| 19 | A | Yeah. |
| 20 | Q | Did he make you any written offers in 2007 or early |
| 21 | | 2008? |
| 22 | A | I can't recall if they were written.  We met, though. |
| 23 | Q | When did you meet? |
| 24 | A | In 2006 I believe it was. |
| 25 | Q | Okay.  And what did you discuss with Mr. Ingram? |

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

440

James W. Andersen
Laurel Park Community, LLC, et al. v. City of Tumwater

Page 82

1       to convert it to another use before the City's zoning

2       ordinance was adopted?

3    A  We were hanging onto it, and we were going to develop

4       it potentially or sell it, whatever the decision was

5       going to be made.  And when we saw the ordinance, we

6       knew that -- that if we didn't move one way or the

7       other, that we wouldn't even have a retirement for

8       Phyllis.

9    Q  How old is your mother?

10   A  Seventy-seven.

11   Q  And she's currently retired?.

12   A  Yes.

13   Q  She living off the income from this park?

14   A  Yes.

15   Q  Okay.  Let's take two minutes, and I think we're just

16      about done.

17                          (Deposition concluded at 4:03 p.m.)

18                          (Signature Reserved.)

19

20

21

22

23

24

25

January 29, 2010
Capitol Pacific Reporting 1-800-407-0148

ba67d02b-5f11-4596-816a-85438585f2b5

441

**EXHIBIT C**

442

**Walt Olsen**

| | |
|---|---|
| **From:** | Bob [altair80@aol.com] |
| **Sent:** | Saturday, March 20, 2010 10:28 AM |
| **To:** | Chris Carlson |
| **Cc:** | Walt Olsen; Emmelyn Hart-Biberfeld |
| **Subject:** | Laurel Park #10 Permit Appeal |

Dear Chris:

Without waiving any legal right or remedy arising in my pending federal lawsuit against the City of Tumwater, I would like to withdraw the appeal on the administrative determination issued by the City of Tumwater regarding a home for space #10 at Laurel Park Estates.

Laurel Park Estates LLC
Robert Eichler, member

443