1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LAUREL PARK COMMUNITY, LLC, a
Washington limited liability company; et
al.,

                 Plaintiffs,

        v.

CITY OF TUMWATER, a municipal
corporation,

                 Defendant.

CASE NO. C09-5312BHS

ORDER GRANTING
DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT,
DENYING PLAINTIFFS'
MOTION FOR PARTIAL
SUMMARY JUDGMENT,
AND DISMISSING CASE

        This matter comes before the Court on the parties' cross motions for summary

judgment (Dkts. 58, 60). The Court has considered the pleadings filed in support of and in

opposition to the motions and the remainder of the file and hereby grants Defendant's

("Tumwater") motion for summary judgment, denies Plaintiffs' motion for partial

summary judgment, and dismisses this case as discussed herein.

## I. PROCEDURAL HISTORY

        On February 19, 2010, Plaintiffs[1] moved for partial summary judgment. Dkt. 15.

On March 17, 2010, Tumwater moved for summary judgment as to all claims. Dkt. 20.

_____

        [1]Plaintiffs include Manufactured Housing Communities of Washington ("MHCW") and
the Manufactured Home Parks ("MHP")  Laurel Park, Tumwater Mobile Estates, and
Velkommen. The MHPs will collectively be referred to as the Parks.

On May 19, 2010, the Court stayed consideration of these motions pending the disposition of *Guggenheim v. City of Golenta*, 582 F.3d 996 (9th Cir. 2009), which was to be reheard *en banc*. Dkt. 52. On December 22, 2010, *Guggenheim* was reheard. *Guggenheim v. City of Golenta*, __ F.3d __, 2010 WL5174984 (9th Cir.).[2]

On March 4, 2011, Tumwater renewed its motion for summary judgment as to all claims brought against it by Plaintiffs. Dkt. 58. On the same day, Plaintiffs filed their renewed motion for partial summary judgment. Dkt. 60. The parties have fully briefed these issues. Dkts. 62, 63, 67.

## II. FACTUAL BACKGROUND

Plaintiffs challenge Tumwater's adoption of two ordinances: Ordinance Nos. O2008-27 and O2008-009. Complaint (Dkt. 1) ¶ 20. These ordinances became effective on March 23, 2009. Tumwater maintains that it adopted these ordinances consistent with its comprehensive plan, which it adopted in accordance with Washington's Growth Management Act, Chapter 36.70A RCW ("GMA"). *Id*. ¶ 8.

The GMA provides that "[p]rivate property shall not be taken for public use without just compensation having been made. The property rights of landowners shall be protected from arbitrary and capricious conduct." RCW 36.70A.020(6). *Id*. The GMA further requires Tumwater's comprehensive plan to identify sufficient and suitable land for housing that provides for, but is not limited to, government assisted housing, low-income housing, manufactured housing, multi-family housing, and group homes and foster care facilities. *Id*. ¶ 9.

According to Washington State Department of Community, Trade, and Economic Development ("CTED"), between 1989-2008, Washington MHPs experienced an increasing MHP closure rate. Declaration of David Ginther (Ginther Decl.), Ex. 1 at 2.

---

[2] To the extent *Guggenheim* is applicable to resolving the issues before the Court in this matter, it is discussed herein.

ORDER - 2

Between 1989-2002 the closure rate was nearly six MHPs per year; between 2003-2008 that number increased to fourteen per year. *Id.*

These matters were addressed by Tumwater in February 2008 as part of the annual comprehensive plan update process. Complaint ¶ 10. Tumwater proposed creating a manufactured home park district ("MHP District"). *Id.* Tumwater maintains that the MHP District "is intended to ensure consistency with RCW 36.70A.070(2)(c) which requires sufficient land be available for all types of housing including manufactured housing." Ginther Decl., Ex. 2 at 14.

Initial proposals for the MHP District included ten existing MHP communities; Tumwater ultimately reduced the final number of MHPs in the district from ten to six MHP communities. Complaint ¶ 12 (describing the proposal that ultimately became Ordinance No. O2008-027); *see also* Ginther Decl., Ex. 2 at 25 (map depicting the six MHPs: Eagles Landing, Laural Park, Tumwater Mobile Estates, Thunderbird Villa, Velkommen, and Western Plaza). Tumwater also adopted standards for the newly created MHP District, which became Ordinance No. O2008-009. These ordinances were codified in Chapter 18.49 of the Tumwater Municipal Code ("TMC"). It is undisputed that the Parks have operated their respective properties as MHPs for 28-45 years.

TMC 18.49.010 provides that the MHP District "is established to promote residential development that is high density, single family in character and developed to offer a choice in land tenancy. The MHP [District] is intended to provide sufficient land for manufactured homes in manufactured home parks." *Id.* TMC 18.49.010 also sets forth the permissible uses for land within the MHP District, which includes the following, among other things: (A) MHP in accordance with TMC 18.48; (B) designated manufactured homes on existing single lots of record; (C) existing MHPs established prior to July 1, 2008; (D) one single family detached dwelling per existing single lot; (E) parks, trails, open spaces, and related recreation facilities; (F) support facilities; and (G)

family child care home, child mini-day care center (subject to approval). *Id.* at 9-10. Conditional uses for the MHP District include, among other things, churches, cemeteries, day care center, public/private schools, community center, group foster homes, and bed and breakfasts.

TMC 18.49.070(1) provides that a MHP owner "may request a use exception or modification from the application of the MHP zoning." TMC 18.49.070(2) provides that such use exceptions may be approved when the owner demonstrates that (a) "they do not have reasonable use of their property under MHP zoning; or" (b) "the uses authorized by the MHP zoning are not economically viable at the property's location." *Id.* at 13.

The following MHPs are a part of the MHP district and owned separately by parties to this litigation: Laurel Park, Tumwater Mobile Estates, and Velkommen Park.

In challenging the MHP District ordinances adopted by Tumwater, Plaintiffs argue that Tumwater's ordinances constitute a regulatory taking and also violate their substantive due process and equal protection rights under the federal and Washington State constitutions. Complaint ¶¶ 27-40.  Additionally, Plaintiffs argue that the challenged zoning constitutes illegal spot zoning. Plaintiffs seek relief from Tumwater for other causes of action, which are derivative of their constitutional claims.

### III. DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party.  The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 255).  Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.   Cross Motions for Summary Judgment**

Plaintiffs move for partial summary judgment, limited to their constitutional claims (regulatory taking, substantive due process, equal protection, and illegal spot zoning). Dkt. 60 at 1.  In opposition, Tumwater moves for summary judgment as to all claims asserted against it by Plaintiffs. *See, e.g.*, Dkt. 58.

### 1.      Zoning, Generally

The Ninth Circuit has noted that "land use law is one of the bastions of local control, largely free of federal intervention."  *Congregation Kol Ami v. Abington Township*, 309 F.3d 120, 135-136 (3d Cir. 2002). Indeed, as the Supreme Court has recognized, "[t]he power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities . . . . [T]he courts generally have emphasized the breadth of municipal power to control land use . . . ." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981); *see also FERC v. Miss.*, 456 U.S. 742, 768 n. 30 (1982) ("[R]egulation of land use is perhaps the quintessential state activity."); *Izzo v. Borough of River Edge*, 843 F.2d 765, 769 (3d Cir. 1988) ("Land use policy customarily has been considered a feature of local government and an area in which the tenets of federalism are particularly strong."). For this reason, federal courts are generally loathe to interfere with land use regulation. *Izzo v. Borough of River Edge*, 843 F.2d 765, 769 (3rd Cir. 1988) ("Federal courts have expressly disavowed any desire to sit as a statewide board of zoning appeals hearing challenges to actions of municipalities.").

### 2.      Regulatory Takings

#### a.      Standards

The Fifth Amendment mandates that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V. The United States Supreme Court has recognized "that the 'Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Penn Central Transp. Co. v. City of N.Y.*, 438 U.S. 104, 123 ("*Penn Central*") (1978) (*quoting Armstrong v. United States*, 364 (1960)). The Fifth Amendment is not designed "to limit the governmental interference with property rights per se, but rather to secure compensation in the event of

otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005) (internal citations omitted) (emphasis in original).

Various takings theories are recognized in the Supreme Court's jurisprudence. *See id.* First is the actual, physical invasion or appropriation of private property by the government. *Id.* at 537. Second are "regulatory takings" in which the "government regulation of private property . . . [is] so onerous that its effect is tantamount to a direct appropriation or ouster." *Id.* These two types of regulatory takings result in a per se taking under the Fifth Amendment. *Id.* at 538. All other regulatory takings are analyzed under a third, more general category of takings, which are subject to the analytical framework set out in *Penn Central*, 438 U.S. 104. Plaintiffs have framed their case under this third category.[3] Dkt. 60 at 9.

Specifically, Plaintiffs allege a facial, rather than as-applied, challenge to the ordinances at issue. To be successful in its facial challenge, Plaintiffs must establish that the "mere enactment of the [ordinances] constitutes a taking." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493 (1987). In a facial takings case, the inquiry is limited to whether "mere enactment" of the regulation has gone too far. *Garneau v. City of Seattle*, 147 F.3d 802, 807 (9th Cir. 1998); *see also Guggenheim*, __ F.3d at *4, 2010 WL 5174984. The Supreme Court has recognized that facial takings challenges "face an uphill battle since it is difficult to demonstrate that mere enactment of a piece of legislation deprived the owner of a economically viable use of his property." *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 736 n. 10 (1997). In a facial challenge, a court will look only to the regulation's "general scope and dominant features, leaving

---

[3]Tumwater moves the Court to grant summary judgment in its favor on the issue of per se takings under the first two categories of regulatory takings, discussed above. Dkt. 58 at 10. Because Plaintiffs frame their claims solely under the third category (regulatory taking) and do not challenge Tumwater on this issue, the Court grants summary judgment in favor of Tumwater on the issue of per se takings.

1    other specific provisions to be dealt with as cases arise directly involving them."

2    Nonetheless, Plaintiffs must still

3          show that the [ordinances] "go too far" in regulating their property by
      introducing evidence of the economic impact of the enactment of the
4          [ordinances] on their property. Thus, plaintiffs must show that the value of
      their property diminished as a consequence of the [ordinances]. Further
5          plaintiffs must show that the diminution in value is *so severe* that the
      [ordinances have] essentially appropriated their property for public use.
6

7    *Garneau*, 147 F.3d at 807-808 (addressing a facial claim under the third-category,

8    regulatory takings) (emphasis added).

9          Similar to the plaintiffs in *Garneau* and *Guggenheim*, Plaintiffs narrowly frame

10   their case as solely a facial challenge to the Tumwater ordinances; they assert that their

11   facial challenge should be evaluated under *Penn Central*. This Court follows the

12   *Guggenheim* court and assumes without deciding that such a facial challenge can be made

13   under the *Penn Central* analytical framework. *Guggenheim,* __ F.3d at *3.

14              **b.    *Penn Central***

15         More recently the Supreme Court articulated the standard for a proper *Penn*

16   *Central* takings analysis. *Lingle v. Cheveron U.S.A. Inc.*, 544 U.S. 528, 540 (2005). In

17   setting out the proper analytical framework, it expressly abrogated the formerly but

18   inappropriately applied "substantially advances legitimate state interests" formula,

19   holding that such a test is the subject of a due process claim and not a regulatory takings

20   claim. Therefore, to the extent Plaintiffs allege a regulatory takings claim against

21   Tumwater on the basis that the ordinances do not substantially advance legitimate state

22   interests, such allegations are rejected in accord with *Lingle*. 544 U.S. at 540-541.

23         The *Lingle* Court also noted the following:

24         Although our regulatory takings jurisprudence cannot be
      characterized as unified, [it] aims to identify regulatory actions that are
25         functionally equivalent to the classic taking in which government directly
      appropriates private property or ousts the owner from his domain.
26         Accordingly, each [the test] focuses directly upon the severity of the burden
      that government imposes upon private property rights . . . . [T]he *Penn*
27

28

*Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.

*Id*. at 539-540.

Following *Lingle*, resolving a *Penn Central* takings claim requires a court to consider the following three factors in assessing whether or not a regulation (e.g., zoning ordinance) effects a "taking" that requires compensation: (1) the regulation's economic impact on the claimant; particularly, (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Penn Central*, 438 U.S. at 124. With regard to this last factor, the Court noted a physical invasion of property is more likely to result in a "taking" than "when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* No physical invasion is alleged in this case.

The Supreme Court has also addressed the test for determining whether a regulatory taking occurred, holding that it requires a court to compare the value that has been taken from the property with the value that remains in the property. *DeBenedictis*, 480 U.S. at 497; *see also Garneau*, 147 F.3d at 808 (discussing lack of quantitative data evidencing a diminution in value from a before and after perspective).

### i.    Economic Affect of Ordinances

To succeed in their claim that the ordinances at issue constitute a regulatory taking, Plaintiffs must establish a sufficient level of economic impact caused by the mere enactment of the regulation. *Id*. at 538-39. In rejecting the facial challenge brought by the plaintiff in *Garneau*, the Ninth Circuit noted the following about the lack of economic impact evidence:

Not only have plaintiffs failed to show the type of "extreme circumstances" necessary to sustain a regulatory takings claim, plaintiffs have refused to produce any evidence of economic impact. Plaintiffs

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

refused to produce evidence regarding the *value of their property before enactment* of the TRAO. They have refused to produce evidence regarding the *value of their property after enactment* of the TRAO. They have refused to produce evidence regarding the anticipated economic consequences of the TRAO. Plaintiffs have not generally alleged that the TRAO makes it commercially impracticable for them to continue operating their apartment buildings. Indeed, not a single member of the plaintiff class has pointed to a single apartment building that can no longer be operated for profit . . . .

There is very little in the record in this case from which we may determine the economic impact of the TRAO on plaintiffs' property. What little evidence there is relates only to an as-applied, not a facial claim.

147 F.3d at 808 (emphasis added, citations omitted).

Similarly here, Plaintiffs have not provided adequate evidence on which the Court could determine whether sufficient diminution in property values has resulted from the mere enactment of the ordinances at issue, which is required to establish a *Penn Central* taking.[4] In fact, Plaintiffs' own expert admits that she did not analyze the impact that the ordinances had on the Parks from a before and after perspective. Declaration of Jeffery S. Myers (Dkt. 23), Ex. D (Dkt. 23-5, Deposition of Jeanne Marie Wilson ("Wilson") at 3).

Instead of providing quantitative evidence of an economic impact, Plaintiffs' expert assigns qualitative opinions in light of facts to establish an economic loss. Plaintiffs argue that the mere enactment of the challenged ordinances caused a transfer of wealth from the Parks to the tenants because the Parks must now offer MHP housing in perpetuity. Plaintiffs, however, have not sufficiently quantified this alleged transfer. Plaintiffs have not provided sufficient evidence on which it could be concluded that the ordinances have deprived them of all reasonable and beneficial use of or return from the subject property, and mere disappointed expectations do not amount to an unconstitutional taking. Plaintiffs do not cite adequate authority for the proposition that an expert's analysis on diminution in value is supportable on conjecture not backed by actual evidence of quantitative value (loss).

_____

[4]Although Plaintiffs have submitted some evidence of loss specifically related to the Velkommen property, such is a matter for an as applied challenge, not a facial challenge.

ORDER - 10

Another argument advanced by Plaintiffs is that the Parks cannot redevelop their land into other, perceived, higher and better uses for their lands. Plaintiffs urge the Court to focus on the Parks' "constitutional injury rather than fixate on dollar amounts." Dkt. 67 at 1. However, for a constitutional injury to be established under *Penn Central*, a plaintiff must be able to establish economic injury. Plaintiffs themselves asserted in their briefing that they must establish "loss of value that may be less than 100 percent, but high enough to have 'gone too far.'" Dkt. 60 at 10 (quoting *Penn Central*, 438 U.S. at 124). Fatal to Plaintiffs' claims is that they have not established an adequate record to show such loss.

Even if such conjecture were sufficient, Plaintiffs have failed to reach the top of the uphill climb required to set out a viable facial challenge takings claim. *See, e.g., DeBenedictis*, 480 U.S. at 495-496. *DeBenedictis* involved several coal companies' challenge to a Pennsylvania Act that required 50 percent of the coal beneath certain structures be kept in place to provide surface support. The case is instructive to the issues presented in this case. The *DeBenedictis* Court noted the following about the heavy burden placed on plaintiffs in cases such as this:

> The hill is made especially steep because petitioners have not claimed, at this stage, that the Act makes it commercially impracticable for them to continue mining their bituminous coal interests in western Pennsylvania. Indeed, petitioners have not even pointed to a single mine that can no longer be mined for profit.

*Id.* The *DeBenedictis* Court distinguished its case from one wherein plaintiffs challenged an Act that caused the mining of "certain coal" to become commercially impracticable. *Id*. at 484. *Debenedictis* is distinguishable. *See id*.

Here, Plaintiffs have not provided competent evidence to establish that operating MHPs, as the Parks have for many years, has now, by mere enactment of the ordinances, become commercially impracticable or unprofitable. In contrast, Tumwater has highlighted competent evidence in the record to support its position that the Parks have not been economically affected in a manner that would support a valid takings claim.

Tumwater notes that Wilson (Plaintiffs' expert) appraised Velkommen at $1.4-1.5 million for 2008, which pre-dates the ordinances at issue. In the spring of 2008, Velkommen's prior owner (James Andersen) listed the property for sale and received offers at $1.75 million and $1.6 million. Declaration of James Andersen ¶ 4 (Dkt. 60-9). Andersen claimed that after the ordinances went into effect, these offers fell through. *Id*. ¶ 5. Plaintiffs use these facts to argue that a loss in value is directly attributable to the mere enactment of the ordinances at issue.

However, their assertion is belied by Andersen's supplemental declaration (Andersen Supp. Decl., Dkt. 60-21). In 2011, post-adoption of the ordinances, Andersen sold Velkommen for $1.6 million, which is a price that at least one willing buyer offered to pay in 2008. Andersen Supp. Decl. ¶ 4.[5] This sale price exceeds Wilson's 2008 valuation by $100,000. Contrary to Plaintiffs' claims, this fact supports Tumwater's position that Plaintiffs have failed to provide competent evidence that the mere enactment of the challenged ordinances have caused property owners in the MHP District a constitutionally sufficient diminution in property value or that their operating of a MHP in Tumwater is now commercially impracticable.

Therefore, this factor weighs in favor of Tumwater.

### ii.    Distinct Investment-Backed Expectations

The Ninth Circuit has well described what is meant by the phrase "distinct investment-backed expectations." *Guggenheim*, __ F.3d at *5. "Distinct investment-backed expectations" implies reasonable probability, like expecting rent to be paid, not starry eyed hope of winning the jackpot if the law changes." *Id*. It follows that distinct investment-backed expectations also do not come in the form of starry eyed hopes that zoning laws will remain in perpetuity so that one day a land owner might act on

---

[5]This fact of Velkommen's sale also disposes of Plaintiffs' argument that the ordinances have "taken" away the owners' ability to freely dispose of their property. *See* Dkt. 60 at 17.

his/her current speculative thoughts about developing his/her property into some other more economically rewarding venture. The latter is Plaintiffs' argument.

Plaintiffs argue that the Parks have each invested in property that was zoned in a way that would have permitted them to re-develop the land into other things other than MHPs, like shopping centers. However, none of the properties in the MHP District were previously zoned for anything other than residential for varying levels of familial density. *See* Ginther Decl. (Dkt. 21-3), Ex. 2 at 25 (map of the properties in and around the MHP District depicting former and current zoning of the MHPs affected by the Tumwater ordinances). While there is some evidence that a MHP was excluded from the MHP District, that MHP (Allimor Carriage) is surrounded by commercially zoned land, unlike the MHPs at issue. In other words, the zoning of the properties that surround the MHPs at issue, prior to and after the challenged ordinances took effect, is consistent with the currently zoned MHP District.

Nonetheless, Plaintiffs argue that the Parks owners' investment expectations have been dashed by the Tumwater ordinances because they restrict their use of the properties to MHPs and other approved uses. Plaintiffs have also introduced some evidence that at least one of the 2008 offers for Velkommen included a premium for the possibility of redeveloping the land into condominiums, which they would claim is now lost as a result of the ordinances at issue.

However, the fact that the Parks may not be able to make the most profitable use of the subject property is not sufficient to state a "takings" claim, *Goldblatt v. Hempstead*, 369 U.S. 590, 592 (1962), and "the submission that [Plaintiffs] may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable," *Penn Central*, 438 U.S. at 130. Even a substantial reduction in the property's value is not sufficient to establish a "taking." *Id.* at 131 (citing *Euclid v. Ambler Realty*

1    *Co.*, 272 U.S. 365 (1926)) (75 percent diminution in value caused by zoning law);

2    *Hadacheck v. Sebastian*, 239 U.S. 394 (1915) (87.5 percent diminution in value).

3    *Euclid* and *Hadacheck* also show that courts are primarily interested in quantified loss

4    and not qualitative conjecture on loss in the abstract (i.e., losses that have not been or are

5    unable to be quantified); *see also Hodel v. Irving*, 481 U.S. 704, 714 (1987) (looking to

6    the market value of the property); *DeBenedictis*, 480 U.S. at 493-96 (looking to whether

7    the regulation makes the property owner's current business operation "commercially

8    impracticable").

9         Plaintiffs have not provided competent evidence of an investment-backed

10   expectation that is distinct, probable, or real beyond mere speculative desires. To the

11   extent Plaintiffs argue that a distinct investment-backed expectation can take the form of

12   an expectation that zoning laws will remain unchanged during the life of their property

13   ownership, such is not supported by case law. *See Pennsylvania Coal Co. v. Mahon*, 260

14   U.S. 393, 413 (1922) ("Government hardly could go on if to some extent values incident

15   to property could not be diminished without paying for every such change in the general

16   law."). To the extent Plaintiffs argue that their plan to operate a MHP until doing so is not

17   economically viable, at which time they would convert the property to something else,

18   which is protected under the scheme of TMC 18.49.070.

19        In short, with respect to distinct investment-backed expectations, Plaintiffs have

20   provided competent evidence that supports only a conclusion that MHP owners have

21   invested in and expect to operate as a MHP. What they have not shown is how the

22   ordinance impinges on that expectation in a manner that could support a takings claim.

23        Therefore, this factor weighs heavily in favor of Tumwater.

24                      **iii.    Character of Regulation**

25        In *Guggenheim*, the Ninth Circuit explained that the "character of the regulation"

26   factor weighed in favor of the City because "[t]he City of Golenta did not adjust the

benefits and burdens of economic life, it left them as they had been for many years."
Plaintiffs have not provided competent evidence that Tumwater's ordinances are either
confiscatory or physically invasive. Instead, the evidence in the record suggests only that
Tumwater has left economic life as it has been for many years. Indeed, the properties
making up the MHP District have operated as MHPs for between 28-48 years.

Therefore, this factor weighs heavily in favor of Tumwater.

### iv.    Conclusion

Plaintiffs have not adequately supported their facial challenge, in that Tumwater's
ordinances do not appear on their face, by mere enactment, to have caused a taking.
Therefore, Plaintiffs have failed to establish a material question of fact as to their facial
takings claim.

### 3.    Substantive Due Process

### a.    Federal Inquiry

Plaintiffs argue that even if Tumwater's adoption of the ordinances did not
constitute a taking, the Tumwater ordinances violate their substantive due process rights.
The parties agree that classic minimal scrutiny (i.e., rational basis) applies to determine
this issue. *See* Dkt. 62 at 19 (citing Dkt. 60 at 19). To succeed on such a claim, a plaintiff
must allege that "a state actor deprived [him] of a constitutionally protected life, liberty,
or property interest." *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008) (citing
*Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020, 1026 (9th
Cir. 2007)). Such a violation is not preempted by the Takings Clause where the land use
action challenged is "so arbitrary or irrational that it runs afoul of the Due Process
Clause." *Shanks*, 540 F.3d at 1087 (quoting *Lingle*, 544 U.S. at 542). When challenging a
municipality's land use action, a plaintiff must show that the "governmental deprivation
of [the] [protected] interest . . . rises to the level of the constitutionally arbitrary." *Id.* at

1087 (emphasis omitted). "[O]nly egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.*

Here, Plaintiffs concede that the ordinances are reasonably related to Tumwater's interest in providing affordable housing in compliance with the goals of the GMA. They argue that "the means used to achieve that pupose are improper, bearing no rational relationship to that purpose." Dkt. 60 at 19.

However, Plaintiffs do not adequately support their argument. Instead they point out that the uses for the MHP owner's property has been restricted under the new ordinances and that Tumwater has many alternatives for supporting affordable housing. Such an argument is irrelevant in the context of rational basis scrutiny, which Plaintiffs admit applies to their case. The question is not whether the land use action (zoning in this case) restricts use or whether other, potentially superior, alternatives exist to achieve the same purpose. Instead, the question for the Court to answer in this case is whether the challenged ordinances are rationally related to Tumwater's stated purpose (complying with the GMA's requirements for affordable housing) and not the product of egregious official conduct.

Because Plaintiffs have not provided competent evidence to support a finding in their favor on this question, they have not established a material question of fact as to their federal substantive due process claim. In light of this failure, Plaintiffs' substantive due process claim is preempted by the Takings Clause. *See Shanks*, 540 F.3d at 1087 (A substantive due process violation claim is preempted by the Takings Clause where the land use action challenged is not "so arbitrary or irrational that it runs afoul of the Due Process Clause.").

      **b.**      **Washington State Inquiry**

Alternatively, Plaintiffs argue that, even if Tumwater's ordinances survive a federal substantive due process inquiry, they are unduly oppressive and, therefore, violate

their Washington State substantive due process rights. Dkt. 60 at 20 (citing *Guimont v. Clarke*, 121 Wn.2d 586, 611 (1993) (adding a third prong to substantive due process, whether the regulation is unduly oppressive)). The *Guimont* court set out the three-part, Washington substantive due process reasonableness inquiry as follows: (1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the landowner. 121 Wn.2d at 609 (citing *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 333 (1990)). If the regulation fails to pass muster under any one of these factors, it will be struck down as violative of due process, and the remedy is invalidation of the regulation. *Presbytery*, 114 Wn.2d at 331-332.

The first two prongs in the state inquiry are the same as those of the federal inquiry. Because the Court concluded above that Plaintiffs' federal substantive due process claim fails, the Court has only the third prong to evaluate. This factor "will usually be the difficult and determinative one." *Presbytery*, 114 Wn.2d at 331. The inquiry "lodges wide discretion in the court and implies a balancing of the public's interest against those of the regulated landowner." *Id.* The factors considered in determining whether a regulation is unduly oppressive are the nature of the harm sought to be avoided, the availability and effectiveness of less drastic protective measures, and the economic loss suffered by the property owner. *Id.* Factors in the public's interest include the seriousness of the problem, the degree to which the owner's land contributes to it, the degree to which the proposed regulation solves it, and the feasibility of less oppressive solutions. On the landowner's side, the court considers the amount and percentage of value loss, the extent of remaining uses, past, present and future uses, temporary or permanent nature of the regulation, the extent to which the owner should have anticipated such regulation, and how feasible it is for the owner to alter present or

currently planned uses. *Christianson v. Snohomish Health Dist.*, 133 Wn.2d 647, 665 (1997).

To support its position that the Tumwater ordinances are unduly oppressive, Plaintiffs rely on *Guimont*. Dkt. 60 at 20. In concluding that the Act at issue in *Guimont* was unduly oppressive, the court seized on the fact that the Act required MHP owners to pay for relocation of its tenants in the event the park owner closed the MHP. The *Guimont* court held that such fees would be unduly oppressive and should be borne by society and not the individual park owners who elect to close their business. *Guimont* is factually distinguishable from this case.

Plaintiffs in this case have not shown any such provision to be at issue. Plaintiffs have also not provided competent evidence of sufficient loss in value of their profitable MHPs. Although it is unclear to what extent Plaintiffs could have anticipated the challenged zoning taking effect, Plaintiffs have not supplied competent evidence to establish that any of the MHP owners had made actual plans to alter the current use of their land as MHPs. To the contrary, the record evidences that, prior to and leading up to the new zoning, the MHP owners planned to continue using their properties as MHPs as they had been for decades.[6] Moreover, in the event that running a MHP becomes economically unviable, the zoning regulations permit the owners to seek a use exception in order that owners of such property may continue utilizing their property in an economically viable manner. In contrast, Tumwater has provided a considerable record that tends to establish that the MHP District is a reasonable and effective way to provide affordable housing without dramatically impacting the current MHP owners' ability to own and operate MHPs as they have for many years.

---

[6]Even if Plaintiffs could establish that this anticipation factor weighed in their favor, it would not alter the Court's findings on this issue given the weight of the evidence in favor of finding that the zoning is not unduly oppressive.

In short, Tumwater articulated Plaintiffs' argument best: Plaintiffs' "contention is that zoning their property for the existing profitable use, that they chose to establish and have continued for decades is somehow oppressive." Dkt. 62 at 20. The Court agrees with Tumwater that such argument is illogical and untenable based on the record before the Court.

Because Plaintiffs have not provided competent evidence to establish that the Tumwater ordinances are unduly oppressive, they have failed to establish a material question of fact as to their Washington State substantive due process claim.

**4.      Equal Protection**

To succeed in their equal protection claim, Plaintiffs must prove they were "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). There can be no rational basis for state action "that is malicious, irrational, or plainly arbitrary." *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir.  2004), *overruled on other grounds by Lingle*, 544 U.S. 528. To defeat Tumwater's motion for summary judgment, Plaintiffs may present evidence that the reason offered for the different treatment was merely a pretext, i.e., the proffered rational basis was "objectively false; or . . . the defendant actually acted based on an improper motive." *Id.* at 946.

Plaintiffs, however, have not provided competent evidence to establish that Tumwater has intentionally treated the MHP District differently than others similarly situated. Even if they could establish such a fact, Plaintiffs have not established that such treatment occurred without a rational basis for doing so. In contrast, Tumwater has supplied evidence to the contrary.

To begin with, Tumwater cites several ordinances that operate similarly to the ordinances at issue. *See* Dkt. 62 at 23 (citing TMC 18.10.020-.040 (restricting uses in

1   Single Family-Low Density district); TMC 18.08.020-.040 (restricting uses in Residential

2   Sensitive Resource district); TMC 18.12.020-040 (restricting uses in Single Family

3   Medium Density district). The restrictions placed on these districts curtail the number and

4   types of uses that may be exploited by a property owner for economic benfit. Thus, if the

5   class to be considered is residential, then Tumwater has similarly restricted various

6   districts in a manner that is rationally related to the comprehensive plan that it adopted to

7   comply with the GMA.

8       If the class is narrowed to include only MHPs, Plaintiffs further argue that other

9   MHPs have not been similarly restricted and, therefore, the ordinances violate their equal

10  protection rights. Plaintiffs point to the MHPs that were originally considered for MHP

11  District designation that was ultimately reduced to six affected properties. While the

12  MHPs that operate outside the MHP District are similarly situated in the fact that they are

13  MHPs, Plaintiffs have not shown this to be more than a superficial connection. In

14  contrast, Tumwater has produced competent evidence to establish that these other MHPs

15  were either too small to be included within the MHP District or that one excluded MHP

16  existed in an area zoned commercial as opposed to residential, which is dissimilar to the

17  six affected MHPs. In fact, Tumwater considered these very issues in adopting the

18  ordinances. *See* Ordinance O2008-009 (noting that three of the possible MHPs to be

19  included in the district were too small and "not the typical easily recognized traditional

20  [MHP] . . . the size of these three 'parks' does not foster a sense of community or

21  neighborhood . . . ."; and further noting that the other MHP at issue, Allimor Carriage

22  estates was zoned commercial and not in an area surrounded by residential zoned

23  properties).

24      Even if these disparities between the properties were overcome and the properties

25  were considered similarly situated for purposes of surviving Tumwater's motion for

26  summary judgment on the issue of equal protection, Plaintiffs have not produced

27

28  ORDER - 20

competent evidence to show that the ordinances were adopted without a rational basis for such disparate treatment. *See, e.g.*, *Village of Willowbrook*, 528 U.S. at 564. In contrast, Tumwater has provided a considerable record to establish such a rational basis for its treatment of the various MHPs within Tumwater's jurisdiction..

Therefore, based on the foregoing, Plaintiffs have not established a material question of fact as to equal protection.

### 5.   Spot Zoning

Plaintiffs assert that the Tumwater ordinances can be characterized as illegal spot zoning under Washington law. Dkt. 60 at 21. The parties agree that the rational basis test applies to Plaintiffs' spot zoning claim, as no suspect class is involved.

The Ninth Circuit has noted that spot zoning has been "variously characterized as a substantive due process violation, a taking, or even an equal protection violation; spot zoning does not neatly fit into one category." *Buckles v. King County*, 191 F.3d 1127, 1137 (9th Cir. 1999) (citing *Save Our Rural Environment v. Snohomish County*, 99 Wn.2d 363, 662 P.2d 816, 819 ("*SORE*") (1983) ("When faced with a challenge to a county's rezone action on the grounds the rezone constitutes an illegal spot zone, the main inquiry is whether the zoning action bears a substantial relationship to the general welfare of the affected community."). Plaintiffs have cast their spot zoning claim as both a substantive due process and equal protection issue.

The Washington Supreme Court has set out the analysis on spot zoning as follows:

> Spot zoning has been consistently defined to be zoning action by which a smaller area is singled out of a larger area or district and specially zoned for a use classification totally different from and inconsistent with the classification of surrounding land, and not in accordance with the comprehensive plan. *E.g., Lutz v. Longview*, 83 Wash.2d 566, 573–74 (1974); *Chrobuck v. Snohomish Cy.*, 78 Wn.2d at 872 (1971); *Smith v. Skagit Cy.*, 75 Wn.2d at 743–44 (1969). We first considered and condemned spot zoning in *State ex rel. Miller v. Cain*, 40 Wn.2d 216 (1952), although we warned in that case against laying down a hard and fast rule that all spot zoning is illegal. *State ex rel. Miller*, 40 Wn.2d at 225, *Accord*, *McNaughton v. Boeing*, 68 Wn.2d 659 (1966); *Anderson v. Seattle*,

64 Wn.2d 198, 199 (1964). When faced with a challenge to a county's rezone action on the grounds the rezone constitutes an illegal spot zone, the main inquiry of the court is whether the zoning action bears a substantial relationship to the general welfare of the affected community. *See Parkridge v. Seattle*, 89 Wn.2d 454, 460 (1978). Only where the spot zone grants a discriminatory benefit to one or a group of owners to the detriment of their neighbors or the community at large without adequate public advantage or justification will the county's rezone be overturned. *See Anderson v. Island Cy.*, 81 Wn.2d 312, 325 (1972).

*SORE*, 99 Wn.2d at 368. Notably, *SORE* stands for the proposition that spot zoning is permitted, provided it is made with "adequate public advantage or justification." *Id.*

The facts that resolve this issue have been discussed above. Plaintiffs have not provided competent evidence that the Tumwater ordinances were adopted contrary to Tumwater's comprehensive plan. *But see* Ginther Decl., Ex. A at 5 (Tumwater city council finding that the proposed ordinances "meet the intent of and are consistent with . . . the [GMA] . . . and the goals and policies of the Tumwater comprehensive plan . . . ."). Plaintiffs have not provided competent evidence that the MHP District is zoned "totally different from and inconsistent with the classification of surrounding land." *But see id.* (Tumwater city council finding the MHP District to be consistent with the classification of the surrounding areas and that including MHPs that were either too small or found in areas zoned commercial would be inconsistent with and would not advance the city's goals). Finally, Plaintiffs have not provided competent evidence that the rezone was done in the absence of an "adequate public justification." *But see id.* at 6 (Tumwater city council determining that the proposed ordinances "support the health, safety, and welfare and are in the best interest of the residents of the City of Tumwater.").

Because Tumwater has not established a material issue of fact as to this issue, their spot zoning claim fails.

### 6.    Tumwater's Motion to Strike

Tumwater moves to strike certain parts of Plaintiffs' evidence submitted in the form of declarations by Jeanne-Marie Wilson, John Woodring, and James Andersen. Dkt.

62 at 4-6. However, given the ruling herein, the Court need not address Tumwater's motion to strike; it is therefore denied.

**7.     Plaintiffs' Remaining Claims**

Because Plaintiffs' remaining claims are derivative to those resolved herein, they are dismissed.

## IV. ORDER

Therefore, it is hereby **ORDERED** that:

(1)     Plaintiffs' motion for partial summary judgment is **DENIED**;

(2)     Tumwater's motion for summary judgment is **GRANTED**;

(3)     Tumwater's motion to strike is **DENIED**; and

(4)     There being no other triable issue of fact, this case is **DISMISSED**.

DATED this 16th day of May, 2011.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 23